## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

No. 05-10849RGS

HELEN RUNGE,
                         Plaintiff

          v.

WALTER J. KELLY,
KERRY L. BLOOMINGDALE, M.D., and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,
                         Defendants

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WALTER J. KELLY'S PARTIAL MOTION TO DISMISS

NOW COMES the Defendant, Walter J. Kelly, ("Kelly"), pursuant to Fed. R. Civ.

P. 12(b)(6), and moves this Court to Dismiss Count I (42 U.S.C. §1983) and Count II (42

U.S.C. §1985) of Plaintiff's Complaint as they relate to Defendant Kelly pursuant to Fed.

R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted.  As grounds

in support of this motion, Defendant states the following:

## I.      FACTS ALLEGED IN THE COMPLAINT

Plaintiff, Helen A. Runge, filed this lawsuit on April 27, 2005 against Walter J.

Kelly ("Kelly"), Kerry L. Bloomingdale, M.D. ("Bloomingdale") and Sunbridge Nursing

and Rehabilitation Center ("Sunbridge").  Plaintiff is an eighty-nine year-old woman who

was a resident of Sunbridge Nursing and Rehabilitation Center ("Sunbridge") up until

April 29, 2003.  [See Complaint, attached hereto as Exhibit A, ¶ 1,6, 40-43].  Upon her

own volition, Plaintiff first entered into assisted living at Marion Manor in 2001, at the

age of eighty-five. [Exhibit A, ¶13-14].  In 2001, Plaintiff contacted Defendant Kelly to

1

40677.2

provide her with legal assistance as a result of her decision to and in preparation of entering into Marion Manor. [Exhibit A, ¶ 13]. After visiting the facility, Plaintiff moved into Marion Manor in July of 2001. [Exhibit A, ¶16].

Plaintiff alleges that at about this time, Defendant Kelly drafted paperwork that would make himself her power of attorney and her medical power of attorney, either unknown to Runge or without her fully understanding his actions. [Exhibit A, ¶ 16].

After living at Marion Manor for some months, Plaintiff decided to move to Bayview Assisted Living in November of 2002, so that she could have a private room. [Exhibit A, ¶ 19]. Plaintiff claims that while at Bayview, her prescription drug card was either stolen or misused by employees, and management was slow in addressing or failed to address her concerns. [Exhibit A, ¶20]. She also alleges that Defendant Kelly knew of these facts, but failed to act on behalf of the Plaintiff. [Exhibit A, ¶ 20]. In January of 2003, Plaintiff accused staff of rummaging through her belongings allegedly with the intent to steal, and contacted the police. [Exhibit A, ¶21]. Plaintiff alleges that Bayview then contacted Defendant Kelly, who directed that Plaintiff be taken to Kearney Hospital for psychiatric evaluation. [Exhibit A, ¶22]. Plaintiff also alleges that upon her discharge from Kearney Hospital, she was admitted to Defendant Sunbridge's skilled care facility. [Exhibit A, ¶24]. Plaintiff alleges that Defendant Kelly "insisted and directed that Runge could not return to Bayview, but rather would go to Defendant Sunbridge." [Exhibit A, ¶25].

Plaintiff claims that she found the living conditions and care at Defendant Sunbridge deplorable and unacceptable, and that Defendant Kelly refused her requests to help her move. [Exhibit A, ¶ 27]. Plaintiff also claims that she was medicated to impair

2

her cognitive abilities and to keep her in a state of diminished capacity. [Exhibit A, ¶28]. She claims that she "was held captive and against her will at that facility." [Id.]. Plaintiff alleges Sunbridge took no action to have her moved to another facility because keeping her there was financially lucrative. [Id.]. Plaintiff further claims that she was denied her usual medical treatment from her podiatrist, dentist, ear doctor and eye doctor, and access to a phone to call her daughter who lived in North Carolina. [Exhibit A, ¶30-32].

Plaintiff's daughter, Dorothy Stanley, entered the picture around this time. She traveled to Boston, took Plaintiff outside the facility, and they executed documentation revoking Defendant Kelly's power of attorney and appointing Stanley as the Plaintiff's health care proxy and her son-in-law, Gilbert Stanley, as power of attorney. [Exhibit A, ¶ 31, 34-35]. Plaintiff alleges that Defendant Sunbridge, acting at the direction of or in concert with Defendant Kelly, refused to allow Plaintiff to be discharged. [Exhibit A, ¶ 39-40]. She alleges Defendant Sunbridge and Kelly directed Defendant Dr. Bloomingdale to examine the Plaintiff and render an opinion that the Plaintiff was mentally incompetent. [Exhibit A, ¶36-38]. She further alleges that Defendant Dr. Bloomingdale has a business relationship with Defendant Sunbridge and generates substantial professional fees while performing services at their request. [Exhibit A, ¶38].

Defendant Sunbridge did not recognize the new powers of attorney, and allegedly attempted to prevent the Plaintiff's daughter and son-in-law from removing the Plaintiff from the nursing home, a scuffle ensued and Defendant Sunbridge contacted the police. [Exhibit A, ¶ 40-42]. Plaintiff was taken by her daughter and son-in-law to North Carolina, where Plaintiff allegedly now resides. [Exhibit A, ¶ 43].

3

Plaintiff alleges that Defendant Kelly enlisted the aid of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition to the court to have himself appointed guardian of the Plaintiff after she was taken to North Carolina by her daughter and son-in-law. [Exhibit A, ¶ 47] Plaintiff also alleges that Defendant Kelly appointed himself guardian of the Plaintiff to gain control over her financial estate. [Exhibit A, ¶ 48].

Plaintiff brings this action under 42 U.S.C. §1983. [Exhibit A, Count I]. She claims that the defendants deprived her of her following rights: her right to free speech under the First and Fourteenth Amendments to the United States Constitution; her right to equal protection under the laws as guaranteed by the Fourteenth Amendment; and due process of law under the Fourteenth Amendment. [Exhibit A, ¶51]. Plaintiffs baldly allege that the defendants' conduct was based upon Plaintiff's age and sex. [Id.].

