IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HELEN A. RUNGE, : | |
|     Plaintiff : | |
| : | No. 05-10849-RGS |
| v. : | (Judge Stearns) |
| : | |
| WALTER J. KELLY, et al. : | CIVIL ACTION |
|     Defendants : | JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER ANSWER
TO DEFENDANT WALTER J. KELLY'S PARTIAL MOTION TO DISMISS**

NOW COMES Plaintiff, Helen A. Runge, in response to Defendant Walter J. Kelly's Motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and requests this Honorable Court deny Defendant Walter J. Kelly's Motion to Dismiss. In support of this request, Plaintiff states as follows:

I.  COUNTERSTATEMENT OF FACTUAL BACKGROUND

Plaintiff Helen A. Runge ("Runge"), is an 89-year old woman who currently resides in Tryon, North Carolina. (Complaint, ¶ 1). At the time of the commencement of the events described in the Complaint, Runge was living independently in an apartment in the Hyde Park area of Boston, and managing her financial affairs. (Complaint, ¶¶ 10, 11). Runge's Attorney was Peter Kerr, who shared office space with Defendant Kelly, an attorney licensed to practice in the Commonwealth of Massachusetts. (Complaint, ¶¶ 2, 11, 12). Though false, Defendant Kelly represented himself to be Kerr's law partner and that he was taking over Kerr's clients, the first of many misrepresentations and other acts of malfeasance against Runge alleged in the Complaint. (Complaint, ¶¶ 12, 13).

100684

In 2001, Runge, on her own initiative, chose to move to Marian Manor, an assisted living facility. (Complaint, ¶¶ 13, 16). At about the same time, Defendant Kelly prepared instruments rendering himself Runge's Power of Attorney over her finances and health care decisions, and had Runge execute these documents without adequately explaining their significance. (Complaint, ¶ 16). These actions prevented Runge's daughter, Dorothy Stanley, from receiving information about her mother from Marion Manor. (Complaint, ¶ 17). Essentially, Defendant Kelly placed himself in a position of dominion and control over Runge's health care decisions and personal finances, with Runge's daughter, Dorothy Stanley, at his mercy for information regarding her mother's health and well being.

Dissatisfied with her living arrangements, Runge voluntarily elected to move to Bayview Assisted Living in November 2002. (Complaint, ¶ 19). While a resident at Bayview Assisted Living, Runge's prescription drug card was either stolen or misused by an employee of Bayview. (Complaint, ¶ 20). On another occasion, Runge returned to her room to find that it had been rummaged through by someone apparently looking for valuables or drugs. (Complaint, ¶ 21). When she complained about this issue, Defendant Kelly directed that Runge be taken to Kearny Hospital in Boston for a psychiatric evaluation, despite having only seen Runge on approximately two occasions in the preceding six months. (Complaint, ¶¶ 20-23). Runge overheard Defendant Kelly refer to her as "mental." (Complaint, ¶¶ 23).

When Runge was discharged from Kearny Hospital, Defendant Kelly had her admitted without Runge's knowledge or consent to Defendant Sunbridge, a skilled nursing care facility. (Complaint, ¶ 24). Defendant Kelly was familiar with Defendant Sunbridge, and Runge has alleged that Defendant Kelly represents other elderly clients at the nursing

facility. (Complaint, ¶¶ 24, 25). Despite Runge's protestations against admission to a skilled nursing unit, Defendant Kelly insisted and directed that Runge could not return to the Bayview assisted living unit, but instead would be placed in Defendant Sunbridge, and he presented her with no other option. (Complaint, ¶ 25) Defendant Kelly did not discuss this decision with Runge, nor did he discuss this with her daughter, Dorothy Stanley. (Complaint, ¶ 25)

