**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **HELEN A. RUNGE,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No. 05-10849RGS** |
| | : | |
| **WALTER J. KELLY, et al.** | : | |
| **Defendants** | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT MEDIPLEX OF MASSACHUSETTS, INC. D/B/A
SUNBRIDGE CARE AND REHABILITATION FOR RANDOLPH'S PARTIAL
MOTION TO DISMISS**

NOW COMES Plaintiff, Helen A. Runge, in response to Defendant

Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for

Randolph's ("Sunbridge") Motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6),

and requests this Honorable Court deny Defendant Sunbridge's Motion to

Dismiss.  In support of this request, Plaintiff states as follows:

**I.      COUNTERSTATEMENT OF FACTUAL BACKGROUND**

Plaintiff Helen A. Runge ("Runge"), is an 89-year old woman who

currently resides in Tryon, North Carolina.  (Complaint, ¶ 1).  At the time of the

commencement  of the events described in the Complaint, Runge was living

independently in an apartment in the Hyde Park area of Boston, and managing

her financial affairs.  (Complaint, ¶¶ 10, 11).  Runge's Attorney was Peter Kerr,

who shared office space with Defendant Kelly, an attorney licensed to practice in

the Commonwealth of Massachusetts.  (Complaint, ¶¶ 2, 11, 12).  Though false,

Defendant Kelly represented himself to be Kerr's law partner and that he was

taking over Kerr's clients, the first of many misrepresentations and other acts of malfeasance against Runge alleged in the Complaint. (Complaint, ¶¶ 12, 13).

In 2001, Runge, on her own initiative, chose to move to Marian Manor, an assisted living facility. (Complaint, ¶¶ 13, 16). Contemporaneously, Defendant Kelly prepared instruments appointing himself Runge's Power of Attorney over her finances and health care decisions, and had Runge execute these documents without adequately explaining their significance. (Complaint, ¶ 16). These actions prevented Runge's daughter, Dorothy Stanley, from receiving information about her mother from Marion Manor. (Complaint, ¶ 17). Essentially, Defendant Kelly placed himself in a position of dominion and control over Runge's health care decisions and personal finances, with Runge's daughter, Dorothy Stanley, at his mercy for information regarding her mother's health and well being.

Dissatisfied with her living arrangements, Runge voluntarily elected to move to Bayview Assisted Living in November 2002. (Complaint, ¶ 19). While a resident at Bayview Assisted Living, Runge's prescription drug card was either stolen or misused by an employee of Bayview. (Complaint, ¶ 20). On another occasion, Runge returned to her room to find that it had been rummaged through by someone apparently looking for valuables or drugs. (Complaint, ¶ 21). When she complained about this issue, Defendant Kelly directed that Runge be taken to Carney Hospital in Boston for a psychiatric evaluation, despite having only seen Runge on approximately two occasions in the preceding six

months.  (Complaint, ¶¶ 20-23).  Runge overheard Defendant Kelly refer to her as "mental."  (Complaint, ¶¶ 23).

When Runge was discharged from Carney Hospital, Defendant Kelly had her admitted without Runge's knowledge or consent to Defendant Sunbridge, a skilled nursing care facility. (Complaint, ¶ 24).  Defendant Kelly was familiar with Defendant Sunbridge, and Runge has alleged that Defendant Kelly has other elderly clients at the nursing facility.  (Complaint, ¶¶ 24, 25).  Despite Runge's protestations against admission to a skilled nursing unit, Defendant Kelly insisted and directed that Runge could not return to the Bayview assisted living unit, but instead would be placed in Defendant Sunbridge, and he presented her with no other option.  (Complaint, ¶ 25)  Defendant Kelly did not discuss this decision with Runge, nor did he discuss this with her daughter, Dorothy Stanley.  (Complaint, ¶ 25)

