IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HELEN A. RUNGE,  :
        Plaintiff  :
        :  No. 05-10849-RGS
    v.  :  (Judge Stearns)
        :
WALTER J. KELLY, et al.  :  CIVIL ACTION
        Defendants  :  JURY TRIAL DEMANDED

## PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY RESPONSES FROM DEFENDANT SUNBRIDGE NURSING AND REHABILITATION CENTER

AND NOW, COMES Plaintiff, Dorothy Stanley, Executrix of the Estate of Helen

Runge ("Plaintiff"), by and through her counsel, and motions to compel discovery

responses from Defendant Sunbridge Nursing and Rehabilitation Center ("Defendant

Sunbridge") and states the following:

    1.     On or about May 19, 2006, Plaintiff served a Request for Production of

Documents on Defendant Sunbridge. (*See* Exhibit A to Document 88.)

    2.     On or about October 6, 2006, Defendant Sunbridge submitted a partial

response to Plaintiff's Request for Production of Documents, which included only

Helen Runge's ("Runge's") medical records, including power of attorney and health

care proxy documents, Defendant Kerry L. Bloomingdale's April 29, 2003 medical

certificate and the Department of Public Health's report regarding the complaint made

to it by Plaintiff regarding Defendant Sunbridge. (*See* Exhibit B to Document 88.)

    3.     In response to Plaintiff's request to either submit a privilege log or

produce the documents withheld, Defendant Sunbridge submitted a Privilege Log to

Plaintiff on or about November 21, 2006 of those documents it had withheld from its response based on a claim of privilege.  (See Exhibit D to Document 88.)

4.      On February 27, 2007, Plaintiff filed a Motion to Compel Discovery Responses from Defendant Sunbridge ("Motion to Compel"), arguing that Defendant Sunbridge had failed to produce adequate documentation in response to its Request for Production of Documents.

5.      Plaintiff incorporates the original Motion to Compel and attachments to it, Document 88, herein as if set forth at length.

6.      Defendant Sunbridge submitted supplemental responses (attached as Exhibit A hereto) to Plaintiff's Request for Production of Documents Numbers 6 and 10 on or about March 8, 2007, which consisted of the following information specific to Runge:  (1) Multiple copies of Runge's admission information sheet; (2) billing information for the majority of the time period Runge was in residence at Sunbridge; (3) another copy of the Durable Power of Attorney and of the Health Care Proxy for Runge; (4) general medicare, including assignment of benefits and payment, and social security information; (5) admission agreement and documentation; (6) a preadmission assessment; and (7) a trust fund authorization, receipts, copies of checks and statements regarding Runge's resident account.

7.      On March 13, 2007, Defendant Sunbridge filed a response to Plaintiff's Motion to Compel entitled Opposition of Defendant Mediplex of Massachusetts, Inc. d/b/a Sunbridge Care and Rehabilitation for Randolph to Plaintiff's Motion to Compel

Discovery Responses ("Opposition"); the Opposition is docketed as Document 94 and is incorporated herein as if set forth at length.

8.    In its Opposition, Defendant Sunbridge stated that it provided Plaintiff with 485 pages as part of its disclosures on July 20, 2006. However, Defendant Sunbridge submitted its disclosures on September 12, 2005; no documents were submitted with the disclosures. Defendant Sunbridge first produced documentation to Plaintiff, 485 pages, on or about October 6, 2006, in response to Plaintiff's Request for Production of Documents.

9.    Defendant Sunbridge further stated in its Opposition that the records it has produced represent "significant compliance with Plaintiff's document requests."

10.    By Order entered March 20, 2007, this Court denied Plaintiff's original Motion to Compel stating the following: "Denied on defendants' representation that the records have been produced."

11.    The records produced by Defendant Sunbridge in no way represent significant compliance with Plaintiff's requests.

12.    Defendant Sunbridge failed to represent to this Court that it has failed to produce documents in response to several of the requested categories.

13.    The deposition testimony of Sandra Porazzo Perry, Defendant Sunbridge's Director of Nurses for the 2000-2004 time period, establishes the existence of the following documents that have not been produced by Defendant Sunbridge:

      a.    All reports, correspondence, etc., that are not part of the normal facility chart (Request for Production of Documents No. 2);

b.       documentation of communication of caregivers regarding Runge (Request for Production of Documents No. 4);

c.       documents provided to Runge's physicians or that memorialize any notification regarding Runge to the physicians (Request for Production of Documents No. 5);

d.       documents relating to any business relationship between Defendant Sunbridge and Defendant Kelly during a specified time period (Request for Production of Documents No. 8);

e.       documents relating to any business relationship between Defendant Sunbridge and Defendant Bloomingdale during a specified time period (Request for Production of Documents No. 9);

f.       documents relating to any payments Defendant Sunbridge made to or received from Defendant Bloomingdale during a specified time period (Request for Production of Documents No. 11);

g.       an employee list for persons who worked at or for Sunbridge on April 29 and 30, 2003 (Request for Production of Documents No. 12) ;

h.       all documentation reflecting any investigations conducted by state or federal agencies concerning Runge (Request for Production of Documents No. 13);

i.       the floor plan of Defendant Sunbridge during Runge's residency (Request for Production of Documents No. 14);

j.      the Policy and Procedures Manuals in effect for Defendant Sunbridge during Runge's residency (Request for Production of Documents No. 16);

k.      written job descriptions for the Medical Director, Administrator, Director of Nursing and Director of Social Services during Runge's residency (Request for Production of Documents No. 17);

l.      guidelines, etc., for evaluating the job performance of specific classes of employees (Request for Production of Documents No. 18);

m.      contracts with Defendant Sunbridge's medical director or outside consultant medical doctors (Request for Production of Documents No. 20);

n.      daily census reports and/or records with resident acuity information during Runge's residency (Request for Production of Documents No. 22);

o.      certain enumerated work information for employees for April 29 and 30, 2006 (Request for Production of Documents No. 23).

