# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

     *Plaintiff,*

*v.*

WALTER J. KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

     *Defendants.*

Civil Action No. 05-10849-RGS

---

## OPPOSITION of DEFENDANT SUNBRIDGE to
## PLAINTIFF'S THIRD REQUEST TO DELAY HER EXPERT DISCLOSURES and to
## PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY RESPONSES

---

## INTRODUCTION

The Plaintiff has filed a motion seeking to delay expert disclosures, the third such motion filed by the Plaintiff, and a motion to compel additional discovery from Defendant SunBridge. Both of these motions are based on identical arguments. In order to avoid providing the Court with two duplicative opposition, SunBridge opposes both motions through this one memorandum in opposition.

The Plaintiff asks this court to once again delay the filing of her expert disclosures required by Rule 26(a)(2). The Plaintiff bases her motion on the representation to the Court that she has been unable to produce her expert disclosures because she has not been provided with certain documents by Defendant SunBridge, a skilled nursing facility at which Helen Runge was a resident. The Plaintiff had previously filed a motion with this Court seeking an order compelling Defendant SunBridge to produce the documents at issue. This Court denied that

motion.  *See March 20, 2007 Order*.  The Plaintiff seeks this third delay based on the identical grounds as her failed earlier motion to compel.  The Plaintiff also renews her earlier motion to compel.  In support of her reasserting grounds already denied by this Court, the Plaintiff claims that counsel for SunBridge has engaged in misconduct.  These allegations of misconduct revolve around the claim that SunBridge "purposefully withheld or negligently failed to produce the documents" sought by the Plaintiff.

The sole basis for this allegation of misconduct is the deposition testimony of former SunBridge Director of Nurses, Sandra Porazzo Perry.  But this deposition does not indicate that SunBridge has withheld documents.  Ms. Porazzo Perry stated that the facility (which is not longer owned by SunBridge) would have maintained some documents of the type sought by the Plaintiff.  This is consistent with the position SunBridge has taken throughout the discovery process in this case.  Throughout this litigation, Defendant SunBridge has informed the Plaintiff and the Court that the facility in question is no longer owned or operated by SunBridge. SunBridge has provided the Plaintiff with the identity of the new operator of the facility and has informed the Plaintiff that the facility had not provided SunBridge with all of the records sought. Despite having this information, the Plaintiff chose not to take the simple step of subpoenaing the documents from this third party.  Instead, the Plaintiff has repeatedly used the lack of these documents as an excuse to delay her expert disclosures, without ever explaining the relevance of the documents to her tenuous claims.

The Plaintiff now seeks a third postponement of her obligation to disclose experts related to her claims against Defendants SunBridge and Dr. Bloomingdale.  The Plaintiff should not benefit from her own inaction.  The Plaintiff could have subpoenaed these documents at any

time, but has chosen to preserve her excuse for avoiding the expense of retaining expert witnesses rather than diligently pursuing her claims.

## FACTS

This matter was originally brought as a §1983 action alleging First Amendment and Equal Protection violations by a privately owned nursing home, an attorney and a psychiatrist. This Court dismissed the civil rights claims and the Plaintiff amended her complain and proceeded under a wide variety of state law claims including, among others: false imprisonment, assault and battery, medical malpractice and breach of fiduciary duty.

The case concerns Helen Runge, who became a resident of Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph (SunBridge) after being discharged from the psychiatric ward at Carney Hospital. Records reveal a long history of psychological illness and repeated hospitalization for psychiatric care for Ms. Runge, both before and after her brief stay at SunBridge. Deposition testimony and written discovery has revealed that Runge had been sent to Carney Hospital after a series of delusional outburst at the nursing home at which she resided. Because that nursing home refused to allow Runge to return following her discharge from the acute care hospital, she and her health care proxy, with the assistance of hospital staff, had to find a skilled nursing facility that could provide continued care to Runge.

From January 22, 2003 through April 30, 2003, Runge resided at a facility operated at the time by SunBridge. Because Runge was becoming increasingly paranoid and was sometimes refusing to take her antipsychotic medications, various individuals involved in her care began the process of seeking a court appointed guardianship to make decisions regarding her antipsychotic medication.

When Runge's daughter and son-in-law became aware of this development, they drove from North Carolina to Massachusetts and removed Runge from the facility without authority to do so, without the knowledge or approval of her treating physician and without following discharge procedures. In the process they made threats to facility staff, shoved facility staff out of the way, and removed this then 88 year old woman by "literally throwing her into the car and put it in drive, and almost ran [a facility staff member] over with their vehicle." **Exhibit A** – *Depo of Sandra Porazzo Perry*, 68:7-68:23. Following this removal of Runge from the facility and from the Commonwealth, the Probate Court granted the temporary guardianship over Runge, finding her to be incompetent. **Exhibit B** – Temporary Decree of Guardianship.

The Plaintiff has brought this action against SunBridge, Dr. Bloomingdale, the psychiatrist who examined Runge for purposes of the guardianship petition, and Walter Kelly, the attorney who had acted as Runge's health care proxy and power of attorney for a number of years prior to, and during, her admission to SunBridge and who was later appointed by the Probate Court as Runge's temporary guardian.

Essentially, the Plaintiff's claims are that these three defendants [1] conspired to hold Ms. Runge in a skilled nursing facility against her will and when no such facility was needed (ignoring the fact that prior to her admission to SunBridge she was sent to an acute care psychiatric hospital and that the two previous nursing homes at which she had resided refused to readmit her because of her delusional state); and [2] conspired to prescribe and administer antipsychotic medication to her when no such medication was needed (ignoring the fact that antipsychotic medication was prescribed to Runge both prior to and after her stay at SunBridge by other healthcare providers).

## ARGUMENT

**I.    The Plaintiff does not present a good faith basis for her motion.**

Once again the Plaintiff has waited until the day her expert disclosures were due before filing a motion to enlarge the time period for those disclosures.  In her motion, the Plaintiff repeatedly alleges misconduct by counsel for SunBridge.[1]  These allegations are based on the refusal of Plaintiff's counsel to distinguish between SunBridge and the third party that now operates the facility at which Helen Runge had been a resident.  Defendant SunBridge has not "purposefully withheld or negligently failed to produce the documents" sought by the Plaintiff.  SunBridge does not have these documents.

It has never been the position of SunBridge that the sought after document do not exist.  All SunBridge has asserted is that the documents are no longer in its custody or control.  As started in the opening paragraph of SunBridge's opposition to Plaintiff's first motion to compel:

> The Plaintiff seeks production of records from a facility that is no longer owned by the Defendant Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph (SunBridge) . . . These records produced by SunBridge represent considerable effort to comply with discovery and represent all responsive documents SunBridge has been able to obtain from the new facility operator, with the exception of those documents listed in SunBridge's privilege log attached to Plaintiff's motion to Compel as Exhibit D (see Docket Entry # 88)").

*Docket Entry #94*, p. 1.

---

[1] Plaintiff's counsel even goes so far as to suggest something nefarious in the fact that counsel for SunBridge did not return his phone calls during the same afternoon in which they were made, but did respond to his e-mail.  If the Court examines the e-mail in question, it will observe that the signature line on the e-mail from SunBridge counsel included the line "Sent using BlackBerry."  *See* **Exhibit B to Docket Entry # 98** – Plaintiff's 3rd Motion to Delay Expert Disclosures, page 5 of 5.  The real problem here is that the Plaintiff once again waited until the afternoon on the day her expert disclosures were due before seeking an additional extension of the time for making those disclosures.  Also included in Exhibit B to Plaintiff's motion is an April 5, 2007 letter that also contains allegations of misrepresentations by counsel for SunBridge.  Exhibit B does not include the facsimiles from counsel for SunBridge that are referenced in the April 5 letter.  Those facsimiles are attached to the opposition as **Exhibit C** and **D** for the Court's reference.

The Plaintiff bases her allegation of misconduct on the deposition of Sandra Porazzo Perry. Ms. Porazzo Perry did testify that some of the sought after documents are of the type typically maintained by the facility. The key part of this testimony being that the records are maintained at the facility, which SunBridge no longer owns. The fact that the Plaintiff has never bothered to request these documents from the third party that posses them is not grounds for the Plaintiff to avoid expert disclosures.

### A.      SunBridge has fully responded to Plaintiff's document requests.

Despite the fact that these documents are no longer in its custody or control, SunBridge has gone to considerable efforts to secure 609 pages of documents from the new operators (a considerable number pages given Helen Runge's brief three month stay).     SunBridge has obtained and produced the medical records, admissions documents and financial records related to Runge. With the exceptions of those documents identified on SunBridge's privilege log, all of the documents obtained by SunBridge from the new facility operators have been provided to the Plaintiff. The Plaintiff does not allege otherwise. Instead, her complaint is that SunBridge has not turned over documents that SunBridge *has not* received from the new operators of the facility.

### B.      Specific documents at issue.

The Plaintiff complains that "Ms. Perry also testified to the existence of a statement made by Al Wilkins regarding an investigation related to Runge . . . but Defendant Sunbridge has never produced this statement." The actual testimony of Ms. Porazzo Perry was:

> Q. Do you know if anyone gave any statements to either the police or the Department of Public Health?

> A. I know Al Wilkins did, and I don't remember if the Department of Public Health came out to investigate.  They would have **talked** to everybody.  But without looking in the file, I don't know if they came out to investigate.

**Exhibit A**, 73:8-73:15 (emphasis added). This testimony appears to refer to oral statements made to a DPH investigator. This oral statement was memorialized by the DPH investigator in its Investigative Report. That report *was* produced by SunBridge. *See* **Exhibit E**, p. 00006-00016.[2] In addition to these oral statement, Wilkins and Porazzo Perry and other SunBridge staff prepared written statements as part of SunBridge's internal review of this incident. As indicated in SunBridge's privilege log documents "PRIV02538-39: 4/30/03 Statement of Al Wilkins", "PRIV02540: Statement of Sandy Parazzo" and "PRIV02541: 5/1/03 Statement of Sandy Parazzo" were withheld as "Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205" and under "Attorney-client privilege and work product doctrine." **Exhibit G**.

