UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

    *Plaintiff,*

v.

WALTER J. KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

    *Defendants.*

Civil Action No. 05-10849-RGS

**OPPOSITION of DEFENDANT SUNBRIDGE to PLAINTIFF'S FOURTH MOTION
for ENLARGEMENT of TIME to SUBMIT EXPERT REPORTS**

Despite the repeated claims that an expert would be hampered in rendering an opinion with only the 609 pages of records already produced by SunBridge, the Plaintiff has in fact retained an expert who has prepared a report using the records originally produced to the Plaintiff in October of 2006. *See* **Exhibit A**.

The report of Nurse Linda Fagan attached as **Exhibit A** could have been prepared for the original January 15, 2007 deadline for Plaintiff's expert disclosures. There is nothing in this report to indicate that the absence of records like employee files, floor plan, or the other documents at issue here in any way limited the ability of Plaintiff's expert to fully opine in this matter. Instead, the Plaintiff's expert relied upon what one would expert her to rely on in this type of case, the medical records of the defendant skilled nursing facility and the medical records

from two previous facilities at which Helen Runge had resided at prior to her brief stay at SunBridge. **Exhibit A**, p.1.[1]

To the extent that SunBridge's policies and procedures may be relevant to any expert's review in this matter, SunBridge has previously offered to produce the only copies of these policy statements it has in its possession but Plaintiff's counsel refused to accept these documents. Docket entry # 100, Exhibit C (letter offering to produce the master copy of the policies and procedures manuals and job descriptions from SunBridge's parent corporation); Docket entry # 100, p. 6, ¶17 (rejecting this offer). These are the only copies of these documents in SunBridge's possession.

Despite the claim of Plaintiff's counsel that SunBridge has failed to act in accordance with this Court's order, SunBridge has contacted the new operators of the facility in order to secure the documents in question.[2] Counsel for SunBridge has contacted the third-party that now

---

[1] Although the Plaintiff's expert report fails to satisfy many of the requirements of Rule 26(a)(2)(B), which in addition to requiring "a complete statement of all opinions to be expressed and the basis and reasons therefore" also requires that the report contain:

> [T]he qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

None of this information has been disclosed by the Plaintiff. These inadequacies in the Plaintiff's expert disclosure are completely unrelated to any gap in the records.

[2] Plaintiff's motion once again contains unfounded accusations leveled at counsel for SunBridge that cannot be left uncorrected. Attached to the motion is a letter to which counsel for SunBridge is purported to have failed to respond. The motion also alleges that counsel refused to return the phone calls of Plaintiff's counsel. In fact the first time counsel for SunBridge saw the letter in question was when it was filed with this Court as an exhibit in support of the present motion.

The letter dated May 7, 2007 that is attached to the Plaintiff's motion as exhibit A purports to be part of that effort by Mr. Davis to contact counsel for SunBridge on May 7, 2007. The letter in question was actually Mailed on May 10, 2007 and only arrived at defense counsel's office the day after the Plaintiff filed her motion to which the letter was attached as an exhibit. *See* **Exhibit B** (envelope in which the letter arrived and post marked May 10, 2007).

Plaintiff's counsel also claims that the same day he sent the letter he attempted to call SunBridge's counsel. Plaintiff's counsel did leave a voice mail on Monday, May 7, 2007, which stated:

operates the facility in question. The new facility operator has once again review its files and has determined that some additional responsive documents exist in its off-site storage. Counsel for Care One, the new operators, has indicated that these document would be delivered by Friday May 25, 2007. He then asked for an additional day and stated that the documents would be delivered by the morning of this filing – May 29, 2007. The documents have not yet been delivered. Counsel for Care One's corporate headquarters in New Jersey has been contacted again and he is inquiring with the local facility as to the status of these documents. As of the time of the filing of this memorandum, no further information has been provided. The documents will be bates stamped and forwarded to all counsel once they arrive.

SunBridge has taken and continues to take steps to secure the documents that had passed out of its control when the facility at which Ms. Runge had been a resident was divested. Counsel for SunBridge has been repeatedly in contact with the parent company of the new facility operators in order to obtain greater cooperation. It bears repeating that these are steps

---

> Mike, Glenn Davis calling regarding Farrah Seidler's deposition. Just following up with you from a call from your law clerk last week. I'm in the office. Today is Monday. It's about 5 after 12:00. The number here 7-1-7-6-2-0-24-24. Thank you.

