**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

EASTERN DIVISION

No. 05-10849RGS

DOROTHY STANLEY, EXECUTRIX OF THE
ESTATE OF HELEN A. RUNGE,
                                        Plaintiff


                    v.


WALTER J. KELLY,
KERRY L. BLOOMINGDALE, M.D., and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,
                                        Defendants

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE THE
TESTIMONY OF ARNOLD ROSENFELD, ESQ.
AND MOTION TO DISMISS FOR LACK OF EXPERT TESTIMONY**

NOW COMES the Defendant, Walter J. Kelly, and moves this honorable Court to

preclude the purported expert testimony of Arnold Rosenfeld, Esq. and to dismiss all

claims against Defendant Kelly.  In support of this motion, the Defendant states that the

expected expert testimony is insufficient as a matter of law.  In further support,

Defendant incorporates this memorandum and states as follows:

**BACKGROUND**

**A.**      **Plaintiff's Complaint and Allegations**

Plaintiff, Helen A. Runge ('Runge"), filed this lawsuit on April 27, 2005 against

Walter J. Kelly ("Kelly"), Kerry L. Bloomingdale, M.D. ("Bloomingdale") and

Sunbridge Nursing and Rehabilitation Center ("Sunbridge").[1]  When Plaintiff filed her

---

[1] The plaintiff, Helen Runge passed away on January 15, 2007 during this litigation, and the Executrix of
her estate, Dorothy Stanley, was substituted as the Plaintiff.  To avoid confusion, we refer to Runge as the
"Plaintiff" in this motion.

Complaint in this matter, she was a ninety-one (91) year-old woman, who had been a resident of Sunbridge Nursing and Rehabilitation Center ("Sunbridge") up until April 29, 2003.  [See Second Amended Complaint, attached hereto as Exhibit A, ¶ 1,6].  Upon her own volition, Plaintiff first entered into assisted living at Marion Manor in 2001, at the age of eighty-five. [Exhibit A, ¶13-14].  In 2001, Plaintiff contacted Defendant Kelly to provide her with legal assistance as a result of her decision to and in preparation of entering into Marion Manor.  [Exhibit A, ¶ 13].  Plaintiff alleges that at about this time, Defendant Kelly drafted paperwork that would make himself her power of attorney and her medical power of attorney, either unknown to Runge or without her fully understanding his actions. [Exhibit A, ¶ 16].

After living at Marion Manor for some months, Plaintiff decided to move to Bayview Assisted Living in November of 2002, so that she could have a private room. [Exhibit A, ¶ 19].  Plaintiff claims that while at Bayview, her prescription drug card was either stolen or misused by employees, and management was slow in addressing or failed to address her concerns.  [Exhibit A, ¶20].  She also alleges that Defendant Kelly knew of these facts, but failed to act on behalf of the Plaintiff.  [Exhibit A, ¶ 20].  In January of 2003, Plaintiff accused staff of rummaging through her belongings allegedly with the intent to steal, and contacted the police.  [Exhibit A, ¶21].  Plaintiff alleges that Bayview then contacted Defendant Kelly, who directed that Plaintiff be taken to Carney Hospital for psychiatric evaluation.  [Exhibit A, ¶22].  Plaintiff also alleges that upon her discharge from Carney Hospital, she was admitted to Defendant Sunbridge's skilled care facility. [Exhibit A, ¶24].

107439.1

Plaintiff also claims that at Sunbridge she was unnecessarily medicated to impair her cognitive abilities and to keep her in a state of diminished capacity. [Exhibit A, ¶28]. She claims that she "was held captive and against her will at that facility." [Id.]. Plaintiff alleges Sunbridge took no action to have her moved to another facility because keeping her there was financially lucrative. [Id.].

She alleges Defendant Sunbridge and Kelly directed Defendant Dr. Bloomingdale to examine the Plaintiff and render an opinion that the Plaintiff was mentally incompetent. [Exhibit A, ¶36-38]. Plaintiff alleges that Defendant Kelly enlisted the aid of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition to the court to have himself appointed guardian of the Plaintiff after she was taken to North Carolina by her daughter and son-in-law. [Exhibit A, ¶ 47]

In addition to separate counts against co-defendants, Plaintiff asserts various counts against Defendant Kelly, including negligence (Count III), abuse of process (Count IX), false imprisonment (Count IX), intentional infliction of emotional distress (Count X), negligent infliction of emotional distress (Count XI), breach of contract (Count XII), breach of fiduciary duty (Count XIII), and violation of M.G.L. c. 93A (Count XVI). Plaintiff relies upon the same set of facts as set forth above for all counts. As to the Negligence and Breach of Contract counts, she alleges that Defendant Kelly's conduct "deviates from the standard of care owed by him to Runge" and Defendant Kelly breached his contract with Runge to provide professional services. [Exhibit A, ¶57, 98]. As to the False Imprisonment, Plaintiff simply alleges that Defendant Kelly "did unlawfully confine Plaintiff." [Exhibit A, ¶83]. As to the Intentional and Negligence Infliction of Emotional Distress claims, Plaintiff simply pleads Defendant Kelly's

107439.1

intentional and negligent actions caused Plaintiff emotional distress. [Exhibit A, ¶87, 92].

Plaintiff further alleges that Kelly breached his fiduciary duty to her as her attorney,

Power of Attorney, Health Care Proxy and Guardian. [Exhibit A, ¶102-105]. Plaintiff

also alleges that Defendant Kelly abused process through the filing of the Guardianship

petition to gain control of and deplete Plaintiff's assets. [Exhibit A, ¶107-108]. Finally,

Plaintiff alleges that Defendant Kelly's actions were in violation of M.G.L. c. 93A.

[Exhibit A, ¶114].

**B.      Plaintiff's Expert Disclosure**

Plaintiff has disclosed Arnold Rosenfeld, Esq. as an expert whom plaintiff expects

to testify at the trial of this matter. [See Plaintiff's Expert Disclosure, attached as Exhibit

B]. According to the disclosure, Attorney Rosenfeld is only expected to testify that it is

his opinion that Defendant Kelly violated Rules 1.14 and 1.7(b) of the Rules of

Professional Conduct.


## ARGUMENT

**A.      Expert Testimony Concerning the Fact of an Ethical Violation is not
Admissible.**

Attorney Rosenfeld's proffered testimony solely concerns his opinion that

Defendant violated Rules 1.14 and 1.7(b) of the Rules of Professional Conduct.

However, "[e]xpert testimony concerning the fact of an ethical violation is not

appropriate…a judge can instruct the jury (or himself) concerning the requirements of

ethical rules. The jurors need no expert on legal ethics to assess whether a disciplinary

rule was violated. A jury would not be aided, and their function could be impinged upon,

107439.1

by expert testimony in such a circumstance." Fishman v. Brooks, 396 Mass. 643, 650 (1986). Federal Rule of Evidence 702 permits expert testimony "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Attorney Rosenfeld's testimony that Defendant Kelly violated Rules of Professional Conduct would not assist the trier of fact to understand the evidence or determine a fact in issue, rather it is a conclusion of law and abdicates the role of the trier of fact.[2] Therefore, the proffered testimony is not admissible under Rule 702.

