UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL DOCKET NO: 05-CV-10849 (RGS)

```
************************************
DOROTHY STANLEY, AS EXECUTRIX OF    *
THE ESTATE OF HELEN RUNGE           *
                                    *
            PLAINTIFF               *
vs.                                 *
                                    *
WALTER J. KELLY,                    *
KERRY L. BLOOMINGDALE, M.D.,        *
AND SUNBRIDG NURSING AND            *
REHABILITATION CENTER               *
                                    *
            DEFENDANTS              *
************************************
```

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KERRY BLOOMINGDALE, M.D.'S MOTION FOR SUMMARY JUDGMENT

### Plaintiff's allegations against Dr. Bloomingdale

The plaintiff Helen Runge[1] filed this lawsuit in 2005 against three defendants – Attorney

Walter Kelly (Attorney Kelly), Mediplex d/b/a Sunbridge Nursing and Rehabilitation Center

(Sunbridge), and Kerry Bloomingdale, M.D. (Dr. Bloomingdale). In 2006, plaintiff filed her

Second Amended Complaint. That Complaint contained sixteen Counts – eight were directed at

Attorney Kelly, seven were directed at Sunbridge, and one was directed at Dr. Bloomingdale.

The claims against Attorney Kelly and Sunbridge include, inter alia, Counts for negligence, false

imprisonment, breach of contract, and intentional infliction of emotional distress. The sole Count

directed at Dr. Bloomingdale alleges professional negligence. The plaintiff claims that the

---

[1]   Ms. Runge died in January, 2007, and her daughter, Dorothy Stanley, as Executrix of the Estate, has been substituted as the plaintiff.

actions of Dr. Bloomingdale, a psychiatrist, "deviated from the standards of care owed by him to Runge."

The negligent actions of Dr. Bloomingdale allegedly occurred on April 29, 2003. On that date, Dr. Bloomingdale had a visit with Ms. Runge, who was a patient/resident at Sunbridge. After the visit, Dr. Bloomingdale prepared and signed a document entitled "Medical Certificate – Guardianship". The document is a Massachusetts Trial Court, Probate Court Department, form. In that form, Dr. Bloomingdale certified under the penalties of perjury that based on his examination that day of Ms. Runge it was his opinion that because of mental illness she was incapable of caring for her personal and/or financial affairs. It is the plaintiff's contention that Dr. Bloomingdale's opinion was incorrect, and arrived at negligently. In responding to the Interrogatory asking her to specify in full and complete detail the manner in which the alleged negligence of Dr. Bloomingdale caused her injury, Ms. Runge stated the following:

> Kelly enlisted the aid of Bloomingdale and Sunbridge in presenting his ex parte guardianship petition, misrepresenting facts to the court and having himself appointed guardian of Runge. Upon information and belief, soon after Kelly's ex parte appointment as the guardian of Runge, he undertook a scheme to distribute funds from her estate to make payment for services allegedly rendered by himself, Bloomingdale and Sunbridge. (Plaintiff's Answers to Interrogatories of Dr. Bloomingdale, Answer No. 2d)

It is Dr. Bloomingdale's contention, since the plaintiff's injuries allegedly were brought about by this Medical Certificate he signed being used in support of the Probate Court guardianship petition, that Ms. Runge's claims are barred by the absolute privilege accorded to sworn statements made in the context of a judicial proceeding.

**Background Information**

Ms. Runge, then age 87, was admitted to Sunbridge, a skilled nursing home type facility, on January 22, 2003. She came to Sunbridge from the Carney Hospital, where she had been an inpatient in the psychiatric unit for 11 days. During that Carney admission, the attending psychiatrist documented, on January 20, 2003:

> Patient remains disorganized. Irritable. Somatic. No insight. Remains preoccupied with her desire to attend some previously scheduled medical appointments this week. Found black spots in her bed which she insists are bugs that are biting her. Unable to reality test around these issues.

The Carney Discharge Summary, dictated by Ms. Runge's attending psychiatrist, Dr. Lilia Feinberg, stated: "Axis I: Rule out paranoid delusional disorder. Rule out Alzheimer's dementia." Ms. Runge's discharge medications, prescribed by Dr. Feinberg, included Zyprexa, an anti-psychotic, 2.5 mg every evening.

Dr. Bloomingdale is a board certified psychiatrist who practices at the Beth Israel Deaconess Medical Center in Boston. In addition, as an independent contractor, he sees patients at several nursing homes on behalf of New England Geriatrics, a company that contracts with those nursing homes to provide mental health services to the patients there. The fees for Dr. Bloomingdale's services usually are billed directly to the patient's insurers, and not to New England Geriatrics or to the nursing homes. It is in this capacity that Dr. Bloomingdale saw Ms. Runge at Sunbridge on 3 occasions – on March 4, exactly four weeks later on April 1, and again exactly four weeks later on April 29, 2003. The payments Dr. Bloomingdale received in total from Ms. Runge's health insurance for the three visits was less than four hundred dollars.