Plaintiff also brings suit under 42 U.S.C. §1985. [Exhibit A, Count II]. She alleges that the defendants conspired for the purpose of depriving the Plaintiff protection of the laws and of equal privileges and immunities under the laws. [Exhibit A, ¶54]. Plaintiff claims that defendants overmedicated her and prevented her from voluntarily discharging herself from Sunbridge, and that defendants' conduct was motivated by Plaintiff's age and sex, personal malice, and by "improper consideration of Plaintiff's exercise of free speech under the First and Fourteenth Amendments". [Exhibit A, ¶ 54].

Additionally, Plaintiff brings state law claims of negligence, breach of contract (against Defendant Kelly only), and breach of fiduciary duties (against Defendants Kelly and Sunbridge).

40677.2

## II.    LEGAL STANDARD

"When evaluating a motion to dismiss under Rule 12(b)(6), [the court] take[s] the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." Pihl v. Massachusetts Dep' t. of Educ., 9 F.3d 184, 187 (1st Cir. 1993).  In deciding a motion to dismiss for failure to state a claim, courts give "no weight to bald assertions, unsupportable conclusions, and opprobrious epithets." Chongris v. Bd. Of Appeals, 811 F.2d 36, 37 (1st Cir. 1987).  When, as here, "it appears to a certainty that the plaintiff would be unable to recover under any set of facts," the complaint must be dismissed.  Roma Const. Co. v. Russo, 26 F.3d 566, 569 (1st Cir. 1996).  Put another way, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) will be granted "if the factual averments do not justify recovery on some theory adumbrated in the complaint." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999).

## III.    ARGUMENT

Plaintiffs' claims brought under 42 U.S.C. §1983 and §1985 are frivolous and must be dismissed for failure to state a claim for which relief can be granted.

### A.    An Attorney Does Not Act "Under Color of Law" And Thus Plaintiff's §1983 Claim Cannot Stand.

42 U.S.C. §1983 provides a private right of action for deprivations of constitutional rights.  Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

5

40677.2

42 U.S.C. §1983.

In order to bring suit under 42 U.S.C. §1983, a plaintiff must allege that a person acting "under color of law" deprived her of her constitutional rights. Id. In this case, Plaintiff has failed to allege any action "under color of law" on the part of Defendant Kelly. Plaintiff merely alleges that "Defendant Kelly using color of law misrepresented himself to Runge as being able to act on her behalf."[1] [Exhibit A, ¶ 17].

It is well settled that lawyers do not act under color of state law for purposes of 42 U.S.C. §1983. See Brown v. Dunne, 409 F.2d 341 (7th Cir. 1969)(attorney seizing property of incompetent pursuant to process issued by the Clerk under the authority of State's Administration of Estates Act does not act "under color of law."). Schaffrath v. Thomas, et al., 199 U.S. App. LEXIS 21075; 1999 Colo J. C.A.R. 4913 (10th Cir. 1999)("Because a *guardian ad litem* is a fiduciary who must act in the minor's best interest, and who owes his or her undivided loyalty to the minor, not the state, he or she does not under color of state law for the purposes of 42 U.S.C. §1983"). Polk County v. Dodson, 454 U.S. 312, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981)(a public defender, although an employee of the state, is not acting "under color of state law" when performing a lawyer's traditional function as counsel to an indigent defendant in state criminal proceeding). Therefore, Defendant has failed to allege any action "under color of law", an essential element of her §1983 claim against Kelly. Accordingly, Plaintiff fails to state a claim against Defendant Kelly for which relief can be granted under 42 U.S.C. §1983, and the claim must be dismissed.

---

[1] What is meant by this is unclear in light of the Complaint and allegations in their entirety. Plaintiff also claims that "[e]ither unknown to Runge, or without her fully understanding his actions...Defendant Kelly drafted paperwork that would make himself not only her power of attorney but also her medical power of attorney for health problems." [Exhibit A, ¶16].

6

40677.2

**B.    Plaintiff Has Failed To Plead All The Essential Elements Of A §1985 Claim, And Therefore The Claim Must Be Dismissed.**

Plaintiff has also failed to state claim under §1985 for which relief can be granted. Like §1983, §1985 is remedial only and requires proof of a conspiracy to violate independent rights. Rice v. New England College, 676 F.2d 9, 1982 U.S. App. LEXIS 20049 (1st Cir. 1982), citing Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 99 S. Ct. 2345 (1979).    Plaintiff claims that Defendants Kelly, Bloomingdale and Sunbridge conspired for the purpose of depriving the Plaintiff the protection of the laws and of equal privileges and immunities under the laws by overmedicating her and preventing her from voluntarily discharging herself from admission at Defendant Sunbridge's facility. [Exhibit A, ¶ 54].    Plaintiff baldly claims that the defendants' conduct in this regard was motivated by Plaintiff's age and sex and "by improper consideration of Plaintiff's exercise of free speech under the First and Fourteenth Amendments." [Id.]. Plaintiff also claims a denial of her "remedial rights". [Exhibit A, ¶ 56].

42 U.S.C. §1985(3)[2] provides in pertinent part:

> (3) Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws,....in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States,

---

[2]  Plaintiff fails to identify the particular provision of §1985 under which she seeks relief. However, Plaintiff has made no allegations relevant to §1985(1) (preventing officer from performing duties) nor §1985(2) (Obstructing justice; intimidating party, witness, or juror), and thus we do not address these provisions.