The living conditions and care at Defendant Sunbridge were deplorable and unacceptable. (Complaint, ¶ 27). Yet, Defendant Kelly ignored Runge's numerous requests to facilitate her move to more appropriate care and living accommodations. (Complaint, ¶ 27). Though Runge advised Defendant Kelly that she was being forced to take medications that were unnecessary and impaired her mental capacity, cognitive abilities, and physical functioning, Defendant Kelly continued to take no action, entrapping her at Defendant Sunbridge. (Complaint, ¶¶ 27, 28). The Complaint specifically alleges that Defendants Kelly and Sunbridge conspired to keep Runge in this state of diminished capacity, an arrangement that was financially lucrative to both Defendant Kelly and Defendant Sunbridge. (Complaint, ¶ 28). Runge remained in this state until she was able to sneak a letter to her daughter advising that she was being held against her will at Defendant Sunbridge and that Defendant Kelly would do nothing to assist her. (Complaint, ¶ 29)

Despite Runge's protestations about her medication program, both Defendant Sunbridge and Defendant Kelly indicted that if she did not take the medication voluntarily, it would be forced upon her. (Complaint, ¶ 30). Defendant Kelly indicated to Dorothy Stanley and her husband, Gilbert Stanley, that he was contemplating having a guardian appointed to force her to take medication. (Complaint, ¶ 30). The Stanleys told Defendant

Kelly that he should not take any action to appoint a guardian and that they would travel from their North Carolina home and be in Boston on April 30, 2003 to assess the situation. (Complaint, ¶ 30).

The Stanleys arrived one day early, April 29, 2003, to visit Runge so they could observe her condition and review her medical records. (Complaint, ¶ 31). Despite a specific directive by Runge to provide her medical records to her daughter, Sunbridge refused to produce Runge's records. (Complaint, ¶ 31). The Complaint alleges that Defendant Kelly had advised the staff not to provide these records to Runge's family. (Complaint, ¶ 31). At this time, it was discovered by Runge's daughter that Runge was denied access to her usual medical providers, and had been denied access to phones and writing materials. (Complaint, ¶ 32).

During this period, Runge's daughter requested that Defendant Kelly contact her to discuss the conditions at Defendant Sunbridge and Defendant Kelly's dismissal as her mother's attorney. (Complaint, ¶ 33). Runge specifically indicated that she wished for Defendant Kelly to never act on her behalf again. (Complaint, ¶ 34). Runge and the Stanleys took a trip outside of the facility, at which time Runge executed documentation revoking Defendant Kelly's authority to serve as Runge's health care proxy and power of attorney, and instead appointing Dorothy Stanley her health care proxy and Gilbert Stanley her power of attorney. (Complaint, ¶ 35).

Upon their return to the facility, while Dorothy and Gilbert Stanley were meeting with Defendant Sunbridge's staff, Defendant Bloomingdale, without permission from either Runge or Dorothy Stanley, entered Runge's room and purportedly performed an competency evaluation. (Complaint, ¶ 36) The examination merely consisted of a brief

100684                                    4

question and answer session lasting only several minutes. (Complaint, ¶ 38). Despite the superficiality of this exam, Defendant Bloomingdale opined at the direction of Defendant Kelly and Defendant Sunbridge that Runge was mentally incompetent. (Complaint, ¶ 38). The Complaint alleges that Defendant Bloomingdale was requested to examine Runge by Defendant Kelly, who by that time had no authority to act on her behalf, or in the alternative, that Defendant Sunbridge made this request, both of whom knew that Runge wished to leave the facility, and both of whom had no authority to act on behalf of Runge. (Complaint, ¶ 38).

Defendant Sunbridge's staff refused to recognize the Stanleys' validly executed Power of Attorney and would not allow Runge to be discharged, even though Runge expressed her desire to leave the facility with the Stanleys and to reside with them in North Carolina. (Complaint, ¶ 39). The Complaint alleges that Defendant Sunbridge's management was acting at the direction or in concert with Defendant Kelly and Defendant Bloomingdale in refusing to allow Runge to be discharged. (Complaint, ¶ 39).