The living conditions and care at Defendant Sunbridge were deplorable and unacceptable.  (Complaint, ¶ 27).  Yet, Defendant Kelly ignored Runge's numerous requests to facilitate her move to more appropriate care and living accommodations.  (Complaint, ¶ 27).  Though Runge advised Defendant Kelly that she was being forced to take medications that were unnecessary and impaired her mental capacity, cognitive abilities, and physical functioning, Defendant Kelly continued to take no action, entrapping her at Defendant Sunbridge.  (Complaint, ¶¶ 27, 28).  The Complaint specifically alleges that Defendants Kelly and Sunbridge conspired to keep Runge in this state of

diminished capacity, an arrangement that was financially lucrative to both Defendant Kelly and Defendant Sunbridge.  (Complaint, ¶ 28).  Runge remained in this state until she was able to sneak a letter to her daughter advising that she was being held against her will at Defendant Sunbridge and that Defendant Kelly would do nothing to assist her.  (Complaint, ¶ 29)

Despite Runge's protestations about her medication program, both Defendant Sunbridge and Defendant Kelly indicted that if she did not take the medication voluntarily, it would be forced upon her.   (Complaint, ¶ 30). Defendant Kelly indicated to Dorothy Stanley and her husband, Gilbert Stanley, that he was contemplating having a guardian appointed to force her to take medication.  (Complaint, ¶ 30).  The Stanleys told Defendant Kelly that he should not take any action to appoint a guardian and that they would be in Boston on April 30, 2003, to assess the situation.  (Complaint, ¶ 30).

The Stanleys arrived one day early to visit Runge so they could observe her condition and review her medical records.  (Complaint, ¶ 31).  Despite a specific directive by Runge to provide her medical records to her daughter, Sunbridge refused to produce Runge's records.   (Complaint, ¶ 31).   The Complaint alleges that Defendant Kelly had advised the staff not to provide these records to Runge's family.  (Complaint, ¶ 31).  At this time, it was discovered by Runge's daughter that Runge was denied access to her usual medical providers, and had been denied access to phones and writing materials. (Complaint, ¶ 32).

During this period, Runge's daughter requested that Defendant Kelly contact her to discuss the conditions at Defendant Sunbridge and Defendant Kelly's dismissal as her mother's attorney. (Complaint, ¶ 33). Runge specifically indicated that she wished for Defendant Kelly to never act on her behalf again. (Complaint, ¶ 34). Runge and the Stanleys took a trip outside of the facility, at which time Runge executed documentation revoking Defendant Kelly's authority to serve as Runge's health care proxy and power of attorney, and instead appointing Dorothy Stanley her health care proxy and Gilbert Stanley her power of attorney. (Complaint, ¶ 35).

Upon their return to the facility, while Dorothy and Gilbert Stanley were meeting with Defendant Sunbridge's staff, Defendant Bloomingdale, without permission from either Runge or Dorothy Stanley, entered Runge's room and purportedly performed a competency evaluation. (Complaint, ¶ 36) The examination merely consisted of a brief question and answer session lasting only several minutes. (Complaint, ¶ 38). Despite the superficiality of this exam, Defendant Bloomingdale opined at the direction of Defendant Kelly and Defendant Sunbridge that Runge was mentally incompetent. (Complaint, ¶ 38). The Complaint alleges that Defendant Bloomingdale was requested to examine Runge by Defendant Kelly, who by that time had no authority to act on her behalf, or in the alternative, that Defendant Sunbridge made this request, both of whom knew that Runge wished to leave the facility, and both of whom had no authority to act on behalf of Runge. (Complaint, ¶ 38).

Defendant Sunbridge's staff refused to recognize the Stanleys' validly executed Power of Attorney and would not allow Runge to be discharged, even though Runge expressed her desire to leave the facility with the Stanleys and to reside with them in North Carolina. (Complaint, ¶ 39). The Complaint alleges that Defendant Sunbridge's management was acting at the direction or in concert with Defendant Kelly and Defendant Bloomingdale in refusing to allow Runge to be discharged. (Complaint, ¶ 39).