The pertinent portions of the deposition transcript which support Defendant Sunbridge's own employee's testimony establishing the existence of these documents are attached hereto as Exhibit B.

14.      Defendant Sunbridge has waived any objections to Plaintiff's Request for Production of Documents, as its response in October 2006 was untimely.

15.      Plaintiff hereby renews its Motion to Compel filed February 27, 2007. As established by the deposition testimony of Sandra Porazzo-Perry, Defendant Sunbridge

misrepresented that it has complied to a significant extent with Plaintiff's discovery requests.

16.    By letter dated April 12, 2007 (attached as Exhibit C hereto), counsel for Defendant Sunbridge admits to now having obtained corporate documents but in perplexing language suggests that there is no representation made to the documents' accuracy and therefore authenticity.

17.    Our office immediately called counsel and questioned what usefulness such documents provided since they have no probative value but rather served to cause confusion; we also questioned why useless exemplars could be obtained when originals cannot.

18.    Counsel's April 12, 2007, letter is the first explicit disclosure to Plaintiff that they "have not had access to the facility files." To the contrary, counsel consistently represented that Defendant Sunbridge was in the process of obtaining the documents and that they would be forthcoming; earlier disclosure would have allowed Plaintiff to have subpoenaed documents from the facility during the discovery period.

19.    Defendant Sunbridge has either purposefully withheld or negligently failed to produce multiple categories of documents responsive to Plaintiff's requests.

20.    Plaintiff respectfully requests that this Honorable Court compel Defendant Sunbridge to adequately respond to Plaintiff's Request for Production of Documents.

21.    In support of the instant Motion, Plaintiff incorporates her Memorandum of Reasons In Support of Motion to Compel Discovery Responses from Defendant Sunbridge.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Second Motion to Compel Discovery Responses from Defendant Sunbridge and aware Plaintiff appropriate sanctions against Defendant Sunbridge.

Respectfully submitted,

LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated: April 18, 2007          By____/s/ Glenn R. Davis_____
                               Glenn R. Davis
                               1700 Bent Creek Boulevard, Suite 140
                               Mechanicsburg, PA 17050
                               (717) 620-2424
                               gdavis@ldylaw.com
                               *Pro Hac Vice*

                               Blake J. Godbout, BBO #196380
                               BLAKE J. GODBOUT & ASSOCIATES
                               33 Broad Street, 11th Floor
                               Boston, MA  02109
                               (617) 523-6677
                               blake@bjgalaw.com
                          Attorneys for Plaintiff, Helen A. Runge

### LOCAL RULE 7.1 CERTIFICATION

I, Glenn R. Davis, counsel for Plaintiff, certify that we have contacted counsel for Defendant Walter J. Kelly, Kerry L. Bloomingdale, M.D. and Sunbridge Nursing and Rehabilitation Center regarding Plaintiff's Second Motion to Compel Discovery Responses from Defendant Sunbridge.  Counsel for Defendant Sunbridge does not concur in the filing of this motion.  Counsel for Defendants Kelly and Bloomingdale have not provided their positions, whether it be concurrence or nonconcurrence with the presentation of this motion.

## LOCAL RULE 37.1 CERTIFICATION

I, Glenn R. Davis, counsel for Plaintiff, certify that we engaged in discovery conferences with counsel for Defendant Sunbridge Nursing and Rehabilitation Center, the defendant involved in the discovery dispute, in a good faith attempt to narrow the areas of dispute and accordingly have complied with the provisions of Local Rule 37.1.


Dated: April 18, 2007                    _____/s/ Glenn R. Davis_____
                                         Glenn R. Davis

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the

attorney of record for each party by electronic transmission.

James S. Hamrock, Jr.
Hamrock & Tocci
101 Main Street, 18th Floor
Cambridge, MA 02142
jhamrock@htclaw.com

Michele Carlucci
George S. Rockas
Wilson Elser Moskowitz Edelman & Dicker LLP
155 Federal Street
Boston, MA 02110
michele.carlucci@wilsonelser.com
george.rockas@wilsonelser.com

Michael Williams
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 145
Boston, MA 02210-1736
mwilliams@lawson-weitzen.com

Dated: April 18, 2007                    _____/s/ Glenn R. Davis_____
                                              Glenn R. Davis

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HELEN RUNGE,

    *Plaintiff,*

v.