The Plaintiff further complains "Ms. Perry testified that Defendant Sunbridge had contact with at least one person with Sunbridge in New Mexico regarding Runge . . . yet Defendant Sunbridge has produced no evidence of any such contact." The testimony of Ms. Porazzo Perry was that she "spoke with the attorney for Sunbridge at the time down in New Mexico." **Exhibit A**, 39:24-40-1. The last entry in SunBridge's privilege log, provided to the Plaintiff in November of 2006 discloses that SunBridge has withheld as privileged a document identified as "PRIV02542-45: Communications with law department." **Exhibit G**.

The Plaintiff claims that SunBridge has withheld documents evidencing a prior business relationship with Defendant Walter Kelly. "Ms. Perry testified that Defendant Kelly and

---

[2] The documents bates numbered at 00001 through 00016 consist of the report filed by SunBridge with the Massachusetts Department of Health reporting the incident to the DPH and the DPH's findings concerning the allegations made to it by the Plaintiff, including (1) that Runge was admitted to SunBridge against her will, (2) that Runge was forced to take medication against her will, (4) that Runge was not provided with money, clothing, identification or access to a telephone and (5) that SunBridge wrongly refused to release Runge's medical records (these claims duplicate the allegations made in this matter). Following an investigation by the DPH, these allegations were found invalid  *See* **Exhibit E**.

Defendant Sunbridge has a relationship that Defendant Sunbridge would contact Defendant Kelly and one other attorney to prepare guardianship petitions . . . Sunbridge has produced no documents evidencing any such business relationship." In support of the accusation, the Plaintiff references two passages of Ms. Porazzo Perry's deposition, but does not include this latter passage:

> Q.  You've been shown what's been marked as Exhibits 1 through 5.  After reviewing those documents, does that refresh your recollection of what Walter Kelly's relationship with Sunbridge was?
>
> A.  Just that he was Helen Runge's power of attorney, healthcare proxy.
>
> Q.  Prior to the petition for guardianship?
>
> A.  Yes.
>
> Q.  And does that refresh your recollection specifically with regard to your earlier statements that Walter Kelly may have had some relationship with Sunbridge where Sunbridge would contact him to seek Rogers petitions for residents other than Helen Runge?
>
> MR. CONTE:  Objection.
>
> A.  I don't know if he had or not.  I mean, they [attorneys] become a blur after a while.

**Exhibit A**, 81:6-81:24.  Both Defendants SunBridge and Kelly have independently stated in their discovery response that they are unaware of any documents evidencing such a relationship.  In his deposition Attorney Kelly testified that no such relationship existed.

> Q.  Had you had prior interaction or prior experience with Sunbridge at Randolph?
>
> A.  Not at Randolph, no.
>
> Q.  Had you had prior experience or dealings with other Sunbridge facilities?
>
> A.  Yes.
>
> Q.  And where were they located?
>
> A.  Weymouth.
>
> Q.  And what was your experience with that Sunbridge facility?
>
> A.  At that time, Ann Ruth Drohan was a patient there.

Q.  Other than Ms. Drohan, did you have experience with any other Sunbridge facility?

A.  No.

**Exhibit H** – Deposition of Walter Kelly, Volume I, 65:10-66:4.  The Plaintiff takes passages from Ms. Porazzo Perry's deposition where is was clearly confused as to whom she was being asked about and attempts to use them to support claims of misconduct by counsel for SunBridge. Much like the Plaintiffs claims in this case, there is simply no support for these allegations.

The Plaintiff's argument concerning the lack of "documentation indicating that Runge's healthcare proxy has been activated" is simply to confused to fully address.  Helen Runge did execute documents, which designated Attorney Kelly as her healthcare proxy and power of attorney.  These documents have been produced by a number of parties, including SunBridge. The record does not include any instances in which Attorney Kelly, as Runge's healthcare proxy and power of attorney, ever overrode or contradicted to wishes of Helen Runge.  While Attorney Kelly did sign certain healthcare documents on behalf of Helen Runge, there is no evidence that Runge did not consent to the various medications at issue or to attorney Kelly signing on her behalf.  It is simply unclear what documents the Plaintiff believes are being withheld.  She has already been provided with the full medical record from the facility.  Included with those records are daily nurses notes, records of Runge's seasons with visiting psychiatrists, and notes from her social worker.

The Plaintiff argues that SunBridge failed to produce appointment lists for Dr. Bloomingdale.  There is no testimony that SunBridge has those records.  There is not even testimony that any such list was retained from week to week.  The testimony was simply that the facility would generate a list in some form that would be provided to Dr. Bloomingdale so that he would know who he was to see that day.

The Plaintiff also fails to state any relevance of this document to the ability of her expert to opine on any of her claims against SunBridge or Dr. Bloomingdale. The Plaintiff has been provided with the medical records from SunBridge and from Dr. Bloomingdale. She has copies of the notes made by Dr. Bloomingdale during his visits with Runge at SunBridge. *See e.g.* **Exhibit I** – example of the Diagnostic/Treatment Evaluations that were produced to the Plaintiff by SunBridge. These forms not only indicate the dates of such visits, but also list the reason for the visit and the diagnose reached.

The Plaintiff has offered nothing to establish that SunBridge, as opposed to the current operator of the facility, would have these appointment lists, or even if these lists were something that were retained at all. The Plaintiff also fails to explain why expert disclosures should be delayed as a result of the absence of this document or why her expert would need the appointment list, that, from the testimony of Ms. Porazzo Perry may have been anything from a slip of paper to some form of notebook. **Exhibit A**, 23:17-23:20 ("Social services would usually just have a list. I don't know if they kept it in a book or just on a piece of paper for that week of who needed to be seen.").

The Plaintiff also complains about certain employee information. Once again, the Plaintiff's motion fails to distinguish between SunBridge and Cedar Hill Healthcare Center – the facilities current operator. It is true that Ms. Porazzo Perry testified that the facility's human resources department would maintain employee files, work schedules and other information. **Exhibit A –** *Depo of Porazzo Perry*, 11:4-11:12 ("Q. The employees that were at Sunbridge, did each employee have an individual employment file that was maintained by the facility? A. Yes. Q. And does that employment file -- who maintained those employment files? A. Human resources in the building. Q. And they were kept at the building? A. Yes."). But the testimony

was that these records are maintained at the facility, which SunBridge no longer owns.  The fact

that the Plaintiff has never bothered to request these documents from the third party that posses

them is not grounds for the Plaintiff to avoid expert disclosures.  Once again the Plaintiff fails to

explain the relevance of these employee files to her claims of malpractice, false imprisonment or

forced medication.

"Ms. Perry testified that Defendant Sunbridge kept a floor plan of the facility . . . Yet

Sunbridge never produced this document."  The testimony was that the facility maintained a

floor plan mounted on its wall.

> Q.  And that was one of the reasons why the Stanleys had stopped in there.  Did
> Sunbridge keep a floor plan of the layout of the facility?
>
> A.  Yes.
>
> Q.  That would show the relationship between your office and the entrance and
> where the patients' rooms were?
>
> A.  In the front lobby -- I mean, it's a state-mandated posting -- it shows a layout
> of the building so that if there's a fire, where people go to exit.

**Exhibit A**, 94:1-94:12.  Presumably this floor plan remains on the wall of the facility.

"Plaintiff requested the Policy and Procedure manuals in effect for Defendant Sunbridge

during Runge's residency."  Despite repeated requests by SunBridge, the facility's new

operators have not provided SunBridge with copies of these documents.  Because

SunBridge has been unable to obtain the "Policy and Procedures Manuals in effect for the

facility during the residency" or the "written job descriptions for the Medical Director,

Administrator, Director of Nursing and Director of Social Services of the facility in effect

during the residency", it has sought an alternative source for these documents.  SunBridge

has search the archives of its parent corporation for the template used in creating the

documents at issue for the facility.  While SunBridge cannot represent that these documents

are full and accurate duplicates of the manuals and job descriptions "of the facility in effect during the residency." It is possible that the manuals and job descriptions at the facility at the relevant time are different than the ones produced by SunBridge on April 12, 2007, but in an effort to be as open as possible in responding to discovery, SunBridge has offered to produce these documents as examples that are probably similar to or identical to the ones used by the facility at the time of Runge's residence. *See* **Exhibit F** – April 12, 2007 letter. The Plaintiff rejected this offer stating that the documents were not responsive to her document request and demands the copies of the manuals and job descriptions from the facility that SunBridge no longer owns.

> **C.** **The Plaintiff has not been diligent in her efforts to obtain the documents at issue.**

Despite the claim by the Plaintiff that she "continues to be diligent in pursuing discovery and requesting relevant documents," her efforts to obtain these documents has been limited to repeated demands that SunBridge produce the documents. This remains the limit of Plaintiff's efforts to obtain the documents, which she claims are necessary in order for her to obtain an expert opinion, even after SunBridge has repeatedly indicated that it does have the documents.

The Plaintiff support, her motion with the astounding claim that "Counsel's April 12, 2007, letter is the first explicit disclosure to Plaintiff that SunBridge 'ha[s] not had access to the facility files.'" *Docket Entry # 100*, ¶18 of Plaintiff's Second Motion to Compel, referring to Exhibit C to that motion. SunBridge has repeatedly informed the Plaintiff that the facility is no longer owned by it and that the facility was not cooperating in producing documents. In fact, that was the entire basis of SunBridge's opposition to Plaintiff's first motion to Compel.

> The Plaintiff seeks production of records from a facility that is no longer owned by the Defendant Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph (SunBridge) . . . These records produced by

> SunBridge represent considerable effort to comply with discovery and represent all responsive documents SunBridge has been able to obtain from the new facility operator, with the exception of those documents listed in SunBridge's privilege log attached to Plaintiff's motion to Compel as Exhibit D (see Docket Entry # 88).