No other voicemail messages have been left by Mr. Davis during the month of May. A paralegal from Lawson & Weitzen did return this call and left a message with Mr. Davis' office, which was not returned. Counsel for SunBridge did not return Mr. Davis' call himself because he was preparing for the out-of-state deposition of a former SunBridge employee the following morning, which Mr. Davis had, at the last minute, moved to Tuesday, May 8, 2007 in a facsimile sent the evening of Friday, May 4, 2007. The next day counsels for SunBridge meet with Plaintiff's counsel at his Pennsylvania office during that deposition. At no point during this Tuesday, May 8, 2007 deposition did Plaintiff's counsel raise the issues addressed in the letter purportedly sent on May 7, 2007.

The suggestion that counsel failed to respond to messages and letters from Plaintiff's counsel is simply inaccurate. No message on point were left and the belatedly mailed letter had not yet been received.

The letter dated May 7, 2007, itself contains numerous inaccuracies. Most relevant of which is the repeated claim that Plaintiff's counsel was not told that the facility in question was no longer operated by SunBridge or that the new operators were being uncooperative. Plaintiff's counsel had been informed of that fact both individually and through SunBridge's filings with this Court. *See e.g.* Docket entry # 94 ("The Plaintiff seeks production of records from a facility that is no longer owned by the Defendant Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph (SunBridge) . . . These records produced by SunBridge represent considerable effort to comply with discovery and represent all responsive documents SunBridge has been able to obtain from the new facility operator"); Docket Entry #73 ("the nursing home at issue in this litigation is no longer owned by Defendant Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph").

3

that Plaintiff's counsel could have taken for himself at any time – as was suggested to him by counsel for SunBridge.

The Plaintiff has never identified why any of the sought after documents are relevant to her expert's ability to review this matter. While it is unfortunate that it has taken this long for the new operators of the former SunBridge facility to produce copies of the employee files, floor plan, etc., it is hard to see how those document – as opposed to the medical records already produced – are relevant to Plaintiff's expert disclosures.

## CONCLUSION

The expert report provided by Plaintiff's counsel clearly demonstrates that the Plaintiff has had in her possession of the document necessary for the preparation of such a report since at least October of 2006. The present motion and the three previous motions seeking leave to extend expert disclosures have served only to delay this matter. The Plaintiff's fourth request to extend expert disclosures should be denied and this 2005 matter should be permitted to move forward.

Respectfully submitted,

**Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph**

by its attorneys,

   /s/ Michael Williams
K. Scott Griggs    (BBO# 555988)
Michael Williams (BBO# 634062)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987
MWilliams@Lawson-Weitzen.com

**CERTIFICATE OF SERVICE**

I hereby certify that this Document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 29, 2007.

   /s/ Michael Williams

4

Linda J. Fagan, R.N.
12 Graves Ave.
Scituate, Ma. 02066

Glenn Davis, Esq.
Latsha Davis Yohe & McKenna, P.C.
1700 Bent Creek Blvd, Suite 140
Mechanicsburg, PA 17050

Re:   Helen Runge

May 14, 2007

Dear Mr. Davis,

I am a registered nurse licensed to practice nursing in the Commonwealth of Massachusetts. I am familiar with the accepted standards of care as they pertain to nurses and long term care facilities in Massachusetts. I have over 15 years experience in long term care. This experience includes being a nurse manager with responsibility for overseeing a 46 bed long term care unit, supervising a 205 bed facility and working as a consultant to long term care facilities in identifying problems and implementing plans of correction.

At your request, I have reviewed the medical records of Helen Runge from the following healthcare providers:

- BayView Assisted Living
- Carney Hospital
- Sunbridge of Randolph

Based on my review of the medical records, it is my opinion that the staff caring for Ms. Runge while she was a resident of Sunbridge of Randolph deviated from the standards of care and breached their duty by failing to adhere to the Patients Bill of Rights and comply with the Code of Federal Regulations with regards to nursing home care. The staff thereby provided an environment of harm. My opinion is based upon a reasonable degree of nursing certainty and is further supported by the following:

Helen Runge was born and lived her entire life in South Boston. She worked for the Boston Edison Company.  Ms. Runge was 87 years old, living independently for the previous 50 years, when she decided to live in an assisted living facility and so went to live at Marion Manor in the fall of 2001.