Moreover, the purported expert testimony would be a waste of time and should be precluded pursuant to Rule 403, because it would confuse and mislead the jury and unfairly prejudice the defendant. See Fed. R. Evid. Rule 403 ("…evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time…"). A plaintiff in a legal malpractice action must establish the standard of professional skill or care through expert testimony. See Brown v. Gerstein, 17 Mass. App. Ct. 558. 566 (1984). Plaintiff's expert fails to address the applicable standard of care and whether or not Defendant Kelly breached that standard. Instead, the Plaintiff's expert is expected to testify that Defendant breached Rules of Professional

---

[2] In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1239, 1246 (N.D. Ca. 2000) (striking from the record "three declarations from law professors opining on the ethical propriety of the various solicitation tactics that the firm employed, a purely legal question"); GST Telecomm., Inc. v. Irwin, 192 F.R.D. 109, 111 (S.D.N.Y. 2000) (stating that "testimony of legal experts on ethics in the profession is hardly an occasion for which credible experts supply legal opinions") (Pollack, J.) (citation and quotation marks omitted); Commonwealth v. Lambert, 1998 WL 558749, at *10 n.34 (Pa. Com. Pl. Aug. 24, 1998) (excluding Professor Wolfram's testimony on ethical propriety of lawyers' conduct and stating: "The interpretation of the Rules of Professional Conduct and the Rules of Criminal Procedure is a legal issue to be decided by a court, for which use of an expert would be wholly inappropriate. A court may not abdicate its role to determine the ultimate issue by allowing expert testimony.").

107439.1

Conduct.  However, a violation of the Rules of Professional Conduct does not give rise to a cause of action against an attorney.  See Doe v. Nutter, McClennen & Fish, 41 Mass. App. Ct. 137, 141, 668 N.E.2d 1329, 1333 (1996)(assuming that defendant attorney's conduct violated a rule, "the violation would not give rise to a cause of action"); Fishman v. Brooks, 396 Mass. 643, 649, 487 N.E.2d 1377 (1986)(The disciplinary rules provide standards of professional conduct of attorneys and do not in and of themselves create independent causes of action).  Therefore, there is a high likelihood that the jury will be mislead into thinking that a violation of a professional rule is a breach of the applicable standard of care, and the testimony should not be allowed.

**B.    The Expert's Opinion is Insufficient to Satisfy the Plaintiff's Burden of Proof and Should be Excluded and the Claims Against Defendant Kelly Should be Dismissed.**

While violation of the rules can be some evidence of negligence, this alone does not fulfill the plaintiff's burden of proof against a defendant attorney, and therefore, Attorney Rosenfeld should be precluded from testifying at the trial of this matter.  See Fishman, 396 Mass. at 646; See Nutter, McClennen & Fish, 668 N.E.2d at 1333.  See also McElroy v. Robinson & Cole, LLP, 2001 Mass. Super. LEXIS 455 (October 25, 2001).  A Massachusetts Court has already found Attorney Rosenfeld's opinion that a defendant attorney violated the professional rules insufficient in a legal malpractice action.  In McElroy, the same expert at issue in this case, Attorney Rosenfeld, offered a similar expert opinion that the defendants' conduct was in violation of the Massachusetts Rules of Professional Responsibility.  The court noted that Massachusetts law bars such opinion testimony, but held that even if such testimony were admissible to prove the asserted violation, "it would not suffice to meet the plaintiff's burden of proof."

McElroy, 2001 Mass. Super. LEXIS 455, *27.[3]  The Court stated:  "Having offered no evidence to show the applicable standard of care under the circumstances, any breach of that standard, or any injury resulting from any such breach, the plaintiff has failed to demonstrate any reasonable expectation that he would be able to meet his burden of proof at trial on the elements of the claim of legal malpractice."  Id. at *28.  The Court did not rule on defendants' motion to strike Attorney Rosenfeld's opinion, because it found the evidence was insufficient to meet the plaintiff's burden of proof and that defendants were entitled to judgment as a matter of law.  Id. at *42.

As in McElroy, Attorney Rosenfeld's opinion is insufficient to meet the plaintiff's burden.  The plaintiff has the burden of introducing expert testimony that Defendant Kelly did not exercise the degree of learning and skill ordinarily possessed by attorneys in similar circumstances.  If the plaintiff has failed to present credible expert testimony that the defendant attorney breached the applicable standard of care, then the plaintiff cannot prove her case.  See Brown v. Gerstein, 17 Mass. App. Ct. 558, 566 (1984).  Assuming for argument's sake that it is admissible, as a matter of law, plaintiffs will be unable to meet their burden of proof as Attorney Rosenfeld's opinion fails to address whether defendant Kelly breached the applicable standard of care.  Therefore, whether or not this Court allows Attorney Rosenfeld's testimony, the claims against Defendant Kelly must be dismissed as a matter of law.

---

[3] While the Court applied Connecticut law, it cited both Connecticut and Massachusetts law for the holding that "…a plaintiff in a legal malpractice action must establish the standard of professional skill or care through expert testimony…", and "…evidence of a violation of the Rules of Professional Conduct does not meet this burden...".  McElroy, 2001 Mass. Super. LEXIS at *27-28, citing Vanacore v. Kennedy, 86 F. Supp. 2d 42, 48 (D. Conn. 1998); Standish v. Sotavento Corp., 58 Conn. App. 789, 796, 755 A.2d 910 (2000); Fishman v. Brooks, 396 Mass. 643, 646, 487 N.E.2d 1377 (1986).

7

While Plaintiff has asserted various counts against Defendant Kelly, including negligence (Count III), abuse of process (Count IX), false imprisonment (Count IX), intentional infliction of emotional distress (Count X), negligent infliction of emotional distress (Count XI), breach of contract (Count XII), breach of fiduciary duty (Count XIII), and violation of M.G.L. c. 93A (Count XVI), all of those claims are based upon the same factual allegations and are dependent upon whether or not what Attorney Kelly did concerning his client, Helen Runge, was below the applicable standard of care. Therefore, all plaintiffs' claims against Defendant Kelly must be dismissed.

In particular, the negligence (Count III), breach of fiduciary duty (Count XIII) and breach of contract counts (Count XII) are all essentially a claim for legal malpractice, and should be dismissed. See Fall River Savings Bank v. Callahan, 18 Mass. App. Ct. 776, 81-82, 463 N.E.2d 555 (1984); Callahan v. Foley, 2007 Mass. Super. LEXIS 432 (Sept. 26, 2007)(dismissing the plaintiff's negligence, breach of fiduciary duty and breach of contract counts for lack of a legal malpractice expert because the facts giving rise to these claims were the same). Similarly, because the M.G.L. c. 93A claims is dependent on the attorney-client relationship, it also must be dismissed.