Dr. Bloomingdale's diagnosis, on March 4, included: Axis I: "Alzheimer's dementia with delusions." He recommended continuing the Zyprexa, which Ms. Runge had been discharged on

from the Carney and which had been continued to be prescribed by other providers during her first five weeks at Sunbridge. On April 1, 2003, Dr. Bloomingdale noted that Ms. Runge "has been at times more paranoid and sadder." He recommended, in reference to a complete blood count and urinalysis that had been ordered a day earlier by a Nurse Practitioner from New England Geriatrics, "if labs drawn turn out to be normal", that the Nurse Practitioner's suggestion of adding a trial of Zoloft be followed. Zoloft is a medication for depression.

Dr. Bloomingdale's last visit with Ms. Runge was on April 29. After that visit, he prepared and signed the Medical Certificate, the doing of which is what the plaintiff alleges caused her injury and damages. In the Certificate there is a check mark in the box with the pre-printed language: "is a mentally ill person to the degree that he/she is incapable of caring for his/her personal and/or financial affairs." In the body of the Medical Certificate, Dr. Bloomingdale's hand-written explanation of the bases of his opinion includes: "…she lacks the ability to make sound decisions about certain personal affairs, including whether to take her psychiatric medications…"

Dr. Bloomingdale never saw Ms. Runge after April 29. Dr. Bloomingdale had never met Attorney Kelly before he started treating Ms. Runge. Dr. Bloomingdale never testified in the Probate Court on the Guardianship petition concerning Ms. Runge, which was filed in Norfolk Probate Court on May 2 by Attorney Kelly. The plaintiff alleges that the Medical Certificate was filed in the Probate Court, and was used by Attorney Kelly to persuade the Probate Court to appoint him Guardian of Ms. Runge. The plaintiff further alleges that Attorney Kelly misused this appointment to obtain control over her bank accounts, out of which he eventually paid legal fees to himself and another attorney in an amount believed to approximate twenty three thousand dollars.

On April 30, the day after Dr. Bloomingdale signed the Medical Certificate, Ms. Runge left Sunbridge with her daughter and son-in-law. They proceeded to North Carolina, where the daughter resided. About a week after she arrived in North Carolina, Ms. Runge was examined by a physician, who deemed her mentally intact and not in need of any anti-psychotic medications. Six months later, in October, 2003, Ms. Runge's daughter brought her to the St. Luke's Hospital in Columbus, N.C. Ms. Runge, according to the hospital record, had been yelling, and accusing her daughter of stealing Ms. Runge's belongings. Ms. Runge was hospitalized for three weeks in the psychiatric unit. The admitting physician raised concern that the reason for Ms. Runge's symptoms was that she was no longer taking the psychiatric medications, which has been prescribed in Massachusetts, while living at her daughter's house. She was prescribed anti-psychotic medications in the Hospital, and she was discharged on the medications. Apparently, Ms. Runge was thereafter continuously on an anti-psychotic medication until her death more than three years later.

Both the plaintiff and Dr. Bloomingdale have noticed expert psychiatric witnesses[2] regarding whether Dr. Bloomingdale met or failed to meet the expected standard of care. The plaintiff's witness Dr. Richard Dupee, opines, in part, as follows:

> On 4/29/03, a temporary medical certificate for guardianship is signed by Dr. Bloomingdale. Dr. Bloomingdale documents that Ms. Runge "suffers from Alzheimer's dementia with paranoid delusions." As stated there is no evidence that Ms. Runge had Alzheimer's disease. This is an incorrect diagnosis…..
>
> I see no evidence that an adequate examination was carried out to determine her decision making capacity. Based upon her normal cognitive status, I would argue that there was no justification for

---

[2]   The Court previously denied the plaintiff's Motion For Extension Of Time to notice her expert as to Dr. Bloomingdale (Paper No. 98); the expert was eventually noticed and his Report was produced two months after the Court's denial. Dr. Bloomingdale does not waive, and expressly reserves the right to challenge the admissibility and use of the Report of this expert.

guardianship on 4/29/03.

As is not unusual in claims of physician negligence, the defense expert has a different opinion than the plaintiff's expert. The Report of defense expert, Dr. Elizabeth Gaufberg, includes:

> Dr. Bloomingdale's pursuit of guardianship was entirely appropriate and in the best interest of Ms. Runge's health and safety…
>
> The psychiatric care Ms. Runge received at Sunbridge for her symptoms of agitation and paranoia was part of a long history of such care. She had admissions to Jewish Memorial Hospital and Carney Hospital inpatient psychiatric units prior to her Sunbridge stay (both admissions involved the legal decision to admit the patient against her will in the interest of her own health and safety), and to St. Luke's Hospital in North Carolina subsequent to her Sunbridge stay… Diagnostic impressions were similar in all facilities and medication recommendations in all facilities were consistent with one another.