7

> the party so injured or deprived may have an action for
> the recovery of damages, occasioned by such injury or
> deprivation, against any one or more of the
> conspirators.[3]

42 U.S.C. §1985(3).

It is true that unlike §1983, §1985 does not specifically provide that the alleged

conspiracy must be conducted "under color of law". However, the Plaintiff alleges

deprivations of rights provided by the First and Fourteenth Amendment, both of which

protect individuals from state action only. See Egger v. Local 276, Plumbers and

Piperfitters Union, et al., 644 F. Supp. 795 (D. Mass. 1986) ("Although §1985(3) is

intended to reach conspiracies between private persons, when the substantive right which

is allegedly violated is one protected by the Fourteenth Amendment some state

involvement is required."), citing United Brotherhood of Carpenters Local 610 v. Scott,

463 U.S. 825, 833, 77 L.Ed. 2d 1049, 103 S.Ct. 3352 (1983). See also Romero-Barcelo

v. Hernandez-Agosto, et al., 75 F.3d 23, 32 (1st Cir. 1996)("A viable procedural due

process claim must demonstrate a deprivation by state action of a constitutionally

protected interest in life, liberty or property...without due process of law.")    The

Fourteenth Amendment provides in part that "[no] state shall...deprive any person of life,

liberty, or property without due process of law." U.S. CONST. amend. XIV. "The

principle has become firmly embedded in our constitutional law that the action inhibited

by the first section of the Fourteenth Amendment is only such action as may fairly be said

to be that of the states." Blum v. Yaretsky, et al., 457 U.S. 991, 1003, 102 S. Ct. 2777, 73

L. Ed. 2d 534 (1982), quoting Shelley v. Kraemer, 334 U.S. 1, 13 (1948).    The

---

[3] 42 U.S.C. §1985(3) also provides a right of action for conspiracies "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws...." However, Plaintiff's Complaint makes no allegations relevant to the hindrance clause of §1985(3), and we therefore do not address this clause.

40677.2

Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." Blum, 457 U.S. at 1003, quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974). Likewise, "a conspiracy to infringe First Amendment rights (protected only against official, but not private, encroachment) 'is not a violation of §1985(3) unless it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State.'" Libertad, et al. v. Father Welch, et al., 53 F.3d 428 (1st Cir. 1995), quoting Carpenters v. Scott, 463 U.S. 825, 833, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). Furthermore, "[w]hen the right deprived is one protected against only official encroachment, a plaintiff must prove that 'the State was somehow involved in or affected by the conspiracy.'" Id. Therefore, because Plaintiff makes no allegation of state action in the alleged deprivation of her rights under the First and Fourteenth Amendments, she fails to state a claim under §1985(3) for which relief can be granted. Accordingly, Plaintiff's claim brought under §1985 must also be dismissed.

Furthermore, "[a]n actionable section 1985(3) claim must allege that (i) the alleged conspirators possessed 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus,' Griffin v. Breckenridge, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971), and (ii) their alleged conspiracy was 'aimed at interfering with rights . . . protected against private, as well as official, encroachment.'" Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir., 1996), quoting United Bhd. of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 833, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). See also Libertad v. Welch, 53 F.3d 428, 446 (1st Cir. 1995) (citing Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 113 S. Ct. 753, 758, 122 L. Ed.

9

2d 34 (1993)).  Plaintiff has failed to allege these essential elements of her §1985(3) claim.

Plaintiff's Complaint fails to allege that the "conspiracy" was launched against her for the purpose of denying her equal protection.  The fact that a protected right is incidentally effected is not enough to establish a claim under §1985(3).  Romero-Barcelo v. Hernandez-Agosto, et al., 75 F.3d 23, 29 (1st Cir. 1996).  "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect on a protected right.  The right must be 'aimed at,' 463 U.S. at 833 (emphasis added); its impairment must be a conscious objective of the enterprise." Bray, 506 U.S. at 275.  Plaintiff alleges that the Defendants were financially motivated in their alleged conspiracy. She alleges Defendants Kelly and Sunbridge conspired to keep the Plaintiff in a state of diminished capacity and that Defendant Sunbridge took no action to have her moved to another facility because keeping her there was financially lucrative.  [Exhibit A, ¶28].  Plaintiff also alleges that Defendant Kelly appointed himself guardian of the Plaintiff to gain control over her financial estate. [Exhibit A, ¶ 48].  She further alleges that Defendant Dr. Bloomingdale has a business relationship with Defendant Sunbridge and generates substantial professional fees while performing services at their request.  [Exhibit A, ¶38]. Thus Plaintiff's Complaint articulates only financial purpose behind the Defendants' alleged conspiracy, and thus fails to allege that the conspiracy was "aimed" at denying her equal protection. Thus, Plaintiff fails to allege and essential element of a claim under §1985(3), and the claim must be dismissed.

Furthermore, Plaintiff's Complaint fails to articulate an overt act that demonstrates that she was conspired against because of age and sex.  A bald assertion

10

that the Plaintiff was discriminated against because of her age or sex is not enough. The Plaintiff must articulate an overt act and a "clear class-based invidious discriminatory animus behind the actions of the alleged conspirators." Romero-Barcelo, 75 F.3d at 34, citing Griffin, 403 U.S. at 93; Libertad, 53 F.3d at 450 n.18. Plaintiff attempts to rely solely on the fact that she is elderly and female in her attempt to claim discrimination. Mere membership in a protected class is not enough. "The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious."[4] Romero-Barcelo, 75 F.3d at 34. Furthermore, Plaintiff must show that she was discriminated against *by reason of her sex or age*. Bray v. Alexandria Women's Health Clinic, et al., 506 U.S. 263, 270, 272-73, 113 S.Ct. 753 (1993). As discussed above, Plaintiff has only articulated financial motivations behind the alleged conspiracy, not discriminatory motivations. Thus, the Plaintiff has failed to allege essential elements of her §1985(3) claim, and it must be dismissed.