On April 30, 2003, Dorothy and Gilbert Stanley arrived at Defendant Sunbridge and were told by the staff that Defendant Kelly had directed that Runge not be allowed to leave her nursing floor, despite the fact that Defendant Kelly had no authority to act for Runge or direct the actions of the facility. (Complaint, ¶ 40). This communication is striking in light of the fact that Defendant Kelly refused to communicate with Runge or the Stanleys. (Complaint, ¶ 40). Based on these facts and circumstances, Runge is alleging that Defendant Kelly was orchestrating a scheme to hold Runge at the facility against her will. (Complaint, ¶ 40). At no time did staff from Defendant Sunbridge communicate with Runge to gain an understanding of her wishes. (Complaint, ¶ 40). To the contrary,

Sunbridge's staff took every effort to intimidate Runge and the Stanleys and prevent Runge from voluntarily discharging herself. (Complaint, ¶ 40). Runge was only able to escape the facility by the actions of the Stanleys, who ushered her through the door and into their waiting vehicle, while the nursing facility staff attempted to restrain them from leaving. (Complaint, ¶ 41). Indeed, the Defendants tried to impede the lawful actions of Runge and the Stanleys by summoning the police. (Complaint, ¶ 42).

While this was occurring, Defendant Kelly, rather than being concerned with Runge's wellbeing or contacting the Stanleys, contacted her financial institutions to direct them to freeze her accounts. (Complaint, ¶ 46). Defendant Kelly took this action knowing that he had no authority to act on behalf of Runge and also knowing that freezing her access to her financial accounts could have a potential and significant effect on her health. (Complaint, ¶ 46).

The Stanleys and Runge traveled to North Carolina to the Stanleys' home. Once there, Defendants Kelly and Sunbridge were informed that Runge was safe and that there should be no concern for her wellbeing, and that she could be contacted at her new residence in North Carolina. (Complaint, ¶ 43). A subsequent proper psychiatric evaluation indicated that she was a competent, well-oriented, 85-year old female, who was in no need of psychiatric or psychotropic medication. (Complaint, ¶ 44).

Nonetheless, Defendant Kelly notified the North Carolina police that Runge was being held against her will. (Complaint, ¶ 48) This blatantly false report, astonishing in light of Runge's requests to be transferred from the nursing facility, her expressed desire to be free of unwanted psychotropic medication, and the expression of her desire to move to North Carolina to live with her daughter, was made for the purpose of aiding and abetting

a scheme by Defendant Kelly to have himself appointed as Runge's guardian to completely deprive her of her rights, gain control over her financial estate and to cause harm to both Runge and the Stanleys. (Complaint, 48).

Despite the confirmation of Runge's well being, despite Defendant Kelly' lack of authority to act on her behalf, and despite the fact that Runge was now in a safe environment in which her needs were being met without psychotropic medication, Defendant Kelly filed an ex parte petition seeking to have himself appointed as guardian of Runge. (Complaint, ¶ 45). Defendant Kelly enlisted the aid of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition, misrepresenting facts to the court and having himself appointed guardian of Runge. (Complaint, ¶ 45). The fruits of this scheme were born out after Defendant Kelly's ex parte appointment when he distributed funds from her estate without any court order, ostensibly as payment for services allegedly rendered by himself, Defendant Bloomingdale and Defendant Sunbridge. (Complaint, ¶49).

II.     STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), the "Court must accept the complaint's allegations as true, indulging all reasonable inferences in favor of the plaintiff." Hogan v. Eastern Enterprises/Boston Gas, 165 F.Supp.2d 55, 57 (D. Mass. 2001) (internal quotations omitted) (citing Kiely v. Raytheon Co., 105 F.3d 734, 735 (1st Cir. 1997)). The Supreme Court has declared that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." Hughes v. McMenamon, 204 F.Supp.2d 178, 180 (D.

Mass. 2002) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

### III. ARGUMENT

#### A. RUNGE HAS ADEQUATELY PLEADED A CAUSE OF ACTION UNDER 42 U.S.C. § 1983

In order to state a valid cause of action under 42 U.S.C. § 1983 or the Fourteenth Amendment a plaintiff must allege the deprivation of a right, which may be fairly attributable to the State. Ponce v. Basketball Feder. of Com. of Puerto Rico, 760 F.2d 375, 377 (1st Cir. 1985) (quoting Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982)). The First Circuit has employed three tests to determine if a private party may be considered a state actor. They are: the state compulsion test; the nexus/joint action test; and the public function test. Estades-Negroni v. CPC Hospital, 412 F.3d 1 (1st Cir. 2005). The first test is satisfied when "the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State." Id. at 5 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)). "The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." Id. (quoting Bass v. Parkwood Hosp., 180 F.3d 234, 242 (5th Cir.1999)). "And, in accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party

performed a public function that has been traditionally the exclusive prerogative of the State. Id. (quoting Blum, 457 U.S. at 1005, 102 S.Ct. at 2798).