On April 30, 2003, Dorothy and Gilbert Stanley arrived at Defendant Sunbridge and were told by the staff that Defendant Kelly had directed that Runge not be allowed to leave the nursing floor, despite the fact that Defendant Kelly had no authority to act for Runge or direct the actions of the facility. (Complaint, ¶ 40). This communication is striking in light of the fact that Defendant Kelly refused to communicate with Runge or the Stanleys. (Complaint, ¶ 40). Based on these facts and circumstances, Runge is alleging that Defendant Kelly was orchestrating a scheme to hold Runge at the facility against her will. (Complaint, ¶ 40). At no time did staff from Defendant Sunbridge communicate with Runge to gain an understanding of her wishes. (Complaint, ¶ 40). To the contrary, Sunbridge's staff took every effort to intimidate Runge and the Stanleys and prevent Runge from voluntarily discharging herself. (Complaint, ¶ 40). Runge was only able to escape the facility by the actions of the Stanleys, who ushered her through the door and into their waiting vehicle, while the nursing facility staff attempted to restrain them from leaving.

(Complaint, ¶ 41). Indeed, the Defendants tried to impede the lawful actions of Runge and the Stanleys by summoning the police. (Complaint, ¶ 42).

While this was occurring, Defendant Kelly, rather than being concerned with Runge's well-being or contacting the Stanleys, contacted her financial institutions to direct them to freeze her accounts. (Complaint, ¶ 46). Defendant Kelly took this action knowing that he had no authority to act on behalf of Runge and also knowing that freezing her access to her financial accounts could have a potential and significant effect on her health. (Complaint, ¶ 46).

The Stanleys and Runge traveled to North Carolina to the Stanleys' home. Once there, Defendants Kelly and Sunbridge were informed that Runge was safe and that there should be no concern for her well-being, and that she could be contacted at her new residence in North Carolina. (Complaint, ¶ 43). A subsequent proper psychiatric evaluation indicated that she was a competent, well-oriented, 85-year old female, who was in no need of psychiatric or psychotropic medication. (Complaint, ¶ 44).

Nonetheless, Defendant Kelly notified the North Carolina police that Runge was being held against her will. (Complaint, ¶ 48) This blatantly false report, astonishing in light of Runge's requests to be transferred from the nursing facility, her expressed desire to be free of unwanted psychotropic medication, and the expression of her desire to move to North Carolina to live with her daughter, was made for the purpose of aiding and abetting a scheme by Defendant Kelly to have himself appointed as Runge's guardian to completely

deprive her of her rights, gain control over her financial estate and to cause harm to both Runge and the Stanleys.  (Complaint, 48).

Despite the confirmation of Runge's well being, despite Defendant Kelly' lack of authority to act on her behalf, and despite the fact that Runge was now in a safe environment in which her needs were being met without psychotropic medication, Defendant Kelly filed an ex parte petition seeking to have himself appointed as guardian of Runge.  (Complaint, ¶ 45).  Defendant Kelly enlisted the aid of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition, misrepresenting facts to the court and having himself appointed guardian of Runge.  (Complaint, ¶ 45).  The fruits of this scheme were born out after Defendant Kelly's *ex parte* appointment when he distributed funds from her estate without any court order, ostensibly as payment for services allegedly rendered by himself, Defendant Bloomingdale and Defendant Sunbridge. (Complaint, ¶49).

## II.    STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), the "Court must accept the complaint's allegations as true, indulging all reasonable inferences in favor of the plaintiff."  Hogan v. Eastern Enterprises/Boston Gas, 165 F.Supp.2d 55, 57 (D. Mass. 2001) (internal quotations omitted) (citing Kiley v. Raytheon Co., 105 F.3d 734, 735 (1st Cir. 1997)).  Furthermore, the Supreme Court has long ago declared that, "a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." Hughes v. McMenamon, 204 F.Supp.2d 178, 180 (D. Mass. 2002) (internal quotations omitted) (citing Conley v. Gibson, 355 U.S. 45, 45-46 (1957)).