WALTER J. KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

    *Defendants.*

Civil Action No. 05-10849-RGS

## SUPPLEMENTAL RESPONSES of DEFENDANT MEDIPLEX OF MASSACHUSETTS to PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

    The Defendant, Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation

of Randolph ("Mediplex") hereby responds to the Plaintiff's Request for Production of

Documents as follows:

### <u>GENERAL OBJECTIONS</u>

1. The Defendant objects to the Plaintiff's Requests and Definitions to the extent they seek

    the disclosure of information or communications subject to the attorney-client privilege,

    work product doctrine or other privileges and immunities such as information prepared for

    a medical peer review committee.

2. The Defendant objects to the Plaintiff's Requests to the extent they are unduly

    burdensome, overly broad, irrelevant and not reasonably calculated to lead to the

    discovery of admissible evidence.

3. Defendant has exercised reasonable diligence to locate responsive documents by

    examining those files that may reasonably be expected to yield such documents. Any

    responses to Plaintiff's requests, are made in a good faith effort to construe and comply

1

therewith, and are made without prejudice to and without waiving any of Defendant's

objections, whether general or specific.

## RESPONSES

### Request No. 6

Please produce complete and itemized bills for any and all services, medical supplies, pharmaceutical supplies, therapies, or any other goods or services for which SunBridge charged Plaintiff or any third party payer on behalf of Plaintiff while she was a resident at SunBridge, including, but not limited to:

(a)  All bills or statements submitted to Plaintiff, her power of attorney, guardian, family, or Medicare for room and board, services, supplies, equipment, or other items provided to Plaintiff, including co-payments or deductibles, by SunBridge;

(b)  All revenue reports and/or remittance advisories that reflect reimbursement made by private insurance, Medicare, or any individual for room and board, services, supplies, equipment, or other items provided by SunBridge;

(c)  All statements, lists, or reconciliations of trust accounts reflecting funds received from Plaintiff, her power of attorney, guardian, or family or held in trust for the benefit of Plaintiff.

### Response to Request No. 6

See the attached facility records (03364-03470).

### Request No. 10

Please produce any and all documents relating to any payments SunBridge made to or received from Kelly during the one year prior to Plaintiff's residency at SunBridge and during or after Plaintiff's residency at SunBridge.

### Response to Request No. 10

See the attached facility records (03364-03470).

Mediplex of Massachusetts, Inc. d/b/a SunBridge
Nursing and Rehabilitation Center,

by its attorneys,

K. Scott Griggs  (BBO# 555988)
Robert J. Roughsedge  (BBO# 638180)
Michael Williams  (BBO# 634062)
James M. Henry (BBO# 663944)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987

...by certify that a true copy of the above
...ument was served upon (each party
...pearing pro se and) the attorney of record
...r each other party by (mail — hand —
telecopier, on _____

3

**ORIGINAL**

1

Volume:  I

Pages: 1-98

UNITED STATES DISTRICT COURT

EASTERN DIVISION

- - - - - - - - - - - - - - - - x

HELEN RUNGE,                    Civil Action

        Plaintiff,       No. 05-10849-RGS

WALTER J. KELLY,
KERRY L. BLOOMINGDALE, M.D, and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

        Defendants.

- - - - - - - - - - - - - - - - x


DEPOSITION OF SANDRA M. PORAZZO-PERRY

Wednesday, March 28, 2007, 10:00 a.m.

Blake J. Godbout & Associates

33 Broad Street - 11th Floor

Boston, Massachusetts 02109


----- **Reporter:  Toni F. Beckwith, RMR** -----


Toni F. Beckwith, Registered Merit Reporter
50 Winsor Avenue
Watertown, Massachusetts 02472
Tel: 617.924.2731
Fax: 617.924.9899

1    training you had received previously or your

2    educational experience?

3         A.   No.

4         Q.   Now, I'd like to focus for the time

5    being on the period between January 23, 2003 and

6    April 30, 2003, and I'd like to know, at that

7    time were there nursing procedures and policies

8    in place at Sunbridge which guided the nurses

9    and the care that they rendered and their

10   obligations, if you understand what I mean?

11        A.   Yes.   Sunbridge had policy and

12   procedures manuals.

13        Q.   So these were written policies and

14   procedures manuals?

15        A.   Yes.

16        Q.   And would that just be for the nursing

17   staff or were there written policy and

18   procedures manuals for the therapy staff and the

19   various departments at Sunbridge?

20        A.   They had a set of policies that was

21   their clinical policies and procedures based on

22   the Mass. State Regulations.   Other than that,

23   I'm not sure.

24        Q.   Now, you said these are written

11

1    policies.  Were they kept in a book or a binder

2    of some sort or how were they maintained?

3         A.   In a binder.

4         Q.   And was this binder given to each

5    employee that worked at Sunbridge?

6         A.   No.  There was a set available on

7    every nursing unit, and then in the director's

8    office and the administrative office.

9         Q.   How often were these manuals updated,

10    if you know?

11         A.   I don't know.  As policies changed

12    based on state regulations, updates would come

13    from the corporate office.

14         Q.   For this same period of time, January

15    23 through April 30, 2003, did you have

16    admissions procedures and policies that you

17    followed for new patients?

18         A.   Yes, we did.

19         Q.   Were these also written policies and

20    procedures?

21         A.   We had an admission packet that went

22    over everything that needed to be done as far as

23    an admission, you know, consents and things that

24    had to be signed, but there wasn't a, per se,

12

1      policy of you did this, this, this to admit a

2      patient.