*Docket Entry #94.*

Even earlier, SunBridge noted that it no longer owned the facility in its response to Plaintiffs first motion for leave to delay expert disclosures. *Docket Entry #73* ("the nursing home at issue in this litigation is no longer owned by Defendant Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph"). SunBridge even indicated that it no longer operated the facility in question in its answer to plaintiff's Amended Complaint. *Docket Entries #68*, ¶4 ("Admitted that Defendant Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph is a Massachusetts corporation formally trading and doing business as SunBridge Care and Rehabilitation for Randolph with a business address of 49 Thomas Patten Drive, Randolph, Massachusetts"). In one previous filing, SunBridge went so far as to provide the identify of the new operator of the facility. *Docket Entry # 95* – SunBridge's Opposition to Plaintiff's Second Request to Delay Her Expert Disclosures, p.2 n.1 (identifying the current operator of the subject facility as Cedar Hill Healthcare Center by 49 Thomas Patten Drive Operating Company, LLC). Despite being informed that the records at issue were not in the custody or control of SunBridge and even being provided with the contact information for the new operators, the Plaintiff chose to never subpoena the records at issue from Cedar Hill Healthcare Center.

Discovery has now closed, expert disclosures have already been delayed twice and the deadline for Dispositive motions has now passed. *See Docket Entry #39* ("All fact discovery (including written discovery and depositions of fact witnesses) shall be completed by 12/22/06",

"Plaintiff's expert reports shall be submitted by 1/15/07", "Dispositive motions shall be filed by 4/16/07"). The Plaintiff has not diligently sought the document at issue and this lack of diligence should not be used as an excuse to further delay the expense of retaining expert witnesses (assuming the Plaintiff could find competent experts given the frivolous nature of her claims). If the Plaintiff fails to produce qualified expert support for her professional negligence claims, summary judgment would be appropriate and could greatly narrow the issues in this case. Once the issue of Plaintiff's belated expert disclosures is resolved, Defendant SunBridge may seek leave of this Court to file for summary judgment.

Counsel for SunBridge cannot make any representations to the Court that the sought after documents were preserved by the new owners and operators of the subject facility, but the fact remains that while Defendant SunBridge has made considerable effort to obtain these documents, the Plaintiff has never made any effort to secure them after learning that they were no longer in SunBridge's custody or control.

## II.    The Plaintiff has failed to explain the relevance of these documents to the ability of her experts to render an opinion or to her claims in this matter.

The Plaintiff fails to explain why an expert could not opine on the claims against Defendants SunBridge or Dr. Bloomingdale without the documents at issue. In fact, the Plaintiff's motion does not even indicate which specific documents her experts would need in formulating an opinion. The Plaintiff has been provided with Runge's medical file, admissions packet, and business file covering her three month stay at the facility. She has also been provided with Dr. Bloomingdale's medical records related to Runge. She has the medical records from numerous other nursing homes and hospitals at which Runge received treatment both before and after her three month stay at SunBridge. Her counsel has taken or attended 10 depositions.

14

The Plaintiff does not explain why any particular document or category of documents is necessary for an expert to opine on her various theories or the Plaintiff to present her claims that SunBridge negligently failed to meet the standard of care for skilled nursing facilities (Count II), that it committed and assault and batter on Runge by medicating her against her will (Count IV), that it falsely imprisoned her (Count V), that it intentional infliction of emotional distress upon her (Count VI), that it negligent infliction of emotional distress on her (Count VII), that it breached it contract with her (Count VIII), or that it breach some unidentified fiduciary duty to her (Count XV).

## CONCLUSION

The Plaintiff has chosen not to subpoena the records of Cedar Hill Healthcare Center. Fact discovery ended in December of 2006.  The Plaintiff should not be permitted to further delay this matter.  The Plaintiff offers nothing to suggest that SunBridge has within its custody or control any documents that were not either produced or disclosed on its privilege log.   The Plaintiff has not explained the relevance of the documents at issue.  The Plaintiff does not even indicate that appropriate experts have been retained by her to review the voluminous documents that have already been produced, even though her expert disclosures were originally due by January 15, 2007.

The Plaintiff's third motion to delay expert disclosures and second motion to compel further discovery responses from SunBridge should both be denied.

Respectfully submitted,

**Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph**,

by its attorneys,

**CERTIFICATE OF SERVICE**

I hereby certify that this Document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 23, 2007.

_/s/ Michael Williams_

_/s/ Michael Williams_
K. Scott Griggs    (BBO# 555988)
Michael Williams (BBO# 634062)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987
MWilliams@Lawson-Weitzen.com

1

1          Volume:  I

2          Pages: 1-98

3      UNITED STATES DISTRICT COURT

4          EASTERN DIVISION

5   - - - - - - - - - - - - - - - - - - x

6   HELEN RUNGE,            Civil Action

7       Plaintiff,        No. 05-10849-RGS

8   WALTER J. KELLY,
    KERRY L. BLOOMINGDALE, M.D, and
9   SUNBRIDGE NURSING AND
    REHABILITATION CENTER,
10
        Defendants.
11
    - - - - - - - - - - - - - - - - - - x
12

13

14      DEPOSITION OF SANDRA M. PORAZZO-PERRY

15     Wednesday, March 28, 2007, 10:00 a.m.

16         Blake J. Godbout & Associates

17         33 Broad Street - 11th Floor

18         Boston, Massachusetts 02109

19

20   ----- Reporter:  Toni F. Beckwith, RMR -----

21

22   Toni F. Beckwith, Registered Merit Reporter
               50 Winsor Avenue
23        Watertown, Massachusetts 02472
               Tel: 617.924.2731
24             Fax: 617.924.9899

11

1    policies.  Were they kept in a book or a binder

2    of some sort or how were they maintained?

3        A.  In a binder.

4        Q.  And was this binder given to each

5    employee that worked at Sunbridge?

6        A.  No.  There was a set available on

7    every nursing unit, and then in the director's

8    office and the administrative office.

9        Q.  How often were these manuals updated,

10   if you know?

11       A.  I don't know.  As policies changed

12   based on state regulations, updates would come

13   from the corporate office.

14       Q.  For this same period of time, January

15   23 through April 30, 2003, did you have

16   admissions procedures and policies that you

17   followed for new patients?

18       A.  Yes, we did.

19       Q.  Were these also written policies and

20   procedures?

21       A.  We had an admission packet that went

22   over everything that needed to be done as far as

23   an admission, you know, consents and things that

24   had to be signed, but there wasn't a, per se,

23

1    contact them to alert them that services were

2    needed?

3         A.   I don't remember that he had a set

4    schedule.  I know he was there quite a bit

5    because of the population we had on another unit

6    in that building.

7         Q.   When Dr. Bloomingdale would arrive to

8    your building, how would he know which patients

9    to see or who he was designated to see or what

10   appointments he had for the day?

11        A.   He would meet with social service.

12        Q.   And was there any sort of written

13   patient list or appointment list that would be

14   provided to Dr. Bloomingdale when he would come

15   which would sort of set forth his schedule for

16   the day or who needed to be seen?

17        A.   Social service would usually just have

18   a list.  I don't know if they kept it in a book

19   or just on a piece of paper for that week of who

20   needed to be seen.

21        Q.   Now, if I inquired whether that book

22   might have been a spiral notebook, would that

23   refresh your recollection as to whether there

24   was a book or pad kept with regard to that?

39

1    when the daughter and son-in-law showed up

2    wanting to take her.  I know I called him to ask

3    about allowing this because he was going to be

4    the guardian for her.

5        Q.  Okay.  Had you contacted

6    Attorney Kelly with regard to Helen Runge at any

7    point prior to that, to the best of your

8    knowledge?

9        A.  I don't remember.

10       Q.  What is your understanding of why

11   Attorney Kelly was going to be the petitioner

12   for a guardianship for Mrs. Runge?

13       A.  She was confused.  She wasn't able to

14   make decisions.  She was on an antipsychotic

15   medication, and she wasn't able to give that

16   consent for that medication.

17       Q.  Did you interact with anyone else on

18   behalf of Helen Runge or with regard to Helen

19   Runge, that you can recall?

20       A.  Yes.

21       Q.  Could you please tell me who you

22   interacted with and your best recollection of

23   those interactions?

24       A.  I spoke with the attorney for

1    in a facility like this; they were taking her.

2    And one way or the other they didn't care who

3    they hurt, they were going to take her.

4         And that's when they were threatening

5    in my office.  They said, Just watch it because

6    she's going.

7         Q.  Now, on the day that Mrs. Runge was

8    removed from the facility, could you please take

9    me through the circumstances that surrounded

10   that?

11        A.  I wasn't there for the first part of

12   it.  I had stepped out of the building to go to

13   the post office.  But prior to my -- after the

14   interaction the day before, I had notified my

15   staff at this point that we -- I was concerned

16   because they said they were going to take her.

17   We had had the make of the car and the plates to

18   watch for.

19        I had stepped out of the building, and

20   I came back to the building just as they were

21   literally throwing her into the car and put it

22   in drive, and almost ran me over with their

23   vehicle.

24        Q.  Were there any other staff members

Q. Okay.

A. A description of the vehicle, probably.

Q. Do you know if anyone else from Sunbridge participated in the subsequent investigation?

A. I don't.

Q. Do you know if anyone gave any statements to either the police or the Department of Public Health?

A. I know Al Wilkins did, and I don't remember if the Department of Public Health came out to investigate. They would have talked to everybody. But without looking in the file, I don't know if they came out to investigate.

Q. Okay. Do you know if the facility did any subsequent investigation with regard to Mrs. Runge after she was taken out of the facility on April 30?

A. I don't know what you mean by "investigation."

Q. Did you investigate Mrs. Runge's whereabouts after she left the facility?

A. I spoke with Attorney Kelly to try to

81

1          MR. CONTE:  I have no further

2    questions.

3          MS. CARLUCCI:  I have some questions.

4          CROSS EXAMINATION

5    BY MS. CARLUCCI:

6       Q.  You've been shown what's been marked

7    as Exhibits 1 through 5.  After reviewing those

8    documents, does that refresh your recollection

9    of what Walter Kelly's relationship with

10   Sunbridge was?

11      A.  Just that he was Helen Runge's power

12   of attorney, healthcare proxy.