Although Ms. Runge had limited physical interaction with her daughter for some years, they always remained in communication through telephone and mail.  She listed her daughter as next of kin and her contact person.

115669

1

Ms. Runge became unhappy with her living arrangements at Marion Manner after a little more than a year and decided to move to BayView where a private apartment was available to her.

At the time of her admission to BayView in November 2002 Ms. Runge had the following diagnoses: hypertension, cataracts, depression, anxiety, hard of hearing, degenerative joint disease, osteoarthritis in both her knees and iron deficiency anemia.

According to the pre-screen for BayView, Ms. Runge was independent for her activities of daily living with the exception of needing help with a shower, laundry and bed making. She scored 9/9 for the answers to the mental status questions.

The plan of care at BayView reflects independence with the exception of laundry and housekeeping. She needed no assistance to make outgoing or receive incoming calls. Ms. Runge took care of her own needs with regard to shopping and made her arrangements to use a taxi for her means of transportation. She handled all her finances and banking functions independently. Ms. Runge was assessed at BayView to be in good general overall health with no serious difficulties preventing independent living. She was oriented in person, place and time but may have had some occasional forgetfulness.

Upon signing the physician clearance form, Dr. Gomes listed Ms. Runge's diagnoses as gastritis, depression and a history of anemia. He listed her level of function for activities of daily living as independent.

For the most part, Ms. Runge did well with her new living arrangements until approximately 12/10/02. She complained of weakness and not being able to keep liquids down. The visiting nurse began monitoring her. The nurse noted that Ms. Runge was having difficulty adjusting to BayView and by the beginning of January, 2003 Ms. Runge was willing to talk to social worker to assist her with the adjustment to BayView.

In the mean time, Ms. Runge believed that people were entering her apartment without authorization and as well, that some one had stolen her prescription card. This caused Ms. Runge to be angry, frustrated and anxious.

On January 9, 2003 Ms. Runge was noted to be more anxious, loud and unreasonable. Dr. Gomes, her primary care physician, made a referral to Dr. Alexander from the Nova Psychiatric Group. Without examining Ms. Runge, Dr Alexander faxed a section 12 order to Carney Hospital psychiatric unit. He did the document by staff information.

After being evaluated at Carney Hospital, Ms. Runge was sent back to BayView later that same day. The physician contacted Ms. Runge's attorney to investigate her living situation and consider changing housing. There is no evidence in the record from BayView that Mr. Kelly did indeed investigate Ms. Runge's living situation.

The physician also spoke with Dr. Gomes who stated that he had not been thinking of prescribing anti-psychotic medications for Ms. Runge. Dr. Gomes agreed that Ms. Runge needed to go back to the facility. From there, they make arrangements for transference at Ms. Runge's request to another facility.

On January 11, 2003, after continually repeating the same allegations to the staff relating to stolen objects and getting no apparent response, she called 911. According to the nurse's note, Police officer Cunniff responded to the call and determined that Ms. Runge needed medical or psyche intervention and transported Ms. Runge to Carney Hospital E.R. for evaluation. It is unclear to me if a police officer is able to make that determination.

According to an emergency room document, it is noted that the physician spoke with Mr. Kelly and identified him as Ms. Runge's guardian. There no evidence in the documents previously reviewed that Mr. Kelly had Guardianship of Ms. Runge.

Ms. Runge was admitted to the inpatient psychiatric unit for containment of agitation and potential danger to self and others from paranoid delusions. Her previous treatment with Paxil was continued. Ms. Runge had a problem with her eye, the nature which was unclear. Potential overuse of steroid eye drops was a concern and may have contributed to agitated mental status.

Ms. Runge's daughter, Dorothy Stanley, who lives in North Carolina, reported that her mother had always been very private and secretive and did not share any information, even with her. Ms. Runge had limited contacted with her daughter for almost 30 years. Ms. Stanley recently became re-involved and wished to move her mother to North Carolina.

Ms. Runge was started on a small dose of Zyprexa 2.5mg. A higher dose of 5mg appeared to over sedate her. She responded nicely to the low dose antipsychotic medication with decreased paranoia and increased overall cooperation with treatment.