Likewise, the facts upon which these malpractice claims are based in this matter, are the same facts upon which plaintiff bases the remaining claims of abuse of process, false imprisonment, negligent and intentional infliction of emotional distress and violation of M.G.L. c. 93A. Because plaintiff cannot establish that Defendant Kelly was negligent, she will be unable to satisfy her burden of proof on the negligent infliction of emotional distress claim. If Defendant Kelly did not breach the standard of case, then he did not negligently inflict emotional distress. Here, the Plaintiff cannot prove the

standard of care was breached, because the expert testimony is defective and should be excluded. Therefore, Plaintiff cannot prove negligent infliction of emotional distress. Likewise, without expert testimony to establish that Defendant Kelly's conduct was below the standard of care to the extent that it was extreme and outrageous and beyond all possible bounds of decency and was utterly intolerable in a civilized community, plaintiff will be unable to establish her burden on the intentional infliction of emotional distress count. See Caputo v. Boston Edison Co., 924 F.2d 11 (1st Cir. 1991).

Plaintiff's abuse of process and false imprisonment counts are based on the factual allegations that Defendant Kelly kept the Plaintiff at Sunbridge and petitioned the court for guardianship of the plaintiff. Expert testimony is required to establish whether Defendant Kelly's actions in this regard was not what an average qualified elder care attorney would have done under the circumstances of this case, and therefore the counts should be dismissed for lack of expert testimony. As to the abuse of process claim, Plaintiff claims that Defendant's filing of the guardianship petition was done with the improper purpose of gaining control of her assets so that he could pay himself fees. The Plaintiff would need expert testimony to establish that the fees paid to Defendant Kelly under the Guardianship were unreasonable or otherwise inappropriate. No such expert testimony has been offered. As to the False Imprisonment claim, based on Plaintiff's bare allegation that she was "unlawfully confined" it is difficult to guess what the Plaintiff alleges was confinement and where she was confined, but presumably Plaintiff bases that count on Defendant Kelly's actions while she was a resident in the various facilities and he acted as her attorney. In any event, Plaintiff would need an expert to establish that Defendant Kelly's actions under the circumstances were outside the

107439.1

standard of care, and thus lead to an *unlawful* confinement of the Plaintiff. Therefore, all

counts against Defendant Kelly should be dismissed based on the lack of expert

testimony.

## CONCLUSION

WHEREFORE, Defendant respectfully requests that this Honorable Court

preclude Arnold Rosenfeld from testifying at trial of this matter and dismiss all claims

against Defendant Kelly.

Respectfully submitted,

The Defendant, Walter J. Kelly,

By his attorneys,

*s/ Michele Carlucci*

George C. Rockas, BBO #544009
Michele Carlucci, BBO #655211
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER  LLP
260 Franklin Street
Boston, MA 02110
(617) 422-5300

## CERTIFICATE OF SERVICE

I, Michele Carlucci, certify that on January 18, 2008 I have served a copy of the
foregoing by electronic filing.

*/s/ Michele Carlucci*
Michele Carlucci

107439.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HELEN A. RUNGE,                    :
            Plaintiff    :
                    :    No. 05-10849-RGS
                    :    (Judge Stearns)
         v.    :    Leave to File Granted on January 4, 2007
                    :
                    :
WALTER J. KELLY, et al.            :    CIVIL ACTION
            Defendants :    JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

### I.    Jurisdiction

Jurisdiction is invoked pursuant to 28 U.S.C. § 1332 on the ground that there is complete diversity of citizenship between the parties. At all times relevant to this action, Plaintiff has been a resident of the State of North Carolina and Defendants have been residents of, and/or have a principal place of business in, Massachusetts; the prayer for relief exceeds $75,000.

### II.    Venue

Venue in this district is authorized by 28 U.S.C. § 1391(c), under residency, and because a substantial part of the events or omissions giving rise to Plaintiff's claims arose here.

### III.  Parties

1.  Plaintiff Helen A. Runge, is a 91-year old adult individual who currently resides at White Oak Manor, 70 Oak Street, Tryon, North Carolina 28782.

2.  Defendant Walter J. Kelly (hereinafter referred to as "Defendant Kelly"), an adult individual, is a member of the Massachusetts Bar with a place of business at 1996 Centre Street, West Roxbury, Massachusetts 02132.

3.  Defendant Kerry L. Bloomingdale, M.D. (hereinafter referred to as "Defendant Bloomingdale"), an adult individual, is a licensed medical practitioner with a place of business at 592 Quinobequin Road, Waban, Massachusetts 02468.

4.  Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph (hereinafter referred to as "Defendant Sunbridge") is a corporation licensed to do business in Massachusetts trading and doing business as Sunbridge Care and Rehabilitation for Randolph with a business address of 49 Thomas Patten Drive, Randolph, Massachusetts 02368.

### IV.  Background

6.  Helen A. Runge (hereinafter referred to as "Runge" or "Plaintiff"), an adult individual, born in 1915, was a lifetime resident of Boston, Massachusetts, until moving to North Carolina in late April 2003 to live with her daughter, Dorothy Stanley, and son-in-law, Gilbert Stanley.

7.  Runge was born in South Boston, Massachusetts, to Lithuanian parents, has supported herself since age 15, was married for a short period of time, and had one

daughter Dorothy Stanley née Runge as a result of that union, who was born on January 4, 1941.

8.    Soon after the birth of her daughter, Dorothy, Runge became divorced from her husband and the father of Dorothy and thereafter lived and worked in the Boston area until April 2003 as a single person.

9.    Runge was employed by NSTAR (Boston Edison) for 30 plus years until her retirement sometime around 1980.

10.    Runge lived by herself for nearly 30 years in a third-floor, walk-up apartment in the Hyde Park area of Boston at 75 Sierra Road, Hyde Park, Massachusetts.

11.    Runge always managed her own affairs including her finances. For years, when necessary, Runge utilized Attorney Peter Kerr, who retired from the practice of law in 1998.

12.    Kerr shared office space with Defendant Kelly who represented himself to Runge be the law partner of Kerr when, in fact, the only relationship was that they shared office space.

13.    In 2001, Runge contacted Defendant Kelly, understanding that he had taken over Attorney Kerr's clients, to provide her with legal assistance as a result of her decision to and in preparation of entering an assisted living facility, Marian Manor.

14.    At the time of the decision to enter Marian Manor, Runge, who was still living in the Hyde Park section of Boston, was 85 years of age, and was finding it increasingly difficult to climb the four flights of stairs to her apartment. Runge felt that

it was important for her to be near persons closer to her age and also in a facility that would look out for her and care for her, if necessary.

15.    Runge was aware of Marian Manor in South Boston through her various Catholic church contacts and was also aware that it had a good reputation among people of her parish.