There is, despite these conflicting expert opinions, no need for a jury to resolve the conflict as to whether Dr. Bloomingdale was warranted in signing the Medical Certificate. Once he signed this Medical Certificate, under the penalties of perjury, he became absolutely immune from any possible civil liability arising from the signing of the Certificate.

### Summary Judgment Standard

When considering a motion for summary judgment, the burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."

6

Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party must produce his own evidence. Hughes v. Joliet Correctional Center, 931 F.2d 425, 428 (7th Cir. 1991). The non-moving party "must do more than simply show that there exists some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

In the instant case, there is no factual dispute that on April 29, 2003 Dr. Bloomingdale signed a Medical Certificate, which is a Massachusetts Probate Court form, that he signed it under oath, and that it was filed with the Probate Court in conjunction with the guardianship petition for Ms. Runge brought by Attorney Kelly.

## ARGUMENT

I.    **A psychiatrist who signs under oath a Medical Certificate that is filed in the Probate Court concerning the guardianship of an individual is absolutely immune from civil liability, regardless of whether the opinions expressed in the Certificate were the product of standard or substandard care.**

Under Massachusetts law, "communications made in the 'institution or conduct of litigation or in conferences and other communications preliminary to litigation' are subject to absolute privilege." Frazier v. Bailey, 957 F. 2d 920, 932 (1st Cir. 1992), quoting Sullivan v. Bermingham, 11 Mass. App. Ct. 359, 361 (1981). The absolute privilege is typically raised as a

defense in defamation cases. In <u>Frazier</u>, the First Circuit held that the privilege also applied to claims for negligence, gross negligence, and intentional infliction of emotional distress. The Supreme Judicial Court has made clear that the absolute privilege that applies to statements made in judicial proceedings applies to all claims, not just claims for defamation:

> A privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort. <u>Correllas v. Viveiros</u>, 410 Mass. 314, 324 (1991).

The absolute privilege applies to the actions of a physician, who signs a certificate that results in a patient being ordered by a court to be confined in a mental institution, even if it is alleged that the physician acted in bad faith and knew or should have known that the patient was sane. <u>Mezullo v. Maletz</u>, 331 Mass. 233, 236-237 (1954). The Court in <u>Mezullo</u> indicated:

> If a physician signing a certificate is entitled to the privilege of a witness - and the <u>Niven</u> case so holds – then it follows that he does not lose it on proof of malice or bad faith. We see no sound basis for holding the privilege of such a witness to be absolute so far as defamatory words are concerned but qualified in a case like the present. The reasons for an absolute privilege are quite as strong in the latter situation as in the former.

The Court in <u>Mezullo</u> went on to discuss the public policy reason for the privilege: while it is obviously important that  an individual be free from false statements about his mental condition, it is more important to the administration of law that physicians be free to opine to a court about a patient's mental condition without their opinions being influenced or compromised by fear of a lawsuit from the patient. In addition, the absolute immunity accorded to participants in judicial proceedings is not unique to Massachusetts. The Supreme Court has made clear that this doctrine had its roots in the English common law, and that it is a tradition well-grounded in the common law of the United States.  <u>Briscoe v. LaHue</u>, 460 U.S. 325, 330-331, 334 (1983).

The plaintiff's claim against Dr, Bloomingdale is that she was caused injury because of his signing the Medical Certificate on April 29, 2003. That Certificate was signed under the penalties of perjury, and filed in Probate Court. It matters not, therefore, that the plaintiff asserts that the opinion expressed in the Certificate was incorrect or that it was the result of a substandard examination or a substandard assessment of her condition. Since a cause of action could not lie against Dr. Bloomingdale if it was alleged that he had signed the Medical Certificate with malice and in bad faith, see <u>Mezullo</u>, supra, surely no cause of action can lie against him in the one Count alleging negligence.

## Conclusion

WHEREFORE, the defendant, Kerry Bloomingdale, M.D., respectfully requests that this Honorable Court grant his Motion For Summary Judgment as there are no genuine issues of material fact which require a trial on the merits and because he is entitled to judgment as a matter of law on the basis of absolute immunity.

Respectfully submitted,
Defendant, Kerry Bloomingdale, M.D.
By his attorney,

/s/ *James S. Hamrock, Jr.*
James S. Hamrock, Jr.
BBO # 219400
Hamrock & Tocci
101 Main Street
Cambridge, MA 02142
(617) 496-5370

9

**Certificate of Service**

I, **James S. Hamrock, Jr.**, Attorney representing Defendant, ***Kerry Bloomingdale, M.D.***, hereby certify that I have this ***18th day of January, 2008*** filed the within ***Memorandum in Support of Motion for Summary Judgment*** through the ECF system, and certify that the within pleading will be served electronically upon the attorneys of record, as identified on the Notice of Electronic Filing (NEF).

/s/ *James S. Hamrock, Jr.*
James S. Hamrock, Jr.
BBO # 219400
Hamrock & Tocci
101 Main Street
Cambridge, MA  02142
(617) 496-5370

10