---

[4] See Griffin v. Breckenridge, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971) ("invidious...tending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating," Webster's Second International Dictionary 1306 (1954))

40677.2

WHEREFORE, the Defendant, Walter J. Kelly, requests that this Honorable Court grant his motion to dismiss Counts I and II of the Plaintiff's Complaint.

Dated: July 18, 2005

Respectfully submitted,

The Defendant,
Walter J. Kelly,
By his attorneys,


_____*s/ Michele Carlucci*_____
George C. Rockas, BBO #544009
Michele Carlucci, BBO #655211
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER  LLP
155 Federal Street
Boston, MA 02110
(617) 422-5400

12

RECEIPT # _63810_
AMOUNT $ _250_
SUMMONS ISSUED _Y-J_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _m_
DATE _4-27-05_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSETTS

HELEN A. RUNGE,  :
      **Plaintiff**  :
        :
**v.**  :    **No.**
        :
WALTER J. KELLY; KERRY L.  :
BLOOMINGDALE, M.D.; and  :    **05 - 10849 RGS**
SUNBRIDGE NURSING AND  :
REHABILITATION CENTER,  :    **CIVIL ACTION**
      **Defendants**  :    MAGISTRATE JUDGE _____
        :    **JURY TRIAL DEMANDED**

## COMPLAINT

### I.    Jurisdiction

Jurisdiction is invoked pursuant to 28 U.S.C. § § 1331-1332 and 1343 on the ground that this action arises under the First and Fourteenth Amendments of the United States Constitution and under 42 U.S.C. § § 1983 and 1985. At all times relevant to this action, Defendants have acted under color of state law. At all times relevant to this action, Defendants have been residents of, and/or have a principal place of business in, Massachusetts; the prayer for relief exceeds $75,000. Plaintiff invokes this Court's pendent jurisdiction with respect to her claims based on the statutory and common law of the Commonwealth of Massachusetts.

## II.    Venue

Venue in this district is authorized by 28 U.S.C. § 1391(c), under residency, and because a substantial part of the events or omissions giving rise to Plaintiff's claims arose here.

## III.    Parties

1.    Plaintiff Helen A. Runge, is an 89-year old adult individual who currently resides at White Oak Manor, 70 Oak Street, Tryon, North Carolina 28782.

2.    Defendant Walter J. Kelly (hereinafter referred to as "Defendant Kelly"), an adult individual, is a member of the Massachusetts Bar with a place of business at 1996 Centre Street, West Roxbury, Massachusetts 02132.

3.    Defendant Kerry L. Bloomingdale, M.D. (hereinafter referred to as "Defendant Bloomingdale"), an adult individual, is a licensed medical practitioner with a place of business at 592 Quinobequin Road, Waban, Massachusetts 02468.

4.    Defendant Sunbridge Nursing and Rehabilitation Center (hereinafter referred to as "Defendant Sunbridge") is a corporation licensed to do business in Massachusetts trading and doing business as Sunbridge Care and Rehabilitation for Randolph with a business address of 49 Thomas Patten Drive, Randolph, Massachusetts 02368.

## IV.    Background

6.    Helen A. Runge (hereinafter referred to as "Runge" or "Plaintiff"), an adult individual, born in 1915, was a lifetime resident of Boston, Massachusetts, until

97105

2

moving to North Carolina in late April 2003 to live with her daughter, Dorothy Stanley, and son-in-law, Gilbert Stanley.

7.    Runge was born in South Boston, Massachusetts, to Lithuanian parents, has supported herself since age 15, was married for a short period of time, and had one daughter Dorothy Stanley née Runge as a result of that union, who was born on January 4, 1941.

8.    Soon after the birth of her daughter, Dorothy, Runge became divorced from her husband and the father of Dorothy and thereafter lived and worked in the Boston area until April 2003 as a single person.

9.    Runge was employed by NSTAR (Boston Edison) for 30 plus years until her retirement sometime around 1980.

10.    Runge lived by herself for nearly 30 years in a third-floor, walk-up apartment in the Hyde Park area of Boston at 75 Sierra Road, Hyde Park, Massachusetts.

11.    Runge always managed her own affairs including her finances.  For years, when necessary, Runge utilized Attorney Peter Kerr, who retired from the practice of law in 1998.

12.    Kerr shared office space with Defendant Kelly who represented himself to Runge be the law partner of Kerr when, in fact, the only relationship was that they shared office space.

13.    In 2001, Runge contacted Defendant Kelly, understanding that he had taken over Attorney Kerr's clients, to provide her with legal assistance as a result of her decision to and in preparation of entering an assisted living facility, Marian Manor.

14.    At the time of the decision to enter Marian Manor, Runge, who was still living in the Hyde Park section of Boston, was 85 years of age, and was finding it increasingly difficult to climb the four flights of stairs to her apartment. Runge felt that it was important for her to be near persons closer to her age and also in a facility that would look out for her and care for her, if necessary.

15.    Runge was aware of Marian Manor in South Boston through her various Catholic church contacts and was also aware that it had a good reputation among people of her parish.

16.    After having visited the facility, Runge moved into Marian Manor in July 2001. Either unknown to Runge, or without her fully understanding his actions, at or about the time of this move, Defendant Kelly drafted paperwork that would make himself not only her power of attorney but also her medical power of attorney for health problems. Defendant Kelly advised and had Runge sign paperwork, which he had prepared, to have himself appointed into these position so that he could act on Runge's behalf and most importantly, control her finances which included her life savings.

17.    Upon her moving into Marian Manor, Defendant Kelly made himself Runge's primary point of contact for health problems. Defendant Kelly knew that Runge had a daughter, Dorothy, yet he readily usurped this position of authority with

little to no contact with Runge's daughter or family. As a result, Runge's daughter could not receive any medical information concerning her mother directly from Marion Manor but, rather, she was forced to receive the information through Defendant Kelly. Defendant Kelly using color of law misrepresented himself to Runge as being able to act on her behalf.