In his Memorandum of Law in support of his Motion To Dismiss, Defendant Kelly states without qualification that "It is well settled that lawyers do not act under color of state law for purposes of 42 U.S.C. § 1983." Memorandum, p. 6. This is an inaccurate statement of the law. There are several instances in which a private attorney has been held liable under section 1983. See Buller v. Buechler, 706 F.2d 844 (8th Cir. 1983), abrogated in part on other grounds, Wyatt v. Cole, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (holding that private defendants charged with section 1983 liability for invoking a state replevin, garnishment, or attachment statute later declared unconstitutional, are not entitled to qualified immunity from suit).

In the Buller case, an attorney sought to garnish the proceeds of a public auction despite the fact that the garnishment statute was unconstitutional. 706 F.2d at 846. When confronted with the unconstitutionality of the statute, the attorney refused to release the garnished auction proceeds. Id. The Court found that the defendant attorney could be liable under section 1983. In so holding, the Court emphasized that the attorney disregarded his client's directive to release the garnished funds and the attorney stood to gain monetarily from the use of state garnishment procedures. Id. at 852. "Under the circumstances, [the Court] believe[d] that an attorney may be liable for damages under section 1983 if on behalf of a client, he or she pursued a garnishment or prejudgment attachment proceeding which he or she knew or reasonably should have known would clearly violate the clearly established constitutional or statutory rights of a debtor." Id. at

852-53 (citing United States General, Inc. v. Schroeder, 400 F.Supp. 713, 716-17 (E.D.Wis. 1975).

This is not the only court to hold a private attorney liable under section 1983. For example, in Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3rd Cir. 1994), the defendant attorneys attempted to argue that they could not be held liable under section 1983 because they were officers of the court representing their clients. The Court held that the attorneys were liable when they availed themselves of the compulsive powers of the state to seize property by executing on a judgment without pre-judgment notice or hearing. Id. at 1267. The Court cited with approval the District Court's holding that private attorneys, acting on their client's behalf, who invoke the machinery of the state to effect an ex parte seizure of property can be found to be state actors within section 1983. Id. at 1267 (citing Jordan v. Fox, Rothschild, O'Brien & Frankel, 787 F.Supp. 471, 477 (E.D.Pa. 1992).

In the matter of United States General, Inc. v. City of Joilet, 432 F.Supp. 346, 354 (N.D.Ill. 1977), a city attorney sought immunity from suit under section 1983, arguing that attorneys acting in their professional roles are immune from liability under civil rights statutes, based on the policy that the attorney is not personally involved in the action. In ruling against the attorney, the Court found it significant that the attorney was acting as an advisor, not a litigator, and that the plaintiff alleged the attorney had acted in bad faith. Id. at 354. This principle is grounded in policy considerations. If an attorney must work in fear, it is the rights of the public that suffer. Schroeder, 400 F.Supp. at 717. A threat of liability casts a chilling effect upon the attorney's ability to defend his or her client's position. Id. However, according to the Schroeder court, the allegation that the defendant attorney maliciously commenced a frivolous garnishment action without substantial hope

of success or other legitimate purpose constitutes a claim under which relief can be granted under section 1983. Id.

Consistent with these policy considerations, the United States District Court for the District of New Jersey explained that where malicious or bad faith use of garnishment procedures is proven, the immunity otherwise available to the attorney would not be applied. Voytko v. Ramada Inn of Atlantic City, 445 F.Supp. 315, 330 (D.N.J. 1978). The threat of civil liability for malicious or bad faith conduct in no way chills the duty of the attorney to zealously represent his client, because, by definition, malicious use of garnishment procedures implies an ulterior motive on the part of the attorney. Id. The Voytko court specifically stated that if an attorney knows that his client acted with malice and without probable cause (in that case filing a criminal complaint), or if the attorney's own acts are taken with malice and without probable cause, the attorney will not be immune from liability where his conduct deprives the adversary of liberty. Id. at 331 (citing Schroeder, 400 F.Supp. at 716-17).