## III.   ARGUMENT

### A. This Court must deny Defendant Sunbridge's Untimely Motion

The Federal Rules of Civil Procedure provide that "[E]very defense in law or fact . . . shall be asserted in the responsive pleading thereto . . . except that the [defense of failure to state a claim] may at the option of the pleader be made by motion." Fed.R.Civ.P. 12(b)(6). "A motion making [this defense] *shall be made before pleading*." [emphasis added] Id. Defendant Sunbridge answered Plaintiff's complaint on June 30, 2005. Defendant Sunbridge filed the instant motion on August 1, 2005. Defendant Sunbridge's Answer failed to contain an affirmative defense asserting that Runge's complaint failed to comply with Rule 12(b)(6). This Court must therefore dismiss Defendant Sunbridge's Fed.R.Civ.P. 12(b)(6) Motion as untimely. 5C C. Wright and A. Miller, Federal Practice and Procedure, § 1361 (2004) ("If a defendant decides to assert a 12(b) motion, then he must do so before filing the answer. . . [T]he court must deny any motion made after a responsive pleading as being too late.").

First Circuit Courts consistently hold that a Rule 12(b)(6) motion to dismiss brought after a defendant has filed an answer may only be considered if the defendant raises the failure to state a claim as an affirmative defense in its

Answer.  See e.g. Tobin v. University of Maine, 59 F.Supp2d 87, 89 (D.Me. 1999);

Gerakis v. Champagne 913 F.Supp 646, 650 (D.Mass. 1996) (Stearns, J.).   In

Gerakis, this Court permitted consideration of the defendant's motion because

the defendant bringing the motion had preserved the defense in the Affirmative

Defenses in the Amended Complaint.  If Defendant Sunbridge intends to raise

the issue of the sufficiency of Plaintiff's pleadings, their failure to make a pre-

answer motion or plead an affirmative precludes the use of Fed.R.Civ.P. 12(b)(6).

As Sunbridge has failed to raise the defense in its Answer, this Motion must be

denied.

### B.   RUNGE HAS ADEQUATELY PLEADED A CAUSE OF ACTION UNDER 42 U.S.C. § 1983

### 1.   Defendant Sunbridge is a State Actor under 42 U.S.C. § 1983.

In order to state a valid cause of action under 42 U.S.C. § 1983 or the

Fourteenth Amendment a plaintiff must allege the deprivation of a right, which

may be fairly attributable to the State.   Ponce v. Basketball Feder. of Com. of

Puerto Rico, 760 F.2d 375, 377 (1st Cir. 1985) (quoting Lugar v. Edmondson Oil

Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982)).  The First

Circuit has employed three tests to determine if a private party may be

considered a state actor.  They are: the state compulsion test; the nexus/joint

action test; and the public function test.  Estades-Negroni v. CPC Hospital, 412

F.3d 1 (1st Cir. 2005).  The first test is satisfied when "the state has exercised

coercive power or has provided such significant encouragement, either overt or

covert, that the [challenged conduct] must in law be deemed to be that of the State." Id. at 5 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)). "The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." Id. (quoting Bass v. Parkwood Hosp., 180 F.3d 234, 242 (5th Cir.1999)).  "And, in accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been traditionally the exclusive prerogative of the State." Id. (quoting Blum, 457 U.S. at 1005, 102 S.Ct. at 2798).

As is fully set forth in Runge's Opposition to Defendant Kelly's Motion to Dismiss, Defendant Kelly is a State actor for purposes of § 1983.  Where a defendant jointly participates with a State actor, they subject themselves to liability under 1983. Downs v. Sawtelle, 574 F.2d 1, 10 (1st Cir. 1978); Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 259 (1st Cir. 1993); Wagenman v. Adams, 829 F.2d 196, 209 (1st Cir. 1987) (private citizens liable under § 1983 when "collogued" with state actor-persons acting under color of state law"); Culebras Enterprises Corp. v. Rivera Rios, 813 F.2d 506, 519 (1st Cir. 1987) (one who conspires with state actors to violate another's civil rights under color of state law may be liable under § 1983); Alexis v. McDonald's Restaurants of

Massachusetts, Inc., 67 F.3d 341 (1ˢᵗ Cir. 1995). Plaintiff's Complaint alleges joint action between Defendant Sunbridge and Defendant Kelly, a State actor for § 1983 purposes. This joint action between a private person and a State actor is sufficient to create liability in Defendant Sunbridge.