3           Q.  So if you would, when a new patient

4      would come into the facility, would the person

5      responsible for the admissions, you know, have a

6      checklist that they would go through and make

7      sure everything was followed?  Is that what you

8      mean?

9           A.  There wasn't really a checklist.

10     Before anybody got admitted to the facility the

11     clinical liaison out in the field would go do a

12     screen of the patient.  I, as the director of

13     nurses, then would read that based on what I

14     found in that whether or not they would be

15     appropriate to come to our facility and we can

16     meet their needs.

17          If that was true, then a bed offer

18     would be made, and then from the time the

19     patient came in, the admission person or social

20     service would then have the appropriate

21     paperwork signed when the patient came into the

22     facility.

23          Q.  Okay.  If I am understanding your

24     testimony correctly, there could have been some

13

1    sort of written paperwork that would have

2    explained to the clinician or whoever was

3    responsible for doing the admissions paperwork

4    to detail exactly what paperwork needed to be

5    signed and to successfully complete the

6    admission?

7        A.  Yes.

8        Q.  The employees that were at Sunbridge,

9    did each employee have an individual employment

10   file that was maintained by the facility?

11       A.  Yes.

12       Q.  And does that employment file -- who

13   maintained those employment files?

14       A.  Human resources in the building.

15       Q.  And they were kept at the building?

16       A.  Yes.

17       Q.  And for each employee that was at the

18   facility, was there a written or a job

19   description for each position, say, nursing

20   position, occupational therapist, physical

21   therapist?

22       A.  Yes.

23       Q.  And these were written explanations or

24   written job descriptions for what was expected

14

1  of each employee, what their job

2  responsibilities might have been?

3          A.  Yes.

4          Q.  For this period of January 2003

5  through May of 2003 or April 30 of 2003, do you

6  remember who the administrator at Sunbridge was?

7          A.  No, I don't, because I had too many of

8  them.

9          Q.  In your time at Sunbridge, how many

10  administrators would you estimate that you had

11  during your tenure there?

12          A.  18.

13          Q.  And do you remember if there was a

14  change in administrator during the period

15  between January 23, 2003 and April 30 of 2003?

16          A.  I don't remember.

17          Q.  Now, when you had residents at the

18  facility, did certain of your residents there

19  operate under powers of attorney and healthcare

20  proxies?

21          A.  Yes.

22          Q.  Could you take me through the

23  procedures and policies by which you determined

24  whether a healthcare proxy or a power of

15

1    attorney would be used for a patient?

2        A.   If a patient came to us and from their

3    documentation from the hospital or if they had

4    been in our facility and through their physician

5    deemed that they were unable, due to a diagnosis

6    of dementia or whatnot, to make their healthcare

7    decisions, then we would activate their

8    healthcare proxy.

9        Q.   Who was responsible for making the

10   decision as to whether the healthcare proxy

11   would be activated or not?

12       A.   The physician.

13       Q.   Would that have to be a written

14   decision that was made specifically authorizing

15   the healthcare proxy?

16       A.   Yes.

17       Q.   And would that written decision

18   authorizing the healthcare proxy to take action

19   on behalf of the patient be maintained in the

20   patient's file at the facility?

21       A.   Yes.

22       Q.   I believe you had said you would check

23   through their prior medical history and see if

24   there was a diagnosis.   Are there specific

16

1   regulations which limit the ability of a

2   healthcare proxy to operate on behalf of the

3   patient?

4           MR. WILLIAMS:  Objection.  Go ahead.

5       A.  I guess it limits the ability when you

6   get into use of antipsychotic medications.

7       Q.  And what is your understanding of the

8   limitations on when you're using antipsychotic

9   medications?

10      A.  The healthcare proxy -- the healthcare

11  proxy can make the consent, the informed consent

12  for the use of the antipsychotic medication for

13  that patient as long as that patient is

14  voluntarily taking that antipsychotic

15  medication.

16          If that patient refuses that

17  antipsychotic medication for any reason, then

18  that basically null and voids the healthcare

19  proxy and you need to go to court for a Rogers

20  guardianship.

21      Q.  And, again, for the healthcare proxy

22  to be making the informed consent decisions,

23  would there first have to have been some sort of

24  a diagnosis or I believe, as you said before, a

1    written order from the physician that the

2    healthcare proxy would be activated?

3              MR. WILLIAMS:   Objection.

4         A.   Yes.

5         Q.   I would state this by way of

6    background: do you remember Helen Runge was

7    operating under a power of attorney and a

8    healthcare proxy while she was a patient at

9    Sunbridge?

10        A.   I think so.

11        Q.   Do you remember the healthcare proxy

12   and the power of attorney, the identity of the

13   healthcare proxy and/or the power of attorney?

14        A.   Well, I don't -- actually, I don't

15   think it was a healthcare proxy.  It was a

16   guardianship that had been filed on her behalf

17   because when she came in, she didn't have a

18   healthcare proxy.

19        Q.   And I probably should have asked this

20   in the beginning.  And if you'll excuse me, I'll

21   go back.  In your preparation for your

22   deposition today, did you review any

23   documentation or otherwise to help refresh your

24   recollection of the facts and circumstances

1    Sunbridge and New England Geriatrics was?

2        A.   New England Geriatrics was one of the

3    psych service providers at the time that we used

4    in Randolph to meet the needs of the clients we

5    had in the facility.