13      Q.  Prior to the petition for

14   guardianship?

15      A.  Yes.

16      Q.  And does that refresh your

17   recollection specifically with regard to your

18   earlier statements that Walter Kelly may have

19   had some relationship with Sunbridge where

20   Sunbridge would contact him to seek Rogers

21   petitions for residents other than Helen Runge?

22          MR. CONTE:  Objection.

23      A.  I don't know if he had or not.  I

24   mean, they become a blur after a while.

1        Q.  And that was one of the reasons why

2    the Stanleys had stopped in there.  Did

3    Sunbridge keep a floor plan of the layout of the

4    facility?

5        A.  Yes.

6        Q.  That would show the relationship

7    between your office and the entrance and where

8    the patients' rooms were?

9        A.  In the front lobby -- I mean, it's a

10   state-mandated posting -- it shows a layout of

11   the building so that if there's a fire, where

12   people go to exit.

13       Q.  Do you know if Sunbridge owned the

14   building that the facility was housed in?

15       A.  No.  They didn't own it.

16       Q.  Do you know whether they leased the

17   space, or do you have an understanding of the

18   relationship between Sunbridge and the owners of

19   the building?

20       A.  It was a leased space.

21       Q.  I believe you had testified earlier

22   that your average daily census was around 160

23   patients or so?

24       A.  Yes.

**Commonwealth of Massachusetts**
**The Trial Court**

*Norfolk* __ Division

**Probate and Family Court Department**

Docket No. *03 P1104 GI*

## TEMPORARY DECREE OF GUARDIANSHIP
### GUARDIAN OF PERSON — AND ESTATE

Name of ward _____ Helen Runge _____

At a Probate and Family Court held at _____ Canton _____ , on

___5/2/03___ , ____ ROBERT W. LANGLOIS, JUSTICE ____ presided.
  (date)                                     (name of justice)

All persons interested having been notified in accordance with the law — Upon an ex-parte motion — and —no objections being made — after hearing — upon representations of counsel, the ward — not — being present:

The Court finds that the situation of the ward which requires emergency attention is _____

_____

and that the petitioners are seeking to avoid the harm of _____

_____

The Court further finds that the ward:

[X]    is incapable of taking care of himself/herself by reason of mental illness.

[ ]    is mentally retarded to the degree that he/she is incapable of making informed decisions with respect to the conduct of his/her — personal —financial affairs and that failure to appoint a guardian would create an unreasonable risk to the ward's health, welfare and property, and that the appointment of a conservator pursuant to G.L.M. c. 201, § 16 would not eliminate the risk.

[ ]    is unable to make or communicate informed decisions due to physical incapacity or illness.

This temporary guardianship includes:

[X]    authorization to admit or commit the ward to a mental health or mental retardation facility, the action being in the best interest of the ward.

[ ]    the authority to consent to the following extraordinary medical procedure

_____

_____

NORFOLK COUNTY
TRUE COPY-ATTEST:

MAY 02 2003

*Bob W. White*
REGISTER

CJ-P 114 (10/93)

00063

**(BACK OF TEMPORARY GUARDIANSHIP DECREE)**

Thus, the Court determines that the welfare of the ward requires the immediate appointment of a temporary guardian and **IT IS DECREED** that:

Walter J. Kelly
(name of guardian(1))

1996 Centre  Street                    W. Roxbury, MA  02132

(street address)                         (city or town)              (state)           (zip code)

— and

(name of guardian(2))

(street address)                         (city or town)              (state)           (zip code)

be appointed the temporary guardian(s) — of the person — and — the estate — of the ward pursuant to G.L.M. c. 201, § 14. The temporary guardian(s) first giving bond — with ~~without~~ — sureties for the due performance of said trust.

**THE APPOINTMENT OF THIS TEMPORARY GUARDIAN IS LIMITED TO A PERIOD OF NINETY DAYS WHICH EXPIRES ON** August  8, 2003

Date   5/2/03

Justice of Probate and Family Court Department

**THE APPOINTMENT OF THIS TEMPORARY GUARDIAN IS EXTENDED FOR AN ADDITIONAL NINETY DAY PERIOD AND SHALL EXPIRE ON**

Date

Justice of Probate and Family Court Department

(The Court may extend for additional ninety (90) day periods the appointment, provided that the affidavit of notice is properly made and an inventory and bond of the temporary fiduciary has been filed in accordance with Probate Court Rule 29B.)

00064

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

**BOSTON**
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

**CAPE COD**
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

**MARLBOROUGH**
LAWSON, WEITZEN & HAILER, LLP
171 LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS 01752
TELEPHONE (508) 618-1025

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN * * *
VALERIE L. PAWSON
GEORGE F. HAILER, PC +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO, PC
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS + +
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS

MICHAEL J. McDEVITT
STEVEN M. BUCKLEY
SONIA K. GUTERMAN, Ph.D.
J. MARK DICKISON * *
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE + + +
RICHARD J. SULLIVAN, JR.
JOSEPH M. KERWIN
CAROLINE A. O'CONNELL *
MICHAEL WILLIAMS
KATHRYN E. PIECZARKA
DEAN J. HUTCHISON
SCOTT T. BUCKLEY
KRISTINA A. ENGBERG
C. KIMBERLY BAKEBERG
JAMES M. HENRY
ADAM M. SCHOEN
JILANE P. BUONOPANE

March 13, 2007

**VIA FACSIMILE  (717) 620-2444**
Glenn R. Davis, Esq.
Latsha Davis Yohe and McKenna, P.C.
1700 Bent Creek Blvd., Suite 140
Mechanicsburg, PA 17050

Re:    *Runge v. Kelley, et al.*, 05-cv-10849-RGS

Dear Attorney Davis:

This letter is intended to follow up on our previous discussion in January of this year. During that discussion you indicated that you had responses to our discovery requests prepared, but could not serve them because you still needed a signature for the interrogatory answers.  I understand that the passing of your client raises issues concerning obtaining an appropriate signature for the answers to interrogatories, but I do not understand the delay in responding to our document requests or the failure to provide an unsigned copy of your interrogatory answers.

Since our discussion in January you have moved to compel further discovery responses from SunBridge and have twice moved to extend the time for expert disclosures based on what you have characterized to the Court as SunBridge's inadequate discovery responses.  You have filed these three motions bemoaning SunBridge's incomplete discovery responses without ever addressing your own failure to provide **any** responses to SunBridge's discovery request to your client, served on November 21, 2006.

Please advise me of when you can provide these responses.  Alternatively, if you are not prepared to provide me with a specific and prompt date by which these responses will be provided, please consider this letter a request for a conference pursuant to Local Rule 37.1 to discuss this matter.  Please feel free to call me at (617) 439-4990 if you have any questions.

Very truly yours,

Michael Williams

* ALSO ADMITTED IN NY
* * ALSO ADMITTED IN NH
* * * ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
+ + ALSO ADMITTED IN NJ & PA
+ + + ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN * * *
VALERIE L. PAWSON
GEORGE F. HAILER, PC *
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO, PC
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS ††
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS

MICHAEL J. McDEVITT
STEVEN M. BUCKLEY
SONIA K. GUTERMAN, Ph.D.
J. MARK DICKISON * *
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE * * *
RICHARD J. SULLIVAN, JR.
JOSEPH M. KERWIN
CAROLINE A. O'CONNELL *
MICHAEL WILLIAMS
KATHRYN E. PIECZARKA
DEAN J. HUTCHISON
SCOTT T. BUCKLEY
KRISTINA A. ENGBERG
C. KIMBERLY BAKEBERG
JAMES M. HENRY
ADAM M. SCHOEN

BOSTON
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

MARLBOROUGH
LAWSON, WEITZEN & HAILER, LLP
171 LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS 01752
TELEPHONE (508) 618-1025

April 5, 2007

**VIA FIRST CLASS MAIL and FACSIMILE (717) 620-2444**

Glenn R. Davis, Esq.
Latsha Davis Yohe and McKenna, P.C.
1700 Bent Creek Blvd., Suite 140
Mechanicsburg, PA 17050

Re:    *Runge v. Kelley, et al.*, 05-cv-10849-RGS

Dear Attorney Davis:

I will not bother to respond to your groundless allegations contained in you April 5, 2007 letter that I included factual inaccuracies in my March 13, 2007 letter other than stating that I have never granted you an extension for your responses to our discovery requests. You are correct that I have repeatedly asked for those responses, and that you have repeatedly assured me that they would be produced. Although you have taken the position that you have some right to withhold responses to properly served discovery, I note that your duty to respond to discovery is not tied to your own perception of whether our responses were sufficient. Even if we provided you with no discovery responses (which is not the case here), you would still have a duty to provide timely discovery responses.

I also wish to clarify your categorization of my client as "recalcitrant." My client has not been recalcitrant at all in this matter. In fact, my client has gone beyond what it is obligated to do under the rules of discovery in order to obtain documents responsive to your discovery requests. As I have repeatedly indicated, the facility at issue in this case is no longer owned by my clients. It is the new owners of the facility who have been recalcitrant in providing those documents. Despite this, I and my client, have gone to considerable lengths to obtain documents from the facility's new owners.

Since you indicate you are finally producing responses to our November 21, 2006 discovery requests, I will not rehash my discussion of your failure to provide timely discovery. Once I have

* ALSO ADMITTED IN NY
* * ALSO ADMITTED IN NH
* * * ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY

LAWSON & WEITZEN, LLP

**Glenn R. Davis**
**April 5, 2007**
**Page 2**

had an opportunity to review those responses, I will follow up with you regarding their completeness. I do note that by operation of Rule 36(a) you have already admitted the one request for admission we served and that by operation of Rule 33(b)(4), you have waived all objections to our interrogatories. I hope that your responses were prepared with this in mind.

With regard to your claim that my client has been non-responsive to discovery and your request for a 37.1 conference. I assume that this requests concerns the same discovery request for which you have already unsuccessfully moved to compel further response. Given that the Court has already denied your motion to compel, I cannot understand your request for a 37.1 conference. Please specify what discovery issues you wish to cover in such a conference and why a further motion to compel would not be considered frivolous.