On 1/14/03 the social worker met with Mr. Kelly. Ms. Runge agreed to transfer to North Carolina where her daughter could be involved with her care and Mr. Kelly would transfer power of attorney to her daughter.

On several occasions during Ms. Runge's hospitalization, she expressed her desire to go to North Carolina to be near her daughter and was looking forward to it.

The discharge summary from the hospital indicated that Ms. Runge was to be transferred to Sunbridge of Randolph while plans were being made for her transfer to North Carolina. The discharge summary also indicated that Mr. Kelly would continue arrangements with Ms. Runge's daughter to move her to North Carolina.

A Preadmission assessment was done January 16, 2003, by Sunbridge in anticipation of discharge to that facility on January 22, 2003. The assessment revealed the following information:

- The estimated length of stay- short term- to facility in North Carolina
- Responsible party and next of kin is listed as Walter Kelly, not Dorothy Stanley
- Diagnosed with dementia – There is no evidence in previous medical record of this diagnosis. While there was documentation in the Carney Hospital record "Rule/Out Alzheimer's", there is no evidence that there were any diagnostics tests such as a Cat Scan, MRI or neuropsychiatry evaluations that would determine the diagnosis of Alzheimer's
- Focuses on eye sight, decreased vision and personal belongings
- Nurse at Carney stated that Ms. Runge would do better on a non dementia floor secondary to being very sociable, likes to interact with younger patients, and plays Scrabble. She does not wander and had no exit seeking behaviors
- Scored very high on the Behavior Assessment with no risk factors
- Minimal assist with ADL's
- Alert & oriented 2-3 times
- Cognitive performance scale (CPS): 2-3: I added up the score and only came to 2 which indicates mild cognitive deficit – age appropriate
- Labs: Glucose 85, Bun 15, Sodium 136- All normal
- Diagnosis on the referral form to Sunbridge: R/out Paranoid delusional disorder
- At time of discharge: easily and pleasantly engaged, sensorium is clear/alert, requires only adequate notice to prepare /attend to ADL's and readily participates in activities, compliant with medications, observed affect bright with good sense of humor

Ms. Runge was admitted to Sunbridge of Randolph on January 22, 2003, at 5:45 pm. She was alert, verbally responsive and presented with pleasant affect, social and very talkative. The admission note continues to assess Ms. Runge as independent with ambulation and ADL's and hard of hearing. This assessment is consistent with her discharge assessment from Carney Hospital

Another nurse did a multiple page assessment that documents the following:
- Assistance with ADL's
- One person assist to help her transfer from the bed
- Locomotion off the unit- this activity did not occur apparently because she was in a locked unit
- One person to help her get dressed
- Help with eating and personal hygiene
- Unsteady gait
- Vision- severely impaired- no vision or appears to see only light, eyes do not appear to follow light
- Hearing- Highly impaired- absence of useful hearing
- Making self understood- Sometimes, ability is limited to making concrete requests
- Ability to understand others- Usually, may miss some part/ intent of message
- Behaviors/ Emotional status- Out of 10 options NONE were checked

115669                                                                                                    4

- Cognitive Status – Short and Long Term problem
- Cognitive skill for decision making: Moderately impaired – decisions poor; cues/supervision required
- Level of consciousness- Confused
- Appetite fair- Yet it's documented that she eats 70%-100%

This assessment is in sharp contrast to not only the admitting nurse's note but to the pre-assessment done by Sunbridge done 5 days before admission.

Mr. Kelly signed all the admission paper work including the consents for use of psychotropic drugs. There is no evidence in any of the medical records that Ms. Runge had been deemed incompetent and unable to sign those documents herself. There is also no evidence of a doctor's order activating the health care proxy which is a federal regulation.

Mr. Kelly is identified as the responsible party/ next of kin first with Ms. Runge's daughter being second. In the other facilities that Ms. Runge was at over the previous months, Ms. Runge's daughter Dorothy Stanley was always identified as first contact. There is no evidence that any of the staff at Sunbridge attempted to call Ms. Runge's daughter at anytime during her stay at Sunbridge to update her on her mothers condition. There is also no evidence that the social worker had any contact with Ms. Stanley to pursue transfer to North Carolina as was the plan on discharge from Carney Hospital as well as the plan on admission to Sunbridge. Moreover, there is nothing in the record to reveal that this plan was changed.