16.    After having visited the facility, Runge moved into Marian Manor in July 2001. Either unknown to Runge, or without her fully understanding his actions, at or about the time of this move, Defendant Kelly drafted paperwork that would make himself not only her power of attorney but also her medical power of attorney for health problems. Defendant Kelly advised and had Runge sign paperwork, which he had prepared, to have himself appointed into these positions so that he could act on Runge's behalf and most importantly, control her finances which included her life savings.

17.    Upon her moving into Marian Manor, Defendant Kelly made himself Runge's primary point of contact for health problems. Defendant Kelly knew that Runge had a daughter, Dorothy, yet he readily usurped this position of authority with little to no contact with Runge's daughter or family. As a result, Runge's daughter could not receive any medical information concerning her mother directly from Marion Manor but, rather, she was forced to receive the information through Defendant Kelly. Defendant Kelly using color of law misrepresented himself to Runge as being able to act on her behalf.

18.    Upon more fully understanding the significance of her appointment of a power of attorney, and after having met with her daughter on several occasions to discuss her care while at Marian Manor, and feeling more comfortable with her daughter, who was a health care professional, being able to address issues on her behalf from her home in North Carolina, Runge signed paperwork at Marion Manor to have her daughter, Dorothy, made her responsible party with Marion Manor.

19.    After having lived at Marian Manor for numerous months in a room that was occupied by herself and another resident, which was a significant life change after having lived by herself for over 30 years, Runge decided that another assisted living facility, where she could have a private room, may be more appropriate for her lifestyle. She moved to Bayview Assisted Living on or about November 2002.

20.    While a resident at Bayview Assisted Living, Runge's prescription drug card, which was one of her retirement benefits, was either stolen or misused by persons (employees) who were subsequently identified; an act which was highly upsetting to Runge. Runge had been in charge of her own affairs for many years and was very knowledgeable and independent in that regard. Runge became further upset when management was slow or failed to address her concerns as she felt that they were somehow dismissing her concerns because of her age and sex, and were acting rather to protect their own employees. Defendant Kelly knew of these facts, however, failed to act on behalf of Runge.

21.    In January 2003, Runge returned to her room at Bayview after having been out for the day to find that her room had been rummaged through by a person or

persons, apparently looking for her valuables or drugs. Runge reported this to the Bayview staff, who took no apparent action. In fact, staff seemed to dismiss Runge's expressed concerns. This caused Runge to become agitated and angry and further caused her to take matters into her own capable hands and report the incident to the local police.

22.    As a result of Runge's agitation, frustration and anger, but more probably, because Runge reported the incident to the local police and implicated staff, Bayview called Defendant Kelly to report the situation. Rather than address this situation on any fiduciary and concerned level on behalf of Runge, Defendant Kelly directed that Runge be taken to Carney Hospital in Boston for a psychiatric evaluation. Upon information and belief, Defendant Kelly had only seen Runge on approximately two occasions in the preceding six months. Defendant Kelly had no firsthand knowledge of the need for such evaluation. Defendant Kelly, in his capacity of a fiduciary, misrepresented facts to Runge in order that she be held at Carney Hospital.

23.    Before leaving Bayview, Runge overheard Defendant Kelly, who was speaking to a staff member, say that she was "mental." This was emotionally traumatizing to Runge. Before she left Bayview, Runge asked Defendant Kelly what would become of her and her possessions. Defendant Kelly indicated that he would take care of them. Runge made Defendant Kelly aware that her few remaining possessions which were in and decorated her living quarters at Bayview were important to her. Defendant Kelly became visibly upset and angry at Runge. Contrary to Defendant Kelly's advice that he should and would undertake fiduciary powers on

Runge's behalf, Defendant Kelly did not faithfully fulfill his fiduciary obligations on behalf of Runge.  Defendant Kelly did, however, charge Runge for his professional services for purportedly the time he was acting on her behalf.

24.   Runge was discharged from Carney Hospital, and upon information and belief, she was not returned to Bayview but rather, at the direction of Defendant Kelly, was taken to and admitted in Defendant Sunbridge, a skilled care nursing facility with which Defendant Kelly was very familiar and had a professional relationship as other elderly clients of Defendant Kelly had been or were residents there.

25.   Runge had no previous experience with or knowledge of Defendant Sunbridge, was not aware that she was being taken to Defendant Sunbridge and did not voluntarily consent to being admitted there nor to any skilled care nursing facility. Runge had questioned Defendant Kelly as to when she could be discharged from Carney Hospital, questioning options with Defendant Kelly as to where she could then live, when he had falsely advised her she could not return to Bayview.  Defendant Kelly insisted and directed that Runge could not return to Bayview but rather would go to Defendant Sunbridge, and he presented her with no other option.  Defendant Kelly did not discuss this decision with Runge nor did he discuss this with her daughter, Dorothy Stanley.

26.   Defendant Kelly provided admission paperwork for Sunbridge to Runge and directed that she needed to execute said paperwork so that he could satisfy her financial obligations to live at the facility.  No discussion took place concerning the implications of her signing the admission paperwork.  Defendant Kelly failed to

properly advise Runge in this regard. Defendant Kelly facilitated Runge's admission to Defendant Sunbridge knowing full well that she had no desire to be at the facility. Upon information and belief, Defendant Kelly had a relationship with Defendant Sunbridge and both served to benefit by Runge's admission.

27.     Runge found the living conditions and care at Defendant Sunbridge to be deplorable and unacceptable. Runge was very unhappy during her stay at Defendant Sunbridge. On numerous occasions she requested that Defendant Kelly facilitate her move to more appropriate care and living accommodations. Defendant Kelly refused and did not take any action in that regard. Runge advised Defendant Kelly that she was being forced to take medications that were unnecessary and impaired her mental capacity. Defendant Kelly took no action. Defendant Kelly refused Runge's various requests for help and required that she stay at Defendant Sunbridge. Defendant Kelly took no affirmative action to help Runge, address her concerns or provide a more suitable living situation.

28.     During her stay at Defendant Sunbridge, Runge received numerous medications which impaired her cognitive abilities. These medications caused her to be in a stupor and to feel as though she was intoxicated. These medications affected her motor skills, including her ability to walk. These medications also caused her to be groggy and sleep more hours during the day than usual. During January, February, March and April 2003, Runge, while resident at Defendant Sunbridge, was held captive and against her will at that facility. Upon information and belief, Defendants Kelly and Sunbridge conspired to keep Runge in this state of diminished capacity. Upon

information and belief, Defendant Sunbridge took no action to have her moved to an assisted living environment because keeping Runge at Sunbridge was financially lucrative. Runge was a private pay resident which allowed Defendant Sunbridge to collect higher daily rates than from its Medical Assistance residents.

29.    In March 2003, with the help of a staff nurse, Runge was able to purloin writing paper, an envelope and stamp, and as a result, wrote a letter to her daughter, Dorothy Stanley. Runge advised her daughter of her predicament and the fact that she was being held against her will at Defendant Sunbridge and that Defendant Kelly would do nothing to assist her. Defendant Kelly had refused to act on Runge's request that he have her medications stopped or adjusted and that he have her moved to other living accommodations.