18.     Upon more fully understanding the significance of her appointment of a power of attorney, and after having met with her daughter on several occasions to discuss her care while at Marian Manor, and feeling more comfortable with her daughter, who was a health care professional, being able to address issues on her behalf from her home in North Carolina, Runge signed paperwork at Marion Manor to have her daughter, Dorothy, made her responsible party with Marion Manor.

19.     After having lived at Marian Manor for numerous months in a room that was occupied by herself and another resident, which was a significant life change after having lived by herself for over 30 years, Runge decided that another assisted living facility, where she could have a private room, may be more appropriate for her lifestyle. She moved to Bayview Assisted Living on or about November 2002.

20.     While a resident at Bayview Assisted Living, Runge's prescription drug card, which was one of her retirement benefits, was either stolen or misused by persons (employees) who were subsequently identified; an act which was highly upsetting to Runge. Runge had been in charge of her own affairs for many years and was very knowledgeable and independent in that regard. Runge became further upset when management was slow or failed to address her concerns as she felt that they were

somehow dismissing her concerns because of her age and sex, and were acting rather to protect their own employees. Defendant Kelly knew of these facts, however, failed to act on behalf of Runge.

21.    In January 2003, Runge returned to her room at Bayview after having been out for the day to find that her room had been rummaged through by a person or persons, apparently looking for her valuables or drugs. Runge reported this to the Bayview staff, who took no apparent action. In fact, staff seemed to dismiss Runge's expressed concerns. This caused Runge to become agitated and angry and further caused her to take matters into her own capable hands and report the incident to the local police.

22.    As a result of Runge's agitation, frustration and anger, but more probably, because Runge reported the incident to the local police and implicated staff, Bayview called Defendant Kelly to report the situation. Rather than address this situation on any fiduciary and concerned level on behalf of Runge, Defendant Kelly directed that Runge be taken to Kearny Hospital in Boston for a psychiatric evaluation. Upon information and belief, Defendant Kelly had only seen Runge on approximately two occasions in the preceding six months. Defendant Kelly had no firsthand knowledge of the need for such evaluation. Defendant Kelly, in his capacity of a fiduciary, misrepresented facts to Runge in order that she be held at Kearny Hospital.

23.    Before leaving Bayview, Runge overheard Defendant Kelly, who was speaking to a staff member, say that she was "mental." This was emotionally traumatizing to Runge. Before she left Bayview, Runge asked Defendant Kelly what

would become of her and her possessions. Defendant Kelly indicated that he would take care of them. Runge made Defendant Kelly aware that her few remaining possessions which were in and decorated her living quarters at Bayview were important to her. Defendant Kelly became visibly upset and angry at Runge. Contrary to Defendant Kelly's advice that he should and would undertake fiduciary powers on Runge's behalf, Defendant Kelly did not faithfully fulfill his fiduciary obligations on behalf of Runge. Defendant Kelly did, however, charge Runge for his professional services for purportedly the time he was acting on her behalf.

24.    Runge was discharged from Kearny Hospital, and upon information and belief, she was not returned to Bayview but rather, at the direction of Defendant Kelly, was taken to and admitted in Defendant Sunbridge, a skilled care facility with which Defendant Kelly was very familiar and had a professional relationship as other elderly clients of Defendant Kelly had been or were residents there.

25.    Runge had no previous experience with or knowledge of Defendant Sunbridge, was not aware that she was being taken to Defendant Sunbridge and did not voluntarily consent to being admitted there nor to any skilled care facility. Runge had questioned Defendant Kelly as to when she could be discharged from Kearny Hospital, questioning options with Defendant Kelly as to where she could then live, when he had falsely advised her she could not return to Bayview. Defendant Kelly insisted and directed that Runge could not return to Bayview but rather would go to Defendant Sunbridge, and he presented her with no other option. Defendant Kelly did not discuss this decision with Runge nor did he discuss this with her daughter, Dorothy Stanley.

26.     Defendant Kelly provided admission paperwork for Sunbridge to Runge and directed that she needed to execute said paperwork so that he could satisfy her financial obligations to live at the facility. No discussion took place concerning the implications of her signing the admission paperwork. Defendant Kelly failed to properly advise Runge in this regard. Defendant Kelly facilitated Runge's admission to Defendant Sunbridge knowing full well that she had no desire to be at the facility. Upon information and belief, Defendant Kelly had a relationship with Defendant Sunbridge and both served to benefit by Runge's admission.

27.     Runge found the living conditions and care at Defendant Sunbridge to be deplorable and unacceptable. Runge was very unhappy during her stay at Defendant Sunbridge. On numerous occasions she requested that Defendant Kelly facilitate her move to more appropriate care and living accommodations. Defendant Kelly refused and did not take any action in that regard. Runge advised Defendant Kelly that she was being forced to take medications that were unnecessary and impaired her mental capacity. Defendant Kelly took no action. Defendant Kelly refused Runge's various requests for help and required that she stay at Defendant Sunbridge. Defendant Kelly took no affirmative action to help Runge, address her concerns or provide a more suitable living situation.

28.     During her stay at Defendant Sunbridge, Runge received numerous medications which impaired her cognitive abilities. These medications caused her to be in a stupor and to feel as though she was intoxicated. These medications affected her motor skills, including her ability to walk. These medications also caused her to be

97105

8

groggy and sleep more hours during the day than usual. During January, February, March and April 2003, Runge, while resident at Defendant Sunbridge, was held captive and against her will at that facility. Upon information and belief, Defendants Kelly and Sunbridge conspired to keep Runge in this state of diminished capacity. Upon information and belief, Defendant Sunbridge took no action to have her moved to an assisted living environment because keeping Runge at Sunbridge was financially lucrative. Runge was a private pay resident which allowed Defendant Sunbridge to collect higher daily rates than from its Medical Assistance residents.