The facts of the case at hand fall within this precedent. Though these cases primarily involve the use of garnishment proceedings to seize property, what drove the determinations in Buller, Schroeder and Voytko, and City of Joilet is the fact that the malicious and bad faith use of process was to advance personal interest and deprive another of liberty. These are precisely the facts alleged in the case at hand. A fair reading of the Complaint, taken as a whole, demonstrates that Defendant Kelly engaged in a pattern of conduct whereby he displayed utter disregard for his fiduciary, ethical and legal obligations to Runge, and instead, deprived her of her rights and liberty while advancing his own interests.

Defendant Kelly's advancement of his personal interest is the crux of Runge's Complaint. When Runge complained about her property being stolen Defendant Kelly had her committed for a psychiatric evaluation rather than address her concerns,. Defendant Kelly then refused to accommodate her requests to return to an assisted living facility, and instead forced her to be admitted to a nursing facility. Once in the facility, Defendant Kelly ignored Runge's repeated requests to move her into a more appropriate care setting. Even though she complained about the psychotropic drugs she was being given, Defendant Kelly took no action.

The Complaint specifically alleges that this arrangement was lucrative to both Defendant Kelly and Defendant Sunbridge, and that Defendant Kelly had an exiting relationship with Defendant Sunbridge, as he had placed other "clients" at the Sunbridge facility, and that the Defendants had conspired to keep Runge in a state of diminished capacity. (Complaint, ¶ 24, 25, and 28.) The Complaint alleges that Defendant Kelly and Defendant Sunbridge sought to ensure that Runge was not able to contact her family, as she was denied access to writing materials and postage, as well as telephone access. Personal interest, malice, and bad faith is readily apparent in these allegations.

Once Runge executed the revocation of Defendant Kelly's Power of Attorney and Health Care Proxy in favor of Dorothy and Gilbert Stanley, the matter should have ended. Yet, Defendant Sunbridge and Defendant Kelly refused to recognize the Stanleys as Runge's duly appointed representatives, refused to discharge her in spite of Runge's and the Stanley's directives, and actively sought to block her departure by enlisting the Massachusetts law enforcement officials to further their illegitimate ends. Defendant Kelly blocked Runge's financial accounts, demonstrating his true motive. Then, in a completely

*ex parte* proceeding, with no notice to either the Stanleys or Runge, Defendant Kelly had himself declared Runge's guardian, whereupon he promptly dispersed her funds without prior court approval to himself, Defendant Sunbridge, and Defendant Bloomingdale. Defendant Kelly contacted the North Carolina police in an attempt to have the Stanleys incarcerated. Runge believes and avers that Defendant Kelly failed to disclose to the Court that he no longer had any authority to represent Runge.

In this manner, Defendant Kelly sought to avail himself of the compulsive power of the state to seize control. However, unlike the garnishment cases, which involved the mere disposition of property, Defendant Kelly seized control of Runge by having her declared incompetent and becoming her guardian. This is a deprivation of civil rights of the highest degree – the nearly complete usurpation of personal liberty and autonomy. Defendant Kelly involved the machinery of the state to affect a complete and total *ex parte* seizure of Runge's personal liberty. He also attempted to avail himself of law enforcement in North Carolina by falsely reporting Runge as being held against her will.

Based on the foregoing, and consistent with the above-cited precedent, Runge has alleged sufficient facts to demonstrate personal motive and interest behind Defendant Kelly's violation of Runge's civil rights. In order to advance his agenda, he deprived Runge of her civil rights, confined her to a nursing home and plundered her finances. To do so, he invoked the machinery of the state to procure an ill-gotten guardianship. He did so despite the fact that the attorney-client relationship was terminated, and despite the fact that he had no authority to proceed on her behalf, with no legitimate purpose. In particular, his use of guardianship process and the utilization of the North Carolina police at a time which had

no authority to act on behalf of Runge was malicious, which by definition, implies ulterior motive. See Voytko, 455 F.Supp. at 330.