In Downs, the Court held that "[j]ust as agents of state hospitals may be sued under s 1983, agents and employees of private hospitals determined to be state actors are similarly liable." 574 F.2d at 10. After so holding, the Court found the private defendant to have acted under color of state law and subjected herself to liability because "her actions were taken in concert with" the state actors. Id. The corollary to the Downs holding is that a private hospital acting as an agent of a state actor is liable under § 1983. Runge's Complaint sets forth sufficient facts to show that Defendant Sunbridge acted as Defendant Kelly's agent throughout the factual period giving rise to this action. (Complaint at ¶¶27-30). As such, Plaintiff has set forth sufficient facts to avail her to at least one theory of relief under § 1983 and Defendant Sunbridge's Motion must be denied. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Defendant Sunbridge cites Blum v. Yaretsky, 457 U.S. 991 (1982) for the proposition that private nursing homes are not state actors for purposes of § 1983 under any of the three above-stated tests. The challenged actions of the nursing home before the Blum Court involved the day-to-day administrative decisions of the facility. Id. at 1011-1012. The Court held that extensive funding and regulation, without more, is insufficient to convert private action into state action

and that the day-to-day decisions of the nursing home are not decisions traditionally and exclusively made by the state. Id. at 1011. Courts in the First Circuit have followed Blum in ruling that decisions of private hospitals and nursing homes do not rise to the level of state action necessary for liability under § 1983. See e.g. Rockwell v. Cape Cod Hospital, 26 F.3d 254 (1st Cir. 1994) (decision to involuntarily commit patient pursuant to Massachusetts statute insufficient by itself to create § 1983 liability); Ahmed v. Berkshire Medical Center, 1998 WL 157016 (D.Mass.) (no state action for selection, review and termination of resident's from defendant's residency program); Benjamin v. Aroostook Medical Center, 937 F.Supp. 957, 969 (D.Me. 1996) (private hospital not state actor even though subject to federal and state regulation).

The instant case involves at least one important difference than Blum in that Runge's allegations do not involve the day-to-day decisions of the defendant, but rather decisions that are traditionally and exclusively the prerogative of the state and that are in and of themselves violations of her civil rights. See Part III.C., infra. Runge has additionally alleged joint participation with an officer of the Court who is a state actor under § 1983. Runge alleges joint action between Defendant Kelly (a state actor) and Defendant Sunbridge in a concerted effort to medicate Runge against her will, keep her confined at the facility against her will and the use of the state court system and police force as a means to that end. Defendant Sunbridge is not only extensively regulated by the state and receives both federal and state funding, but Runge has pleaded the

13

additional elements not present in the Blum/Rockwell line of cases.  Therefore,

contrary to Defendant Sunbridge's assertions, Blum is not controlling.

> **2.    Plaintiff is at least entitled to the benefit of full discovery in order to find out if the facts involve any state action.**

Runge has alleged violations by Defendant Sunbridge of her Civil Rights.

It is only "by sifting facts and circumstances can the non-obvious involvement of

the state be attributed its true significance."  Hudson v. S.D. Warren, 665 F.Supp.

937 (D.Me. 1987) citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744,

73 L.Ed.2d 482 (1982).  A determination of the "state action issue at this early

stage is not appropriate where there is a chance, however slight, that state action

is present."  Cain v. Archdiocese of Kansas, 508 F.Supp. 1021, 1026 (D. Kan.

1981); see also, Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969); Braden v.

University of Pittsburgh, 552 F.2d 948 (3d Cir. 1977).  At this stage it is premature

for this Court to determine the state action issue and Runge should be granted

full discovery.  Cain, 508 F.Supp. at 1026.

Runge alleges a detailed scheme between Defendant Kelly, an officer of

the Court, and Defendant Sunbridge, a private nursing facility, to deprive her of

her civil rights.  The allegations in the complaint involve not only these two

parties, but also the involvement of the Massachusetts Probate Court and the

Massachusetts police force.  Runge will meet the "nexus" test if she can show

that the state has exercised coercive power or has provided encouragement,

either overt or covert, so that the choice must be deemed that of the state.  Blum,