6        Q.   Now, the relationship between

7    Sunbridge and New England Geriatrics, do you

8    know if there was any written contract between

9    the two facilities, to your knowledge?

10       A.   To my knowledge, there was a contract

11   between Randolph and New England Geriatrics.

12       Q.   And what was the procedure to

13   establish -- you said it was for psych consults.

14   How would New England Geriatrics be alerted that

15   someone from their facility was needed at

16   Sunbridge?

17       A.   We would call them if we had somebody

18   that came into the facility new that had a

19   psychiatric diagnosis and/or any psychiatric

20   medication that needed to be reviewed.  If we

21   had anybody that was having some behavioral

22   issues, we would call them and notify them.

23       Q.   Were the doctors or physicians that

24   would be from New England Geriatrics, would they

22

1    have on-call schedules to appear at Sunbridge or

2    would you use a different facility for on-call

3    or emergency services?

4         A.   We would call them first if we had

5    somebody who was truly behavioral and acting

6    out.  They would then, if they could, come into

7    the facility and help us try to manage the

8    patient and/or facilitate a hospitalization if

9    needed.

10        Q.   And do you know, to your recollection,

11   how many physicians from New England Geriatrics

12   were there that would come to Sunbridge?

13        A.   We had just the one physician, and

14   then there was clinicians, the psychotherapist

15   that would come in weekly to meet with residents

16   that had orders for one-to-one weekly

17   psychotherapy.

18        Q.   Do you remember the name of the

19   physician that was assigned to your facility

20   from New England Geriatrics?

21        A.   Dr. Bloomingdale.

22        Q.   Did Dr. Bloomingdale have a set

23   schedule that he would come to Sunbridge on

24   certain days, or was it only when you would

1    contact them to alert them that services were

2    needed?

3        A.  I don't remember that he had a set

4    schedule.  I know he was there quite a bit

5    because of the population we had on another unit

6    in that building.

7        Q.  When Dr. Bloomingdale would arrive to

8    your building, how would he know which patients

9    to see or who he was designated to see or what

10    appointments he had for the day?

11        A.  He would meet with social service.

12        Q.  And was there any sort of written

13    patient list or appointment list that would be

14    provided to Dr. Bloomingdale when he would come

15    which would sort of set forth his schedule for

16    the day or who needed to be seen?

17        A.  Social service would usually just have

18    a list.  I don't know if they kept it in a book

19    or just on a piece of paper for that week of who

20    needed to be seen.

21        Q.  Now, if I inquired whether that book

22    might have been a spiral notebook, would that

23    refresh your recollection as to whether there

24    was a book or pad kept with regard to that?

24

1    A.  I don't know, because I didn't do it.

2    Q.  Okay.  As far as Dr. Bloomingdale is

3  concerned, was there any direct relationship

4  between Sunbridge and Dr. Bloomingdale, or was

5  that relationship maintained solely through his

6  employment with New England Geriatrics?

7    MS. OH:  Objection.

8    A.  To the best of my knowledge, it was

9  just solely through the employment.

10    Q.  Do you have any recollection as to who

11  at Sunbridge would have requested

12  Dr. Bloomingdale to provide services to Helen

13  Runge?

14    A.  It would probably have been either me

15  or the social worker.

16    Q.  Do you have an understanding of who

17  the individual named Walter Kelly is?

18    A.  Yes.

19    Q.  Could you please explain to me your

20  understanding of Walter Kelly's relationship

21  with Sunbridge?

22    A.  He was an attorney that would help

23  when we needed to file for guardianships.

24    Q.  How many guardianships do you recall

1  Attorney Kelly assisting you in filing?

2      A.  I don't know.

3      Q.  Would Attorney Kelly's relationship --

4  strike that question.

5          So it's your understanding that Walter

6  Kelly was involved with Sunbridge in filing

7  guardianship petitions on behalf of patients?

8      MS. CARLUCCI:  Objection.

9      A.  He was one of the attorneys.

10     Q.  Do you happen to know who the other

11 attorneys were?

12     A.  I don't.

13     Q.  As to your understanding, would

14 Sunbridge contact Attorney Kelly for the

15 assistance in filing these guardianship

16 petitions?

17     MS. CARLUCCI:  Objection.

18     A.  Yes.

19     Q.  And to your recollection, this

20 happened on more than one occasion?

21     A.  Yes.

22     Q.  And is it your understanding that this

23 was done at Sunbridge's request, or was this

24 done for patients of Sunbridge who were

1    Mr. Kelly's clients?

2        A.  This was done at Sunbridge's request

3    for a patient who had an antipsychotic and

4    couldn't make the decision to take those

5    antipsychotics.

6        Q.  So when that decision was made, would

7    you then contact Attorney Kelly for assistance

8    in preparing the guardianship petition and the

9    legal paperwork necessary to establish the

10   guardianship?

11       A.  Yes.

12       Q.  If you can recall, on how many

13   occasions did Attorney Kelly provide these

14   services to Sunbridge with regard to

15   establishing guardianship?