Very truly yours,

Michael Williams

cc:  Blake J. Godbout, Esq. (617) 227-3709



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
### Division of Health Care Quality
### 10 West Street, Boston, MA 02111-1212
### 617-753-8000

MITT ROMNEY
GOVERNOR

KERRY HEALEY
LIEUTENANT GOVERNOR

RONALD PRESTON
SECRETARY

CHRISTINE C. FERGUSON
COMMISSIONER

August 8, 2003

Administrator
SUNBRIDGE CARE & REH FOR RAND
49 THOMAS PATTEN DRIVE
RANDOLPH, MA  02368

Dear Administrator:

Enclosed is a copy of the surveyor's findings following the investigation
of a complaint regarding your facility on May 21, 2003.  Complainant and/or
patient identifiable information has been deleted pursuant to Massachusetts
General Laws, Chapter 4, Section 7.

If you have any questions, please contact the Complaint Unit at (617)
753-8150.

Sincerely,

Marianne McNamara, RN
Complaint Unit

/compreg
Enclosure
Ref.#:  03-0593
cc:  Regional Manager

*Sandy*
*Do we do a*
*respons to water temp*
*and environment issue*

0 0 0 0 1

## LONG TERM CARE FAX REPORT FORM

TO:    INTAKE STAFF
       DEPARTMENT OF PUBLIC HEALTH, DIVISION OF HEALTH CARE QUALITY
       **FAX NUMBER  (617) 753-8165**

FROM:  Facility Name:       _Sunbridge For Randolph_
       Address (Street):    _49 thomas Patten Drive_
       Address (City/Town): _Randolph  Ma  02330_

DATE OF REPORT:  _4.30.03_              NUMBER OF PAGES: _____

**GENERAL INFORMATION:**
Report prepared by:   _Sandra Parazzo Perry_
Title:                _RN  DNS_
Phone Number:         (_781_) _961_ - _1160_    Ext: _15_
Date of Occurrence:   Month _4_    Date _30_   Year _03_
Time of Occurrence:   _Approx 310 pm_     am _____  pm _____

**RESIDENT INFORMATION:**
Name:                 First _Helen_    Last _Runge_
Age:                  _87_
Sex:                  Male _____   Female _X_
Admission Date:       Month _1_   Date _22_   Year _03_
Ambulatory Status (See table #1):   _I_
ADL Status (See table #2):          _SUP_
Cognitive Level (See table #3): _Conf. Alert_
Mentally Retarded/Developmentally Disabled: _____ Yes  _X_ No
 If yes, Service Coordinator or Case Manager (if known): _____

**REPORT DETAIL:**
Occurrence Type (See table #4): _Alleged  Kidnapping_
Type of Harm (See table #5): _Yet To be  Determined_
Body Part Affected:          _____  L:____  R: ____
Resident's activity at time of
 occurrence (See table #6):  _Visiting  ₹ Family_
Place of Occurrence:         _Front of Facility \_
What equipment, if any, was being
 used at time of occurrence?  _____
Any safety precautions in place? Yes _✓_   No _____
 If yes, describe what preventive measures were in place:
  _On  15 min Checks - and Supervised visit with Family_

[Form continues to page 2]

FACILITY NAME: _Sunbridge Randolph_    DATE OF OCCURRENCE: _4.30.03_

NARRATIVE: (Please address the following: What happened? What factors contributed to the occurrence? Any relevant information which establishes cause? Have there been similar incidents in the past? How were the injuries treated? [Attach additional pages as needed.] )

Police Notified, State Police Notified, Staff attempted
to Stop Abduction — Family Pushed + shoved 2 Staff then
attempted to Run over
                     Statements In the Process

Were there any unusual circumstances involved? Yes_____ No_____ If yes, please describe. [Attach additional pages as needed.]

CORRECTIVE MEASURES NARRATIVE: (Please address the following: Was there an internal investigation: Yes_____ No_____. If No - why? If yes - What are the investigation findings? What action was taken with regard to: Resident?; Staff?; Facility practice? What is the resident's current status? What corrective action taken regarding equipment involved, if applicable? [Attach additional pages as needed.] )

NOTIFICATION:
Was family notified:          Yes_____ No_____
Was MD notified:             Yes_____ No_____
Name of MD if notified: _____
Was resident brought to hospital:  Yes_____ (Hospital:_____) No_____
Were police notified:         Yes_____ No_____

STAFF PERSON IN CHARGE OF FACILITY AT TIME OF OCCURRENCE:
Name:                    Title:              Directly Involved:
                                             YES____ NO_____
_____

WITNESS INFORMATION:       (Check here if unwitnessed: _____)
Name:                    Title:.             Directly Involved:
                                             YES____ NO_____
                                             YES____ NO_____
_____

ACCUSED INFORMATION: (Check here if unknown or not applicable: _____)
                              Telephone #:
Name:                    ____(____)____-____ CNA____; RN/LPN____

If CNA, RN/LPN or other licensed individual, indicate license #:_____
FILENAME = FAX LTC 9-2002.doc

0 0 0 0 3

MAY-05-2003 11:12     McGEE & SCHIAVONI     17815994310     P.02

# McGEE & SCHIAVONI

*Attorneys at Law*

37 Friend Street

P.O. Box 311

Lynn, Massachusetts 01903

MARY C. McGEE

THOMAS F. SCHIAVONI

TEL: 781-596-1090

FAX: 781-599-4310

mslawfirm@aol.com

May 5, 2003

Patrolman Brent Jackson

Police Department

Columbus NC 28722

Dear Patrolman Jackson:          **RE:     Helen Runge**
                                                     **Missing Person**

As a result of our teleconference of May 4, 2003, I have forwarded the attached documents, including a certificate of guardianship, nursing home incident report, and affidavit filed with the Norfolk County Probate Court in Massachusetts.

Helen Runge is an 87-year-old lifelong resident of Massachusetts who in the past several years has experienced a decline in her health.  A psychiatrist, who examined Mrs. Runge as recently as April 30, found that she was experiencing symptoms of paranoia due to Alzheimer's disease. Mrs. Runge has a longtime trusted legal adviser, Attorney Walter Kelly, who has been serving as her health care and financial agent under a health care proxy and power of attorney.

Helen Runge's sole next of kin is Dorothy Stanley (5 Stirrup Downes Lane, Columbus, N.C. 28722; telephone 828-863-0598)  who has had limited contact with her mother in the past 30 years.   Dorothy Stanley recently contacted Attorney Kelly about bringing the mother to Columbus for placement in a nearby nursing facility. She arrived unannounced, had her mother sign some documents, and, without consulting Mrs. Runge's physician or care givers, removed her from the nursing home after a confrontation with staff in the parking lot. **NOTE: The attached affidavit provides background information about Helen Runge and the incident at the nursing home.**

Based on a traced telephone call, Atty. Kelly has reason to believe that Mrs. Runge is either with her daughter in North Carolina or has been admitted to a local nursing home. On Friday, May 2, 2003, he was appointed as an emergency temporary guardian by a Massachusetts Probate and Family Court. He also filed a missing persons report with the Town of Randolph Massachusetts police department. Atty. Kelly is attempting to confirm Mrs. Runge's whereabouts and arrange for a geriatric physician or social worker to speak with her to assure that she is safe and medically stable after her abrupt removal.

Your cooperation is requested in attempting to contact and visit Mrs. Runge to confirm her condition. Please share this communication with any state or local agencies who may have jurisdiction in investigating protective incidents involving the elderly.

**Please ask to interrupt me when you call my office. If I am not available, please ask to speak to my partner, Atty. Mary McGee who is familiar with the circumstances of this case.**

Thank you for your assistance.

Very truly yours,

Thomas F. Schiavoni

TFS/jmjp

cc  Atty. Walter Kelly (Guardian)
    Farrah Siedler, LICSW ( Sunbridge Nursing Care and Rehabilitation Center)

00005

```
=======================
| INVESTIGATION REPORT |
=======================
```

FACILITY: SUNBRIDGE CARE & REH FOR RAND
       49 THOMAS PATTEN DRIVE
       RANDOLPH, MA  02368

Reference #: 03-0593
Page 1

DATE RECEIVED:  05/08/2003
DATE INVESTIGATED: 05/16/2003, 05/21/2003

```
================================================================
```

A.  INVESTIGATORY STEPS:

   1.  PERSONS INTERVIEWED:

      Administrator
      Social Worker
      Unit Manager
      Power of Attorney
      Director of Plant Operations
      CNA #1
      Director of Social Services

      Director of Nurses
      Staff Development Coordinator
      Family Member #1
      Nurse #1
      Director of Behavioral Services
      CNA #2

   2.  RECORDS REVIEWED:

      Clinical Records
      Internal investigation report

      Incident Reports

   3.  PHYSICAL EVIDENCE REVIEWED:

      Physical Plant
      Observation of Patients

      Water Temperature

```
================================================================
```

B. ISSUES FOR INVESTIGATION

   1. SYNOPSIS:  There were several allegations of poor quality of care and
              violations of the Resident's rights that included:
              1. The Resident had been admitted to the Facility against
              her will, by her power of attorney.
              2. The Resident had been forced to take medication against
              her will, including anti-hypertensive medication that made
              her "pass out".
              3. The Facility was dirty, had clogged toilets, and there
              was seldom warm water for showers.
              4. The Resident had been admitted to the Facility with no
              money, no identification, no clothes and no phone.
              5. The Facility failed to release the Resident's medical
              records to the "new" power of attorney on 4/29/03.
              6. The Facility would not allow Family Member #1


00006

Facility: SUNBRIDGE CARE & REH FOR RAND          Reference #: 03-0593
                                                                        Page 2

1. SYNOPSIS (continued)

unsupervised time with the Resident, and the Facility would
not allow the Resident to go out of the Facility with
Family Member #1 on 4/30/03.
7. The Facility did not obtain any appointments for the
Resident to get an eye exam, her teeth cleaned and a hearing
appointment.
8. The food quality was poor.