It was not until 5 days after Ms. Runge was admitted that the nurse practitioner performed a history and physical. It documents that the nurse practitioner (NP) is unable to obtain a family history or social history secondary to dementia. There is no evidence that Ms. Runge had been diagnosed with Alzheimer's nor was there evidence that the NP even attempted to speak to Ms. Runge. It is a very poorly filled out document and lists the current diagnosis as SDAT (senile dementia of the Alzheimer's type). It documents that her rehab potential was fair and that Ms. Runge was not informed of her diagnosis because of SDAT.

Ms. Runge had a long history of depression and was treated with antidepressants for years, yet that problem was not even addressed.

The NP assessed Ms. Runge for anemia and the plan was to check a CBC (complete blood count). There is no evidence that the CBC was ever ordered and there is no indication in Ms. Runge's record that a CBC was ever done during her stay at Sunbridge.

Laboratory tests (liver function, CBC, BMP, thyroid profile) were ordered on admission. There is no evidence that these test were ever performed as ordered.

A nurse practitioner from New England Geriatrics (NEG), a psychiatric service, saw Ms. Runge on 2/10/07. The contract was not signed by Ms. Runge with the reason that the client was unable to sign because of dementia, Alzheimer's and delusions.

115669

5

It was noted on the contract that the lawyer had HCP/POA. Once again, there is no evidence that the HCP was legally activated at this time.

During the NP's exam Ms. Runge was apparently "hording food and paper products in her room" according to the staff. The NP called Dr. Bloomingdale and he ordered that the dose of Zyprexa be increased. When Mr. Kelly was called for approval of the dose increase, he instructed the staff to do as the physician ordered.

Dr. Bregoli saw Ms. Runge on 2/12/02, assessed her as being anxious and agreed to increase the Zyprexa. He also wrote in note to check labs. There is no evidence that any labs were ordered or checked. He saw her again on 2/26/03 and noted Ms. Runge's behavior to be poor on Zyprexa, spoke with the RN, and agreed to put Ms. Runge on Buspar, an anti-anxiety medication. At this time, Ms. Runge's history of depression and active diagnosis at Sunbridge was still not addressed

The NP saw Ms. Runge on 3/3 /03 and staff reported her to be slightly better on Buspar 10mg twice a day. The NP documents that Ms. Runge was rambling about many different complaints including constipation (seems legitimate). The NP questioned the use of Paxil but never followed through with it. However she did increase the Buspar to 15mg twice a day.

Two days later, Dr. Bregoli came in and felt that Ms. Runge was doing well on Buspar 10mg and ordered that it be decreased.

On 3/26/03, Dr. Bregoli wrote a note that Ms. Runge was paranoid per staff. (This isn't a new symptom!) He increased the Zyprexa to 2.5mg in the AM and 5mg in the PM.

On 3/31, the NEG NP saw Ms. Runge and requested that labs be drawn (chemistry, liver function, CBC and u/a for c/s. She also requested that Ms. Runge be started on Zoloft 25mg/day x 1 week and if tolerated increase to 50mg every day.

When the NEG NP returned on month later, (4/21) and determined that Ms. Runge never had the requested labs done nor had she been started on the Zoloft as requested.

There never was an order for Zoloft. It is interesting to note that on the April medication sheet "Zoloft" was written but was never administered.

It is interesting to note, without any creditable documentation to support, there is a physician's telephone order on April 11, 2003 at 5 PM stating "Resident is no longer capable of making decisions, healthcare proxy is in effect per previously expressed wishes"

On or about 4/15/03 Ms. Runge began to refuse to take her evening medications. She was however compliant with taking all morning medications. Mr. Kelly was notified. Throughout the next few days while refusing to take her evening meds, Ms. Runge is quoted as saying that the medications make her sick and tired, she

takes enough medications in the morning and she will only take medications in the morning.

Mr. Kelly came to see Ms. Runge on April 24, 2003 and with the nurse present, both tried to convince her to take her medications. She refused to take that many medications. Dr. Bregoli had been aware of this. It was documented that Mr. Kelly was going to look into Guardianship and that nursing would call the next day and keep updated him if she continued to refuse medication.