30.    When Runge questioned her need to take the medication, not only management at the nursing home, but also Defendant Kelly insisted that she take the medication indicating that if she refused to take medication, it would be forced upon her. In fact, during a conversation with Dorothy Stanley about April 25, 2003, Defendant Kelly indicated that he was considering having a guardian appointed to force Runge, against her will, to take medication. During that conversation, both Dorothy Stanley and her husband advised Defendant Kelly that they felt Runge was being overmedicated by the care providers at Defendant Sunbridge. The Stanleys indicated that Defendant Kelly should not take any action to appoint a guardian and that they would travel to Boston from their North Carolina residence, arriving Wednesday, April 30, to assess the situation.

31.    On or about April 29, 2003, Runge's daughter, Dorothy Stanley, along with her husband, visited Runge in her room at Defendant Sunbridge. Dorothy Stanley had purposefully arrived one day earlier than Defendant Kelly and Defendant Sunbridge had anticipated so that she could observe their mother's condition. During that visit, Runge directed the staff, who seemed quite concerned that her daughter had arrived one day early, to provide her daughter with Runge's medical records, however, the nursing staff and administration refused to follow the directions of the resident and did not give her those records. Upon information and belief, Defendant Kelly had advised the staff not to provide these records to the family of Runge. Defendant Sunbridge's refusal constitutes abuse.

32.    During the April 29 discussion between Runge and her daughter, it was learned by Runge's daughter, Dorothy, that while at Defendant Sunbridge, Runge was denied her usual medical care from her podiatrist, dentist, ear doctor and eye doctor. Runge had not been provided with adequate clothing and personal hygiene products. These actions constitute abuse. Runge had not been given money in order to purchase these items or to purchase writing stationery or stamps. She had been denied access to the phone in order to be able to call her daughter.

33.    After having long discussions with her daughter, Runge indicated that she wanted to "fire" Defendant Kelly as she did not trust him and wanted no more to do with him. Runge indicated that she felt he was taking her money while treating her with contempt. Dorothy Stanley placed a call to Defendant Kelly's office and left a message in his voice mail system directing him to call Stanley to discuss her mother, the

conditions at Defendant Sunbridge and Defendant Kelly's dismissal as her mother's attorney.

34.    Dorothy Stanley asked Runge whether Runge wanted her daughter to become her health care proxy rather than Defendant Kelly.    Runge indicated that she would be delighted to have her daughter serve as her health care proxy.    Moreover, Runge indicated that she wanted her son-in-law, Gilbert Stanley, to be her power of attorney.    Runge made it clear that she did not want Defendant Kelly to ever act on her behalf again.

35.    After repeatedly representing to Defendant Sunbridge that she wanted nothing further to do with Defendant Kelly, Runge and her daughter and son-in-law took a trip outside of the facility, at which time they executed documentation which revoked Defendant Kelly's authority to serve as Runge's health care proxy and power of attorney.    Moreover, Runge executed documentation which then appointed Dorothy Stanley her health care proxy and her son-in-law, Gilbert Stanley, her power of attorney.    These documents were notarized before a Massachusetts notary public prior to Runge's return to the facility some hours later.    At that time, there was no adjudication that Runge was incapacitated or lacked the capacity to make such appointments.

36.    While Dorothy and Gilbert Stanley were meeting with Defendant Sunbridge's nursing and administrative staff with regard to the appointment to act on their mother's behalf and her discharge from the facility, Defendant Bloomingdale, without request or permission from either Runge or Dorothy Stanley, her then health

care proxy, entered Runge's room and purportedly gave a medical examination or consultation by asking her several questions including, "Why don't you want to take your medicine?"

37.    Runge's response to Defendant Bloomingdale was, "If I don't need medicine, then no one should tell me what to take." Runge further questioned, "If you didn't have a headache, would you take Tylenol in case you might get one?" Defendant Bloomingdale answered her question saying that he would not and thereafter left Runge's room.

38.    Upon information and belief, the conversation between Runge and Defendant Bloomingdale was brief, lasting only several minutes, however, upon information and belief, Defendant Bloomingdale rendered a medical opinion at the direction of Defendant Kelly and Defendant Sunbridge that Runge was mentally incompetent as a result of his brief and solitary interaction with her. Upon information and belief, Defendant Bloomingdale was requested to examine Runge by Defendant Kelly, who by that time had no authority to act on her behalf. Alternatively, Defendant Bloomingdale was requested to examine Runge by Defendant Sunbridge who had knowledge that Runge wanted to leave the facility. Upon further information and belief, Defendant Bloomingdale has a business relationship with Defendant Sunbridge and generates substantial professional fees while performing services at their request for residents. The examination by Defendant Bloomingdale failed to meet any acceptable standards of practice.

39.     Dorothy and Gilbert Stanley informed Runge that Defendant Sunbridge's staff would not recognize the health care proxy or the power of attorney and would not allow Runge to be discharged.  Runge was visibly and emotionally upset to learn that Defendant Sunbridge would not follow her wishes.  Runge expressed her desire to leave the facility with her daughter and son-in-law and to reside with them in North Carolina.  Management at Defendant Sunbridge was fully made aware that their actions were directly against the wishes of Runge and her fiduciaries, Dorothy and Gilbert Stanley.  Such conduct by Defendant Sunbridge constitutes abuse.  Upon information and belief, management of Defendant Sunbridge was acting at the direction or in concert with Defendant Kelly and Defendant Bloomingdale in refusing to allow Runge to be discharged.

40.     On April 30, Dorothy and Gilbert Stanley arrived at Defendant Sunbridge at approximately 2:00 p.m. and were told by the staff that Defendant Kelly had directed that Runge not be allowed to leave the nursing floor.  This fact was significant to the Stanleys as Defendant Kelly had not returned their phone call nor had he made any effort to discuss Runge's situation with them.  Rather, it appeared that Defendant Kelly was orchestrating a scheme to hold Runge at the facility against her will.  Defendant Sunbridge had made Defendant Kelly aware that his power of attorney had been revoked by Runge.  After a long discussion, during which the management of Defendant Sunbridge was again told by the Stanleys that Defendant Kelly had no authority to act on Runge's behalf, the Stanleys insisted that Runge be allowed to leave the facility.  At no time did staff from Defendant Sunbridge communicate with Runge

to gain an understanding of her desire.  After some period of time, staff agreed that Runge could accompany her children from her nursing floor to the first floor lobby in order to have a private conversation as long as a large male nursing assistant and employee of Defendant Sunbridge accompany them.  Upon information and belief, this was not typical procedure for Defendant Sunbridge who was attempting to influence and intimidate both Runge and the Stanleys and prevent Runge from voluntarily discharging herself.

41.    Upon reaching the front lobby of the building, Runge's children ushered her through the door and into their waiting vehicle.  The large male nursing assistant, along with other employees, attempted to physically restrain Runge and her children from exiting the building.  One if not several employees grabbed both Dorothy and Gilbert Stanley in an attempt to stop them and prevent Runge from departing.