29.    In March 2003, with the help of a staff nurse, Runge was able to purloin writing paper, an envelope and stamp, and as a result, wrote a letter to her daughter, Dorothy Stanley. Runge advised her daughter of her predicament and the fact that she was being held against her will at Defendant Sunbridge and that Defendant Kelly would do nothing to assist her. Defendant Kelly had refused to act on Runge's request that he have her medications stopped or adjusted and that he have her moved to other living accommodations.

30.    When Runge questioned her need to take the medication, not only management at the nursing home, but also Defendant Kelly insisted that she take the medication indicating that if she refused to take medication, it would be forced upon her. In fact, during a conversation with Dorothy Stanley about April 25, 2003, Defendant Kelly indicated that he was considering having a guardian appointed to force Runge, against her will, to take medication. During that conversation, both Dorothy Stanley and her husband advised Defendant Kelly that they felt Runge was

being overmedicated by the care providers at Defendant Sunbridge. The Stanleys indicated that Defendant Kelly should not take any action to appoint a guardian and that they would travel to Boston from their North Carolina residence, arriving Wednesday, April 30, to assess the situation.

31. On or about April 29, 2003, Runge's daughter, Dorothy Stanley, along with her husband, visited Runge in her room at Defendant Sunbridge. Dorothy Stanley had purposefully arrived one day earlier than Defendant Kelly and Defendant Sunbridge had anticipated so that she could observe their mother's condition. During that visit, Runge directed the staff, who seemed quite concerned that her daughter had arrived one day early, to provide her daughter with Runge's medical records, however, the nursing staff and administration refused to follow the directions of the resident and did not give her those records. Upon information and belief, Defendant Kelly had advised the staff not to provide these records to the family of Runge. Defendant Sunbridge's refusal constitutes abuse.

32. During the April 29 discussion between Runge and her daughter, it was learned by Runge's daughter, Dorothy, that while at Defendant Sunbridge, Runge was denied her usual medical care from her podiatrist, dentist, ear doctor and eye doctor. Runge had not been provided with adequate clothing and personal hygiene products. These actions constitute abuse. Runge had not been given money in order to purchase these items or to purchase writing stationery or stamps. She had been denied access to the phone in order to be able to call her daughter.

97105

10

33.    After having long discussions with her daughter, Runge indicated that she wanted to "fire" Defendant Kelly as she did not trust him and wanted no more to do with him. Runge indicated that she felt he was taking her money while treating her with contempt. Dorothy Stanley placed a call to Defendant Kelly's office and left a message in his voice mail system directing him to call Stanley to discuss her mother, the conditions at Defendant Sunbridge and Defendant Kelly's dismissal as her mother's attorney.

34.    Dorothy Stanley asked Runge whether Runge wanted her daughter to become her health care proxy rather than Defendant Kelly. Runge indicated that she would be delighted to have her daughter serve as her health care proxy. Moreover, Runge indicated that she wanted her son-in-law, Gilbert Stanley, to be her power of attorney. Runge made it clear that she did not want Defendant Kelly to ever act on her behalf again.

35.    After repeatedly representing to Defendant Sunbridge that she wanted nothing further to do with Defendant Kelly, Runge and her daughter and son-in-law took a trip outside of the facility, at which time they executed documentation which revoked Defendant Kelly's authority to serve as Runge's health care proxy and power of attorney. Moreover, Runge executed documentation which then appointed Dorothy Stanley her health care proxy and her son-in-law, Gilbert Stanley, her power of attorney. These documents were notarized before a Massachusetts notary public prior to Runge's return to the facility some hours later. At that time, there was no

97105                                     11

adjudication that Runge was incapacitated or lacked the capacity to make such appointments.

36.    While Dorothy and Gilbert Stanley were meeting with Defendant Sunbridge's nursing and administrative staff with regard to the appointment to act on their mother's behalf and her discharge from the facility, Defendant Bloomingdale, without request or permission from either Runge or Dorothy Stanley, her then health care proxy, entered Runge's room and purportedly gave a medical examination or consultation by asking her several questions including, "Why don't you want to take your medicine?"

37.    Runge's response to Defendant Bloomingdale was, "If I don't need medicine then no one should tell me what to take." Runge further questioned, "If you didn't have a headache, would you take Tylenol in case you might get one?" Defendant Bloomingdale answered her question saying that he would not and thereafter left Runge's room.

38.    Upon information and belief, the conversation between Runge and Defendant Bloomingdale was brief, lasting only several minutes, however, upon information and belief, Defendant Bloomingdale rendered a medical opinion at the direction of Defendant Kelly and Defendant Sunbridge that Runge was mentally incompetent as a result of his brief and solitary interaction with her. Upon information and belief, Defendant Bloomingdale was requested to examine Runge by Defendant Kelly, who by that time had no authority to act on her behalf. Alternatively, Defendant Bloomingdale was requested to examine Runge by Defendant Sunbridge who had

knowledge that Runge wanted to leave the facility. Upon further information and belief, Defendant Bloomingdale has a business relationship with Defendant Sunbridge and generates substantial professional fees while performing services at their request for residents. The examination by Defendant Bloomingdale failed to meet any acceptable standards of practice.

39.     Dorothy and Gilbert Stanley informed Runge that Defendant Sunbridge's staff would not recognize the health care proxy or the power of attorney and would not allow Runge to be discharged. Runge was visibly and emotionally upset to learn that Defendant Sunbridge would not follow her wishes. Runge expressed her desire to leave the facility with her daughter and son-in-law and to reside with them in North Carolina. Management at Defendant Sunbridge was fully made aware that their actions were directly against the wishes of Runge and her fiduciaries, Dorothy and Gilbert Stanley. Such conduct by Defendant Sunbridge constitutes abuse. Upon information and belief, management of Defendant Sunbridge was acting at the direction or in concert with Defendant Kelly and Defendant Bloomingdale in refusing to allow Runge to be discharged.