A fair reading of the complaint, with all reasonable facts and inferences drawn in favor of Runge, demonstrates that Defendant Kelly acted in his own interest, with bad faith and malice and utter disregard for his fiduciary, legal and ethical duties, and instead sought to advance his own interests. In the process, he made the Commonwealth of Massachusetts his unwitting accomplice to further the advancement of his nefarious plan. Runge has alleged that Defendant Kelly availed himself of the compulsive power of the state by utilizing the tribunal to seize Runge's personal liberties, and by attempting to utilize the police to coercively enforce this end. Moreover, in effectively imprisoning Runge, Defendant Kelly has taken over a role that is traditionally the prerogative of the state. In the process, Defendant Kelly deprived Runge of her rights in free speech, travel, personal freedom and liberty, and the right to equal protection, due process and privileges and immunities guaranteed by the Fourteenth Amendment.

Such a ruling is consistent with the policy articulated by the Schroeder court. There would be no chilling effect on advocacy. Defendant Kelly took action with malice and without probable cause, and therefore, should not be immune from liability where his conduct deprives Runge of her liberty. In light of what he knew, there can be no legitimate purpose to his actions. Schroeder, 400 F.Supp. at 716-17.

Defendant Kelly's most persuasive authority would appear to be a case in which a plaintiff's legal attorney-in-fact brought an action against, among others, a lawyer who had himself declared conservator of an elderly persons estate allegedly procured through fraud. Brown v. Dunne, 409 F.3d 341 (7th Cir. 1969). In Brown, the defendant allegedly used a state

100684

14

statute to enter and remove property from the plaintiff's home by petitioning the court to declare himself conservator of the estate. Thereafter, the plaintiff brought suit alleging that the defendant's misuse of the statute in a state forum rises to the level of acting under color of law. The Seventh Circuit disagreed, holding that such facts do not state a claim upon which relief can be granted. However, the Court in concurrence stated, "we do not pass on the question of whether 42 U.S.C. § 1983 provides a federal cause of action against any state court plaintiffs who intentionally and maliciously use a knowing and willing state forum to deprive persons of constitutionally protected rights. Id. at 344 (Kerner, J., concurring).

In the instant case Defendant Kelly was both Runge's power of attorney and health care medical power of attorney. A power of attorney creates a traditional principal-agent relationship. That relationship has one key characteristic: an attorney-in-fact is in a fiduciary relationship with the principal concerning all matters within the scope of the agency. Gagnon v. Coombs, 654 N.E.2d 54 (Mass. App. Ct. 1995). Furthermore, fiduciaries owe a duty of utmost good faith and absolute loyalty to their principal. Id. (citing Restatement (Second) of Agency §§ 1, 13, 375). In contrast to Brown, Defendant Kelly acted in his own interest, not in any fiduciary capacity to Runge. In contrast to the principal in Brown, Runge received no notice of hearing and thus no opportunity to assert her interest. To the contrary, Defendant Kelly, by and through his actions, become Runge's antagonist and adversary.

Defendant also cites Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) in which the Supreme Court concluded that public defenders do not act under color of state law when performing traditional functions of counsel, even though employed by the state. Polk County also states that although lawyers are officers of the court, they are

not to be considered state actors. Polk County, 454 U.S. at 318, 102 S.Ct. at 450. In contrast, Defendant Kelly was not acting as an attorney; he was an attorney-in-fact. As Runge's attorney-in-fact, Defendant Kelly was required to act in Runge's best interest. Having used his power for self-gain, Defendant Kelly should not be afforded the same protection from section 1983 as attorneys performing duties of traditional counsel.

Moreover, Defendant cites an unpublished Tenth Circuit Order and Judgment for the proposition that a *guardian ad litem* is a fiduciary who acts for the best interest of the minor and not the state, and as such does not act under color of state law. Schaffarth v. Thomas, et. al., 1999 U.S. APP LEXIS 20175 (10th Cir. 1999). Defendant Kelly, by comparison, used his fiduciary status to corrupt the court system and deprive a citizen of guaranteed rights.

    B.    **RUNGE HAS ADEQUATELY PLEADED A CAUSE OF ACTION UNDER 42 U.S.C. § 1985(3).**

A claim under section 1985(3) requires a plaintiff to show some racial or otherwise class-based invidiously discriminatory animus, and that the conspiracy was aimed at interfering with rights protected against both private and official encroachment. Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996) (citing Griffen v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed. 338 (1971) and United Bhd. Of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358-59, 77 L.Ed.2d 1049 (1983)). The complaint must allege facts showing that the defendants conspired against a plaintiff because of her membership in a class and that the criteria defining the class were invidious. Id.