457 U.S. at 1005. Alternatively, Runge can show state action if she can show that Defendant Sunbridge "collogued with state actor-persons acting under color of law to deprive plaintiff of [her] civil rights." Wagenmann, 829 F.2d at 209. Without discovery it is impossible to determine whether Defendant Sunbridge was either overtly or covertly encouraged by a state actor to engage in the actions alleged in the Complaint. It is also impossible at this stage to determine if the extent of the joint action between Defendant Sunbridge, Defendant Kelly, the Probate Court and the Massachusetts police is sufficient to create liability under § 1983 at this stage in the litigation. See, e.g. Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("a private party involved in such a conspiracy, even though not an official of the state, can be liable under s 1983"); Wagenman, 829 F.2d at 209 (defendant liable if found to be "a willful participant in joint activity with the state or its agents"). Consequently, Defendant Sunbridge's Motion is premature and Runge should be granted the opportunity to conduct full discovery to determine the issue of state action.

**C. RUNGE HAS ADEQUATELY PLEADED A CAUSE OF ACTION UNDER 42 U.S.C. § 1985(3).**

A claim under § 1985(3) requires a plaintiff to show some racial or otherwise class-based invidiously discriminatory animus, and that the conspiracy was aimed at interfering with rights protected against both private and official encroachment. Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996) (citing Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798,

29 L.Ed. 338 (1971) and <u>United Bhd. Of Carpenters & Joiners of America v. Scott</u>, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358-59, 77 L.Ed.2d 1049 (1983)). The complaint must allege facts showing that the defendants conspired against a plaintiff because of her membership in a class and that the criteria defining the class were invidious. <u>Id</u>.

Within the ambit of § 1985(3) there are two clauses to note - the deprivation clause and the hindrance clause. Under the deprivation clause a "plaintiff must show that some class based animus is present and the rights affected are protected against both private and official encroachment." <u>Libertad v. Welch</u>, 53 F.3d 428, 450-51 (1st Cir. 1995). The hindrance clause only requires a deprivation of a right protected by official encroachment. The hindrance clause requires a discriminatory animus of a protected class, and the conspiracy must be as such to limit a state officer's ability to provide his citizens with equal protection under the law. <u>Id</u>. at 451. The hindrance clause, unlike the deprivation clause, implicates the ability of the state to ensure and safe guard rights protected against any infringement. "When private individuals conspire for the purpose of arresting or impeding the state's power to protect or secure equal protection of the laws to a group of citizens, those conspirators are supplanting the state's conduct with their own." <u>Id</u>. In <u>Libertad</u>, the hindrance clause was held to be applicable when the discriminatory act was mob-like protesting at an abortion clinic.

In its brief, Defendant Sunbridge states Plaintiff has failed to meet the pleading requirements because she has not established a cognizable class and does not point to any evidence establishing a conspiracy aimed at depriving the class of its constitutional rights.  Women are a class protected under § 1985(3).  Id. at 448 ("at the very least, the classes protected by § 1985(3) encompass those classes that warrant heightened scrutiny under Equal Protection Clause analysis").  In the case at hand, Runge has alleged that the discriminatory animus was based on her age and gender.  (Complaint, ¶ 54).  The suppression by the Defendants of Runge's rights are inextricably tied to her status as an elderly woman.  She has been imprisoned, both within the walls of the nursing facility and as a result of the unwanted administration of psychotropic medication.  She has been denied basic constitutional rights.

Defendant Sunbridge implies that the infringement of Runge's rights is merely collateral damage in the pursuit of the conspirators' ultimate goal of monetary gain, and as such, Runge has failed to state a claim under section 1985(3).  Defendant's "reasoning on this point misses the trees for the forest . . . [T]he properly framed issue is whether, in effectuating that goal, [Defendants] purposefully employed tactics designed to prevent the authorities from securing equal protection of the laws to [Plaintiff]."  Libertad, 53 F.3d at 446.  "It is akin to saying that a bank robber lacks mens rea and thus cannot be convicted because his ultimate objective was to make money, not to commit robbery."  Id.  The impairment of Runge's rights is a necessary and inherent objective of the

conspiratorial enterprise. She is a victim precisely because of age and gender, a member of the class most vulnerable to this sort of exploitation. But for her age and gender, she would not have been victimized by the Defendants and deprived of her rights.