16           MS. CARLUCCI:  Objection.

17       A.  I don't know.  I mean, we worked with

18   a couple of different attorneys, and we had a

19   unique situation.  We had a behavioral

20   population on one of our units, so most of those

21   patients had guardians.

22       Q.  If you can, your best estimation as to

23   how many attorneys you would use, how many

24   different attorneys you would use to provide

1   legal services for you in this regard?

2       A.  I think there were two or three.

3       Q.  Was this relationship with

4   Attorney Kelly, if you can remember, was that

5   used during your entire tenure at Sunbridge from

6   the time you came in 2000 until when you left,

7   or was that something that started sometime

8   during your tenure at Sunbridge?

9           MS. CARLUCCI:  Objection.

10      A.  I don't know.

11      Q.  With regard to these services that

12  Attorney Kelly would provide, do you know if the

13  facility would bill Mr. Kelly for the services,

14  the legal services, or would Mr. Kelly bill the

15  facility for the legal services that he would

16  provide?

17          MS. CARLUCCI:  Objection.

18      Q.  Or would he bill the individual

19  patients?

20          MS. CARLUCCI:  Objection.

21      A.  I don't know.

22      Q.  Who was, to your understanding, who

23  would have been responsible at Sunbridge for

24  contacting one of the attorneys to establish the

33

1    facility, there was no prohibition for a patient

2    on 3-East leaving the facility as long as the

3    physician approved it?

4         A.   Correct.

5         Q.   Was Mrs. Runge assigned a primary

6    caregiver while she was at the facility, if you

7    understand the term "primary caregiver"?

8         A.   A nurse or a CNA or a physician?

9         Q.   Who were the individuals who would

10   have provided care to Helen while she was a

11   patient at the facility?

12        A.   There would have been the nurse on the

13   floor and whoever the CNAs were.  They had

14   assignments every day.

15        Q.   And as far as a medical doctor, would

16   she be assigned a specific medical doctor or

17   would it depend on the staff doctor?

18        A.   She would have been assigned a

19   physician upon admission to the facility.

20        Q.   Now, out of the individuals who were

21   assigned to provide Helen care and/or treatment,

22   were any of them sort of given the role as her

23   primary caregiver?

24        A.   We had the same nurses working the

34

1    floor regularly, and we had the same CNAs

2    working the floor regularly.  Their assignments

3    changed, you know, from week to week on who they

4    had on their assignments.

5         Q.  Do you recall the names of the RNs or

6    the CNAs who would have been assigned to Helen

7    on the day shift during this time period?

8         A.  I remember who the unit manager was on

9    the floor at that time.

10        Q.  Who was that?

11        A.  Cathleen Couch.

12        Q.  And at that time, do you know how many

13   RNs you had on staff at that time at the

14   facility?

15        A.  I don't know specifically how many

16   were RNs.  There were LPNs.

17        Q.  Do you know how many total LPNs and

18   RNs there were underneath you as the director of

19   nurses?

20        A.  Probably 40 licensed nurses.

21        Q.  How many shifts were there for the

22   nursing staff?

23        A.  Three.

24        Q.  And out of the 40 licensed nurses, how

1    when the daughter and son-in-law showed up

2    wanting to take her.  I know I called him to ask

3    about allowing this because he was going to be

4    the guardian for her.

5         Q.   Okay.  Had you contacted

6    Attorney Kelly with regard to Helen Runge at any

7    point prior to that, to the best of your

8    knowledge?

9         A.   I don't remember.

10        Q.   What is your understanding of why

11   Attorney Kelly was going to be the petitioner

12   for a guardianship for Mrs. Runge?

13        A.   She was confused.  She wasn't able to

14   make decisions.  She was on an antipsychotic

15   medication, and she wasn't able to give that

16   consent for that medication.

17        Q.   Did you interact with anyone else on

18   behalf of Helen Runge or with regard to Helen

19   Runge, that you can recall?

20        A.   Yes.

21        Q.   Could you please tell me who you

22   interacted with and your best recollection of

23   those interactions?

24        A.   I spoke with the attorney for

40

1    Sunbridge at the time down in New Mexico.

2        Q.   Do you remember his name?

3        A.   It was Gloria Gelnick.

4        Q.   G E L N I C K?

5        A.   Yes.

6        Q.   Do you remember speaking with anyone

7    else with regard to Helen Runge?

8        A.   I'm sure I spoke with her doctor.

9        Q.   But other than staff members at

10   Sunbridge, do you recollect speaking with any

11   third parties or otherwise with regard to Helen

12   Runge during her stay or after?

13       A.   No.

14           MR. CONTE:   I'd like to take a short

15   break.   If you guys need a water, maybe like

16   five or ten minutes.

17           (Recess taken)

18   BY MR. CONTE:

19       Q.   Just a couple of things.   I wanted to

20   go back for a second.   I know you had stayed at

21   Sunbridge through 2004.   Where are you currently

22   employed?

23       A.   I work for Kindred Healthcare.

24       Q.   And you also said you do real estate

41

1    sales part time?

2         A.  For my husband's company.

3         Q.  So is your position with Kindred

4    Healthcare full time or part-time?

5         A.  Full-time.

6         Q.  I know you had testified earlier with

7    regard to Mr. Kelly and the services he provided

8    to Sunbridge.  About how many patients did you

9    have at Sunbridge?