Based on record review and interview, Issue #3 was found to
be valid, Issues #1,2,4,5,6 and 7 were found to be invalid,
and Issue #8 was found unable to be determined.

2. ISSUES:      1. Resident/Patient Rights Admiss/Disch/Trans
                2. Resident/Patient Rights Informed Consent
                3. Physical Environment Sanitation
                4. Resident/Patient Rights Admiss/Disch/Trans
                5. Medical Records Confidentiality of Records
                6. Resident/Patient Rights General
                7. Quality of Care Other
                8. Quality of Life Comfort & Safety

=============================================================================

C. ISSUE # 1

Resident/Patient Rights Admiss/Disch/Trans

BRIEF EXPLANATION OF FINDINGS

It was alleged that the Resident was admitted to the Facility on 1/22/2003
against her will.

Federal regulations require that the resident has the right to a dignified
existence, self determination, and communication with and access to persons
and services inside and outside the facility.

The Health Care Proxy was interviewed on the phone in a three way
conference call with his attorney.  The Health Care Proxy said that he had
known the Resident for years.  The Health care Proxy said in the summer of
2001, the Resident asked him to become her health care proxy and power of
attorney.  The Health Care Proxy said he had asked the Resident to put her
requests in writing, so the Resident wrote a letter on 11/8/01 to the
Health Care Proxy with her request.  The Health Care Proxy said the
Resident had a family member in another state, but had been estranged from
her for many years.

A letter from the Health Care Proxy's Attorney indicated the Resident had
asked the Health Care Proxy to become her Power of Attorney on 11/8/01.
A durable power of attorney was issued on 12/7/01.

A signed and witnessed Health Care Proxy was initiated on 5/10/02 for the


00007

Facility: SUNBRIDGE CARE & REH FOR RAND

Reference #: 03-0593
Page 3

C. ISSUE # 1 (continued)

Resident.

The Health Care Proxy said the Resident had resided in two assisted living facilities prior to her mental decline.  The Health Care Proxy said around 1/12/03, the Resident had become agitated and called the police department several times about people stealing her belongings.  The Health Care Proxy said these behaviors precipitated the Resident being taken to an acute care hospital twice, the second time as an emergency admission, on 1/12/2003.

The Unit Manager was interviewed in person.  The Unit Manager said that the Resident had adjusted well to the Facility admission until around April, 2003, when the Resident began to refuse her medication and become more paranoid and agitated.  The Unit manager said that the Facility, along with the Health Care Proxy, were in the process of obtaining a "Rogers" petition, (a court ordered document that mandates the administration of needed antipsychotic medication) when the Resident was removed from the Facility on 4/30/03, by Family Member #1 and Family Member #2, without any physicians orders, medication or discharge planning.

The nursing care plan dated 4/16/03 indicated the Resident had been refusing her medication, and a calm approach and one on one interventions were initiated to assist the Resident with her treatment plan.

The allegation was determined to be invalid based on:

1. The Resident was treated in January, 2003 at an acute care hospital, for a psychiatric illness, and had been placed at the Facility for continued care.

2. The Health Care Proxy had been chosen by the Resident, in 2001, and in 2002 became her Health Care Proxy at her request.

**VALIDITY: Invalid**

C. ISSUE # 2

Resident/Patient Rights Informed Consent

**BRIEF EXPLANATION OF FINDINGS**

It was alleged that the Resident had been forced to take anti-psychotic and anti-hypertensive medication against her will that made her "pass out".

Federal regulations require that the Resident has the right to consent to treatment.

See Issue #1 for a description of the Resident.

Family Member #1 was interviewed by phone.  Family Member #1 said the Resident told her that her medications made her sleepy and she would pass out from them at times.



Facility: SUNBRIDGE CARE & REH FOR RAND                Reference #: 03-0593
                                                                  Page 4

C. ISSUE # 2 (continued)

The Health Care Proxy was interviewed by phone in a conference call with
his attorney.  The Health Care Proxy said that although he had signed the
medication consent forms for the Resident, he went over in detail each
medication and side effects with the Resident.  The Health Care Proxy said
that when the Resident started to refuse her medication and her behaviors
escalated, the Health Care Proxy said that a competency evaluation was
obtained to assess if the Resident was competent to make her own decisions.

A psychiatric competency evaluation dated 4/30/03 indicated that the
Resident was not competent to make any decisions regarding her medication.

The Unit Manager was interviewed in person.  The Unit Manager said that
when the Resident started to refuse her evening medication, the nursing
staff changed the time of the Resident's medication administration from the
evening to the daytime, as it seemed that the Resident would take her
medication more readily.  The Unit Manager said that after a period of
time, the Resident refused to take her medication, even on the day shift.

Nurse #1 was interviewed in person.  Nurse #1 said that she had cared for
the Resident frequently during her stay at the Facility.  Nurse #1 said the
Resident would take her medication but toward the end of the Resident's
stay she became more paranoid and fearful of the medication.  Nurse #1 said
the Resident had indicated to her that she had passed out one day and said
that she was sleepier with the medication change from night time to
morning.  Nurse #1 said that she had never heard, or observed the Resident
pass out from any medication or for any other reason.

The psychiatric consultant progress notes dated from 2/10/03 through
4/21/03 indicated that the Resident's medication was reviewed routinely,
and that the behavioral care plan indicated the medications Buspar, Aricept
and Zyprexa were indicated for the treatment of the Resident's paranoid
symptoms.

The Social Worker was interviewed in person.  The Social Worker said and
her documentation indicated that nursing staff, the physician, and the
Resident's Healix Care Proxy had developed and implemented interventions to
address the Resident's medication refusal.

The Interdisciplinary care plan dated 4/16/03 identified the Resident's
refusal of her psychotropic medications on the evening shift as a problem.
Interventions included to notify the physician and the Resident's guardian,
obtain a psychiatric consultation, monitor every shift for changes in
behavior, staff were to provide one on one redirection, talk to the
Resident in an unhurried manner and use a calm approach toward the
Resident.  On 4/23/03 the Resident's medication administration time was
changed to the morning time.
CNA #1 was interviewed in person and said she had frequently provided care
to the Resident.  CNA #1 said that she had never observed the Resident
acting dizzy or sick at any time that she cared for her.


00009

Facility: SUNBRIDGE CARE & REH FOR RAND                    Reference #: 03-0593
                                                                      Page 5

C. ISSUE # 2 (continued)

The DON was interviewed in person.  The DON and the Health Care Proxy said that the Resident had never fainted, been ill or any other side effects from any of her medication.

Although the Resident had told Family Member #1 that her medications made her sleepy and she would pass out from them at times, the allegation was determined to be invalid based on:

1.  The Health Care Proxy, Director of Nurses, Unit Manager, Nurse #1 and CNA #1 said that they had never witnessed the Resident becoming weak or dizzy from her medication or any other reasons.

2.  The Health Care Proxy said he went over all of the Resident's medication with her along with describing the side effects.

3.  The Social Worker said and her documentation indicated that nursing staff, the physician, and the Resident's Health Care Proxy had developed and implemented interventions to address the Resident's medication refusal.

**VALIDITY: Invalid**

C. ISSUE # 3

Physical Environment Sanitation

**BRIEF EXPLANATION OF FINDINGS**

It was alleged that during the Resident's stay the Facility was dirty, had clogged toilets, and the water for showers was not warm.

Federal regulation require that the Facility must provide a safe, clean, comfortable and homelike environment, allowing the resident to use his or her personal belongings to the extent possible.

CNA # 1 was interviewed in person and said there had been problems with the hot water for showers.  CNA #1 said that sometimes there was no water at all coming out of the faucet.  CNA #1 said that there had been some ongoing problems with a clogged toilet in the Resident's room.

The Staff Development Coordinator was interviewed in person.  The Staff Development Coordinator said that if the housekeepers were using the sinks in their closets, the water pressure may be low or the water may be cold, but that the problem had always been resolved quickly when she had called maintenance.

CNA #2 was interviewed in person and said if the water was cold during a shower, which has been a problem in the past, the maintenance department would always be able to quickly fix the problem.

Nurse #1 was interviewed in person.  Nurse #1 said that she recalled that the toilet in the Resident's room being plugged with paper towels.  Nurse


0 0 0 1 0

Facility: SUNBRIDGE CARE & REH FOR RAND

Reference #: 03-0593
Page 6

C. ISSUE # 3 (continued)

#1 said that maintenance staff would have to unplug the toilet at least weekly.

The Director of Plant Operations was interviewed in person.  The Director of Plant Operations said he had resolved the issue of the cold water in the last few weeks ( 5/1/03 to 5/14/03) because he had changed the "mixing" valve for the main water supply.  The Director of Plant Operations said that he had been unclogging the toilet in the Resident's room weekly and had almost opted to replace the toilet when he discovered that some one had been flushing paper towels down the toilet.  The Director of Plant Operations said that he had not had any issues with any plugged toilets in the last two weeks( 5/7/03 to 5/21/03).

The tour conducted by the Surveyor on 5/16/2003 did not indicate any clogged toilets, dirty rooms or hallways.

The Surveyor spoke with a CNA and with a resident after a shower had been given to the resident.  The resident reported that the shower had been comfortable.  The Surveyor checked the hot water temperature in the shower room and noted that the water temperature felt comfortable to the touch.

The allegations were determined to be valid based on:

1.  CNA # 1, CNA #2 and the Director of Plant Operations all said that cold showers had occurred and the toilet had been plugged.

2.  Nurse #1 also said that the toilet in the Resident's room being plugged with paper towels and that the maintenance staff would have to unplug the toilet at least weekly.


VALIDITY: Valid

C. ISSUE # 4

Resident/Patient Rights Admiss/Disch/Trans

BRIEF EXPLANATION OF FINDINGS

It was alleged that the Resident had been admitted to the Facility with no money, no identification, no clothes and no phone.

Federal regulations require that the resident has the right to a dignified existence, self determination, and communication with and access to persons and services inside and outside the facility.