On 4/25/03 there was a conference call with Mr. Kelly, the social worker and nurse. Ms. Runge was compliant with her medication that morning.

Dr. Bregoli ordered that Ms. Runge's evening meds be given in the morning as Ms. Runge was compliant with morning meds. He also ordered that psychiatry see Ms. Runge. Dr. Bloomingdale did not come to see Ms. Runge for 4 days after the physicians order. Coincidently, it was the same afternoon that Ms. Runge's daughter was visiting.

According to the nurse's notes, Ms. Runge realized that the medications had been increased in the morning and refused to take Zyprexa, Zoloft and Aricept. There are no medication administration documents that show evidence of the medications changed to the morning.

On April 29.2003, Ms. Runge's daughter and son-in-law took her out to lunch and when they returned to the facility, the presented the staff with a new POA and Healthcare Proxy. The facility refused to honor the documents.

Although Ms. Runge was anxious after her family visit, the nurse's notes document that she was pleasant and compliant with her meds and slept well all night.

The next day Ms. Runge went to the dining room for lunch and napped afterwards. Her daughter came to visit and apparently was following through with plans made the day before to leave the facility and come to live in North Carolina.

The facility and Mr. Kelly were not in agreement with this plan and documented that Ms. Runge's family had kidnapped her against her will.

Even though Ms. Runge was safe at her daughter's home in North Carolina, Mr. Kelly pursued the Guardianship and according to the social service documentation, the facility fully cooperated with Mr. Kelly's effort to seek and obtain Guardianship.

In summation, the care provided to Ms. Runge fell far below the standard of acceptable nursing care. The deviations in the standard care caused Ms. Runge to endure great stress, anxiety and frustration. The comprehensive plan of care was inadequate. When the plan of care no longer meets the resident's needs, a re-evaluation must done, new interventions must be developed and those changes must be reflected in the care plan.

115669

7

The intent of the admission to the facility was to care for the resident in a manner that promoted her quality of life. Right from the beginning of her admission the staff treated her as if she was severely cognitively defected. There is no evidence that the staff ever pursued her desire to move to North Carolina and by keeping her in locked unit they made her feel like a prisoner. The staff assessed her as paranoid rather than treating her like a human being and investigate her fears and concerns.

In conclusion, after a thorough review of the medical records, it is my opinion that the staff caring for Ms. Runge at the Sunbridge of Randolph denied her optimum outcomes by deliberate failures to develop a comprehensive care plan that would address her needs. They failed to follow through with the plan to discharge her to North Carolina to be close to her daughter as she desired and as she frequently informed the staff of such desire. They deemed her incompetent without adequately assuring that this was done in a legal manner. They continually violated her patient's rights.

## Deviations in the Standard of Care

**42 CFR #**

**483.10**     **Resident Right**
- Exercise her rights (483.10(a)
- Be in formed about what rights and responsibilities she has (483.10 (b)
- Choose a physician and treatment and participate in decisions and care planning(483.10(d))
- Voice grievances and have the facility respond to those grievances (483.10(f))
- Visit and be visited by others from outside the facility(483.10(j))
- Use a telephone in privacy(483.10(k)

**483.20**     **Resident Assessment**
Failed to accurately assess the resident

**483.15**     **Quality of Care**
Failed to care for the resident in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life

**483.40**     **Physician orders shall be followed**
Staff failed to follow physician orders when neglecting to do Laboratory work as ordered and give medications as ordered

**483.13(c)**     **Each Resident shall be free of abuse and neglect**

115669

8

These failures and deviations from prudent standards of care resulted in foreseeable harm to Ms. Runge. My opinion states in this report are based on a reasonable degree of nursing probability. These deviations were a substantial contributing factor affecting Ms. Runge's removal from the facility.

I reserve the right to amend or supplement this report as additional information is provided to me.

*Linda J. Fagan RN*
Linda J. Fagan R.N.

115669



LATSHA DAVIS YOHE
& McKENNA, P.C.
1700 BENT CREEK BOULEVARD, SUITE 140
MECHANICSBURG, PA 17050

MICHAEL WILLIAMS ESQ
LAWSON & WEITZEN LLP
88 BLACK FALCON AVE SUITE 145
BOSTON MA 02210-1736