42.    Once the Stanleys and Runge were finally in their vehicle, the vehicle was slowly driven down the driveway and the employees moved aside.  At about this time, it appeared that the facility had summoned the local police as a police cruiser was coming up Defendant Sunbridge's driveway as Runge was exiting the facility with her children.  The employees, including several attendants, the social worker supervisor and the nursing home director, attempted to prevent the vehicle from leaving by standing in front and back of the vehicle.

43.    Runge accompanied her children to their residence in North Carolina, where she remains today.  The day after this event, Runge caused the facility to be called by a third party and informed Defendant Sunbridge that she was safe and that

112160                                    14

there should be no concern for her wellbeing. Likewise, Defendant Kelly received the same phone call advising him of Runge's wellbeing and that she could be contacted at her new residence in North Carolina with her daughter, Dorothy Stanley. Defendant Sunbridge was directed to send Runge's belongings to the North Carolina address, however, the facility refused to cooperate in any manner, indicating that this was a police matter.

44. Upon arrival in North Carolina, Runge was taken by her children to the local hospital for a physical examination by a qualified medical doctor. Runge was also given a psychiatric evaluation which indicated that she was a competent, well-oriented, 88-year old female, who was in no need of psychiatric or psychotropic medication.

45. At no time did Runge authorize Defendant Kelly to act on her behalf as a temporary guardian. Upon information and belief, on April 30, 2003, in the midst of the above events occurring, Defendant Kelly, rather than being concerned with Runge's medical wellbeing or contacting the Stanleys, contacted her two financial institutions, Hyde Park Credit Union and Member Service Credit Union, directing both financial institutions to freeze her accounts. Defendant Kelly took this action knowing that he had no authority to act on behalf of Runge and also knowing that freezing her access to her financial accounts could have a potential and significant effect on her health. Upon information and belief, these actions were taken in concert with Defendant Sunbridge in order that the Defendants could obtain funds from these accounts.

46. The Nursing Home Reform Act, part of Title XIX of the Social Security Act, requires that nursing facilities, in accordance with a written plan of care, provide

services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident . . . . 42 U.S.C. § 1396r(b)(2). Under such plan of care, nursing homes such as Defendant Sunbridge must ensure that the resident receives services necessary to allow him or her to ambulate. 42 C.F.R. § 483.25. To develop this plan of care, nursing facilities must upon an individual's entry into the facility and periodically thereafter "conduct a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity." 42 U.S.C. § 1396r(b)(3)(A). Its assessments include an individual's potential for discharge as well as his or her physical functioning. 42 C.F.R. § 483.20(b). Under Title XIX, nursing facilities must provide residents with "sufficient preparation" to ensure their "safe and orderly transfer or discharge" from the facility. 42 C.F.R. § 483.12(a)(7). State Medicaid agencies are responsible for ensuring that nursing facilities who receive medical assistance comply with the Nursing Home Reform Act's provisions. Defendant Sunbridge failed to meet and comply with these provisions.

47.    On or about May 2, 2003, three days after Runge had left Defendant Sunbridge's facility, as well as the State of Massachusetts, and with full knowledge of that fact, Defendant Kelly filed an ex parte petition seeking to have himself appointed as guardian of Runge. Prior to filing such petition, Defendants Kelly and Sunbridge had knowledge that Runge had dismissed him as her counsel and revoked both the power of attorney and medical power of attorney which had previously authorized him to act on her behalf if necessary. Defendants Kelly and Sunbridge had been notified that Runge had made a choice to leave Sunbridge voluntarily and that she was safe and

well and living with her daughter in North Carolina. Defendant Kelly enlisted the aid of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition, misrepresenting facts to the court and having himself appointed guardian of Runge.

48.    Prior to having himself appointed guardian of Runge, Defendant Kelly notified North Carolina police local to Runge and her daughter and son-in-law, the Stanleys, and reported that she was being held against her will. This false reporting by Defendant Kelly was made for the purpose of aiding and abetting his scheme to have himself appointed as guardian of Runge to gain control over her financial estate and to cause embarrassment and harm to both Runge and the Stanleys.

49.    Upon information and belief, soon after Defendant Kelly's ex parte appointment as the guardian of Runge, he undertook a scheme to distribute funds from her estate to make payment for services allegedly rendered by himself, Defendant Bloomingdale and Defendant Sunbridge.

### COUNT I

#### Negligence
#### (vs. Bloomingdale)

50.    Plaintiff incorporates by reference Paragraphs 1 through 49 of this Complaint as though same were fully set forth at length herein.

51.    The conduct of Defendant Bloomingdale, as alleged in the foregoing claims constitute negligence as it deviates from the standards of care owed by him to Runge.

112160

17

52.     As a result of Defendant Bloomingdale's negligence, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Kerry Bloomingdale, M.D., on Count I together with interest and costs of this action.

## COUNT II

### Negligence
### (vs. Defendant Sunbridge)

53.     Plaintiff incorporates by reference Paragraphs 1 through 52 of this Complaint as though same were fully set forth at length herein.

54.     The conduct of Defendant Sunbridge, as alleged in the foregoing claims, constitutes negligence as it deviates from the standards of care owed by it, its employees, agents, servants or assigns, to Runge.

55.     As a result of Defendant Sunbridge's negligence, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count II together with interest and costs of this action.

## COUNT III

### Negligence
### (vs. Defendant Kelly)

56.    Plaintiff incorporates by reference Paragraphs 1 through 55 of this Complaint as though same were fully set forth at length herein.

57.    The conduct of Defendant Kelly, as alleged in the foregoing claims, constitutes negligence as it deviates from the standards of care owed by him to Runge.

58.    As a result of Defendant Kelly's negligence, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count III together with interest and costs of this action.

## COUNT IV

### Assault and Battery
### (vs. Defendant Sunbridge)

59.    Plaintiff incorporates by reference Paragraphs 1 through 58 of this Complaint as though same were fully set forth at length herein.

60.    Through the actions described hereinabove, Defendant Sunbridge, by its actions or by the actions of its agents, or someone for whose conduct said Defendant was legally responsible as described herein, did intentionally force Runge to ingest medications through the threats of force and/or the intentional and unjustified use of force against Runge.

61.    Defendant Sunbridge's actions were done without Runge's consent and/or through objectively menacing conduct, which placed Runge in fear of immediate bodily harm.

62.    As a result of Defendant Sunbridge's actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count IV together with interest and costs of this action.

## COUNT V

### False Imprisonment
### (vs. Defendant Sunbridge)

63.    Plaintiff incorporates by reference Paragraphs 1 through 62 of this Complaint as though same were fully set forth at length herein.

64.    Through the actions described hereinabove, Defendant Sunbridge, by its actions or by the actions of its agents, servants or employees, or someone for whose conduct said Defendant was legally responsible as described herein, did unlawfully confine the Plaintiff.