40.     On April 30, Dorothy and Gilbert Stanley arrived at Defendant Sunbridge at approximately 2:00 p.m. and were told by the staff that Defendant Kelly had directed that Runge not be allowed to leave the nursing floor. This fact was significant to the Stanleys as Defendant Kelly had not returned their phone call nor had he made any effort to discuss Runge's situation with them. Rather, it appeared that Defendant Kelly was orchestrating a scheme to hold Runge at the facility against her will. Defendant

Sunbridge had made Defendant Kelly aware that his power of attorney had been revoked by Runge. After a long discussion, during which the management of Defendant Sunbridge was again told by the Stanleys that Defendant Kelly had no authority to act on Runge's behalf, the Stanleys insisted that Runge be allowed to leave the facility. At no time did staff from Defendant Sunbridge communicate with Runge to gain an understanding of her desire. After some period of time, staff agreed that Runge could accompany her children from her nursing floor to the first floor lobby in order to have a private conversation as long as a large male nursing assistant and employee of Defendant Sunbridge accompany them. Upon information and belief, this was not typical procedure for Defendant Sunbridge who was attempting to influence and intimidate both Runge and the Stanleys and prevent Runge from voluntarily discharging herself.

41.    Upon reaching the front lobby of the building, Runge's children ushered her through the door and into their waiting vehicle. The large male nursing assistant, along with other employees, attempted to physically restrain Runge and her children from exiting the building. One if not several employees grabbed both Dorothy and Gilbert Stanley in an attempt to stop them and prevent Runge from departing.

42.    Once the Stanleys and Runge were finally in their vehicle, the vehicle was slowly driven down the driveway and the employees moved aside. At about this time, it appeared that the facility had summoned the local police as a police cruiser was coming up Defendant Sunbridge's driveway as Runge was exiting the facility with her children. The employees, including several attendants, the social worker supervisor

and the nursing home director, attempted to prevent the vehicle from leaving by standing in front and back of the vehicle.

43.     Runge accompanied her children to their residence in North Carolina, where she remains today. The day after this event, Runge caused the facility to be called by a third party and informed Defendant Sunbridge that she was safe and that there should be no concern for her wellbeing. Likewise, Defendant Kelly received the same phone call advising him of Runge's wellbeing and that she could be contacted at her new residence in North Carolina with her daughter, Dorothy Stanley. Defendant Sunbridge was directed to send Runge's belongings to the North Carolina address, however, the facility refused to cooperate in any manner, indicating that this was a police matter.

44.     Upon arrival in North Carolina, Runge was taken by her children to the local hospital for a physical examination by a qualified medical doctor. Runge was also given a psychiatric evaluation which indicated that she was a competent, well-oriented, 85-year old female, who was in no need of psychiatric or psychotropic medication.

45.     At no time did Runge authorize Defendant Kelly to act on her behalf as a temporary guardian. Upon information and belief, on April 30, 2003, in the midst of the above events occurring, Defendant Kelly, rather than being concerned with Runge's medical wellbeing or contacting the Stanleys, contacted her two financial institutions, Hyde Park Credit Union and Member Service Credit Union, directing both financial institutions to freeze her accounts. Defendant Kelly took this action knowing that he had no authority to act on behalf of Runge and also knowing that freezing her access to

97105                                   15

her financial accounts could have a potential and significant effect on her health. Upon information and belief, these actions were taken in concert with Defendant Sunbridge in order that the Defendants could obtain funds from these accounts.

46.    The Nursing Home Reform Act, part of Title XIX of the Social Security Act, requires that nursing facilities, in accordance with a written plan of care, provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident. . . . 42 U.S.C. § 1396r(b)(2). Under such plan of care, nursing homes such as Defendant Sunbridge must ensure that the resident receives services necessary to allow him or her to ambulate. 42 C.F.R. § 483.25. To develop this plan of care, nursing facilities must upon an individual's entry into the facility and periodically thereafter "conduct a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity." 42 U.S.C. § 1396r(b)(3)(A). Its assessments include an individual's potential for discharge as well as his or her physical functioning. 42 C.F.R. § 483.20(b). Under Title XIX, nursing facilities must provide residents with "sufficient preparation" to ensure their "safe and orderly transfer or discharge" from the facility. 42 C.F.R. § 483.12(a)(7). State Medicaid agencies are responsible for ensuring that nursing facilities who receive medical assistance comply with the Nursing Home Reform Act's provisions. Defendant Sunbridge failed to meet and comply with these provisions.

47.    On or about May 2, 2003, three days after Runge had left Defendant Sunbridge's facility, as well as the State of Massachusetts, and with full knowledge of that fact, Defendant Kelly filed an ex parte petition seeking to have himself appointed

as guardian of Runge. Prior to filing such petition, Defendants Kelly and Sunbridge had knowledge that Runge had dismissed him as her counsel and revoked both the power of attorney and medical power of attorney which had previously authorized him to act on her behalf if necessary. Defendants Kelly and Sunbridge had been notified that Runge had made a choice to leave Sunbridge voluntarily and that she was safe and well and living with her daughter in North Carolina. Defendant Kelly enlisted the aid of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition, misrepresenting facts to the court and having himself appointed guardian of Runge.

48.      Prior to having himself appointed guardian of Runge, Defendant Kelly notified North Carolina police local to Runge and her daughter and son-in-law, the Stanleys, and reported that she was being held against her will. This false reporting by Defendant Kelly was made for the purpose of aiding and abetting his scheme to have himself appointed as guardian of Runge to gain control over her financial estate and to cause embarrassment and harm to both Runge and the Stanleys.

49.      Upon information and belief, soon after Defendant Kelly's ex parte appointment as the guardian of Runge, he undertook a scheme to distribute funds from her estate to make payment for services allegedly rendered by himself, Defendant Bloomingdale and Defendant Sunbridge.