Within the ambit of § 1985(3) there are two clauses to note - the deprivation clause and the hindrance clause. Under the deprivation clause a "plaintiff must show that some class based animus is present and the rights affected are protected against both private and official encroachment." Libertad v. Welch, 53 F.3d 428, 450-51 (1st Cir. 1995). The hindrance clause only requires a deprivation of a right protected by official encroachment. The hindrance clause requires a discriminatory animus of a protected class, and the conspiracy must be as such to limit a state officer's ability to provide his citizens with equal protection under the law. Id. at 451. The hindrance clause, unlike the deprivation clause, implicates the ability of the state to ensure and safe guard rights protected against any infringement. "When private individuals conspire for the purpose of arresting or impeding the state's power to protect or secure equal protection of the laws to a group of citizens, those conspirators are supplanting the state's conduct with their own." Id. In Libertad, the hindrance clause was held to be applicable when the discriminatory act was mob-like protesting at an abortion clinic.

In his brief, Defendant Kelly argues that Runge's section 1985(3) claim should be dismissed because she is unable to prove state action. As more fully set forth above, Runge has sufficiently alleged state action. Accordingly, Runge's Section 1985(3) claim should not be dismissed on this basis.

Defendant Kelly also argues that Runge has failed to meet pleading requirements because she does not allege that the conspiracy was for the purpose of denying her equal protection and that she has not alleged an overt act that demonstrates she was conspired against because of her age and her sex. In the case at hand, Runge has alleged that the discriminatory animus was based on her age and gender. (Complaint, ¶ 54). The

suppression by the Defendants of Runge's rights are inextricably tied to her status as an elderly woman. She has been imprisoned, both within the walls of the nursing facility and as a result of the unwanted administration of psychotropic medication. She has been denied basic constitutional rights. Defendant Kelly seems to suggest that the infringement of Runge's rights is merely collateral damage in the pursuit of his ultimate goal of monetary gain, and as such, Runge has failed to state a claim under section 1985(3). The impairment of her rights is a necessary and inherent objective of the conspiratorial enterprise. She is a victim precisely because of age and gender, a member of the class most vulnerable to this sort of exploitation. But for her age and gender, she would not have been victimized by the Defendants and deprived of her rights.

By petitioning for guardianship in an *ex parte* proceeding, Defendant Kelly deprived Runge of her right to appear before the tribunal so that she could state her case and have the tribunal evaluate her. In this manner, he deprived her of all personal liberty, equal protection under the laws, her freedom of speech, and also attempted to restrain her interstate travel by attempting to dupe the North Carolina police into believing she was being held against her will. In short, Defendant Kelly did everything in his power to deprive Runge, an elderly woman, of rights protected from official encroachment. Because Defendant Kelly abused the system, he rendered the state's ability to provide its citizens equal protection meaningless, satisfying the hindrance clause under section 1985(3).

IV.    CONCLUSION

Based on the foregoing, Defendant Kelly's 12(b)(6) motion should be denied. Plaintiff has successfully alleged a cause of action under both section 1983 and 1985(3). Defendant Kelly should be ordered to file an answer to the Complaint within 30 days of the

date of the order denying Defendant's Motion to Dismiss. In the alternative, if the Court finds that Runge has not alleged facts sufficient to establish liability under section 1983 and 1985(3), then Runge requests leave of court to amend her Complaint.

                Respectfully submitted,

                LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated: August 16, 2005        By   /s/ Glenn R. Davis
                                      Glenn R. Davis
                                      1700 Bent Creek Boulevard, Suite 140
                                      Mechanicsburg, PA 17050
                                      (717) 620-2424
                                      gdavis@ldylaw.com
                                      *Pro Hac Vice*

                                      Blake J. Godbout, BBO #196380
                                      **BLAKE J. GODBOUT & ASSOCIATES**
                                      33 Broad Street, 11th Floor
                                      Boston, MA 02109
                                      (617) 523-6677

Attorneys for Plaintiff, Helen A. Runge