Plaintiff alleges that Defendant Sunbridge, in concert with Defendant Kelly, forced psychotropic medication on her that was unnecessary and impaired her mental capacity. (Complaint, ¶ 27,28). The First Circuit holds that "forcible medication will not occur absent specified substantive predicates: a declaration of incompetency and substituted judgment calling for medication, or strictly defined emergencies justifying invocation of delimited police powers or *parens patriae* powers." Rogers v. Okin, 738 F.2d 1, 7 (1st Cir. 1984) (finding the allegation of forced medication without court order to be sufficient to defeat motion to dismiss under 1983). The United States Supreme Court has long recognized the principle that the Constitution recognizes a protected liberty interest in avoiding the unwanted administration of antipsychotic drugs. Mills, 457 U.S. at 299. Defendant Sunbridge's forced medication of Runge standing alone constitutes an intentional deprivation of rights guaranteed to Runge under the Due Process Clauses of the Fifth and Fourteenth Amendments.

The Rogers case was based in part on a decision by the Massachusetts Supreme Judicial Court holding that "where no emergency exists, antipsychotic medication may be forcibly administered to a non-institutionalized individual only in accordance with a court order." In re guardianship of Roe, 383 Mass.415,

453, 421 N.E.2d 40, 61 (1981). This is because "Massachusetts law requires 'greater protection of relevant liberty interests than the minimum adequate to survive scrutiny under the Due Process Clause.'" Rogers v. Okin, 738 F.2d at 7, citing Mills v. Rogers, 457 U.S. 291, 303 (1982). As with the party in Roe, Runge was a non-institutionalized individual administered psychotropic medications against her will in violation of her established constitutional rights. Plaintiff's Complaint alleges that a conscious objective of the enterprise was the very deprivation of this protected liberty interest. Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 275 (1993).

In furtherance of the conspiracy, Defendant Kelly petitioned for guardianship in an *ex parte* proceeding. Defendants deprived Runge of her right to appear before the tribunal so that she could state her case and have the tribunal evaluate her. In this manner, Defendants Kelly, Sunbridge and Bloomingdale deprived her of all personal liberty, equal protection under the laws and her freedom of speech. As the principal actor in the conspiracy, Defendant Kelly then attempted to conceal his action by alleging to the North Carolina police that Runge had been taken against her will by her daughter and son-in-law.

In conclusion, Defendant Kelly, acting in concert with Defendant Sunbridge, endeavored to deprive Runge, an elderly woman, of rights protected by official encroachment. Defendant Sunbridge, with the assistance of Defendant Kelly, forced psychotropic medications on Runge, refused her access to means of

communicated her plight and abused the system. These acts impeded the state's ability to provide its citizens the guarantees of the equal protection and due process clauses rendering their protections meaningless and satisfying the hindrance clause under section 1985(3).

## IV.    CONCLUSION

Based on the foregoing, Defendant Sunbridge's 12(b)(6) motion should be denied. Defendant Sunbridge failed to submit a pre-Answer Motion or preserve 12(b)(6) in its Affirmative Defenses and therefore the Rule is unavailable. Notwithstanding, Plaintiff has successfully alleged a cause of action under both section 1983 and 1985(3). In the alternative, if the Court finds that Runge has not alleged facts sufficient to establish liability under section 1983 and 1985(3), then Runge requests leave of court to amend her Complaint.

Respectfully submitted,

Dated:  August 22, 2005                **BLAKE J. GODBOUT & ASSOCIATES**

By: /s/ Blake J. Godbout
        Blake J. Godbout, BBO #196380
33 Broad Street, 11th Floor
Boston, MA  02109
(617) 523-6677

Glenn R. Davis, Esq.
**LATSHA DAVIS YOHE & MCKENNA, P.C.**
1700 Bent Creek Boulevard, Suite 140
Harrisburg, PA  17050
(717) 620-2424
*Pro Hac Vice*

***Attorneys for Plaintiff, Helen A. Runge***

## <u>CERTIFICATE OF SERVICE</u>

I, Blake J. Godbout, hereby certify that a true copy of the above document was served upon each party by mailing a copy of same, postage prepaid, to all counsel of record.

<u>/s/ Blake J. Godbout</u>
Blake J. Godbout