10        A.  It's a 168-bed facility.  Our census

11   ran probably around 160 at any given time.

12        Q.  And on average, how many guardianships

13   would you have to initiate on behalf of the

14   patients at the facility?

15        A.  To actually initiate, there was

16   probably, you know, like, one a month that we

17   would have to initiate.  We had a lot of people

18   with guardianships in the facility.

19        Q.  You said you used Attorney Kelly and

20   another attorney to initiate those?

21        A.  Mm-hmm.

22        Q.  Do you remember who the other

23   attorney's name was?

24        A.  I don't.

73

1        Q.  Okay.

2        A.  A description of the vehicle,

3  probably.

4        Q.  Do you know if anyone else from

5  Sunbridge participated in the subsequent

6  investigation?

7        A.  I don't.

8        Q.  Do you know if anyone gave any

9  statements to either the police or the

10  Department of Public Health?

11        A.  I know Al Wilkins did, and I don't

12  remember if the Department of Public Health came

13  out to investigate.  They would have talked to

14  everybody.  But without looking in the file, I

15  don't know if they came out to investigate.

16        Q.  Okay.  Do you know if the facility did

17  any subsequent investigation with regard to

18  Mrs. Runge after she was taken out of the

19  facility on April 30?

20        A.  I don't know what you mean by

21  "investigation."

22        Q.  Did you investigate Mrs. Runge's

23  whereabouts after she left the facility?

24        A.  I spoke with Attorney Kelly to try to

83

1        A.  It would make sense.

2        Q.  Why do you say "it would make sense"?

3        A.  We used to get a lot of admissions

4  from Carney Hospital.

5        Q.  Did you have any knowledge of either

6  Gilbert or Dorothy Stanley ever contacting Helen

7  Runge or anyone at Sunbridge prior to their

8  arrival the day before they removed her from the

9  facility?

10       A.  No.

11       Q.  Were you present at Sunbridge when

12  Gilbert and Dorothy Stanley first arrived?

13       A.  I don't remember.

14       Q.  Do visitors have to check in anywhere?

15       A.  At the reception desk there's a

16  sign-in for visitors.

17       Q.  Do you know one way or another whether

18  they spoke to anyone at the facility before

19  visiting with Helen Runge other than to just

20  check in?

21       A.  To the best of my knowledge, they

22  hadn't spoken to anybody.  They just arrived one

23  day and said who they were.

24       Q.  Do you know what they did that day

1    BY MS. OH:

2         Q.   Just backing up, again my name is

3    Heidi Oh, and I represent Dr. Bloomingdale in

4    this matter.  You were just asked a series of

5    questions about some of the threats and

6    activities of Mr. and Mrs. Stanley following

7    their arrival on April 29.

8              Did you communicate with

9    Dr. Bloomingdale about any of those interactions

10   with the Stanleys?

11        A.   No.

12        Q.   I think you testified that

13   Dr. Bloomingdale was at the facility fairly

14   frequently; is that right?

15        A.   Yes.

16        Q.   And that was in relation to all of the

17   patients at the facility, not Mrs. Runge?

18        A.   Correct.

19        Q.   And if Dr. Bloomingdale had seen

20   Mrs. Runge on an occasion prior to April 29,

21   would that surprise you?  Let me ask you this.

22   Do you recall Dr. Bloomingdale seeing Mrs. Runge

23   before April 29?

24        A.   I don't recall, but I didn't typically

93

1    draft resident assessment protocols?

2          A.  We had assessments that we did on

3    every patient upon admission.

4          Q.  And would they --

5          A.  They were standard assessments.

6          Q.  Would these be separate documents or

7    would they be included in the patient's files?

8    How would they be maintained?

9          A.  In the patient record.

10         Q.  The employees and the various nurses

11   that you had under your care as director of

12   nursing, do you know if Sunbridge kept employee

13   lists for the days, for each individual day who

14   would have been working, et cetera?

15         A.  We had daily schedules of who was

16   working on what unit and what times.

17         Q.  Would these be written schedules that

18   would be available to the various staff members?

19         A.  It was handwritten, and it was posted

20   on the units every day.

21         Q.  I believe you had testified earlier

22   that your office was right inside the entrance

23   to the facility?

24         A.  Yes.

94

1      Q.  And that was one of the reasons why

2  the Stanleys had stopped in there.  Did

3  Sunbridge keep a floor plan of the layout of the

4  facility?

5      A.  Yes.

6      Q.  That would show the relationship

7  between your office and the entrance and where

8  the patients' rooms were?

9      A.  In the front lobby -- I mean, it's a

10  state-mandated posting -- it shows a layout of

11  the building so that if there's a fire, where

12  people go to exit.

13      Q.  Do you know if Sunbridge owned the

14  building that the facility was housed in?

15      A.  No.  They didn't own it.

16      Q.  Do you know whether they leased the

17  space, or do you have an understanding of the

18  relationship between Sunbridge and the owners of

19  the building?

20      A.  It was a leased space.

21      Q.  I believe you had testified earlier

22  that your average daily census was around 160

23  patients or so?

24      A.  Yes.

95

1       Q.  Did you keep written daily census logs

2  for each day that would show how many patients

3  and which beds were filled?