Family Member #1 said that on 1/22/03 the Facility removed all the Resident's money, medical and identification cards, and clothing upon the Resident's admission to the Facility.  Family Member #1 said the Resident told her that she had been unable to make phone calls while at the


0 0 0 1 1

Facility: SUNBRIDGE CARE & REH FOR RAND                Reference #: 03-0593
                                                        Page 7

C. ISSUE # 4 (continued)

    Facility.

    The Director of Nurses (DON) was interviewed in person.  The DON said that
the Facility never had the Resident's medical and identification cards at
the time of the Resident's admission to the Facility.

    The Health Care Proxy was interviewed by phone in the presence of his
attorney.  The Health Care Proxy said that he was not aware of any
identification cards that the Resident had in her wallet, pocketbook or
elsewhere because he did not look in the Resident's personal belongings.
The Health Care Proxy said the Resident had the identification cards in the
past but he was not aware of where they were.

    The Unit Manager was interviewed in person and said that the Resident's
Health Care Proxy had opened a personal account for the Resident at the
Facility.  The Unit Manager said the account was for the Resident to go on
trips to the store, restaurants and other activities.  The Unit Manager
said that while at the Facility, the Resident had numerous personal
clothing.

    The Health Care Proxy said he had been in the process of getting the
Resident her own phone and had been waiting for the phone company to
install the phone.  The Health Care Proxy said that the Resident always had
access to a phone when she did make calls and was able to use the Social
Worker's office frequently.

    Nurse #1 said the Resident had been able to use the phone at the nurses'
station phone.

    The Unit Manager and the DON said it may have taken a few days to get all
the Resident's clothes from the Hospital or her home, but that she had many
articles of clothing at the Facility.

    Although the Resident's identification cards were determined not to be
available on admission, the allegation of no phone, money and clothing was
determined to be invalid based on:

    1.  The Unit Manager said a personal account had been established for the
Resident at the Facility.

    2.   Interviews with Facility staff indicated the Resident had numerous
personal  clothing.

    3.  The Health Care Proxy and Nurse #1 said the Resident had been able to
make phone calls from the Social Worker's office and from the nurses'
station.  The Health Care Proxy said that he had been waiting for the phone
company to install the Resident's phone.

    **VALIDITY: Invalid**



Facility: SUNBRIDGE CARE & REH FOR RAND        Reference #: 03-0593
                                                          Page 8

C. ISSUE # 5

     Medical Records Confidentiality of Records

     BRIEF EXPLANATION OF FINDINGS

     It was alleged that the Facility failed to release the Resident's medical
     records to the "new" power of attorney on 4/29/03.

     Federal regulations require that the resident and his or her legal
     representative has the right upon an oral or written request, to access all
     records pertaining to himself or herself including current clinical records
     within 24 hours.

     See issue #1 for a description of the Resident.

     The Social Service Director said that on 4/29/2003, Family Member #1 and
     Family Member #2 brought documents indicating they were now the Resident's
     power of attorney.  The Social Service Director said Family Member #1 and
     Family Member #2 wanted to review the Resident's medical records. The
     Social Service Director said that she had not been comfortable with the new
     documents that the Resident's family had produced to the Facility because
     the Resident had a power of attorney and there had been an alleged
     estrangement between the Resident and her family.

     The Unit Manager said that on 4/29/03 she notified the Resident's Power of
     Attorney about Family Member #1 and Family Member #2's request to review
     the Resident's health record.  The Unit Manager said the Power of Attorney
     said that Family Member #1 and Family Member #2 could view the Resident's
     chart with supervision.  The Unit Manager said that she saw Family Member
     #1 and Family Member #2 view the Resident's chart on 4/29/03, in the social
     service office.

     The allegation was determined to be invalid based on:

     1. The Unit Manager said that on 4/29/03 she observed Family Member #1 and
     Family Member #2 reviewing the Resident's record in the social service
     office.


     VALIDITY: Invalid



Facility: SUNBRIDGE CARE & REH FOR RAND          Reference #: 03-0593
                                                              Page 9

C. ISSUE # 6

    Resident/Patient Rights General

    **BRIEF EXPLANATION OF FINDINGS**

    It was alleged that the Facility would not allow Family Member #1
    unsupervised time with the Resident.

    Federal regulations require that the resident has the right to a dignified
    existence, self determination, and communication with and access to persons
    and services inside and outside the facility.

    Family Member #2 said that on 4/29/03 and 4/30/03, the Facility would not
    allow the Resident to be alone with Family Member #1.

    The Director of Nurses and the Unit Manager said that on 4/29/03, the
    Resident went out to lunch with Family Member #1 and Family Member #2 for
    about two hours, with the permission of the Health Care Proxy .

    The Director of Behavioral Services was interviewed in person.  The
    Director of Behavioral Services said that on 4/30/03, Family Member #1 and
    Family Member #2 wanted to take the Resident to lunch again.  The Director
    of Behavioral Services said that the Resident's Health Care Proxy did not
    want the Resident to leave the Facility again, but that Family Member #1
    and Family Member #2 could visit with the Resident in a private room in the
    Facility.  The Director of Behavioral Services said that Family Member #1
    wanted to take the Resident out of the Facility and that is when Family
    Member #1 and Family Member #2 put the Resident in their van and drove away
    resulting in the Facility contacting the local police department.  The
    Resident did not return to the Facility.

    The allegation was determined to be invalid based on:

    1.  The resident did have unsupervised visits with Family Member #1 and
    Family Member #2 and on 4/30/03 Family Member #1 and Family Member #2 were
    provided the option to visit with the Resident in a private room.

    **VALIDITY: Invalid**

C. ISSUE # 7

    Quality of Care Other

    **BRIEF EXPLANATION OF FINDINGS**

    It was alleged that the Facility did not schedule any appointments for the
    Resident to have an eye examination, a hearing examination or have her
    teeth cleaned since her admission in January, 2003.

    Federal regulations require that the Facility must assist the resident in
    making appointment or arranging transportation to and from the office of
    the Practitioner specializing in the treatment of vision or hearing
    impairment.



Facility: SUNBRIDGE CARE & REH FOR RAND          Reference #: 03-0593
                                                          Page 10

C. ISSUE # 7 (continued)

The clinical record indicated that on 2/25/03, the Resident had an eye
examination performed at the Facility.  The results of the eye examination
indicated that the Resident's "current glasses satisfactory" and to
continue the eye lubricant.

The clinical record indicated that an annual oral examination had been done
by the Facility's Dental consultant and a cleaning had been performed for
the Resident.  There was no date on the report but indicated that the
examination was done at the Facility.

The Health Care Proxy, the Unit Manager and the Social Worker said that the
Resident refused to wear any hearing aides because she believed "bugs"
would grow in them.

The Social Worker said the speech pathologist devised a head phone type of
device that the Resident could utilize when she was talking on the phone.
The Social Worker said that the Resident did not want to use anything that
went inside her ears.

The allegation was determined to be invalid based on:

1.  The clinical record indicated that on 1/22/03 the Resident had received
a teeth cleaning examination and an eye examination.  When the Resident
refused to wear her hearing aide the speech therapist utilized adaptive
equipment to assist the Resident to use a telephone.

**VALIDITY: Invalid**

C. ISSUE # 8

Quality of Life Comfort & Safety

**BRIEF EXPLANATION OF FINDINGS**

It was alleged that the Facility's food quality was poor.

Federal regulations require that food is palatable, attractive and at the
right temperature.

Family Member #1 said the Resident told her the food was " not fit to eat,"
but gave no specifics.

During the tour of the Facility on 5/15/03, several residents were
interviewed by the Surveyor about the quality of the food at the Facility.
The reviews were mixed, with some days the food was described as being
"good" and some days the food was described as being "ok".

Nurse #1 was interviewed in person.  Nurse #1 said the Resident, at times,
would tell her the food was "bad" but there were no more specifics to her
complaints.



Facility: SUNBRIDGE CARE & REH FOR RAND          Reference #: 03-0593
                                                                    Page 11

C. ISSUE # 8 (continued)


     The Resident Council Meeting minutes dated on 4/23/03 indicated  the
     residents requested new menus for the spring and summer months and more
     cook outs, but there was no indication the residents thought the food
     quality was considered poor.  No complaints were logged regarding food
     quality in the minutes of the meeting or the previous meeting.

     The allegation was unable to be determined based on:

     1. Although it appeared that the quality of the food was not an identified
     problem at the Facility, the Resident told Family Member #1, the Health
     care Proxy and Nurse #1 she did not like the food.

     VALIDITY: Unable to determine

=================================================================================

D. RECOMMENDATIONS/COMMENTS

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

BOSTON
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS. 02631
TELEPHONE  (508) 255-3600

MARLBOROUGH
LAWSON, WEITZEN & HAILER, LLP
171 LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS. 01752
TELEPHONE  (508) 618-1025

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN ***
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MENESIS++
NATALIE A. KANELLIS †
PATRICIA L. FARNSWORTH
 K. SCOTT GRIGGS

MICHAEL McDEVITT
STEVEN M. BUCKLEY
SONIA K. GUTERMAN, PH.D.
J. MARK DICKISON **
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE +++
RICHARD J. SULLIVAN, JR.
JOSEPH M. KERWIN
CAROLINE A. O'CONNELL *
MICHAEL WILLIAMS
KATHRYN E. PEICZARKA
DEAN J. HUTISON
SCOTT T. BUCKLEY
KRISTINA A. E. ENGBERG
C. KIMBERLY BAKEBERG
JAMES M. HENRY
ADAM M. SCHOEN

April 12, 2007

**VIA ELECTRONIC MAIL and FACSIMILE  (717) 620-2444**
Glenn R. Davis, Esq.
Andrea Dean, Esq.
Latsha Davis Yohe and McKenna, P.C.
1700 Bent Creek Blvd., Suite 140
Mechanicsburg, PA 17050

      Re:    *Runge v. Kelley, et al.*, 05-cv-10849-RGS

Dear Attorneys Davis and Dean:

      This letter concerns our continuing in our efforts to obtain documents relevant to this matter. The facility's current operators have not provided us with any additional documents beyond those we have already disclosed.  Given the fact that we have not been able to obtain a complete record from the facility's current operators, we have made efforts to find alternative sources.   With regard to the job descriptions and policy and procedure manuals, we have managed to locate documents that **are not the documents from the facility**, but that should be similar to or the same as the job descriptions and manuals in effect at the facility during Helen Runge's stay.   The versions of the job descriptions and manuals we have obtained are the "master version" or template that was prepared by the parent corporation.  The job descriptions used by the facility would have been based on these documents.