65.    Defendant Sunbridge's actions were done with intent.

66.    As a result of Defendant Sunbridge's actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count V together with interest and costs of this action.

## COUNT VI

### Intentional Infliction of Emotional Distress
### (vs. Defendant Sunbridge)

67.    Plaintiff incorporates by reference Paragraphs 1 through 66 of this Complaint as though same were fully set forth at length herein.

68.    Defendant Sunbridge, by its actions or by the actions of its agents, servants or employees, or someone for whose conduct said Defendant was legally responsible as described herein, did intentionally cause severe emotional distress to the Plaintiff or knew or should have known that emotional distress was likely to result from its conduct.

69.    Defendant Sunbridge's conduct was extreme and outrageous, was beyond all possible bounds of human decency and was utterly intolerable in a civilized community.

70.    Defendant Sunbridge's actions were the cause of Plaintiff's emotional distress.

71.    The emotional distress sustained by Plaintiff was severe and of a nature that no reasonable person could be expected to endure.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count VI together with interest and costs of this action.

## COUNT VII

### Negligent Infliction of Emotional Distress
### (vs. Defendant Sunbridge)

72.    Plaintiff incorporates by reference Paragraphs 1 through 71 of this Complaint as though same were fully set forth at length herein.

73.  As described hereinabove, Defendant Sunbridge did commit negligence with regard to a duty it owed to the Plaintiff.

74.  As a result of Defendant Sunbridge's negligence, the Plaintiff did suffer and continues to suffer emotional distress.

75.  Plaintiff's emotional distress was a direct and proximate result of the Defendant Sunbridge's negligence.

76.  Plaintiff's emotional distress resulted in physical harm to the Plaintiff manifested by objective symptomology.

77.  A reasonable person in Plaintiff's position would have suffered emotional distress under the circumstances described hereinabove.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts,

Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count VII together with interest and costs of this action.

## COUNT VIII

### Breach of Contract
### (vs. Defendant Sunbridge)

78.    Plaintiff incorporates by reference Paragraphs 1 through 77 of this Complaint as though same were fully set forth at length herein.

79.    Defendant Sunbridge entered into a contract with Plaintiff when it accepted her monthly rental payment in exchange for agreeing to provide room and board, competent health care and other good and valuable consideration

80.    The conduct of Defendant Sunbridge as alleged in the foregoing paragraphs is in breach of its contract with Runge.

81.    As a result of Defendant Sunbridge's Breach of Contract, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count VII together with interest and costs of this action.

## COUNT IX

### False Imprisonment
### (vs. Defendant Kelly)

82.    Plaintiff incorporates by reference Paragraphs 1 through 81 of this Complaint as though same were fully set forth at length herein.

83.    Through the actions described hereinabove, Defendant Kelly, by his actions or by the actions of his agents, servants or employees, or someone for whose conduct said Defendant was legally responsible as described herein, did unlawfully confine Plaintiff.

84.    Defendant Kelly's actions were done with intent.

85.    As a result of Defendant Kelly's actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count IX together with interest and costs of this action.

## COUNT X

### Intentional Infliction of Emotional Distress
(vs. Defendant Kelly)

86.    Plaintiff incorporates by reference Paragraphs 1 through 85 of this Complaint as though same were fully set forth at length herein.

87.    Defendant Kelly, by his actions or by the actions of his agents, servants or employees, or someone for whose conduct said Defendant Kelly was legally responsible as described herein, did intentionally cause severe emotional distress to Plaintiff or knew or should have known that emotional distress was likely to result from his conduct.

88.    Defendant Kelly's conduct was extreme and outrageous, was beyond all possible bounds of human decency and was utterly intolerable in a civilized community.

112160                          24

89.    Defendant Kelly's actions were the cause of Plaintiff's emotional distress.

90.    The emotional distress sustained by Plaintiff was severe and of a nature that no reasonable person could be expected to endure.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count X together with interest and costs of this action.

## COUNT XI

### Negligent Infliction of Emotional Distress
### (vs. Defendant Kelly)

91.    Plaintiff incorporates by reference Paragraphs 1 through 90 of this Complaint as though same were fully set forth at length herein.

92.    As described hereinabove, Defendant Kelly did commit negligence with regard to a duty it owed to Plaintiff.

93.    As a result of Defendant Kelly's negligence, Plaintiff did suffer and continues to suffer emotional distress.

94.    Plaintiff's emotional distress was a direct and proximate result of Defendant Kelly's negligence.

95.    Plaintiff's emotional distress resulted in physical harm to Plaintiff manifested by objective symptomology.

96.    A reasonable person in Plaintiff's position would have suffered emotional distress under the circumstances described hereinabove.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XI together with interest and costs of this action.

## COUNT XII

### Breach of Contract
### (vs. Defendant Kelly)

97.    Plaintiff incorporates by reference Paragraphs 1 through 96 of this Complaint as though same were fully set forth at length herein.

98.    Defendant Kelly entered into a contract with Plaintiff to provide professional services.

99.    The conduct of Defendant Kelly as alleged in the foregoing paragraphs is in breach of his contract with Runge to provide professional services.

100.    As a result of Defendant Kelly's Breach of Contract, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XII together with interest and costs of this action.

## COUNT XIII

### Breach of Fiduciary Duty
### (vs. Defendant Kelly)

101.    Plaintiff incorporates by reference Paragraphs 1 through 100 of this Complaint as though same were fully set forth at length herein.

102.    Defendant Kelly, as Plaintiff's attorney, owed her a fiduciary duty.

103.    Defendant Kelly, as Plaintiff's Power of Attorney and Health Care Proxy owed her a fiduciary duty.

104.    Defendant Kelly, as Plaintiff's Guardian, owed her a fiduciary duty.

105.    The conduct of Defendant Kelly as alleged in the foregoing paragraphs is in breach of Defendant Kelly's fiduciary duty owed to Plaintiff.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XIII together with interest and costs of this action.

## COUNT XIV

### Abuse of Process
### (vs. Defendant Kelly)

106.    Plaintiff incorporates by reference Paragraphs 1 through 105 of this Complaint as though same were fully set forth at length herein.

107.    Defendant Kelly, through the actions described hereinabove, did use process through the filing of the Guardianship petition.

108.    Defendant Kelly's institution of process was for the ulterior or illegitimate purpose of gaining control of and depleting Plaintiff's assets.

109.    As a result of Defendant Kelly's Abuse of Process, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XIV together with interest and costs of this action.

## COUNT XV

### Breach of Fiduciary Duty
### (vs. Defendant Sunbridge)

110.    Plaintiff incorporates by reference Paragraphs 1 through 109 of this Complaint as though same were fully set forth at length herein.

111.    The conduct of Defendant Sunbridge as alleged in the foregoing paragraphs is in breach of the Defendant Sunbridge's fiduciary duty owed to Plaintiff.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count XV together with interest and costs of this action.