**COUNT I**

**42 U.S.C. § 1983**

50.      Plaintiff incorporates by reference Paragraphs 1 through 49 of this Complaint as though same were fully set forth at length herein.

97105

51.     Defendants Kelly, Bloomingdale and Sunbridge, acting on the color of Massachusetts law, subjected Plaintiff to the deprivation of the following rights, privileges and immunities secured by the Constitution and laws of the United States when they decided to hold her against her will and wishes, not permit her to be discharged from the facility and also not permit her to have access to a meaningful institutional remedy for the violation of her rights.

a.     The Defendants deprived Plaintiff of her right of free speech under the First and Fourteenth Amendments to the United States Constitution by having her inappropriately medicated, isolated and not allowing her to discharge herself.

b.     The Defendants deprived Plaintiff of her right to equal protection under the laws as guaranteed by the Fourteenth Amendment of the United States Constitution by intensely basing their decisions to an impermissible extent on Plaintiff's age and sex.

c.     The Defendants deprived Plaintiff of her right to due process of law under the Fourteenth Amendment of the United States Constitution by refusing to remedy the wrongful actions causing Plaintiff to be improperly confined against her will and failing to abide by her wishes or any procedural requirements to prevent her voluntary discharge from Sunbridge.

d.     Defendant denied Plaintiff her privileges and immunities secured by the Fourteenth Amendment of the United States Constitution and due process and equal protection of law under that amendment by impermissibly basing their actions on Plaintiff's exercise of rights guaranteed by the First Amendment of the United States

Constitution and other laws of the Massachusetts, as well as upon Plaintiff's age, sex and upon personal malice toward Plaintiff.

52.    As a result of the foregoing deprivations, Plaintiff was or has been unlawfully detained from her choice of free movement and failed to obtain the privileges and rights to which she would otherwise be entitled, has suffered anxiety and other depression, has suffered humiliation and embarrassment as a result of being unlawfully detained and prevented from her free movement, she has suffered and will continue to suffer losses and other compensatory damages to be proven at trial.

## COUNT II

### 42 U.S.C. § 1985

53.    Plaintiff incorporates by reference Paragraphs 1 through 52 of this Complaint as though same were fully set forth at length herein.

54.    Defendants Kelly, Bloomingdale and Sunbridge conspired for the purpose of depriving Plaintiff the protection of the laws and of equal privileges and immunities under the laws by overmedicating her and preventing her from voluntarily discharging herself from admission at Defendant Sunbridge's facility; Defendants' conduct in this regard was motivated impermissibly by Plaintiff's age and sex, by personal malice against Plaintiff and by improper consideration of Plaintiff's exercise of free speech under the First and Fourteenth Amendments to the United States Constitution.

55.    In furtherance of the objective of this conspiracy to deprive Plaintiff of the equal protection of laws and her privileges and immunities under the laws, the

97105

Defendants have caused or caused to be done the acts set forth in this Complaint which resulted in Plaintiff's denial of remedial rights.

56.    Plaintiff sustained injury to her person and property and was deprived of exercising her rights and privileges as a citizen by virtue of the conduct of the conspiring Defendants.  Plaintiff's allegations and damages in Paragraph 58 are incorporated herein by reference.

### COUNT III

### State Law Claim

57.    Plaintiff incorporates by reference Paragraphs 1 through 56 of this Complaint as though same were fully set forth at length herein.

58.    The conduct of Defendants as alleged in the foregoing claims constitute negligence as it deviates from the standards of care owed by them to Runge.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter an order on Counts I, II and III providing the following:

a.    That Plaintiff recover from Defendants, jointly and severally, damages including compensatory damages in excess of $75,000.00, exemplary punitive damages and such other monetary relief as the Court deems just.

b.    That Plaintiff recover from Defendants, jointly and severally, her costs, including expert witness fees and reasonable attorney's fees, together with such other remedies as may be provided by law.

c.    That the Court grant such other relief as it deems just and proper.

Plaintiff demands a jury trial.

97105

## COUNT IV

### State Law Claim

59.     Plaintiff incorporates by reference Paragraphs 1 through 58 of this Complaint as though same were fully set forth at length herein.

60.     The conduct of Defendant Kelly as alleged in the foregoing paragraphs is in breach of his contract with Runge to provide professional services.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter an order on Count IV providing the following:

a.     That Plaintiff recover from Defendant Kelly damages including compensatory damages, exemplary punitive damages and such other monetary relief as the Court deems just.

b.     That Plaintiff recover from Defendant Kelly her costs, including expert witness fees and reasonable attorney's fees, together with such other remedies as may be provided by law.

c.     That the Court grant such other relief as it deems just and proper. Plaintiff demands a jury trial.

## COUNT V

### State Law Claim

61.     Plaintiff incorporates by reference Paragraphs 1 through 60 of this Complaint as though same were fully set forth at length herein.

62.     The conduct of Defendant Kelly and Defendant Sunbridge as alleged in the foregoing paragraphs is in breach of those Defendants' fiduciary duty owed to Runge.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter an order on Count V providing the following:

a.     That Plaintiff recover from Defendants Kelly and Sunbridge, jointly and severally, damages including compensatory damages, exemplary punitive damages and such other monetary relief as the Court deems just.

b.     That Plaintiff recover from Defendants Kelly and Sunbridge, jointly and severally, her costs, including expert witness fees and reasonable attorney's fees, together with such other remedies as may be provided by law.

c.     That the Court grant such other relief as it deems just and proper.

Plaintiff demands a jury trial.

Respectfully submitted,

LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated: April 26 2005                By_____
                                    Glenn R. Davis, Esq.
                                    P. O. Box 825
                                    Harrisburg, PA  17108-0825
                                    (717) 761-1880

                                    Attorneys for Plaintiff, Helen A. Runge

97105                              22