4       A.  Yes.

5       Q.  During Ms. Carlucci's testimony, you

6  described a sign-in sheet for visitors?

7       MS. CARLUCCI:  Objection.  My

8  testimony?

9       Q.  During Ms. Carlucci's questioning I

10  believe she asked you about the Stanleys

11  arrival, and you had said there was a sign-in

12  sheet for visitors?

13       A.  Visitors' logbook kept at the front

14  reception window.

15       Q.  Who maintained the logbook?

16       A.  The receptionist.

17       Q.  And it was maintained at the reception

18  station?

19       A.  Yes.

20       Q.  Do you know if the logbooks were kept

21  after they were filled?

22       A.  I don't know that.

23       Q.  Did you have employee sign-in sheets,

24  or I believe you said you had handwritten weekly

96

1    work schedules for all the employees.  Did that

2    include management employees as well or was it

3    just for the general staff?

4           A.  There was a master schedule as far as

5    the nursing department went, and it included

6    nursing management.

7           Q.  For the visitor sign-in sheet, would

8    everyone who came into the facility have to sign

9    in even if the facility knew who they were, if

10   they weren't associated with the facility?

11          A.  They were supposed to.  Not everybody

12   did.  I mean, if there was no receptionist at

13   the window for whatever reason, people would

14   walk in.

15          MR. CONTE:  I have no further

16   questions.  Thank you very much.

17          THE WITNESS:  Thank you.

18          MR. WILLIAMS:  We'd like 30 days to

19   read and sign to give her a chance to read and

20   correct it and I assume waiving notary.

21          MR. CONTE:  Yes.  We'll waive the

22   notary.

23        (The deposition was concluded at 12:56 p.m.)

24

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN ***
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MENESIS++
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
 K. SCOTT GRIGGS

MICHAEL McDEVITT
STEVEN M. BUCKLEY
SONIA K. GUTERMAN, Ph.D.
J. MARK DICKISON **
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE +++
RICHARD J. SULLIVAN, JR.
JOSEPH M. KERWIN
CAROLINE A. O'CONNELL *
MICHAEL WILLIAMS
KATHRYN E. PEICZARKA
DEAN J. HUTISON
SCOTT T. BUCKLEY
KRISTINA A. E. ENGBERG
C. KIMBERLY BAKEBERG
JAMES M. HENRY
ADAM M. SCHOEN

BOSTON

TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD

LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS. 02631
TELEPHONE  (508) 255-3600

MARLBOROUGH

LAWSON, WEITZEN & HAILER, LLP
171 LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS. 01752
TELEPHONE  (508) 618-1025

April 12, 2007

**VIA ELECTRONIC MAIL and FACSIMILE  (717) 620-2444**
Glenn R. Davis, Esq.
Andrea Dean, Esq.
Latsha Davis Yohe and McKenna, P.C.
1700 Bent Creek Blvd., Suite 140
Mechanicsburg, PA 17050

Re:    *Runge v. Kelley, et al.*, 05-cv-10849-RGS

Dear Attorneys Davis and Dean:

This letter concerns our continuing in our efforts to obtain documents relevant to this matter. The facility's current operators have not provided us with any additional documents beyond those we have already disclosed. Given the fact that we have not been able to obtain a complete record from the facility's current operators, we have made efforts to find alternative sources. With regard to the job descriptions and policy and procedure manuals, we have managed to locate documents that **are not the documents from the facility**, but that should be similar to or the same as the job descriptions and manuals in effect at the facility during Helen Runge's stay. The versions of the job descriptions and manuals we have obtained are the "master version" or template that was prepared by the parent corporation. The job descriptions used by the facility would have been based on these documents.

I want to be absolutely clear on this issue. **We do not make any representations about these documents being accurate reflections of the manuals and job descriptions that were "for the facility in effect during [Runge's] residency."** The only representation we make is that the facility would have had job descriptions and manuals that were similar to or identical to these documents. But, since we have not had access to the facility files, we do not know if the

* ALSO ADMITTED IN NY
** ALSO ADMITTED IN NH
*** ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY

# LAWSON & WEITZEN, LLP

**Glenn R. Davis**
**April 12, 2007**
**Page 2**


actual job descriptions and manuals at the facility during Runge's stay were different versions or altered from these templates provided by the parent corporation.

These documents are in the process of being bates numbered and will be produced once that process is complete.

I intend to call your office at 3:30 P.M. to discuss your latest request for a 37.1 conference. If you have any concerns about the limitations on our representation about the authentication of these documents, we should discuss those concerns at that time as well.

Very truly yours,

Michael Williams

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HELEN A. RUNGE,                          :
         Plaintiff              :
                              :     No. 05-10849-RGS
        v.                       :     (Judge Stearns)
                              :
WALTER J. KELLY, et al.                  :     CIVIL ACTION
         Defendants             :     JURY TRIAL DEMANDED

## ORDER

      AND NOW, this _____ day of _____, 2007,

upon consideration of Plaintiff's Second Motion to Compel Discovery Responses From

Defendant Sunbridge Nursing and Rehabilitation Center, it is hereby ORDERED and

DECREED that said Motion is GRANTED.

                         BY THE COURT:


                         _____
                         Richard C. Stearns, J.

114929