      I want to be absolutely clear on this issue.  **We do not make any representations about these documents being accurate reflections of the manuals and job descriptions that were "for the facility in effect during [Runge's] residency."**  The only representation we make is that the facility would have had job descriptions and manuals that were similar to or identical to these documents.  But, since we have not had access to the facility files, we do not know if the

*    ALSO ADMITTED IN NY
**   ALSO ADMITTED IN NH
***  ALSO ADMITTED IN CA
+    ALSO ADMITTED IN DC
++   ALSO ADMITTED IN NJ & PA
+++  ALSO ADMITTED IN RI, CT, NH & ME
†    ALSO ADMITTED IN NH & NY

# Lawson & Weitzen, LLP

**Glenn R. Davis**
**April 12, 2007**
**Page 2**

actual job descriptions and manuals at the facility during Runge's stay were different versions or altered from these templates provided by the parent corporation.

These documents are in the process of being bates numbered and will be produced once that process is complete.

I intend to call your office at 3:30 P.M. to discuss your latest request for a 37.1 conference.  If you have any concerns about the limitations on our representation about the authentication of these documents, we should discuss those concerns at that time as well.

Very truly yours,

Michael Williams

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HELEN RUNGE,

    *Plaintiff,*

*v.*

WALTER J.  KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

    *Defendants.*

Civil Action No. 05-10849-RGS

## DEFENDANT SUNBRIDGE'S
## PRIVILEGE LOG

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Defendant Mediplex of

Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph produces the

following privilege log of reflecting documents responsive to discovery requests, but withheld

based on a claim of privilege.

| DOCUMENT DESCRIPTION | PRIVILEGE |
|---|---|
| PRIV02525: list prepared by facility staff for counsel. | Attorney-client privilege and work product doctrine. |
| PRIV02526: Statement of Vivian Johnson. | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02527-28: 4/30/03 Statement of Gina Ford. | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02529: Statement of John Vandenburgh | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |

| | |
|---|---|
| PRIV02530: Statement of Rosemarie Cass | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02531: 4/30/03 Statement of Kathy Crouch | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02532: 4/30/03 Statement of James Okeyweke | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02533: 4/30/03 Statement of Primus Chalon | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV-02534-36: Statement of Ellen Richwine | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02537: Statement of Farrah Seidler | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02538-39: 4/30/03 Statement of Al Wilkins | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02540: Statement of Sandy Parazzo | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02541: 5/1/03 Statement of Sandy Parazzo | Confidential information protected by the medical peer review statute, G.L. c. §§204 and 205. Attorney-client privilege and work product doctrine. |
| PRIV02542-45: Communications with law department | Attorney-client privilege and work product doctrine. |

Respectfully submitted,

**Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph**

by its attorneys,

   /s/ Michael Williams
K. Scott Griggs    (BBO# 555988)
Michael Williams (BBO# 634062)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987
MWilliams@Lawson-Weitzen.com

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by First Class Mail.

Dated: November 21, 2006

  /s/ Michael Williams

1

1                          Volume:  I

2                          Pages: 1-304

3          UNITED STATES DISTRICT COURT

4             EASTERN DIVISION

5   - - - - - - - - - - - - - - - - - - x

6   HELEN RUNGE,              Civil Action

7          Plaintiff,       No. 05-10849-RGS

8   WALTER J. KELLY,
    KERRY L. BLOOMINGDALE, M.D, and
9   SUNBRIDGE NURSING AND
    REHABILITATION CENTER,
10
          Defendants.
11  - - - - - - - - - - - - - - - - - - x

12

13

14        DEPOSITION OF WALTER J. KELLY

15     Friday, December 1, 2006, 9:26 a.m.

16        Blake J. Godbout & Associates

17         33 Broad Street - 11th Floor

18         Boston, Massachusetts 02109

19

20   ----- Reporter:  Toni F. Beckwith, RMR -----

21

22   Toni F. Beckwith, Registered Merit Reporter
                50 Winsor Avenue
23      Watertown, Massachusetts 02472
                Tel: 617.924.2731
24              Fax: 617.924.9899

65

1       Q.  And how did you provide them

2  information?  Over the phone, physically?

3       A.  Went there.

4       Q.  Did you accompany Helen from Carney

5  Hospital to Sunbridge?

6       A.  No.  She went by ambulance.

7       Q.  Were you there the same day she

8  arrived?

9       A.  No, the next day.

10       Q.  Prior to your being at Sunbridge on

11  that day, had you had any prior discussions or

12  interaction with Sunbridge Nursing Home?

13       A.  Sunbridge had several nursing homes.

14       Q.  Had you had prior interaction or prior

15  experience with Sunbridge at Randolph?

16       A.  Not at Randolph, no.

17       Q.  Had you had prior experience or

18  dealings with other Sunbridge facilities?

19       A.  Yes.

20       Q.  And where were they located?

21       A.  Weymouth.

22       Q.  And what was your experience with that

23  Sunbridge facility?

24       A.  At that time, Ann Ruth Drohan was a

66

1    patient there.

2         Q.  Other than Ms. Drohan, did you have

3    experience with any other Sunbridge facility?

4         A.  No.

5         Q.  How long was Ms. Drohan a resident at

6    the Sunbridge facility?

7         A.  Eight months.

8         Q.  If I could just direct your attention

9    to the document that we had started to look at

10   earlier, Kelly No. 1.  Had you seen that

11   document prior to today?

12          (Pause)

13        A.  I've seen that document, yes.

14        Q.  When did you see that document --

15        A.  When did I see it?

16        Q.  -- first?  When did you first see that

17   document?

18        A.  Probably ten years ago.

19        Q.  And what was the circumstance of you

20   first seeing that document?

21        A.  Well, no.  Probably '92.  '92 I saw

22   this document.  Around the time she signed it.

23        Q.  At the time Helen signed it?

24        A.  No.  Prior to Helen signing it.

# NEW ENGLAND GERIATRICS

## DIAGNOSTIC/TREATMENT EVALUATION

**Patient Name** Helen Runge    **DOB** 8/3/15    **Case#** 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    **Date:** 4/29/

**Procedure Code:** 99313

**Facility:** Sunbridge - Randolph    **Data Sources:** Kathleen - Nurse manager; Farrah & Ellen social work; Walter Redwine of Kelly Health Care Proxy and Power of attorney and Patient chart: Ruth

✓ where approp
∅ if not present
MSE:

**\*Appearance**
___WDWN
___Alert
___Lethargic
___Clear Sens.
___Fluctuating
___Thin
___Cachectic
___Obese
___Hemiplegic
___Disheveled
___Malodorous
___Restless
___Akinetic
___Other

**Behavior**
___Calm
___Cooperative
___Congenial
___Engaged
___Poorly Related
___Poor Appetite
___Poor Sleep
✓Agitated
___Menacing
___Threatening
___Anxious
___Somatic
___Hostile
___Assaultive
___Self-abusive
___Volatile
___Other

**\*Speech**
___Ab. Rate
___Ab. Rhythm
___Ab. Vol.
___Spontaneous
___Logical
___Aphasic
___Anomic
___Mute
___Paraph. errors
___Hypophonic
___Dysarthric
___Impoverished
___Nonsensical
___Other

**\*Thought Process**
**Content**
✓Organized
___Logical/Coher
___Illogical
___Abstraction
___22x4,8x7

**\*Abn/Psychotic Thought**
___AH
___VH
___HI
___SI
✓Paranoid

**\*Associations**
___LOA
___Tang/foi
✓Intact

**\*Mood/Affect**
___Euthymic
___FROA
___Constricted
___Depressed
___Dysphoric
___Tearful
___Hopl/Help
___Anhed.
___Anergic
___Anxious
___Labile
___Hypomanic
___Manic
___Angry
___Other

**\*Memory**
___Registr.
___Recall
___Recent
___Remote
___Unable

**\*Orientation**
___Person
___Place
___Time

**\*Concentration**
___Serial 7's
___Serial Presidents
___House

**\*Language**
___Naming
✓Repeating

**\*Judgement**
___Intact
✓Impaired

**Insight**
___Intact
✓Impaired
___Aware
___of illness

**\*Fund of Knowledge**
___Current Pres.
___Recent News

**\*Constitution**
(any 3)
TRP/BP
Weight
Height
Musculo/Skel
\*Gait/Station
\*EPS/Abn

### CC/Reason for Evaluation:
Paranoia; Refusal of meds

### HPI/PMH/PSYCH/FH/SH/MEDS/ALLER/LABS:
This 87 y.o. divorced Caucasian ♀ was admitted 1/22/03. She was last evaluated by me 4/1/03, since then she has become more paranoid. It was felt that she was more cooperative c̄ Nursing staff on 7-3 shift, so Zyprexa order was A'd to 5 mg qam (none at hs). This was briefly effective - she took the Zyprexa - but then she began refusing it in the a.m. as well.

### Expanded MSE (from checklist):
She was init-ially pleasant, but then became more aggravated - at the NH - c̄ many paranoid ideas about her treatment

### Medical Necessity:
2° paranoia

**DX: Axis 1:** Alzheimer's dementia c̄ delusions    **Axis 2:** Defer

**Axis 3:** HBP    **Axis 4:** Placement    **Axis 5:** 20

### Impression:
This ♀ is more paranoid, prob-ably in part because she is not tak-ing her Zyprexa. She lacks the ability to make sound decisions about her medications & a possible of other personal

### Medical Decision Making/Plan:
For now, I would keep Zyprexa dose unchanged - problem is not c̄ medication but c̄ her refusal to take it. Consider

**Signature**

[barcode]