## COUNT XVI

### Violation of M.G.L. c. 93A
### (vs. Defendant Kelly)

112.    Plaintiff incorporates by reference Paragraphs 1 through 111 of this Complaint as though same were fully set forth at length herein.

113.    Defendant Kelly, as an attorney licensed to practice law in the Commonwealth of Massachusetts, is a person engaged in "trade or commerce" as that term is defined pursuant to M.G.L. c. 93A ("Chapter 93A").

114.    Defendant Kelly, through the acts described hereinabove, did commit unfair and deceptive acts and/or practices prohibited by Chapter 93A.

115.    Defendant Kelly's unfair and deceptive acts and/or practices did occur primarily and substantially within the Commonwealth of Massachusetts.

116. By correspondence dated July 13, 2006, Plaintiff submitted a written demand for relief in accordance with Massachusetts General Laws ("M.G.L.") 93A § 9 to Defendant Kelly via his counsel (the "Demand Letter").

117. By correspondence dated August 10, 2006, Defendant Kelly responded to the Demand Letter, through counsel, denying liability and failing to make a reasonable offer of settlement.

118. More than thirty (30) days have passed since Plaintiff sent the Demand Letter.

119. As a direct and proximate result of the unfair and deceptive acts committed by Defendant Kelly, Plaintiff was injured, suffered damages and will continue to suffer damages.

120. Defendant Kelly, by the actions described hereinabove, did willfully and knowingly commit unfair and deceptive acts or practices prohibited by Chapter 93A and as a result Plaintiff suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XVI and grant her the following relief:

1. Award Plaintiff compensatory damages in any amount which may be proven at trial;

2. Award Plaintiff treble damages;

3. Award Plaintiff her costs and expenses incurred in this action, including reasonable attorneys' fees; and,

4.    Award such other relief as the Court may deem just and proper.

## JURY CLAIM

Plaintiff, Helen A. Runge, respectfully demands a trial by jury on all issues so triable.

Respectfully submitted,

LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated: January 8, 2007

By____/s/ Glenn R. Davis_____
    Glenn R. Davis
    1700 Bent Creek Boulevard, Suite 140
    Mechanicsburg, PA 17050
    (717) 620-2424
    gdavis@ldylaw.com
    *Pro Hac Vice*

    Blake J. Godbout, BBO #196380
    BLAKE J. GODBOUT & ASSOCIATES
    33 Broad Street, 11th Floor
    Boston, MA  02109
    (617) 523-6677

Attorneys for Plaintiff, Helen A. Runge

112160

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the

attorney of record for each party by electronic transmission.

James S. Hamrock, Jr.
Hamrock & Tocci
101 Main Street, 18th Floor
Cambridge, MA 02142
jhamrock@htclaw.com

Michele Carlucci
George S. Rockas
Wilson Elser Moskowitz Edelman & Dicker LLP
155 Federal Street
Boston, MA 02110
michele.carlucci@wilsonelser.com
george.rockas@wilsonelser.com

Michael Williams
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 145
Boston, MA 02210-1736
mwilliams@lawson-weitzen.com


Date: January 8, 2007                    /s/ Glenn R. Davis
                                         Glenn R. Davis

# BLAKE J. GODBOUT & ASSOCIATES
### ATTORNEYS-AT-LAW

#### 33 BROAD STREET - 11ᵀᴴ FLOOR
#### BOSTON, MASSACHUSETTS 02109

BLAKE J. GODBOUT

JAMES L. KIMBALL
DAVID A. CONTI

TELEPHONE: (617) 523-6677
FACSIMILE: (617) 227-3709

January 16, 2007

**By Facsimile (617) 423-6917**
**& First Class Mail**

George Rockas, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
155 Federal Street
Boston, MA 02110

**By Facsimile (617) 496-1707**
**& First Class Mail**

James S. Hamrock, Jr., Esq.
**HAMROCK & TOCCI**
101 Main St., 18ᵗʰ Floor
Cambridge, MA 02142

**By Facsimile (617) 439-3987**
**& First Class Mail**

Michael Williams, Esq.
**LAWSON & WEITZEN, LLP**
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-2414

RECEIVED
JAN 1 8 2007
By_____

Re:  **Helen A. Runge v. Walter J. Kelley, et als**.
      CA No: 05-10849-RGS

Dear Counsel:

Please be advised that Plaintiff has engaged Arnold R. Rosenfeld, Esq., to serve as an expert witness relative to her claims against Defendant Walter J. Kelly.

Enclosed please find Mr. Rosenfeld's report.  To the extent that Supplemental Answers to Interrogatories are due as a result of this report, we will provide them under separate cover.

BLAKE J. GODBOUT & ASSOCIATES

        If you have any questions or comments, please feel free to
contact me at the office.

                                    Very truly yours,

                                    David A. Conti

Enclosure

# K&L|GATES

Kirkpatrick & Lockhart Preston Gates Ellis LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950

t 617.261.3100    www.klgates.com

January 16, 2007

Arnold R. Rosenfeld
D 617.951.9125
F 617.261.3175
arnie.rosenfeld@klgates.com

Glenn R. Davis, Esq.
Latsha Davis Yohe & McKenna, P.C.
1700 Bent Creek Boulevard, Suite 140
Mechanicsburg, PA 17050

Re:    Runge v. Kelly, et al
       U.S. District Court C.A. No. 05-cv-10849-RGS

Dear Attorney Davis:

You have requested that I provide you with an opinion as to whether Walter J. Kelly, who was acting as the attorney for your client, Helen Runge, acted in compliance with the Massachusetts Rules of Professional Conduct in his representation of her and in particular, with regard to whether his petitioning the Probate Court to become the guardian of Helen Runge, his appointment as guardian, and the payment of his and his attorney's legal bills was appropriate ethical conduct.

Let me first describe some of my relevant background to offer this opinion. I am Of Counsel in the Boston Office of the international law firm of Kirkpatrick & Lockhart Preston Gates Ellis LLP (K&L Gates), where my practice includes, besides civil and criminal litigation, representing law and law firms on professional responsibility matters, including acting as an expert witness in legal malpractice cases where there are questions regarding a lawyer's responsibilities pursuant to the Rules of Professional Conduct. Prior to joining K & L Gates, I was the Chief Bar Counsel of the Board of Bar Overseers of the Supreme Judicial Court in Massachusetts for eight years. I also am a Visiting Professor of Law at Boston University Law School where I have taught Professional Responsibility for seventeen years and an Adjunct Professor of Law at Northeastern University Law School where I have taught Professional Responsibility for ten years. I am an appointed member of the American Bar Association Committee on Lawyer Discipline and the Massachusetts Supreme Judicial Court's Standing Advisory Committee on the Rules of Professional Conduct.

I have reviewed the Second Amended Complaint, in Runge v. Kelly, and the two days of Deposition of Walter J. Kelly, as well as other exhibits, in preparation of this opinion.

In my opinion, by seeking to have him self appointed the guardian of Helen Runge, considering the circumstances of this case, Kelly violated the Massachusetts Rules of

BOS-1045211 v1