UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL DOCKET NO: 05-CV-10849 (RGS)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DOROTHY STANLEY, AS EXECUTRIX OF    *
THE ESTATE OF HELEN RUNGE    *
   *
        PLAINTIFF    *
vs.    *
   *
WALTER J. KELLY,    *
KERRY L. BLOOMINGDALE, M.D.,    *
AND SUNBRIDG NURSING AND    *
REHABILITATION CENTER    *
   *
        DEFENDANTS    *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>DEFENDANT KERRY BLOOMINGDALE, M.D.'s<br>EXHIBITS TO MOTION FOR SUMMARY JUDGMENT.</u>

*Exhibit A*     <u>Second Amended Complaint</u>

*Exhibit B*     <u>Plaintiff Helen Runge's Answers To Interrogatories of Defendant Kerry Bloomingdale, M.D.</u>, Answer No. 2

*Exhibit C*     <u>Carney Hospital Psychiatric Discharge Summary</u>, January 22, 2003

*Exhibit D*     <u>Carney Hospital Progress Notes</u>, January 20, 2003

*Exhibit E*     <u>Deposition of Dr. Bloomingdale</u>, December 14, 2006

*Exhibit F*     <u>New England Geriatrics Diagnostic/Treatment Evaluation form</u>, April 1, 2003

*Exhibit G*     <u>Medical Certificate</u>, April 29, 2003

*Exhibit H*     <u>Medicare and Medex Statements</u>, March 3, April 1 and April 29, 2003

*Exhibit I*     <u>Letter of Dr. Robert Palmer</u>, July 25, 2003

*Exhibit J*     <u>St. Luke's Hospital Discharge Summary</u>

*Exhibit K*      <u>Psychiatric Assessment</u>, October 9, 2003.

*Exhibit L*      <u>Deposition of Dorothy Stanley</u>, November 15, 2006 (Day2), p. 25

*Exhibit M*      <u>Report of Dr. Richard Dupee, M.D.</u>, May 16, 2007

*Exhibit N*      <u>Report of Elizabeth Gaufberg, M.D.</u>, August 3, 2007

<u>**Certificate of Service**</u>

I, **James S. Hamrock, Jr.**, Attorney representing Defendant, ***Kerry Bloomingdale, M.D.***, hereby certify that I have this *18th day of January, 2008* served the within ***Exhibits to Motion for Summary Judgment*** by mail upon the attorneys of record.

<u>/s/ *James S. Hamrock, Jr.*</u>
James S. Hamrock, Jr.
BBO # 219400
Hamrock & Tocci
101 Main Street
Cambridge, MA  02142
(617) 496-5370

2

# EXHIBIT A

Second Amended Complaint, pp. 17-30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HELEN A. RUNGE, | : | |
| **Plaintiff** | : | |
| | : | No. 05-10849-RGS |
| v. | : | (Judge Stearns) |
| | : | |
| WALTER J. KELLY, et al. | : | CIVIL ACTION |
| **Defendants** | : | JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

### I.   Jurisdiction

Jurisdiction is invoked pursuant to 28 U.S.C. § 1332 on the ground that there is complete diversity of citizenship between the parties. At all times relevant to this action, Plaintiff has been a resident of the State of North Carolina and Defendants have been residents of, and/or have a principal place of business in, Massachusetts; the prayer for relief exceeds $75,000.

### II.   Venue

Venue in this district is authorized by 28 U.S.C. § 1391(c), under residency, and because a substantial part of the events or omissions giving rise to Plaintiff's claims arose here.

### III.   Parties

1.   Plaintiff Helen A. Runge, is a 91-year old adult individual who currently resides at White Oak Manor, 70 Oak Street, Tryon, North Carolina 28782.

of Defendant Bloomingdale and Defendant Sunbridge in presenting his petition, misrepresenting facts to the court and having himself appointed guardian of Runge.

48.    Prior to having himself appointed guardian of Runge, Defendant Kelly notified North Carolina police local to Runge and her daughter and son-in-law, the Stanleys, and reported that she was being held against her will. This false reporting by Defendant Kelly was made for the purpose of aiding and abetting his scheme to have himself appointed as guardian of Runge to gain control over her financial estate and to cause embarrassment and harm to both Runge and the Stanleys.

49.    Upon information and belief, soon after Defendant Kelly's ex parte appointment as the guardian of Runge, he undertook a scheme to distribute funds from her estate to make payment for services allegedly rendered by himself, Defendant Bloomingdale and Defendant Sunbridge.

### COUNT I

#### Negligence
#### (vs. Bloomingdale)

50.    Plaintiff incorporates by reference Paragraphs 1 through 49 of this Complaint as though same were fully set forth at length herein.

51.    The conduct of Defendant Bloomingdale, as alleged in the foregoing claims constitute negligence as it deviates from the standards of care owed by him to Runge.

52.    As a result of Defendant Bloomingdale's negligence, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Kerry Bloomingdale, M.D., on Count I together with interest and costs of this action.

## COUNT II

### Negligence
### (vs. Defendant Sunbridge)

53.    Plaintiff incorporates by reference Paragraphs 1 through 52 of this Complaint as though same were fully set forth at length herein.

54.    The conduct of Defendant Sunbridge, as alleged in the foregoing claims, constitutes negligence as it deviates from the standards of care owed by it, its employees, agents, servants or assigns, to Runge.

55.    As a result of Defendant Sunbridge's negligence, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count II together with interest and costs of this action.

## COUNT III

### Negligence
### (vs. Defendant Kelly)

56.    Plaintiff incorporates by reference Paragraphs 1 through 55 of this Complaint as though same were fully set forth at length herein.

112160                              18

57.    The conduct of Defendant Kelly, as alleged in the foregoing claims, constitutes negligence as it deviates from the standards of care owed by him to Runge.

58.    As a result of Defendant Kelly's negligence, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count III together with interest and costs of this action.

## COUNT IV

### Assault and Battery
### (vs. Defendant Sunbridge)

59.    Plaintiff incorporates by reference Paragraphs 1 through 58 of this Complaint as though same were fully set forth at length herein.

60.    Through the actions described hereinabove, Defendant Sunbridge, by its actions or by the actions of its agents, or someone for whose conduct said Defendant was legally responsible as described herein, did intentionally force Runge to ingest medications through the threats of force and/or the intentional and unjustified use of force against Runge.

61.    Defendant Sunbridge's actions were done without Runge's consent and/or through objectively menacing conduct, which placed Runge in fear of immediate bodily harm.

62.    As a result of Defendant Sunbridge's actions, Plaintiff has suffered damages.

112160                                    19

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count IV together with interest and costs of this action.

## COUNT V

### False Imprisonment
### (vs. Defendant Sunbridge)

63.    Plaintiff incorporates by reference Paragraphs 1 through 62 of this Complaint as though same were fully set forth at length herein.

64.    Through the actions described hereinabove, Defendant Sunbridge, by its actions or by the actions of its agents, servants or employees, or someone for whose conduct said Defendant was legally responsible as described herein, did unlawfully confine the Plaintiff.

65.    Defendant Sunbridge's actions were done with intent.

66.    As a result of Defendant Sunbridge's actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count V together with interest and costs of this action.

## COUNT VI

### Intentional Infliction of Emotional Distress
### (vs. Defendant Sunbridge)

67.    Plaintiff incorporates by reference Paragraphs 1 through 66 of this Complaint as though same were fully set forth at length herein.

68.    Defendant Sunbridge, by its actions or by the actions of its agents, servants or employees, or someone for whose conduct said Defendant was legally responsible as described herein, did intentionally cause severe emotional distress to the Plaintiff or knew or should have known that emotional distress was likely to result from its conduct.

69.    Defendant Sunbridge's conduct was extreme and outrageous, was beyond all possible bounds of human decency and was utterly intolerable in a civilized community.

70.    Defendant Sunbridge's actions were the cause of Plaintiff's emotional distress.

71.    The emotional distress sustained by Plaintiff was severe and of a nature that no reasonable person could be expected to endure.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count VI together with interest and costs of this action.

## COUNT VII

### Negligent Infliction of Emotional Distress
### (vs. Defendant Sunbridge)

72.    Plaintiff incorporates by reference Paragraphs 1 through 71 of this Complaint as though same were fully set forth at length herein.

73.    As described hereinabove, Defendant Sunbridge did commit negligence with regard to a duty it owed to the Plaintiff.

74.    As a result of Defendant Sunbridge's negligence, the Plaintiff did suffer and continues to suffer emotional distress.

75.    Plaintiff's emotional distress was a direct and proximate result of the Defendant Sunbridge's negligence.

76.    Plaintiff's emotional distress resulted in physical harm to the Plaintiff manifested by objective symptomology.

77.    A reasonable person in Plaintiff's position would have suffered emotional distress under the circumstances described hereinabove.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count VII together with interest and costs of this action.

### COUNT VIII

### Breach of Contract
### (vs. Defendant Sunbridge)

78.    Plaintiff incorporates by reference Paragraphs 1 through 77 of this Complaint as though same were fully set forth at length herein.

79.    Defendant Sunbridge entered into a contract with Plaintiff when it accepted her monthly rental payment in exchange for agreeing to provide room and board, competent health care and other good and valuable consideration

80.    The conduct of Defendant Sunbridge as alleged in the foregoing paragraphs is in breach of its contract with Runge.

81.    As a result of Defendant Sunbridge's Breach of Contract, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count VII together with interest and costs of this action.

### COUNT IX

### False Imprisonment
### (vs. Defendant Kelly)

82.    Plaintiff incorporates by reference Paragraphs 1 through 81 of this Complaint as though same were fully set forth at length herein.

83.    Through the actions described hereinabove, Defendant Kelly, by his actions or by the actions of his agents, servants or employees, or someone for whose

conduct said Defendant was legally responsible as described herein, did unlawfully confine Plaintiff.

84.    Defendant Kelly's actions were done with intent.

85.    As a result of Defendant Kelly's actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count IX together with interest and costs of this action.

## COUNT X

### Intentional Infliction of Emotional Distress
### (vs. Defendant Kelly)

86.    Plaintiff incorporates by reference Paragraphs 1 through 85 of this Complaint as though same were fully set forth at length herein.

87.    Defendant Kelly, by his actions or by the actions of his agents, servants or employees, or someone for whose conduct said Defendant Kelly was legally responsible as described herein, did intentionally cause severe emotional distress to Plaintiff or knew or should have known that emotional distress was likely to result from his conduct.

88.    Defendant Kelly's conduct was extreme and outrageous, was beyond all possible bounds of human decency and was utterly intolerable in a civilized community.

89.    Defendant Kelly's actions were the cause of Plaintiff's emotional distress.

90.     The emotional distress sustained by Plaintiff was severe and of a nature that no reasonable person could be expected to endure.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count X together with interest and costs of this action.

### COUNT XI

### Negligent Infliction of Emotional Distress
### (vs. Defendant Kelly)

91.     Plaintiff incorporates by reference Paragraphs 1 through 90 of this Complaint as though same were fully set forth at length herein.

92.     As described hereinabove, Defendant Kelly did commit negligence with regard to a duty it owed to Plaintiff.

93.     As a result of Defendant Kelly's negligence, Plaintiff did suffer and continues to suffer emotional distress.

94.     Plaintiff's emotional distress was a direct and proximate result of Defendant Kelly's negligence.

95.     Plaintiff's emotional distress resulted in physical harm to Plaintiff manifested by objective symptomology.

96.     A reasonable person in Plaintiff's position would have suffered emotional distress under the circumstances described hereinabove.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XI together with interest and costs of this action.

## COUNT XII

### Breach of Contract
### (vs. Defendant Kelly)

97.    Plaintiff incorporates by reference Paragraphs 1 through 96 of this Complaint as though same were fully set forth at length herein.

98.    Defendant Kelly entered into a contract with Plaintiff to provide professional services.

99.    The conduct of Defendant Kelly as alleged in the foregoing paragraphs is in breach of his contract with Runge to provide professional services.

100.    As a result of Defendant Kelly's Breach of Contract, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XII together with interest and costs of this action.

## COUNT XIII

### Breach of Fiduciary Duty
### (vs. Defendant Kelly)

101.    Plaintiff incorporates by reference Paragraphs 1 through 100 of this Complaint as though same were fully set forth at length herein.

102.    Defendant Kelly, as Plaintiff's attorney, owed her a fiduciary duty.

103.    Defendant Kelly, as Plaintiff's Power of Attorney and Health Care Proxy owed her a fiduciary duty.

104.    Defendant Kelly, as Plaintiff's Guardian, owed her a fiduciary duty.

105.    The conduct of Defendant Kelly as alleged in the foregoing paragraphs is in breach of Defendant Kelly's fiduciary duty owed to Plaintiff.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XIII together with interest and costs of this action.

## COUNT XIV

### Abuse of Process
### (vs. Defendant Kelly)

106.    Plaintiff incorporates by reference Paragraphs 1 through 105 of this Complaint as though same were fully set forth at length herein.

107.    Defendant Kelly, through the actions described hereinabove, did use process through the filing of the Guardianship petition.

108.    Defendant Kelly's institution of process was for the ulterior or illegitimate purpose of gaining control of and depleting Plaintiff's assets.

109.    As a result of Defendant Kelly's Abuse of Process, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XIV together with interest and costs of this action.

## COUNT XV

### Breach of Fiduciary Duty
### (vs. Defendant Sunbridge)

110.    Plaintiff incorporates by reference Paragraphs 1 through 109 of this Complaint as though same were fully set forth at length herein.

111.    The conduct of Defendant Sunbridge as alleged in the foregoing paragraphs is in breach of the Defendant Sunbridge's fiduciary duty owed to Plaintiff.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, on Count XV together with interest and costs of this action.

## COUNT XVI

### Violation of M.G.L. c. 93A
### (vs. Defendant Kelly)

112.    Plaintiff incorporates by reference Paragraphs 1 through 111 of this Complaint as though same were fully set forth at length herein.

113.    Defendant Kelly, as an attorney licensed to practice law in the Commonwealth of Massachusetts, is a person engaged in "trade or commerce" as that term is defined pursuant to M.G.L. c. 93A ("Chapter 93A").

114.    Defendant Kelly, through the acts described hereinabove, did commit unfair and deceptive acts and/or practices prohibited by Chapter 93A.

115.    Defendant Kelly's unfair and deceptive acts and/or practices did occur primarily and substantially within the Commonwealth of Massachusetts.

116. By correspondence dated July 13, 2006, Plaintiff submitted a written demand for relief in accordance with Massachusetts General Laws ("M.G.L.") 93A § 9 to Defendant Kelly via his counsel (the "Demand Letter").

117. By correspondence dated August 10, 2006, Defendant Kelly responded to the Demand Letter, through counsel, denying liability and failing to make a reasonable offer of settlement.

118. More than thirty (30) days have passed since Plaintiff sent the Demand Letter.

119. As a direct and proximate result of the unfair and deceptive acts committed by Defendant Kelly, Plaintiff was injured, suffered damages and will continue to suffer damages.

120. Defendant Kelly, by the actions described hereinabove, did willfully and knowingly commit unfair and deceptive acts or practices prohibited by Chapter 93A and as a result Plaintiff suffered damages.

WHEREFORE, Plaintiff, Helen A. Runge, respectfully requests that this Honorable Court enter Judgment against the Defendant Walter J. Kelly, on Count XVI and grant her the following relief:

1. Award Plaintiff compensatory damages in any amount which may be proven at trial;

2. Award Plaintiff treble damages;

3. Award Plaintiff her costs and expenses incurred in this action, including reasonable attorneys' fees; and,

4.      Award such other relief as the Court may deem just and proper.

## JURY CLAIM

Plaintiff, Helen A. Runge, respectfully demands a trial by jury on all issues so triable.

Respectfully submitted,

LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated:                          By_____

Glenn R. Davis
1700 Bent Creek Boulevard, Suite 140
Mechanicsburg, PA 17050
(717) 620-2424
gdavis@ldylaw.com
*Pro Hac Vice*

Blake J. Godbout, BBO #196380
BLAKE J. GODBOUT & ASSOCIATES
33 Broad Street, 11th Floor
Boston, MA  02109
(617) 523-6677

Attorneys for Plaintiff, Helen A. Runge

112160                              30

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the

attorney of record for each party by electronic transmission.

James S. Hamrock, Jr.
Hamrock & Tocci
101 Main Street, 18th Floor
Cambridge, MA 02142
jhamrock@htclaw.com

Michele Carlucci
George S. Rockas
Wilson Elser Moskowitz Edelman & Dicker LLP
155 Federal Street
Boston, MA 02110
michele.carlucci@wilsonelser.com
george.rockas@wilsonelser.com

Michael Williams
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 145
Boston, MA 02210-1736
mwilliams@lawson-weitzen.com

Date:_____    _____
                                              Glenn R. Davis

# <u>EXHIBIT B</u>

Plaintiff Helen Runge's Answers To Interrogatories
of Defendant Kerry Bloomingdale, M.D., Answer
No. 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HELEN A. RUNGE,
        Plaintiff

        v.

WALTER J. KELLY, et al.,
        Defendants

No. 05-10849-RGS
(Judge Stearns)

CIVIL ACTION
JURY TRIAL DEMANDED

## PLAINTIFF HELEN RUNGE'S RESPONSE TO DEFENDANT KERRY L. BLOOMINGDALE, M.D.'S FIRST SET OF INTERROGATORIES

Plaintiff Helen Runge hereby responds to Defendant Kerry L. Bloomingdale, M.D.'s First Set of Interrogatories as follows:

## GENERAL OBJECTIONS

1.      Runge objects to the Interrogatories to the extent that they impose a greater obligation than that required by Rules 26 and 33 of the Federal Rules of Civil Procedure. Runge will respond and assert objections consistent with its obligations under such rules and expressly declines to undertake any broader obligations.

2.      Runge objects to the Interrogatories to the extent they exceed the scope of Rule 33 of the Federal Rules of Civil Procedure and seek information that must be sought instead through other Federal Rules of Civil Procedure.

108933

3.     Runge objects to the Interrogatories to the extent that they call for the disclosure of:

(a)     information developed, acquired or prepared in anticipation of litigation or which otherwise constitutes attorney work product;

(b)     mental impressions, conclusions, opinions or legal theories of legal counsel;

(c)     privileged attorney-client communications; or,

(d)     information otherwise protected as privileged under state or federal statutory, constitutional or common law.

4.     By responding to these Interrogatories, Runge does not concede the admissibility of any statement made herein.

5.     Runge reserves the right to supplement or amend its responses to the Interrogatories if further information becomes available.

## SPECIFIC RESPONSES AND OBJECTIONS

The General Objections set forth above apply to all individual numbered Requests, and Runge hereby incorporates each of those General Objections by reference into her responses to each of the individual Requests.  Any additional objections stated in the following responses are expressly made in addition to, and not in lieu of, the General Objections and for the purpose of setting forth, where appropriate, Runge's specific position as to Kelly's Requests.

1.     Please state your full name, home address, business address, occupation, date of birth and Social Security Number.

Response:     Helen Anne Runge; retired; no business address;

Home address:    5 Stirrup Downs
                 Columbus, NC 28722;
Date of birth:   ████████████
Social Security Number:   ████████

2.     With reference to the alleged acts of negligence of Defendant Kerry L. Bloomingdale, M.D. (Dr. Bloomingdale) referred to in Count III of your Complaint, please state in full and complete detail with reference to each act of alleged negligence:

a)     the date and time of day it took place;

b)     where it took place;

c)     the manner in which it took place, describing each examination or procedure, or negligent act, and the persons present at each examination or procedure or negligent act;

d)     the manner in which it cause injury to you; and

e)     the facts which tend to show, as alleged by you, that the conduct of Defendant, Dr. Bloomingdale, was negligent.

Response:

a)     April 29, 2003;

b)     Sunbridge Nursing and Rehabilitation Center (Defendant "Sunbridge");

c)     While Dorothy and Gilbert Stanley, Runge's daughter and son-in-law, were meeting with Sunbridge's nursing and administrative staff with regard to the appointment to act on Runge's behalf and her discharge from the facility, Kelly L. Bloomingdale (Defendant "Bloomingdale"), without request or permission from either Runge or Dorothy Stanley, her then health care proxy, entered Runge's room and purportedly gave a medical examination by asking her several questions including, "Why don't you want to take your medicine?" Runge's response to Bloomingdale was, "If I don't need medicine

108933                                    3

then no one should tell me what to take."  Runge further questioned, "If you didn't have a headache, would you take Tylenol in case you might get one?" Bloomingdale answered her question saying that he would not and thereafter left Runge's room.  Upon information and belief, the conversation between Runge and Bloomingdale was brief, lasting only several minutes, however, upon information and belief, Bloomingdale rendered a medical opinion at the direction of Walter J. Kelly (Defendant "Kelly") and Sunbridge that Runge was mentally incompetent as a result of his brief and solitary interaction with her.  Upon information and belief, Bloomingdale was requested to examine Runge by Kelly, who by that time had no authority to act on her behalf. Alternatively, Bloomingdale was requested to examine Runge by Sunbridge who had knowledge that Runge wanted to leave the facility.  Upon further information and belief, Bloomingdale has a business relationship with Sunbridge and generates substantial professional fees while performing services at their request for residents.  The examination by Bloomingdale failed to meet any acceptable standards of practice.

d)     Kelly enlisted the aid of Bloomingdale and Sunbridge in presenting his ex parte guardianship petition, misrepresenting facts to the court and having himself appointed guardian of Runge.  Upon information and belief, soon after Kelly's ex parte appointment as the guardian of Runge, he undertook a scheme to distribute funds from her estate to make payment for services allegedly rendered by himself, Bloomingdale and Sunbridge.

e)     Runge herein incorporates her Response to Interrogatory No. 2(c) and (d).

3.     For each occasion from January 1, 2002, until the present that you were examined, evaluated, treated and/or counseled by any physician, physician's assistant, nurse, nurse practitioner, psychiatrist, psychiatric counselor, psychologist, social worker, therapist, mental health worker or other health care professional, please state:

a)     the name, address and occupation of each such health care professional;

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL DOCKET NO: 05-CV-10849 (RGS)

```
*********************************************
DOROTHY STANLEY, AS EXECUTRIX OF    *
THE ESTATE OF HELEN RUNGE           *
                                    *
              PLAINTIFF             *
vs.                                 *
                                    *
WALTER J. KELLY,                    *
KERRY L. BLOOMINGDALE, M.D.,        *
AND SUNBRIDG NURSING AND            *
REHABILITATION CENTER               *
                                    *
              DEFENDANTS            *
*********************************************
```

NOTICE OF FILING WITH CLERK'S OFFICE


Notice is hereby given that the following exhibits listed below have been manually filed

with the Court and are available in paper form only:


EXHIBIT C     Carney Hospital Psychiatric Discharge Summary, January 22, 2003

EXHIBIT D     Carney Hospital Progress Notes, January 20, 2003

EXHIBIT F     New England Geriatrics Diagnostic/Treatment Evaluation form, April 1, 2003

EXHIBIT H     Medicare and Medex Statements, March 3, April 1 and April 29, 2003

EXHIBIT I     Letter of Dr. Robert Palmer, July 25, 2003

EXHIBIT J     St. Luke's Hospital Discharge Summary

EXHIBIT K     Psychiatric Assessment, October 9, 2003.


The original documents are maintained in the case file in the Clerk's Office.

Respectfully submitted,
Defendant, Kerry Bloomingdale, M.D.
By his attorney,

/s/ *James S. Hamrock, Jr.*
James S. Hamrock, Jr.
BBO # 219400
Hamrock & Tocci
101 Main Street
Cambridge, MA 02142
(617) 496-5370

# EXHIBIT E

Deposition of Dr. Bloomingdale, December 14, 2006

Page 1

Volume:   I
Pages: 1-109

UNITED STATES DISTRICT COURT
EASTERN DIVISION
- - - - - - - - - - - - - - - x
HELEN RUNGE,                Civil Action
     Plaintiff,        No. 05-10849-RGS
WALTER J. KELLY,
KERRY L. BLOOMINGDALE, M.D., and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

     Defendants.

- - - - - - - - - - - - - - - x

DEPOSITION OF KERRY L. BLOOMINGDALE, M.D.
Thursday, December 14, 2006, 9:16 a.m.
Blake J. Godbout & Associates
33 Broad Street - 11th Floor
Boston, Massachusetts 02109

----- Reporter:  Toni F. Beckwith, RMR -----

Toni F. Beckwith, Registered Merit Reporter
50 Winsor Avenue
Watertown, Massachusetts 02472
Tel: 617.924.2731
Fax: 617.924.9899

---

Page 2

1  APPEARANCES:
2
3  LATSHA DAVIS YOHE & MCKENNA, P.C.
   By Glenn R. Davis, Esquire
   1700 Bent Creek Boulevard, Suite 140
4  Mechanicsburg, Pennsylvania 17050
   Counsel for the Plaintiff
5
6
   WILSON, ELSER, MOSKOWITZ,
7  EDELMAN & DICKER, LLP
   By Michele Carlucci, Esquire
8  155 Federal Street
   Boston, Massachusetts 02110
9  Counsel for Walter J. Kelly
10
11 HAMROCK & TOCCI
   By James S. Hamrock, Jr., Esquire
12 101 Main Street, 18th Floor
   Cambridge, Massachusetts 02142
13 Counsel for Kerry L. Bloomingdale, M.D.
14
15 LAWSON & WEITZEN, LLP
   By Michael Williams, Esquire
16 88 Black Falcon Avenue
   Boston, Massachusetts 02210
17 Counsel for Mediplex d/b/a Sunbridge
   Nursing and Rehabilitation Center
18
19 ALSO PRESENT:
20   Gilbert Stanley
21   Madeline S. Goff, Claims Adjuster
22
23
24

---

Page 3

1              I N D E X
2  Deposition of:      Direct Cross Redirect
3  KERRY L. BLOOMINGDALE, M.D.
4    By Mr. Davis          4
5    By Mr. Williams       106
6    By Mr. Hamrock
7
8
9
10
11
12
13            E X H I B I T S
14 No.                      Page
15
16 1      Handwritten Notes       34
17
18
19
20
21
22
23
24

---

Page 4

1           P R O C E E D I N G S
2
3      MR. DAVIS:  We had agreed to the usual
4  stipulations.  We were waiving all objections,
5  except as to the form of the question, until
6  time of trial.
7      MR. HAMROCK:  That's fine.  And
8  reading and signing?
9      MR. DAVIS:  Reading and signing was
10 your choice.  Whatever you'd like to do.
11     MR. HAMROCK:  I'd like to read and
12 sign, 30 days from receipt, and waive the
13 notary.
14
15     KERRY L. BLOOMINGDALE, M.D.,
16 having been satisfactorily identified by the
17 production of his driver's license, and duly
18 sworn by the Notary Public, was examined and
19 testified as follows:
20
21        DIRECT EXAMINATION
22 BY MR. DAVIS:
23     Q.  Good morning, Dr. Bloomingdale.  My
24 name is Glenn Davis.  As you probably know at

---

Page 5

1  this point, I'm the attorney who represents
2  Helen Runge in this litigation.
3         MR. HAMROCK: This is Mindy Goff who
4  was the claim rep for the case for
5  Dr. Bloomingdale's insurer. A lot of people to
6  meet.
7         Q. Dr. Bloomingdale, I guess a couple of
8  housekeeping chores before we get started. Have
9  you ever had your deposition taken before?
10        A. Yes.
11        Q. So you know how this works. I ask
12  questions; if you don't understand that
13  question, please ask me to clarify it. If you'd
14  like me to rephrase the question, I'll try to do
15  that.
16        If at any time you want to take a
17  break, consult with counsel -- I know that
18  taking a deposition is a rather grueling task
19  for a witness at times -- just say that you'd
20  like to take a break and we can do that. I
21  think we have a couple of hours, and I think we
22  can certainly get your deposition in today.
23        To the extent that I ask you a
24  question and you don't ask for clarification,

Page 6

1  I'll understand that you understood the question
2  and you're answering it to the best of your
3  information and knowledge.
4         Obviously we've got a court reporter
5  in the room who is taking down everything
6  stenographically, so we've got to talk each time
7  separately. So when I'm asking questions, I'd
8  ask for your patience just to listen. When
9  you're talking, I'll certainly wait until you're
10  done.
11        To the extent you give an answer, you
12  have to verbalize an answer. You have to say
13  yes or no. Head nods or mm-hmms are very
14  difficult to understand on the record. Do you
15  understand that?
16        A. Yes.
17        Q. Prior to coming here today, did you
18  ingest or did you take any alcohol or drugs that
19  would affect your ability to answer the
20  questions?
21        A. No.
22        Q. Would you state your name for the
23  record, please?
24        A. Kerry Bloomingdale, M.D.

Page 7

1         Q. Would you give me your residential
2  address?
3         A. 592 Quinobequin Road, Waban, Mass.,
4  02468.
5         Q. And your business address?
6         A. 333 Brookline Avenue, Boston, 02215.
7         Q. Dr. Bloomingdale, what is your date of
8  birth?
9         A. 9/15/51.
10        Q. Where were you born?
11        A. Baltimore.
12        Q. If I could ask, are you married?
13        A. Yes.
14        Q. How long have you been married?
15        A. Twenty-eight years.
16        Q. Congratulations.
17        A. Thank you.
18        Q. Children?
19        A. Two.
20        Q. Boy, girl?
21        A. Girls.
22        Q. Condolences. How old are they?
23        A. They're 27 and 24.
24        Q. I'll just explore briefly your

Page 8

1  educational background. Where did you go to
2  high school?
3         A. Scarsdale High School in New York.
4         Q. When did you graduate?
5         A. 1968.
6         Q. Did you go to college?
7         A. Yes.
8         Q. Where did you go to college?
9         A. Yale College.
10        Q. Graduated when?
11        A. 1973.
12        Q. With a degree in?
13        A. Psychology.
14        Q. Did you go immediately to medical
15  school?
16        A. Yes.
17        Q. And where did you go to medical
18  school?
19        A. Harvard Medical School.
20        Q. When did you graduate?
21        A. 1977.
22        Q. After your graduation from Harvard
23  Medical School, what was your further training
24  at that point?

Page 9

1    A. Well, I did a rotating internship and
2 then a psychiatry residency at Massachusetts
3 Mental Health Center and then a postgraduate
4 research fellowship through the National
5 Institutes of Mental Health.
6    Q. Where did you do your psychiatric
7 residency?
8    A. At the Massachusetts Mental Health
9 Center, Massachusetts Mental Health
10 Center/Harvard University Psychiatric Residency.
11    Q. When did you complete that?
12    A. 1981.
13    Q. Did you take board certifications in
14 psychiatry?
15    A. Yes.
16    Q. And did you pass those?
17    A. Yes.
18    Q. When did you receive your
19 certification?
20    A. 1983. Psychiatry and neurology, it
21 is, technically.
22    Q. Do you have any further psychiatry
23 certifications, child psychiatry, geriatrics?
24    A. No. Well, I do have certification in

Page 10

1 electroconvulsive therapy.
2    Q. You won't be practicing that today on
3 any questioner, will you?
4    A. No. I promise.
5    Q. After you finished your internship in
6 psychiatry, would you give me a brief
7 description of your employment history at that
8 point?
9    A. Well, I was involved in the
10 fellowship, the research fellowship; then I
11 worked for a year at the Deaconess Hospital,
12 then I completed the fellowship; then I
13 continued to work at Deaconess Hospital, and now
14 I work at Beth Israel/Deaconess Hospital after
15 they merged in 1996.
16    Q. When you say you worked at Deaconess
17 Hospital, would it be fair to understand that
18 you were an employee of the hospital?
19    A. Well, there's a physicians group, and
20 I'm an employee of that.
21    Q. And what physicians group would that
22 be?
23    A. It used to be called DPPG. I think
24 that stood for Deaconess Physicians Group. I

Page 11

1 don't know what the other P was for. I now am
2 with HMFP, Harvard Medical Faculty Physicians.
3    Q. That's your employer?
4    A. Yes.
5    Q. Is Harvard Medical Faculty Physicians
6 a corporation?
7    A. I don't know.
8    Q. Is Harvard Medical Faculty Physicians
9 the successor to DPPG? Is that the same
10 organization, or are these two different
11 entities?
12    A. I think it became the doctors' group
13 after the merger of the two hospitals in 1996.
14    Q. And, Dr. Bloomingdale, how are you
15 paid by Harvard Medical Faculty Physicians?
16    A. I get a check every -- twice a month.
17    Q. Are you on salary to Harvard Medical
18 Faculty Physicians?
19    A. Yes.
20    Q. What is your salary?
21    MR. HAMROCK: Objection to that. You
22 don't have to answer that. I'm advising the
23 witness not to answer that.
24    Q. Other than receiving salary from

Page 12

1 Harvard Medical Faculty Physicians, do you
2 receive any other compensation in your practice
3 of psychiatry?
4    A. Yes. I have a private practice in
5 which I see some patients individually and work
6 at some nursing homes.
7    Q. And your private practice, what does
8 that -- could you describe what that consists
9 of?
10    A. Well, again, it involves seeing a
11 small number, very small number of patients in a
12 home office and working at a number of nursing
13 homes.
14    Q. And when you say working at nursing
15 homes, what do you do at nursing homes?
16    A. Well, I provide psychiatric care
17 generally of a psychopharmacologic nature,
18 evaluation, assessment and treatment.
19    Q. What nursing homes do you currently
20 provide those services to?
21    A. Armenian Nursing Home, Wingate of
22 Brighton, Wingate of Needham, Heathwood,
23 Goddard, Emerson, and Meadowgreen.
24    Q. Dr. Bloomingdale, are any of those

Page 13

1   facilities associated with one another?
2       A.  Well, I believe the Wingate facilities
3   have a common governance I think.  The others
4   I'm not aware of being related.
5       Q.  Do you serve as medical director to
6   any of those facilities?
7       A.  No.
8       Q.  Do you have a contract with those
9   facilities?
10      A.  No.
11      Q.  When you indicate that you provide
12  services to those facilities, on what basis do
13  you get referral?  Is it correct to understand
14  that you get referrals, then, to those
15  facilities?
16      A.  Yes.  I get referrals.  I work along
17  with a group called New England Geriatrics, and
18  generally they get the referrals and refer them
19  to me.  Occasionally I will get a direct
20  referral from a nursing home.
21      Q.  And who is New England Geriatrics?
22      A.  It's a group that goes into nursing
23  homes and provides psychiatric services.
24      Q.  Are you an employee of New England

Page 14

1   Geriatrics?
2       A.  No.
3       Q.  Are you an independent contractor to
4   them?
5       A.  That's probably the best description,
6   although I'm not an expert on those kinds of
7   business relationships.
8       Q.  How long have you been affiliated in
9   any respect with New England Geriatrics?
10      A.  About eight years.
11      Q.  Do you have any ownership interest in
12  New England Geriatrics?
13      A.  No.
14      Q.  Explain to me a little more; New
15  England Geriatrics, do they have contracts with
16  these facilities you've identified?
17      A.  Yes.  I think they do.
18      Q.  And then am I correct in understanding
19  they get the call for some type of psychiatric
20  service need, and then they call you and ask you
21  to come in?
22      A.  Yes.
23      Q.  Do you have a particular contact at
24  New England Geriatrics that contacts you when

Page 15

1   they need your services at a nursing facility?
2       A.  Yes.  The most common one would be
3   called Mary Barbato.
4       Q.  Who is Mary Barbato, if you know?
5       A.  Her title is program director.
6       Q.  Is Ms. Barbato a physician?
7       A.  No.  She's a clinical specialist, a
8   nurse.
9       Q.  Do you know if New England Geriatrics
10  has any psychiatrists on staff?
11      A.  I believe they may have a medical
12  director.
13      Q.  Do you know what his or her name is?
14      A.  I don't.
15      Q.  When you provide services to the
16  nursing homes, how are you compensated?  By that
17  I mean, do you submit an invoice to the nursing
18  home, does New England Geriatrics take care of
19  billing for those services?
20      A.  In the majority of those cases I send
21  a bill to a private billing company that I have
22  engaged to do my billing.  In a small minority
23  of cases New England Geriatrics serves as the
24  billing agent, in effect.

Page 16

1       Q.  And you say small, private billing
2   company.  What company is that?
3       A.  It's called Moik Associates.
4       Q.  Can you spell that for me?
5       A.  M O I K, Associates.
6       Q.  Where are they located?
7       A.  Westborough.
8       Q.  You said in other instances the bill
9   goes to New England Geriatrics?
10      A.  Yes.
11      Q.  Are there instances where you send the
12  bill directly to the nursing home?
13      A.  No.
14      Q.  Are there instances where you bill a
15  resident at --
16      A.  Are you talking about now or in 2003?
17      Q.  Well, I'm asking now, and we'll go
18  back as soon as we get through this.
19      A.  There are occasional instances now
20  where Moik Associates sends a bill to the
21  nursing home.
22      Q.  Approximately how much of your
23  practice, Dr. Bloomingdale, in a percentage
24  form, do you think this nursing home and private

Page 17

1  practice takes up? Is it 50 percent of your
2  practice, 60 percent?
3      A. I would say about 25 percent.
4      Q. When you say 25 percent, are you
5  basing that on the time you invest in that, or
6  are you basing that on the income the practice
7  generates?
8      A. Time.
9      Q. If you based it on income that that
10  generated, would the percentage change?
11      A. I guess income would be about
12  35 percent.
13      Q. Dr. Bloomingdale, in providing --
14      A. Although it's a little -- I mean, it's
15  a little confusing, though, because that's
16  counting just gross income. So I'm sort of
17  balancing gross income from the private practice
18  against salary from the hospital, which reflects
19  costs. So it's a little bit of an apples and
20  oranges comparison.
21      Q. I guess that begs another question.
22  What do you mean "reflects costs?" What do you
23  mean by that?
24      A. Well, in other words, figured into

Page 18

1  what I get paid at the hospital is what I
2  generate, but also what I cost in the way of
3  support, space and other considerations;
4  whereas, the figure I'm giving you for the
5  private practice is just gross.
6      Q. Okay.
7      A. So it's, again, sort of apples and
8  oranges.
9      Q. Are there any other psychiatrists that
10  provide services on behalf of New England
11  Geriatrics?
12      A. Yes.
13      Q. Do you know who they are?
14      A. One is James Thompson, another is
15  Charles Forbes, another is a Dr. Arif, another
16  is Dr. Goldman, another is a gentleman with a
17  long Russian name. He's known as Dr. Z.
18      MR. HAMROCK: Not Zhivago?
19      A. There are others. I can't think of
20  their names.
21      Q. Do any of the doctors that you're
22  mentioning, do any of those doctors also work
23  for Harvard Medical Facility Physicians?
24      A. No.

Page 19

1      Q. On the ground we've covered, let me
2  catch up then or go back to 2003 and ask you, in
3  2003 by whom were you employed?
4      A. The same people.
5      Q. And it would have been the same format
6  that we've talked about, that you also provided
7  services for New England Geriatrics at that
8  time?
9      A. Yes.
10      Q. And I think I understand this, but
11  just so we put this on the record, in 2003 --
12  obviously this lawsuit involves Helen Runge -- I
13  understand that you provided some services or
14  medical services to Helen Runge in that time
15  frame?
16      A. Yes.
17      Q. And as I understand, they were
18  provided by you through New England Geriatrics?
19      A. Yes. They were provided by me in
20  affiliation with New England Geriatrics.
21      Q. And how would you have billed for the
22  services you provided to Helen Runge?
23      A. Through my billing group, Moik
24  Associates.

Page 20

1      Q. Who would you have billed for the
2  services you provided on behalf of Helen Runge?
3      MR. HAMROCK: I think this was in the
4  document response, Glenn. There were copies of
5  the -- they were able to track down from the
6  bills, but if you want to look at those.
7      A. Do you mean to whom?
8      MR. HAMROCK: Who was paying for it?
9      MR. DAVIS: Who was paying the bill.
10      Q. I'm not trying to trick you in any
11  means. If you don't know or don't recall and
12  give that answer, we'll move on.
13      MR. HAMROCK: But he can look at the
14  document, obviously. If you can tell by looking
15  at the billing records as to who paid the bill,
16  Dr. Bloomingdale, feel free to answer the
17  question.
18      A. I believe it was Medicare and Medex.
19      Q. Dr. Bloomingdale, after you graduated
20  from medical school, is it fair to assume that
21  you became licensed as a physician?
22      A. Yes.
23      Q. In what state was your original
24  licensure?

Page 21

1    A.  Massachusetts.
2    Q.  Are you licensed in any other states?
3    A.  No.
4    Q.  Is it fair to assume that your
5  original licensure in Massachusetts was by
6  testing?
7    A.  Yes.  It was by virtue of testing.
8      MR. HAMROCK:  Was it a test or just
9  fill out an application?
10      THE WITNESS:  Well, I mean you need to
11  have passed Parts 1, 2 and 3 of the national
12  boards, yeah, and then you just write a letter
13  and get the license.
14    Q.  Are you licensed in any other state,
15  Dr. Bloomingdale?
16    A.  No.
17    Q.  Is your license current in
18  Massachusetts?
19    A.  Yes.
20    Q.  Have you had any licensure actions
21  filed against you in the state of Massachusetts?
22    A.  No.
23    Q.  You indicated at the beginning of your
24  deposition that your deposition had been taken

Page 22

1  before.
2    A.  Yes.
3    Q.  Under what circumstance was your
4  deposition taken before?
5    A.  I was a defendant in a lawsuit.
6    Q.  Was that lawsuit -- you were a
7  defendant?
8    A.  I was a defendant.
9    Q.  A defendant?
10    A.  Yes.
11    Q.  When was that?
12    A.  I think the lawsuit, it was in the
13  mid-'90s.
14    Q.  Do you recall the name of the
15  plaintiff?
16    A.  I believe it was called the Estate of
17  Stanley Howard.
18    Q.  Where was that lawsuit filed?
19    A.  It was in this state.
20    Q.  The state of Massachusetts?
21    A.  Yes.
22    Q.  Do you recall what county?
23    A.  I don't.
24    Q.  Were there other defendants?

Page 23

1    A.  Yes.
2    Q.  Do you recall who they were?
3    A.  New England Deaconess Hospital,
4  Anthony Weiner, Antoinette Abrams, Christine
5  Fitzpatrick, Sheila St. Just.
6    Q.  And the individuals you named, who
7  were they, Anthony Weiner?
8    A.  He was a chief resident at the time.
9    Q.  At Deaconess Hospital?
10    A.  Yes.
11    Q.  By the time frame involved, it's fair
12  to assume that you weren't in a residency at
13  Deaconess Hospital at that time?
14    A.  Correct.
15    Q.  Were you in charge or a supervisor of
16  Anthony Weiner, Christine Fitzpatrick -- there
17  was a Ms. St. Just, and I've missed the other
18  person.
19    A.  Antoinette Abrams.
20    Q.  Were you their supervisor?
21    A.  Well, I served in a supervisory
22  capacity to Antoinette Abrams and Anthony
23  Weiner.
24    Q.  Who was Antoinette Abrams?  Was she

Page 24

1  also a resident?
2    A.  Yes.
3    Q.  And Ms. Fitzpatrick was whom?
4    A.  She was the nurse manager.
5    Q.  And Ms. St. Just?
6    A.  She was an attendant.
7    Q.  What do you mean by "an attendant"?
8    A.  An aide, a nurse's aide, mental health
9  attendant.
10    Q.  What did that lawsuit involve?
11    A.  A man who was an inpatient had left an
12  MRI and gone to the roof of a fifth floor and
13  fell or jumped and subsequently died.
14    Q.  When you say "left an MRI," what do
15  you mean by that?
16    A.  Well, at that time, MRIs were off
17  site, so his MRI was in a little building just
18  across a little street from the hospital.  And
19  he left the charge of the attendant and went to
20  the top of this garage.
21    Q.  In 2003, Dr. Bloomingdale, did you
22  provide services for the Sunbridge Healthcare
23  Group?
24    A.  Well, again, if they referred patients

Page 25

1  to New England Geriatrics or directly to me, I
2  did, at that Randolph facility. I don't think I
3  had anything to do with any other Sunbridges.
4      Q. Do you currently have anything to do
5  with any Sunbridge facilities?
6      A. No.
7      Q. Do you recall how long you provided
8  services at the Sunbridge Randolph facility?
9      A. I believe it was in the neighborhood
10 of a year and a quarter.
11     Q. Do you recall about when you might
12 have started to provide those services?
13     A. I don't.
14     Q. Do you recall when the last time you
15 provided services there was?
16     A. I don't.
17     Q. In relation to the events with
18 Ms. Runge in April of 2003, did you continue to
19 provide services after that?
20     A. I believe I did, yes.
21     Q. Do you recall how long after April
22 2003 you continued to provide services at
23 Sunbridge?
24     A. I don't.

Page 26

1      Q. Do you recall how many residents at
2  Sunbridge you may have provided services to
3  after April of 2003?
4      A. I don't.
5      Q. Let me take you back and focus in
6  particular now in that time frame of 2003, if I
7  could. In the beginning part of 2003 -- and I
8  guess when I reference 2003, if we could just
9  agree unless you or I specify otherwise, let's
10 talk about the time frame, I believe, when
11 Ms. Runge was a resident at Sunbridge which was
12 January through April.
13        In that time frame of January through
14 April, is it fair to understand that you were
15 then providing medical services at Sunbridge?
16     A. Yes. I'm pretty sure I was providing
17 them by the time she got there in January.
18     Q. And prior to your deposition having
19 been taken today, Dr. Bloomingdale, did you have
20 a chance to review the medical records that you
21 have for Helen Runge?
22     A. Yes.
23     Q. What else might you have reviewed in
24 preparation for your deposition?

Page 27

1      A. I reviewed the Sunbridge record.
2      Q. When you say "the Sunbridge record,"
3  are you talking about Helen Runge's medical
4  record at Sunbridge?
5      A. Yes.
6      Q. Is that the first time you ever had a
7  chance to look at the Sunbridge record, in
8  preparation for your deposition?
9      A. No.
10     Q. Is it the first time you had seen the
11 entire record?
12     A. Yes.
13     Q. What part of the record, then, had you
14 seen prior to seeing the entire record in
15 preparation for your deposition?
16     A. I'm sorry?
17     Q. What part of the medical record had
18 you seen prior, then, to the preparation of your
19 deposition?
20     A. Well, there were a couple of elements
21 of the record that looked to be from after I
22 last saw her. Everything else I would have seen
23 when I had seen the patient.
24     Q. When you say everything else you would

Page 28

1  have seen, could you describe what you would
2  have seen other than those notations in the
3  record that came after the last time you had
4  seen the patient?
5      A. Well, notes from other disciplines
6  mainly, preadmission evaluations -- mainly, as I
7  say, notes from other clinicians, including
8  occupational therapy, New England Geriatrics,
9  nursing, nutrition, a few administrative forms.
10     Q. Were you the medical director at
11 Sunbridge?
12     A. No.
13     Q. Do you know who the medical director
14 in 2003 was?
15     A. I don't.
16     Q. Did you ever have any interaction with
17 the medical director at Sunbridge in 2003?
18     A. I might have, not knowing who he was,
19 so it's hard to say.
20     Q. Fair enough. In the time frame,
21 again, that we're speaking of when Helen Runge
22 was at Sunbridge in 2003, do you know who the
23 administrator of the facility was?
24     A. I do not.

Page 29

1    Q. Did you ever have interaction with the
2 administrator?
3    A. Not that I recall.
4    Q. Do you know who the DON was in that
5 time period?
6    A. I don't recall.
7    Q. Did you have interaction with the DON
8 in that time period?
9    A. I don't recall.
10    Q. Does the name Walter Kelly mean
11 anything to you, Dr. Bloomingdale?
12    A. Yes.
13    Q. And what does it mean to you?
14    A. I believe he was the healthcare proxy
15 and power of attorney for Helen Runge.
16    Q. And how did you gain that information?
17    A. I believe it was from the chart.
18    Q. Did you have any personal interaction
19 with Kelly?
20    A. I believe I had one phone call with
21 him.
22    Q. Do you recall when that phone call
23 was?
24    A. I believe it was on 4/29/03.

Page 30

1    Q. Do you recall who made that phone
2 call? In other words, did you call Mr. Kelly or
3 did Mr. Kelly call you?
4    A. I don't.
5    Q. Do you recall what the purpose of that
6 phone call was?
7    A. I believe it was to tell me about the
8 patient.
9    Q. What do you recall it was that Walter
10 Kelly wanted to tell you about the patient?
11    MS. CARLUCCI: Objection. You can
12 answer.
13    A. That I don't remember.
14    Q. Do you recall where you were when you
15 took this phone call?
16    A. I think I may have been on the nurses'
17 station.
18    Q. When you say "on the nurses' station,"
19 is it fair to understand, then, you were in the
20 Sunbridge facility when you took that call?
21    A. Yes.
22    MS. CARLUCCI: Objection.
23    Q. Do you have a recollection of any of
24 the content of your conversation with Walter

Page 31

1 Kelly?
2    A. No.
3    Q. Did you make any notes or did you make
4 any recordings of any of the information that
5 was being exchanged between you and Mr. Kelly
6 that day?
7    A. No.
8    Q. Do you recall why you were at the
9 facility and at the nurses' station on April 29
10 in order to have taken that call?
11    MS. CARLUCCI: Objection.
12    A. I believe one of the people I worked
13 with, Ruth Miller or Ruth Murray, had asked me
14 to.
15    Q. To be there?
16    A. Yes.
17    Q. Or to take the call?
18    A. Oh, no. No. No.
19    MS. CARLUCCI: Objection.
20    A. To see the patient.
21    Q. To see the patient?
22    A. Yes.
23    Q. You said Ruth Miller or Ruth Murray.
24 Were you referring to two different people or

Page 32

1 were you just not recalling the last name of the
2 person?
3    A. Two different people.
4    Q. Who was Ruth Miller?
5    A. She was a nurse practitioner who
6 worked with New England Geriatrics on the case.
7    Q. When you say "on the case," Helen
8 Runge's case?
9    A. Yes.
10    Q. And who was Ruth Murray?
11    A. She was a therapist that worked on the
12 case.
13    Q. When you say "therapist," what do you
14 mean by --
15    A. That social worker, I believe.
16    Q. Who did you understand Ruth Murray was
17 employed by?
18    A. I don't fully understand their
19 financial relationships. I think that they were
20 either employed by or consultants to New England
21 Geriatrics.
22    Q. When you say "they," you're referring
23 to both Ruth Murray and Ruth Miller being
24 affiliated with New England Geriatrics then?

Page 33

1    A.  Yes.
2    Q.  When did you first come into contact
3  with Helen Runge?
4    A.  I believe it was on March 4 of '03.
5    Q.  Did you provide professional services
6  for her that day?
7    A.  Yes.
8    Q.  And could you describe the
9  circumstances about how you came into contact
10  with her that day?
11    A.  Well, I was asked to see her.
12    Q.  And who asked you to see her?
13    A.  It was either Ruth Miller or the
14  nursing home.  I think it was Ruth Miller.
15    Q.  And, again, Ruth Miller was a nurse
16  practitioner with New England Geriatrics?
17    A.  Yes.
18    Q.  Do you recall why Ruth Miller may have
19  asked you to see Helen Runge?
20    A.  I believe it was for agitation and
21  paranoia.
22    MR. DAVIS:  Could we go off the record
23  for a second?
24    (Discussion off the record)

Page 34

1    (Exhibit 1 marked
2      for identification)
3  BY MR. DAVIS:
4    Q.  Dr. Bloomingdale, I'm handing you a
5  document that we've marked as Bloomingdale
6  Exhibit 1.  And I had noticed you were making
7  reference to some notes.  I'll ask you to take a
8  look at that, but I'll represent that what I did
9  in that exhibit was I copied the records that
10  had been provided to me by Sunbridge, and it
11  appears to be all of New England Geriatrics
12  records.
13    Would notes that you made with regard
14  to you seeing Helen Runge on March 4 be in that
15  document?
16    A.  Yes.
17    Q.  Am I correct in understanding that
18  would be on the page that's Bates stamped at the
19  bottom 452?
20    A.  Yes.
21    Q.  I notice you're now on Page 452, and
22  are those your notes from you having provided
23  services to Helen Runge on that day?
24    A.  Yes.

Page 35

1    Q.  Did you make a diagnosis of Helen
2  Runge on that day?
3    A.  Yes.
4    Q.  What was that diagnosis?
5    A.  Alzheimer's dementia with delusions.
6    Q.  If you could just direct me, is that
7  contained on that page or are you on the next
8  page, 453?
9    A.  Oh, I'm on the next page.
10    Q.  And in that your diagnosis is at the
11  top under, Diagnosis:  Axis I, Alzheimer's
12  dementia with delusions?
13    A.  Yes.
14    Q.  What did you base that diagnosis on,
15  Dr. Bloomingdale?
16    A.  Well, she seemed paranoid at the time.
17  She was angry at a long list of things at the
18  nursing home that I think had a paranoid flavor.
19  She had a paranoid history, possibly quite a
20  long one, and had been acting somewhat paranoid
21  in the nursing home.
22    Q.  When you say she possibly had quite a
23  long history, what do you mean by that?
24    A.  Well, her daughter had referred to her

Page 36

1  as being paranoid for most of her life.
2    Q.  And when did you speak with her
3  daughter?
4    A.  I did not speak to her daughter.
5    Q.  When did you obtain the information
6  that her daughter had referred to her as
7  paranoid for most of her life?
8    A.  I believe that was in the preadmission
9  forms.
10    Q.  And that was the preadmission forms
11  for Sunbridge Healthcare?
12    A.  Yes.
13    Q.  Did you have an understanding that her
14  daughter was involved in the admissions process
15  at Sunbridge?
16    A.  I don't know.  I was not aware of
17  that.
18    Q.  Do you know who was involved in Helen
19  Runge's admission process?
20    A.  I don't, other than representatives
21  from the Carney Hospital and representatives
22  from the Sunbridge.
23    Q.  Did you speak to anyone at the Carney
24  Hospital in the time period of March 4, 2003?

Page 37

1  A. No.
2  Q. Did you speak to anyone from the
3  Carney Hospital between March 4 of 2003 and
4  April 30 of 2003 --
5  A. No.
6  Q. -- with regard to Helen Runge?
7  A. No.
8  Q. Did you ever speak to Helen Runge's
9  daughter on March 4 with regard to her possible
10 history of paranoia?
11  A. No.
12  Q. Who specifically did you speak with,
13 if anyone, on March 4 with regard to Helen
14 Runge's history?
15  A. I spoke to a couple of the nurses on
16 the 7:00 to 3:00 shift, I spoke to the patient.
17 Those were probably the main people I spoke to.
18  Q. And that would be reflected in your
19 notes at the top where you say your source is
20 two 7:00 to 3:00 nurses, patient and chart?
21  A. Yes.
22  Q. Do you recall who those two nurses
23 were that you spoke to?
24  A. No.

Page 38

1  Q. Do you recall what those nurses
2  specifically told you?
3  A. No.
4  Q. The background information that you've
5  put into Helen Runge's history, where did you
6  gain that information?
7  A. From her and the chart.
8  Q. I see in the history that you say down
9  about in the middle, She had been estranged from
10 her daughter. I'm not sure what the next phrase
11 is outside that bracket, there's something, and
12 then it says until recently?
13  A. Until recently.
14  Q. Until recently. There's a little
15 something there (indicating).
16  A. Oh, this is a different -- in other
17 words, I blocked off the history of present
18 illness from the mental status exam and
19 psychiatric history, so you just read down to
20 the right of that vertical line.
21  Q. If I could just point you to this
22 little block (indicating). I'm reading there.
23 It says, from her daughter, and then it says
24 something inside the little block you're

Page 39

1  referring to, and I can't make out your writing
2  there.
3  A. Right, but I'm just saying that would
4  have nothing to do with this sentence. That
5  refers to the mental status exam.
6  Q. I see. When it says they became
7  reconciled, what did you understand that
8  reconciliation to be?
9  A. I don't know. I don't recall.
10  Q. Then you say, Patient has said that
11 she hopes to move to North Carolina; is that
12 correct?
13  A. Yes.
14  Q. Do you recall you made that note?
15  A. I don't recall whether that's
16 something the patient told me or the notes.
17  Q. Is it fair to understand, though, that
18 as of March 4, it was your understanding that
19 she wanted to move to North Carolina with her
20 daughter?
21  A. Yes.
22  Q. The next phrase says, She carries DX
23 of Alzheimer's and lived in BayView. I think it
24 says ALF, which I'm assuming means the assisted

Page 40

1  living facility?
2  A. Yes.
3  Q. And then Marion Manor. What did that
4  mean?
5  A. Marion Manor was a nursing home. It's
6  possible that those were reversed, that she
7  lived in Marion Manor and then BayView, but my
8  understanding, I guess, at the time was the
9  other way around.
10  Q. When you say she carries a DX, and
11 your reference to DX there means what?
12  A. Diagnosis.
13  Q. When you say she carries a diagnosis
14 of Alzheimer's, whose diagnosis was that?
15  A. I believe that came with her from the
16 Carney Hospital.
17  Q. Did you see the Carney Hospital
18 records on March 4?
19  A. No. I don't believe I did. I
20 customarily -- I always ask for them when
21 they're not there, but I don't recall seeing
22 them.
23  Q. When do you recall first having seen
24 the Carney Hospital records?

Page 41

1    A.  I don't know that I saw actual Carney
2  Hospital records.  As I say, I always ask for
3  them in a situation like that, but they don't
4  always come.
5    Q.  Would it be fair to assume or
6  understand that you never saw the Carney
7  Hospital records during the period of your care
8  of Helen Runge?
9    A.  I'm not aware that I did see them.
10    Q.  If you had seen them, would you have
11  made a note on your data source that you had
12  seen the Carney Hospital records?
13    A.  No, not if they were in the chart.
14    Q.  But if the Carney Hospital records
15  were not part of the chart, then would you have
16  recorded them as having been a data source?
17    A.  In those situations, the records are
18  invariably in the chart, so I record them as
19  chart.
20    Q.  But, again, the question is:  If they
21  were not in the chart at Sunbridge, then it
22  would be fair to assume that you did not see
23  those records?
24    A.  I don't know.  I don't recall seeing

Page 42

1  them.
2    Q.  Was there a specific concern or was
3  there a specific reason that Ruth Miller had
4  asked you for the consultation with Helen Runge
5  on March 4?
6    A.  I believe it would have related to
7  agitation and paranoia.
8    Q.  And did you at that time in March of
9  2003, was there a specific day that you
10  generally went to Sunbridge?
11    A.  I believe it was Tuesday.
12    Q.  Was that weekly on Tuesdays?
13    A.  I can't remember if it was weekly or
14  every other week.
15    Q.  Approximately how many residents would
16  you see when you went to Sunbridge on the
17  Tuesdays?
18    A.  I would say an average of three to
19  four.
20    Q.  Do you recall how many other residents
21  you may have seen on March 4 when you were at
22  Sunbridge?
23    A.  No.
24    Q.  On a typical Tuesday in your practice,

Page 43

1  do you go to other places or do you see or
2  perform other tasks or services in your practice
3  on a Tuesday?
4    A.  Can you repeat that.
5    Q.  Let me try to rephrase it.  It was
6  poorly worded.
7      Do you do anything on Tuesdays for
8  Harvard Medical Faculty Physicians?
9    A.  Yes.
10      MR. HAMROCK:  This is back in 2003,
11  right?
12      MR. DAVIS:  Back in 2003.
13    A.  Yes.
14    Q.  What did you do on Tuesdays in 2003
15  for that practice group?
16    A.  See patients generally until 1:15.
17    Q.  When you say "until 1:15," starting
18  when?
19    A.  8:00.
20    Q.  How many patients do you see generally
21  in that time frame between 8:00 and 1:30?
22    A.  I would say an average of eight.
23    Q.  Where would you have been seeing those
24  patients?

Page 44

1    A.  In my office there.
2    Q.  And that's in Deaconess Hospital?
3    A.  Beth Israel/Deaconess.
4    Q.  And then at 1:30 what would you have
5  done for the remainder of your day?
6    A.  Well, I would have to generally answer
7  phone calls and e-mails for a while, and when
8  finished with that would go to Randolph.
9    Q.  How far a distance is it from the Beth
10  Israel/Deaconess Hospital to Randolph?  And by
11  Randolph, I'm assuming you mean the Sunbridge
12  facility?
13    A.  Yes.
14    Q.  What's that distance?
15    A.  I would guess 13 miles.
16    Q.  Is it fair to assume that you would
17  have driven from the hospital to Sunbridge?
18    A.  Yes.
19    Q.  Generally speaking, what time would
20  you typically arrive at Sunbridge?
21    A.  It varied a fair amount.  Typically
22  2:30, 3:00, 3:30.
23    Q.  Do you recall what time it was when
24  you first met Helen Runge on March 4?

Page 45

1   A. No.
2   Q. Is it recorded on your notes anywhere
3 what time it was?
4   A. No.
5   Q. This page that we're looking at in
6 Exhibit 1 -- and I believe we're looking at
7 Page 452 and 453 -- are they your notes from
8 that meeting?
9   A. Yes.
10   Q. And are they all your notes from that
11 meeting? Would there be any other notes
12 anywhere that you recall?
13   A. No.
14   Q. And that's your signature on Page 453
15 at the end of the notes?
16   A. Yes.
17   Q. I notice that the form says New
18 England Geriatrics at the top. Is it fair to
19 assume that that's a form, then, that New
20 England Geriatrics has developed and you use
21 when performing services for them?
22   A. Yes.
23   Q. Are you the only individual that
24 filled the information on this form?

Page 46

1   A. Yes.
2   Q. Do you recall how much time you spent
3 with Helen Runge on the 4th?
4   A. No.
5   Q. Is it recorded anywhere on your notes
6 on these two pages how much time you spent with
7 Helen Runge?
8   A. No.
9   Q. Did you prescribe any medication for
10 Ms. Runge on that day?
11   A. Well, I -- I don't prescribe really.
12 I'm just a consultant. The PCM orders or
13 prescribes, but it looks as though I did not
14 recommend any changes.
15   Q. When you say you don't recommend any
16 changes, are you looking at the bottom of
17 Page 453?
18   A. Yes.
19   Q. And it says, I would not change dose
20 of Zyprexa for now? Is that what you are
21 referring to?
22   A. Yes.
23   Q. Then it says, She seems to be
24 tolerating -- it looks like drug?

Page 47

1   A. Yes.
2   Q. Do you recall what her dose of Zyprexa
3 was on that day?
4   A. I believe it was five milligrams at
5 bedtime.
6   Q. Is that referenced anywhere on your
7 note?
8   A. Yes, under the meds section on the
9 left-hand side of Page 452.
10   Q. What other drugs did you understand
11 that she was taking at that time?
12   A. Lisinopril, Aricept, BuSpar, Colace,
13 Senokot.
14   Q. And are any of those drugs for
15 depression, for agitation, for paranoia?
16   A. Zyprexa is for paranoia and agitation.
17   Q. And do you know who had prescribed the
18 Zyprexa?
19   A. Again, it would have had to be her PCP
20 because he prescribed everything.
21   Q. Do you know who her PCP was? And by
22 "PCP," you're referring to personal care
23 physician?
24   A. Yes. I believe it was Dr. Bregoli.

Page 48

1   Q. Were you familiar with Dr. Bregoli on
2 March 4 of 2003?
3   A. Yeah. I mean, I knew him to be one of
4 the doctors there.
5   Q. When you say "doctors there," you're
6 referring to where?
7   A. At Sunbridge Randolph.
8   Q. Did you have any understanding of the
9 employment affiliation of Dr. Bregoli?
10   A. No.
11   Q. Did he work for New England
12 Geriatrics?
13   A. No.
14   Q. Did he work for Harvard Medical
15 Faculty Physicians?
16   A. No.
17   Q. What would the BuSpar have been
18 prescribed for?
19   A. Anxiety.
20   Q. And the Aricept?
21   A. Dementia.
22   Q. Are any of the drugs that we're
23 referring to or looking at there, do any of
24 those drugs present any particular problems for

Page 49

1  elderly patients?
2      A.  They can.
3      Q.  And when you say "they can," which one
4  are you referring to first?  Let's take them one
5  by one.
6      A.  Well, Lisinopril can present kidney
7  problems.
8      Q.  And Lisinopril is used for what?
9      A.  Blood pressure, generally.
10     Q.  This says Lisinopril.  Do you know
11 what had been actually prescribed for her for
12 Lisinopril?
13     A.  The dose?
14     Q.  Yes.
15     A.  Not offhand.
16     Q.  Does Zyprexa have any concerns in a
17 prescription?
18     A.  It can.
19     Q.  And what concern would you have with
20 Zyprexa?
21     A.  Weight gain, sedation, tardive
22 dyskinesia, diabetes.
23     Q.  How about the Aricept?
24     A.  That can sometimes lead to nausea.

Page 50

1      Q.  The BuSpar?
2      A.  BuSpar occasionally can lead to nausea
3  or diarrhea.
4      Q.  Any other drugs that you were
5  concerned with there?
6      A.  What do you mean "concerned with"?
7      Q.  Well, any other drugs that you would
8  have a concern with an elderly patient?
9      A.  Well, Colace can cause diarrhea, as
10 can Senokot.
11     Q.  What did you understand Ms. Runge's
12 agitation to be caused by, if anything, as a
13 result of your examination on the 4th?
14     A.  She seemed angry about a long list of
15 things that were not being done.  She seemed
16 paranoid.
17     Q.  Do you know whether Ms. Runge had a
18 personality that was angry in nature prior to or
19 did she have a history of an angry personality?
20     A.  Well, I believe she had been described
21 as paranoid and secretive for a long time.  I
22 don't recall her having an angry personality.
23     Q.  When you say she was described as
24 paranoid and secretive, do you recall who gave

Page 51

1  you that description or where you gained that
2  information?
3      A.  I believe that was her daughter.
4      Q.  I think I asked you this, but I might
5  not have asked it in the right time frame.  Did
6  you ever talk to Helen Runge's daughter, ever?
7      A.  Not that I recall.
8      Q.  When was the next time that you had
9  any interaction with Helen Runge after March 4?
10     A.  I think it was April 1.
11     Q.  Do you recall the circumstances as to
12 why you saw Helen Runge on that day?
13     A.  Not directly.  The note indicates
14 sadness and paranoia.
15     Q.  When you say you are referring to a
16 note, again, we're still looking at, I believe,
17 Bloomingdale Exhibit 1.  I think we're now on
18 Page 447.  Is that correct?
19     A.  Yes.
20     Q.  And was the note you made from seeing
21 Helen on that day, was it just a one-page note?
22     A.  Yes, I think it was.
23     Q.  I had to search a little, but I think
24 I found it.  Is that your signature way in the

Page 52

1  left-hand corner of that page?
2      A.  Yes.
3      Q.  From your data sources, from your
4  consultation on that day, you seem to say that
5  you received information from a 3:00 to 11:00
6  nurse.  Is that correct?
7      A.  Yes.
8      Q.  Would it be fair to assume, then, that
9  you were seeing Helen sometime after 3:00?
10     A.  Yes.
11     Q.  You also indicate "the patient," which
12 I assume is referring to Helen Runge?
13     A.  Yes.
14     Q.  The chart, which would be her medical
15 chart?
16     A.  Yes.
17     Q.  Ruth Miller, nurse practitioner, and
18 Ruth Murray.  And those are the two Ruths you
19 referred to as being with New England
20 Geriatrics?
21     A.  Yes.
22     Q.  Do you recall how long you spent with
23 Helen on April 1?
24     A.  No.

Page 53

1    Q. Do your notes of that day refer in any
2  way to Helen with respect to her?
3    A. No.
4    Q. What was your diagnosis on April 1
5  after having met with Helen Runge with regard to
6  her condition?
7    A. Alzheimer's dementia with delusions.
8    Q. Where is that noted on that page?
9    A. About two-thirds of the way through.
10   Q. Is that under DX: Axis I?
11   A. Yes.
12   Q. Where it says, Due to paranoia,
13 Alzheimer's dementia with delusions?
14   A. No. The "due to paranoia" would refer
15 to medical necessity.
16   Q. Under Axis IV you say, Placement
17 change. What do you mean by that?
18   A. Well, the placement change from Marion
19 Manor to BayView to Carney to Sunbridge.
20   Q. The placement change was affecting
21 Helen in some way?
22   A. Yes. I don't know exactly that it
23 was; but it sometimes can, moving around like
24 that.

Page 54

1    Q. Do you recall what time frame those
2  changes or those movements had occurred in? Do
3  you recall when she went from Marion Manor to
4  BayView?
5    A. I think it was sometime in late '02.
6  And then BayView to Carney was 1/12/03, and then
7  Carney to Sunbridge was 1/22/03.
8    Q. When you say under your impressions,
9  This 87-year-old female has been at times more
10 paranoid and saddened -- sadder I guess it says?
11   A. Sadder.
12   Q. What did you mean by that?
13   A. Well, she had been crying, she had
14 been paranoid. I think there was an incident a
15 few days before where she was more paranoid.
16   Q. Dr. Bloomingdale, when you say she had
17 been crying, how often had she been crying?
18   A. I didn't see too many notations of her
19 crying, but I did see one or two.
20   Q. When you say "notations of her
21 crying," you would have been looking at her
22 chart?
23   A. Yes.
24   Q. And when you look at the chart, would

Page 55

1  you be looking specifically at nurse notes or
2  would you be looking at any other particular
3  area of the chart?
4    A. Pretty much everything.
5    Q. And as I recall, Sunbridge kept a
6  graphic chart that detailed her mental status on
7  a shift-by-shift basis; is that correct?
8    A. Yes. I believe they did.
9    Q. And would you have looked at that?
10   A. Yes.
11   Q. When you say, The patient is
12 chronically somewhat dissatisfied, what did you
13 mean by that? Actually, it says chronically
14 somewhat dissatisfied and it goes on to state
15 something, but I'm not sure what it states.
16   A. Angry.
17   Q. And angry. What did you mean by that?
18   A. Well, that she often had complaints
19 about the facility and often seemed to be angry.
20   Q. I notice back up in the middle you
21 indicate she was moving things around in room
22 and said, Things could be better; they could be
23 worse. Was that a quote from Helen Runge as you
24 were interviewing her?

Page 56

1    A. Yes.
2    Q. What did you understand her to mean by
3  that?
4    A. I guess just that things for her could
5  be less good or they could be better.
6    Q. Was Helen any type of behavioral
7  problem with regard to her stay at Sunbridge on
8  April 1?
9    A. I believe there had been some kind of
10 problematic incident a few days before that. I
11 think up until then that was the only incident.
12   Q. And when you say "the only incident,"
13 what do you mean by that?
14   A. Well, you had asked about behavioral
15 problems.
16   Q. So there was a specific instance that
17 you recalled that was a behavioral issue?
18   A. Well, where she had become paranoid.
19 Where she had become paranoid earlier that week.
20   Q. And was that incident to such a degree
21 that the facility didn't have the means to care
22 for Helen?
23   A. No, I don't believe so.
24   Q. What were Helen's social activities

Page 57

1  during this time period? And by that I mean,
2  you know, where did she eat and how did she
3  interact with folks?
4      A. I believe she ate in the main dining
5  room. I think at times she was described as
6  social. I don't remember too much more.
7      Q. Did she have the ability to care for
8  herself at that time?
9      A. In terms of activities of daily
10  living, dressing herself, going to the bathroom,
11  I believe she did.
12      Q. Did she have the ability to take care
13  of her finances at that time, do you know?
14      A. I don't recall.
15      Q. Was she doing that when she was at
16  BayView or when she was at Marion Manor, do you
17  know?
18      A. I don't know.
19      Q. Did you discuss finances with her on
20  April 1?
21      A. I don't recall.
22      Q. Would that be something you typically
23  would ask a patient to get a sense for her
24  mental state when you were making that

Page 58

1  consultation?
2      A. I would say sometimes, but not
3  typically.
4      Q. Would it be fair to understand that
5  you didn't talk to Walter Kelly to get any
6  information about Helen Runge on April 1?
7      A. Yes.
8      Q. Dr. Bloomingdale, do you think Helen
9  Runge's mental status on April 1, 2003 required
10  her to be in a lock-down unit?
11      A. I'm not sure what you mean by a
12  "lock-down unit."
13      Q. As I understand, she was on the third
14  floor at Sunbridge which was a lock-down unit.
15  Was she required to be on that type of floor?
16      A. There was a locked unit. But, as I
17  recall, she wasn't on it. The locked unit, I
18  believe, was opposite hers or maybe opposite on
19  the floor below or above it. She may have had
20  to push a code to get down the stairs of the
21  elevator.
22      Q. Let me ask this question: Would her
23  mental condition on April 1, 2003 have required
24  her to be in a locked unit?

Page 59

1      A. Maybe. I mean, she did show poor
2  judgment. She showed poor insight. She was
3  psychotic. She was paranoid. It's possible
4  that that would have been required. I don't
5  recall actually making that judgment.
6      Q. When you say she had poor judgment,
7  are you referring to the check in "impaired" on
8  the left-hand side? Is that the basis for your
9  recollection that she had poor judgment?
10      A. Yeah. She repeatedly had shown poor
11  judgment with me. She had repeatedly been
12  described by the nurses as manifesting poor
13  decision-making abilities.
14      Q. Did you note that anywhere on this
15  particular form on April 1, that the nurses said
16  she had poor judgment?
17      A. Well, I noted speaking to the nurse.
18      Q. Right.
19      A. I don't know that I noted the nurses'
20  notations of poor decision-making.
21      Q. Were there any issues with her taking
22  her medications at that time?
23      A. Not that I recall.
24      Q. Were you concerned at that time with

Page 60

1  her ability to make a decision as to whether she
2  should take medication or not?
3      A. I don't recall.
4      Q. Who was making her antipsychotic
5  medication decisions on March 1?
6      A. I believe Mr. Kelly.
7      Q. And what's the basis of that belief?
8      A. She signed the consent forms.
9      Q. And when did you see those consent
10  forms?
11      A. I probably saw them in reviewing the
12  chart.
13      Q. And what was your understanding of why
14  Mr. Kelly would have signed a consent form for
15  antipsychotic drugs?
16      A. I don't know.
17      Q. Did you ever see a healthcare proxy
18  for Walter Kelly executed by Helen Runge?
19      A. Yes. I believe I've seen one.
20      Q. When did you see that?
21      A. I saw it in going over the Randolph
22  records.
23      Q. Had you seen it on or before April 1,
24  2003?

Page 61

1    A. I don't recall.
2    Q. Had you seen it on or about April 30
3 of 2003?
4    A. I don't recall.
5    Q. How did you determine that Ms. Runge
6 had poor judgment in your analysis on April 1 of
7 2003?
8    A. I don't recall. Generally it's from
9 either talking to the patient, asking them about
10 their situation. Sometimes it's asking
11 hypothetical questions like what would you do in
12 certain situations.
13    Q. But you don't recall what you might
14 have asked her, if anything, on that day?
15    A. I don't recall what exactly that
16 assessment was based on.
17    Q. What did you base your statement that
18 she had paranoia on, if you recall?
19    A. Well, in the last week she had been
20 seen as more paranoid and more depressed in her
21 mood.
22    Q. Did you note her medication regime on
23 April 1?
24    A. I guess I did not note it.

Page 62

1    Q. Did you comment on it?
2    A. Well, I noted that Ms. Miller's
3 recommendation on 3/31 of Zoloft might be
4 helpful.
5    Q. And what would Zoloft have been
6 prescribed for at that time?
7    A. Depression.
8    Q. Do you know if Zoloft was ever
9 prescribed?
10    A. I think it was, later on in April.
11    Q. Would Zoloft be taken in addition to
12 the other drugs that we had looked at that were
13 indicated on March 4?
14    A. It could be.
15    Q. So could you take Zoloft along with
16 the Aricept, the Zyprexa, the BuSpar?
17    A. Yes.
18    Q. Do you recall what the dosage
19 recommendation was for the Zoloft?
20    A. I believe it was 25 milligrams. I
21 think, actually, it was 25 milligrams for a week
22 and, if tolerated, increased to 50.
23    Q. Do you know if there were any labs
24 called for or run on Ms. Runge in that time

Page 63

1 period?
2    A. I know that Ms. Miller had suggested
3 some.
4    Q. I believe I might have seen that back
5 in the March -- was that on the March 4 notes
6 that I had seen that?
7    A. I think on March 31.
8    Q. Do you know if those labs were
9 actually ordered?
10    A. I don't recall.
11    Q. Did you order any labs?
12    A. No, I did not.
13    Q. Would that be something that you would
14 have been able to do within the scope of your
15 engagement as a consultant?
16    A. No.
17    Q. And why not?
18    A. Again, as a consultant, I didn't write
19 orders.
20    Q. Other than your consultation with
21 Ms. Runge on the 4th, April 1 or at any other
22 time that you provided services for Ms. Runge,
23 did you do any type of psychological testing,
24 standard form testing?

Page 64

1    A. Not that I'm aware of.
2    Q. Do you know if anyone else did any
3 psychological testing?
4    A. I believe Ms. Miller may have done a
5 mini mental status exam.
6    Q. Do you have a recollection of when
7 that might have been done?
8    A. It might have been done around
9 February 10.
10    Q. And would you have reviewed that when
11 you reviewed the chart on March 4 of 2003?
12    A. Yes.
13    Q. Do you recall what the outcome of that
14 MME might have been?
15    A. I believe it was 28 out of 30.
16    Q. What does the score 28 out of 30
17 indicate to you?
18    A. Well, it suggests that at that point
19 in time the person is functioning fairly well
20 cognitively.
21    Q. Other than that February 10 MME, were
22 there any other MMEs performed by you on Helen
23 Runge throughout the services that you provided?
24    A. No, I don't believe so.

Page 65

1    Q. Were there any other MMEs performed by
2 anyone else, whether it be in the New England
3 Geriatrics realm or anyone else, while Helen was
4 at Sunbridge?
5    A. No, I don't think so.
6    Q. Were there any MMSEs, I started to say
7 MMEs, but were there any MMSEs performed for
8 Helen in that period?
9    A. Not that I'm aware of.
10    Q. After April 1, when was the next time
11 you had contact with Helen Runge?
12    A. I believe it was April 29.
13    Q. Do you recall the circumstances of
14 that contact?
15    A. I believe I had been asked to see her
16 by Ruth Miller.
17    Q. Do you recall why Ruth Miller asked
18 you to see Helen on that day?
19    A. I believe she was worried about her.
20    Q. And was April 29 a Tuesday?
21    A. Yes.
22    Q. And that, again, would have been the
23 typical day you came to the Sunbridge Randolph
24 facility?

Page 66

1    A. Yes.
2    Q. In fact, did you see Helen on the
3 29th?
4    A. Yes.
5    Q. Do you recall when Ms. Miller asked
6 you to consult with Helen?
7    A. I don't.
8    Q. How would Ms. Miller have typically
9 communicated her request to you for a
10 consultation?
11    A. In the communication book.
12    Q. And what was the communication book?
13    A. It was a book that people from NEG
14 wrote notes to each other basically in terms of
15 who to see.
16    Q. Was that a physical book or an
17 electronic book?
18    A. Physical.
19    Q. Where would that physical book have
20 been kept?
21    A. I think it was kept in the social work
22 office.
23    Q. Social work office of Sunbridge?
24    A. Correct.

Page 67

1    Q. And was that a notebook or a large
2 book, a small book?
3    A. I believe it was a spiral notebook.
4    Q. Could you just describe how that would
5 work?
6    A. Well, you would check it when you got
7 there; and if someone wanted you to see someone,
8 they would indicate it there.
9    Q. So when you went to Sunbridge on a
10 Tuesday, is it fair to say that you weren't
11 quite sure who you were going to see?  You
12 looked at the spiral notebook and you saw
13 whoever it was indicated that they may want you
14 to consult with that day?
15    A. Yes.
16    Q. Do you have a recollection of when you
17 first became aware that you were being requested
18 to see Helen on the 29th of April?
19    A. No.  As I say, it's possible that Ruth
20 called me before that or it's possible that I
21 saw it on the communication book from her.
22    Q. Do you recall whether you had any
23 contact with Mr. Kelly, Walter Kelly, prior to
24 the 29th with regard to a consultation for Helen

Page 68

1 Runge?
2    A. I don't believe I did.
3    Q. Does the name Thomas Schiavoni mean
4 anything to you?
5    A. I think he's an attorney that was
6 retained by Mr. Kelly.
7    Q. Did you have any contact with
8 Mr. Schiavoni?
9    A. Not that I recall.
10    Q. Dr. Bloomingdale, I'm going to make
11 reference to a document that we had discussed
12 earlier that you haven't seen, but it's a Walter
13 Kelly deposition document.  It's Exhibit 15.
14 And if you could just take a look at that
15 document for a moment.
16    (Pause)
17    Q. Do you recall having seen that
18 document prior to today?
19    A. Well, I saw it in some -- in the
20 Sunbridge record that I reviewed.
21    Q. Do you recall having received that
22 document?
23    A. In 2003?
24    Q. Correct.

Page 69

1    A.  No.
2    Q.  It appears to be a letter dated April
3  25, 2003 addressed to Kerry Bloomingdale, M.D.,
4  New England Geriatrics, address 1132 Westfield
5  Street, Springfield, Mass., 01089.
6        Did you receive mail or fax
7  transmissions at that address and at that phone
8  number?
9    A.  No.
10    Q.  Is that the business address of New
11  England Geriatrics?
12    A.  Yes.
13    Q.  Were you provided a copy of this
14  letter on or about April 25, 2003 by New England
15  Geriatrics?
16    A.  Not that I recall.
17    Q.  The letter from Mr. Schiavoni to you
18  says, I understand from staff at Sunbridge in
19  Randolph that you are scheduled for a
20  consultation on Tuesday, April 29, in regard to
21  Helen Runge, an 87-year-old resident who has
22  recently been experiencing confusion.
23        Do you see that?
24    A.  Yes.

Page 70

1    Q.  Did you have that understanding on
2  April 25?
3    A.  I'm sorry?  Did I --
4    Q.  Did you have an understanding that you
5  were scheduled for a consultation with Helen on
6  the 29th?
7        MR. HAMROCK:  As of the 25th you mean?
8        MR. DAVIS:  As of the 25th.
9    A.  I don't know.
10    Q.  When you indicated you recall having
11  seen this document in the Sunbridge records,
12  when was it that you saw the documents in the
13  Sunbridge records?
14    A.  About a month ago.
15    Q.  And that's the first time you have a
16  recollection of seeing this?
17    A.  Yes.
18    Q.  Did you ever talk to Walter Kelly
19  about this document?
20    A.  Not that I remember.
21    Q.  Have you spoken with Mr. Kelly at any
22  time between April 30 of 2003 and today?
23    A.  I don't believe so.
24    Q.  Have you spoken with Mr. Schiavoni in

Page 71

1  that same time frame?
2    A.  I don't believe so.
3    Q.  Have you spoken with Farrah Siedler in
4  that time frame?
5    A.  I may have.
6    Q.  And have you spoken with her with
7  regard to Helen Runge?
8    A.  I may have.
9    Q.  Do you recall what those discussions
10  may have been about?
11    A.  She might have updated me on the
12  developments of the case after April 29.
13    Q.  Other than her updating you on the
14  case, do you recall any other conversations you
15  would have had with her about Helen Runge?
16    A.  No.
17    Q.  What do you recall that she may have
18  updated you about?
19    A.  Well, I don't know if it was her.  I
20  believe that I knew that the family had removed
21  her from the premises.
22    Q.  And when did you gain information that
23  the family had removed her from the premises?
24    A.  I think it was in -- I think it was

Page 72

1  probably in May of 2003.
2    Q.  Did Helen ever tell you that she
3  didn't want to live with her daughter?
4    A.  Not that I recall.
5    Q.  In fact, I believe your note on March
6  3 said just the opposite, that she wanted to
7  live with her daughter; didn't it?
8    A.  Yes.  Well, it said that she hoped to
9  move to North Carolina.
10    Q.  And you understood that to be with her
11  daughter who lived there?
12    A.  Yeah.  I don't know if I knew it meant
13  with the daughter, but presumably close by.
14    Q.  Did she ever express to you any fear
15  of living with or close to her daughter in North
16  Carolina, fear for her person?
17    A.  Not that I recall.
18    Q.  On April 29, I'm correct in
19  understanding that you met with Helen on that
20  day?
21    A.  Yes.
22    Q.  Doctor, do you want to take a break?
23  Can I continue on?
24    A.  I'm fine.

Page 73

1     Q.  That hammering in your ear might be
2  annoying.
3     A.  I'm fine.
4     Q.  Directing your attention to April 29,
5  and I'm back to the exhibit that was in front of
6  you, the Bloomingdale Exhibit No. 1.  I believe
7  the first page of that appears to be your notes
8  from that meeting with Helen; is that correct?
9     A.  Yes.
10     Q.  And actually, Doctor, let me just
11  represent, I copied that page or there were two
12  copies of that page within the document, and
13  you'll see one is out of numerical sequence.
14  The documents that had been provided, it looked
15  like it at least captured a little more of the
16  bottom of the page and that's the only reason
17  why I copied it twice.
18         Let me direct your attention back to
19  the top of that document.  It says, Procedure
20  code, and there's a procedure code there.  It
21  looks like it's 99313.  Do you understand what
22  that means?
23     A.  Yes.
24     Q.  What does that code mean?

Page 74

1     A.  That's a follow-up billing code.
2     Q.  Is that New England Geriatics' billing
3  code or is that someone else's billing code?
4     A.  It's someone else's billing code.
5     Q.  Whose billing code is that?
6     A.  I think it's a fairly commonly used
7  one by different insurers.
8     Q.  And when you say "a follow-up billing
9  code," what does that mean, that you are billing
10  for the service that you provided to Helen Runge
11  that day?
12     A.  I believe it's a fairly intensive
13  follow-up psychiatric billing code.
14     Q.  When you say "intensive follow-up,"
15  what do you mean by that?
16     A.  In other words, involving history
17  taking, interview, medical decision-making.
18     Q.  Do you recall when you got to Randolph
19  to provide services to residents on Tuesday,
20  April 29 of 2003?  By that I mean what time.
21     A.  I don't.
22     Q.  Do you recall what time frame or what
23  time of the day you met with Helen Runge?
24     A.  I don't.

Page 75

1     Q.  Do you recall where you met with Helen
2  Runge?
3     A.  I don't.
4     Q.  Do you recall if you met with Helen
5  Runge?
6     A.  Yes.  I think I remember meeting with
7  her.
8     Q.  Would that be reflected by at the top
9  again under the data sources where it says,
10  Patient?
11     A.  Yes.  But what I mean is I think I
12  actually remember -- I mean putting "patient"
13  there would denote that I did meet with her.
14  But when you say do you remember meeting her, I
15  think I actually remember meeting with her.
16     Q.  So when you denote someone in that
17  data source, when you put someone down, that
18  means you actually met with them?
19     A.  Spoke to or met with.
20     Q.  When you say "spoke to," that could be
21  by phone, then?
22     A.  Yes.
23     Q.  Do you recall if you spoke to any of
24  the folks that you identify as a data source by

Page 76

1  phone or if you met with them?  And maybe we can
2  just go through them would be the easiest way.
3  I believe you say, Cathleen, nurse.  Do you know
4  who that was?
5     A.  The nurse manager.  I believe that was
6  in person.
7     Q.  And when you say "nurse manager,"
8  would that have been of the facility of the
9  floor, of the unit?
10     A.  Well, of the unit and floor.  Of the
11  unit.
12     Q.  As I understood, that was the third
13  floor?
14     A.  I think so.  It might have been the
15  second, but I -- I'm not sure if it was the
16  second or the third.
17     Q.  Was the floor differentiated?  Was it
18  all one floor that a nurse manager had or were
19  there two?
20     A.  There were two units per floor.
21     Q.  Two units per floor.  Do you recall
22  which unit Helen was on?
23     A.  Well, it was the one if you went up
24  the elevator, you would turn left.

Page 77

1    Q. I know this is three years ago, but do
2 you recall where her room was?
3    A. Yes. I think I do.
4    Q. What is your recollection of where her
5 room was?
6    A. You would walk down the corridor that
7 was a continuation of the hallway outside of the
8 elevators, and it was on your left about halfway
9 down. I may be wrong, but that's my
10 recollection.
11    Q. Do you recall if she was in a private
12 room, a semi-private room, a multiple-resident
13 room?
14    A. I don't.
15    Q. Would you have typically met with
16 Helen in her room, or would you have met with
17 her somewhere else?
18    A. Typically in a room.
19    Q. Do you recall where you met her on the
20 29th?
21    A. No.
22    Q. Do you recall how long you met with
23 her on the 29th?
24    A. Not specifically. I think it would

Page 78

1 have taken a while to gather all this data, but
2 I don't have a specific recollection of how long
3 I met with her.
4    Q. When you say "a while," do you have
5 some type of estimation of how long you would
6 have met with her?
7    A. I'd say probably over 15 or 20
8 minutes.
9    Q. Do you recall when you met with Helen
10 that day whether she referenced that her
11 daughter or family were in to see her?
12    A. I don't remember that.
13    Q. Did any of the staff at Sunbridge tell
14 you her family were in on that day?
15    A. I don't remember them telling me that.
16    Q. Well, I note that your data source
17 indicates you looked at Helen's chart on that
18 day?
19    A. Yes.
20    Q. Did her chart indicate that her family
21 was there?
22    A. I don't recall.
23    Q. Do you recall meeting with her family
24 on that day?

Page 79

1    A. No.
2    Q. Dr. Bloomingdale, what was your
3 understanding of why you were meeting with Helen
4 on April 29 again?
5    A. Well, I think primarily, as I recall,
6 Ruth Miller had asked me to because of her
7 concerns about her.
8    Q. What were those concerns, if you
9 recall?
10    A. She had become more paranoid. She was
11 refusing her medications.
12    Q. What medications was it that she was
13 refusing?
14    A. I think, variously, all of them:
15 Zyprexa, BuSpar, Aricept, maybe others.
16    Q. And these were all medications that
17 had been prescribed by a physician other than
18 yourself?
19    A. Yes.
20    Q. In your data source you indicate
21 Farrah and Ellen Redwine of social work. I
22 think we've already identified Farrah Siedler.
23 Who was Ellen Redwine?
24    A. Another social worker.

Page 80

1    Q. You also indicate another data source,
2 Walter Kelly. Do you recall what contact you
3 had with Walter Kelly on that day?
4    A. I think it was a phone call.
5    Q. Did you call Mr. Kelly or did
6 Mr. Kelly call you?
7    A. I don't remember.
8    Q. Do you recall any of the content of
9 that dialogue between yourself and Mr. Kelly?
10    A. I have a feeling he wanted to tell me
11 his concerns about the patient, but I'm not
12 sure.
13    Q. Do you recall what those concerns
14 were?
15    A. Her increasing paranoia and agitation.
16    Q. Did you make a diagnosis of Mrs. Runge
17 as a result of your consultation on April 29?
18    A. I think it was Alzheimer's dementia
19 with delusions.
20    Q. Did you indicate any other care other
21 than what was already being provided to Helen
22 that would be needed as a result of your
23 diagnosis?
24    A. Well, I think my point was that she

Page 81

1  was getting more paranoid from not taking her
2  medication, so rather than change or increase
3  the medication dose, I recommended considering a
4  guardianship.
5      Q. And did you note that on the record?
6      A. Yeah, at the bottom of my note.
7      MR. HAMROCK: I don't know if it came
8  out on this copy. We have another copy here.
9      MR. DAVIS: Let me take a quick look
10 at it.
11     (Pause)
12 BY MR. DAVIS:
13     Q. When you say in your note, Considered
14 guardianship, is that the first time you had
15 noted that?
16     A. I think so.
17     Q. And did you express that to anyone?
18     A. Directly?
19     Q. Yes.
20     A. I don't recall.
21     Q. Did you discuss guardianship with
22 Mrs. Runge in your interview with her?
23     A. I don't recall.
24     Q. Did you have a discussion with

Page 82

1  Mrs. Runge about her taking her medications?
2      A. Yes.
3      Q. And do you recall what that discussion
4  was?
5      A. I believe she told me that the staff
6  was asking her to take more medications than
7  were really prescribed.
8      Q. Do you recall any other dialogue you
9  had with her on medications?
10     A. Not specifically.
11     Q. Did you ask her why she wasn't taking
12 her medications?
13     A. Probably.
14     Q. Do you recall what her response was?
15     A. No, other than maybe, you know, she
16 did feel that more were being prescribed than
17 were ordered.
18     Q. Do you recall her saying anything to
19 the nature of, If you don't have a headache, you
20 don't take aspirin?
21     A. No.
22     Q. In your notes you say she lacks the
23 ability to make sound decisions about her
24 psychoactive medications and about a variety of

Page 83

1  other personal issues.
2      What are the other personal issues
3  that she had the inability to make sound
4  decisions with regard to?
5      A. Her care, her belongings.
6      Q. And what was the basis for that
7  opinion?
8      A. Well, she seemed to have developed a
9  paranoia against black or non-American staff.
10 She seemed to have a tendency and pattern of
11 thinking she had lost things and getting upset
12 about them and then finding them and sometimes
13 getting paranoid in the process.
14     Q. Had she had a history of that?
15     A. Well, it had happened a few times at
16 the facility. And I think there also had been
17 accusations of that at BayView or Marion Manor.
18     Q. And how did Marion Manor or BayView
19 address those issues of her belongings being
20 taken?
21     A. I don't recall.
22     Q. Did you review the record to see if
23 they were dealt with on a drug regimen basis or
24 if they were dealt with on a counseling basis?

Page 84

1      A. At BayView and Marion Manor?
2      Q. That's correct.
3      A. I don't remember.
4      Q. Is there any type of redirection going
5  on here to sway her from these ideations or
6  paranoia rather than medication?
7      A. At Randolph?
8      Q. That's correct.
9      A. Yes. There were several references
10 to, you know, she responded to redirection. I
11 think somewhere she didn't respond to
12 redirection.
13     Q. And in your opinion on the 29th,
14 redirection wasn't an alternative?
15     A. No. I mean, her medication which
16 seemed to be leading to, in part, her worsening,
17 didn't seem to be -- she didn't seem to respond
18 to redirection about taking her medication. And
19 the loss of the medication appeared to be
20 contributing to her increased paranoia.
21     Q. Just so I'm clear, from the reading of
22 your notes on the 29th, it was your
23 understanding on that date that Helen Runge did
24 not want to take her antipsychotic medication?

Page 85

1    A.  On a fairly consistent basis.
2    Q.  Would it be fair, then, to understand
3  that if you were indicating that a guardianship
4  should be sought, the result of that
5  guardianship would be she would be forced to
6  take antipsychotic medication?
7    A.  Yes.  I mean, when I say consider
8  guardianship, I mean consider guardianship where
9  somebody objective would be able to step in who
10  could manifest better judgment than her about
11  her medications.
12    Q.  Did you have an understanding on the
13  29th of who that guardian would be if one were
14  sought?
15    A.  No.
16    Q.  Did you have an understanding on the
17  29th that Walter Kelly was seeking to appoint
18  himself as guardian of Helen Runge's person?
19    A.  I don't think so.  I think -- no.
20    Q.  When was the first time you gained
21  knowledge Walter Kelly wanted to have himself
22  appointed guardian of Helen Runge?
23    A.  I don't recall.
24    Q.  Did you ever gain that knowledge?  In

Page 86

1  other words, did you ever learn that he wanted
2  to have himself appointed?
3    A.  Well, I think in recently reviewing
4  the records I learned that.
5    Q.  But at the time -- and when I say at
6  the time, in the time frame of April 29 -- you
7  did not have that knowledge?
8    A.  Not that I remember.
9    Q.  When you say, The resident is more
10  paranoid probably in part because she's not
11  taking her Zyprexa, what other part would have
12  caused her to be more paranoid?
13    A.  She seemed to have flare-ups of
14  paranoia that had been going on since late
15  March, and I'm not sure I fully know what fueled
16  that, but not taking the Zyprexa seemed to be
17  part of it.
18    Q.  When you say "flare-ups", how often
19  did these flare-ups occur?
20    A.  Well, I think in the hospital it
21  seemed to take place starting around late March
22  and building up through April.  It looked as
23  though there may have been a flare-up around
24  early January.

Page 87

1    Q.  So we had the early January flare-up.
2  When was the next flare-up that you observed?
3    A.  Before January?
4    Q.  No.  From January --
5    A.  Oh, I'd say late March into April.
6    Q.  And how often did she have a flare-up
7  in the period late March into April?
8    A.  Well, there seemed to be some paranoia
9  in the last week in March, and then it seems to
10  start getting mentioned a lot more in mid-April.
11    Q.  And nothing between the March to
12  mid-April with regard to paranoia?
13    A.  I didn't see too many distinctions
14  either way, that she wasn't paranoid or that she
15  was.
16    Q.  And, Dr. Bloomingdale, how many
17  flare-ups or how long would a flare-up of
18  paranoia have to last in order for you to
19  recommend a guardianship being appointed for a
20  resident?
21    A.  I guess I would base it more on their
22  condition and prognosis than length of flare-up.
23    Q.  And what was Helen's prognosis on
24  April 29?

Page 88

1    A.  Well, it looked like she was getting
2  more and more paranoid and might certainly have
3  to, at the very least, go back into a hospital.
4    Q.  Just so I'm clear, then,
5  Dr. Bloomingdale, we were talking about the time
6  frame January through April, and we talked about
7  the flare-up I believe in January, and that was
8  when she was in Carney Hospital you're speaking
9  of?
10    A.  Yes.
11    Q.  And then the next flare-up you're
12  indicating would have been sometime in late
13  March?
14    A.  Yes.
15    Q.  And then after that we looked to, I
16  believe, the time frame of, you said, April --
17  mid-April time frame?
18    A.  Yes.
19    Q.  And would those flare-ups be
20  documented where in her records?
21    A.  In the nurses' notes, in some of the
22  NEG notes.
23    Q.  Did you document any of the flare-ups
24  in any of your consultation notes?

Page 89

1    A.  Well, I think on 4/29 I referred to
2  her having become more paranoid on a couple of
3  occasions.  I think on 4/1 I referred to her
4  being more paranoid over the last week, again,
5  more paranoid.  I don't think on 3/4 I referred
6  to anything particular going on at the nursing
7  home.
8       I had referred to her thinking that
9  her roommate at Marion Manor was stealing from
10 her in her admission to the Carney, but I don't
11 think I referred to paranoia at Randolph other
12 than at the top where that was one of the
13 reasons for my being asked to see her.
14    Q.  Would it be fair to characterize,
15 then, your observation on the paranoia
16 throughout this time frame that it came at
17 times, it increased at times, it decreased at
18 times?
19    A.  Yeah, but not on a day-to-day basis.
20 I mean, it seemed that often when it came up, it
21 stayed around and worsened.
22    Q.  And was Mrs. Runge's overall health in
23 immediate jeopardy because of her increased
24 paranoia as you observed on April 29 of 2003?

Page 90

1    A.  You mean her medical health?
2    Q.  Yes.
3    A.  Well, I believe that there were times
4  that she was refusing her Lisinopril and that
5  that was endangering her blood pressure.
6    Q.  Had you checked her blood pressure on
7  April 29?
8    A.  I didn't generally check.  I mean,
9  that wasn't part of what I did, directly
10 checking her blood pressure.
11    Q.  So you weren't sure what her blood
12 pressure was, whether it had increased or
13 decreased on April 29?
14    A.  I don't know.
15    Q.  Other than the blood pressure issue,
16 was there any other immediate jeopardy with
17 regard to her medical condition on April 29?
18    A.  She had been losing weight, and I
19 think that was a concern.
20    Q.  Now, did you typically address the
21 weight loss issue, or was that Dr. Bregoli that
22 would have addressed that issue with regard to
23 her medical care?
24    A.  Well, I mean, since it seemed to be

Page 91

1  interacting with her psychiatric care, I had
2  some involvement with it.  Her weight overall
3  would have been more under Dr. Bregoli's aegis
4  than mine.
5    Q.  Did you discuss her weight loss that
6  you noted on April 29 with Dr. Bregoli at or
7  about that time?
8    A.  Well, I didn't discuss it verbally
9  with him.  I had been noting her weight, and it
10 had dropped from being in the normal range in
11 March to being more on the thin side in April.
12    Q.  Did you have any conversations with
13 Dr. Bregoli at all as a result of your April 29
14 consultation?
15    A.  Verbal or phone?
16    Q.  Well, either in person or by phone.
17    A.  Not that I recall.
18    Q.  Did you have any conversation with
19 Dr. Bregoli as a result of your April 1
20 consultation either in person or by phone?
21    A.  Not that I remember.
22    Q.  Who did you talk to about your April
23 29 consultation, Dr. Bloomingdale, if anyone?
24    A.  I believe I spoke to the nurse manager

Page 92

1  and the social workers.
2    Q.  And the nurse manager would have been
3  Cathleen?
4    A.  Yes.
5    Q.  Do you recall Cathleen's last name?
6    A.  I don't.
7    Q.  And you say "social workers" plural.
8  Would that have been Farrah Siedler and Ellen
9  Redwine?
10    A.  Yes.  I may have only spoken to one of
11 them.
12    Q.  Do you recall having spoken with the
13 administrator of the facility that day?
14    A.  No.
15    Q.  Did you speak with the administrator
16 of the facility the next day, April 30?
17    A.  Not that I remember.
18    Q.  Did you speak with the DON on the
19 29th?
20    A.  I don't remember speaking to her.
21    Q.  Dr. Bloomingdale, when you say you
22 noted weight loss between the consultation on
23 March 3 and the April consultations, do you have
24 a recollection of what weight loss there was?

Page 93

1  Was that by physical observation or did you
2  actually check her weight somehow?
3      A. I think it was physical observation,
4  but it may have been checking the chart.
5      Q. Do you recall how often Sunbridge made
6  a practice of weighing a resident? Did they
7  weigh them daily? Did they weigh them weekly?
8  Did they weigh them monthly?
9      A. I don't remember.
10      Q. Dr. Bloomingdale, let me refer you to
11  an exhibit that we used in Mr. Kelly's
12  deposition, and I'm referring you to Walter
13  Kelly, I believe it's 15.
14      MR. HAMROCK: It looks like it's 16.
15      Q. 16. That's a two-page document. Have
16  you seen that document prior to today,
17  Dr. Bloomingdale?
18      A. Yes.
19      Q. What do you understand that document
20  to be?
21      A. It's a medical certificate.
22      Q. And is that your signature on the
23  second page of that certificate?
24      A. Yes.

Page 94

1      Q. Do you recall how you got this
2  certificate in order to sign it?
3      A. I think the social workers gave it to
4  me.
5      Q. Do you recall which social worker?
6      A. No.
7      Q. Do you recall when they gave it to
8  you?
9      A. I think it was on the 29th of April.
10      Q. While you were at the facility?
11      A. I think so.
12      Q. Is that the first time you saw this
13  document?
14      A. You mean...
15      Q. The blank document.
16      A. Well, I mean, I had seen others
17  before.
18      Q. When you say "others," you mean like a
19  blank form?
20      A. For someone else, yeah.
21      Q. Have you completed other medical
22  certificates for guardianships prior to the one
23  you completed for Helen Runge?
24      A. Yes.

Page 95

1      Q. How often have you completed those?
2      A. Probably about once a month, maybe
3  twice a month.
4      Q. Have you completed other guardianship
5  certificates for residents at Sunbridge
6  Randolph?
7      A. I don't remember.
8      Q. Dr. Bloomingdale, the medical
9  certificate for guardianship is partially typed
10  and it's partially handwritten. I understand
11  the handwriting is yours.
12      A. Yes.
13      Q. And did you type out Ms. Runge's name
14  on this form with the address and the date?
15      A. I don't think so.
16      Q. Do you know who typed that out?
17      A. No.
18      Q. Not only is Helen Runge's name and
19  address on the front, but also your name and
20  address are on the back; is that correct?
21      A. Yes.
22      Q. And I see the address 1132 Westfield
23  Street. Is that your office?
24      A. No.

Page 96

1      Q. Whose office is that?
2      A. New England Geriatrics.
3      Q. Would you typically use your address
4  for your office in filling out a form?
5      A. Yes.
6      Q. Under what circumstance would you use
7  that address when filling out a form?
8      A. If it's at a facility where I work for
9  New England Geriatrics.
10      Q. So would it have been your practice to
11  put New England Geriatrics's address if you were
12  at a facility that you were asked to consult by
13  New England Geriatrics?
14      A. Yes.
15      Q. I also note up at the top there's
16  three Xs in a box. And the box says, Is a
17  mentally ill person to the degree that he/she is
18  incapable of caring for his/her personal and/or
19  financial affairs.
20      Do you see that?
21      A. Yes.
22      Q. Did you fill in that box?
23      A. I don't think so.
24      Q. At the time you signed this

Page 97

1  certificate, were you aware that that box had
2  been checked?
3      A. I would strongly think so.
4      Q. Okay. By signing this certificate,
5  were you opining that Helen Runge could not take
6  care of her financial affairs?
7      A. No.
8      Q. What was your opinion with regard to
9  her being able to take care of her financial
10  affairs?
11      A. I'm not sure I had one.
12      Q. Did you understand that this medical
13  certificate could be used for someone to gain
14  control of Helen Runge's financial affairs?
15      A. I guess I thought this was mainly
16  being used for the medical, so-called Rogers
17  guardianship. I'm not -- I don't know if I -- I
18  don't know if I thought that it could be used
19  for financial affairs or not.
20      I don't believe -- you know, when it
21  said incapable of caring for his or her health
22  and/or financial affairs, I believe I meant the
23  "or" there.
24      Q. You would have had the opportunity to

Page 98

1  cross out financial affairs; would you not?
2      A. I guess, yeah.
3      Q. So when you say you signed this and
4  you would have had an understanding of that,
5  then your understanding would have allowed you
6  to modify the representations in that language?
7  In other words, you could have changed it to
8  say, Caring for his personal affairs, Caring for
9  his financial affairs or both?
10      A. Yeah. Again, I guess I took the "or"
11  to mean or, that it was personal or financial or
12  both.
13      Q. In your writing on the bottom in the
14  middle where you say, Because of her paranoia
15  and probably also because of her cognitive
16  limitations she lacks the ability to make sound
17  decisions about certain personal affairs,
18  including whether to take her psychoactive
19  medications.
20      When you say "certain personal
21  affairs, including," were there other personal
22  affairs that she didn't have the ability to make
23  sound decisions with regard to?
24      A. Well, again, I was concerned about her

Page 99

1  overall treatment. She seemed to be paranoid of
2  non-American people, of whom there were quite a
3  few at the facility. She seemed to have this
4  recurrent problem of forgetting where she had
5  put things and then becoming agitated and/or
6  afraid that they had been taken from her. So I
7  think I thought that those kinds of issues could
8  get into personal difficulties.
9      Q. When you said that she lacked the
10  ability to make sound decisions with regard to
11  certain personal affairs, am I correct in
12  understanding your testimony that you did not
13  intend that statement to mean personal affairs
14  with regard to her financial affairs?
15      A. I don't remember when I wrote this.
16      Q. What was your understanding with
17  regard to why this medical certificate was being
18  completed by you?
19      A. I think mainly that it grew out of my
20  suggestion that a guardianship be obtained for
21  medication purposes.
22      Q. Just go through the time frame with
23  me, then, if you will. You're asked to consult
24  on Helen Runge on 4/29; you make the

Page 100

1  consultation. In the consultation you make a
2  reference to maybe the appointment of a guardian
3  is appropriate, and then all of a sudden you've
4  got a medical certificate for guardianship, the
5  court form presented to you.
6      How did the social worker know to
7  present it to you on the 29th?
8      A. I think, you know, it had been an
9  issue whether or not the patient was taking her
10  medications. I mean, that's pretty standard in
11  hospitals or nursing homes, that when a patient
12  doesn't take their medication and seems to be
13  getting worse because of it, that a guardianship
14  is at least on the table.
15      Q. After you consulted with Helen on the
16  29th, how much longer were you at Randolph
17  before you left that day?
18      A. I don't remember.
19      Q. Was this medical certificate presented
20  to you by the social workers immediately after
21  you made your consultation?
22      A. I don't remember.
23      Q. Am I correct in my understanding that
24  since your second page is signed and dated April

Page 101

1   29, that, in fact, you signed this on the 29th?
2       A. Yes.
3       Q. And is it your recollection that you
4   signed it while you were at Sunbridge?
5       A. I don't remember signing it at
6   Sunbridge. My guess is I did.
7       Q. Is it fair to assume that you don't
8   recall who you gave it to after you signed it?
9       A. Yes.
10      Q. Did you ever talk to Walter Kelly
11  about this medical certificate?
12      A. I don't recall.
13      Q. Did you --
14      A. I did speak to him, but I don't recall
15  if it was -- I don't recall if it was about the
16  certificate.
17      Q. Do you recall discussing this medical
18  certificate with Thomas Schiavoni?
19      A. No.
20      Q. Do you recall discussing this medical
21  certificate with anyone at Sunbridge?
22      A. I seem to remember discussing it with
23  a social worker.
24      Q. But you don't recall which one?

Page 102

1       A. No.
2       Q. Anyone else that you recall, whether
3   they were at Sunbridge or not at Sunbridge, that
4   you discussed this with, obviously other than
5   counsel?
6       A. No.
7       Q. After your April 29 consultation with
8   Helen Runge, did you have any further
9   interaction with her for any reason whatsoever?
10      A. Not that I recall.
11      Q. Other than I believe you previously
12  testified you looked at some follow-up notes
13  from the social workers as to what was going on
14  with Helen, did you have any interaction with
15  anyone with regard to Helen Runge?
16      A. Well, no. I mean, I believe I had
17  verbally been told on a repeat visit to Randolph
18  about the departure from the facility.
19      Q. Okay. Do you recall when that
20  information was given to you?
21      A. As I said, I would guess that it was
22  in May.
23      Q. Do you recall who gave that to you?
24      A. I don't.

Page 103

1       Q. Did anyone tell you on April 29 that
2   Helen had executed a power of attorney and
3   healthcare proxy appointing either her daughter
4   or her son-in-law as her representative?
5       A. Not that I remember.
6       Q. Did anyone tell you that Helen had
7   revoked Mr. Kelly's healthcare proxy and power
8   of attorney on April 29?
9       A. I don't remember that.
10      Q. Did Helen indicate to you that she had
11  gone out to lunch that day with her family?
12      A. I don't remember her saying that.
13      Q. Did she indicate that her grandchild
14  was in town to see her that day?
15      A. I don't remember her saying that.
16      MR. DAVIS: Can we take a five-minute
17  break, and I'll look at my notes quickly, and I
18  think I may be done.
19      (Recess taken)
20  BY MR. DAVIS:
21      Q. Dr. Bloomingdale just a couple more
22  questions from my side, and I think we'll rap it
23  up. On several occasions we talked about
24  medications of Mrs. Runge. I'd like to clarify

Page 104

1   what it was that your role was, so let me ask
2   this question: What did you understand your
3   role in consulting on behalf of New England
4   Geriatrics for Helen Runge? What was your role
5   with regard to medications?
6       A. Well, to make certain consultative
7   recommendations.
8       Q. And who were those recommendations
9   being made to?
10      A. Dr. Bregoli.
11      Q. And does Dr. Bregoli work for New
12  England Geriatrics?
13      A. No.
14      Q. And the manner in which you would
15  communicate those recommendations to Dr. Bregoli
16  would be just to have filled out the
17  consultation form of New England Geriatrics?
18      A. Yes.
19      Q. Then how would Dr. Bregoli have gotten
20  that form?
21      A. I believe they were faxed to him.
22      Q. And who faxed them?
23      A. The charge nurse.
24      Q. I'd like to follow the document. You

Page 105

1 have a consultation with Helen Runge, whether it
2 be the March, the April 1 or the April 29
3 consultation. You fill out the forms we've been
4 looking at at the time of the consultation?
5     A. Yes.
6     Q. Then you physically give that form to
7 whom?
8     A. The charge nurse.
9     Q. The charge nurse on the floor?
10    A. Yes.
11    Q. And then do you have any understanding
12 of what she does with the form?
13    A. I believe she faxes them to
14 Dr. Bregoli or whoever the physician is.
15    Q. And I would assume that in addition,
16 the form is made part of Helen's medical record?
17    A. Yes.
18    Q. When you filled out Kelly 16, which is
19 the probate and family court department medical
20 certificate, who did you understand you were
21 filling that form out for?
22    A. Well, I think it was the social worker
23 that asked me to do it.
24    Q. Did you have any understanding at all

Page 106

1 when you filled this out as to who was
2 petitioning the court to be appointed guardian?
3     A. Not that I recall.
4     Q. But it was your understanding that at
5 least someone would be petitioning the court?
6     A. Yes.
7     Q. Did you understand that you were being
8 asked to fill out this petition as a medical
9 expert?
10    A. No. I have filled these forms out
11 before as a psychiatrist. I hadn't thought of
12 myself as an expert.
13    Q. Was there a separate fee involved with
14 filling out this medical certificate?
15    A. No.
16    Q. So the only fee that you would have
17 billed that day was Procedure Code 99313?
18    A. Yes.
19    MR. DAVIS: I have no further
20 questions.
21    MR. WILLIAMS: Just a couple.
22 BY MR. WILLIAMS:
23    Q. When you were talking to the
24 facilities staff at Sunbridge and there were

Page 107

1 incidents where Helen was not agreeing to take
2 her medication, did the facility ever force her
3 to take her medication?
4     A. Not that I'm aware of.
5     Q. And given your own observations of
6 Helen Runge, was there reason for the facility
7 staff to have concerns about her mental
8 well-being?
9     A. Yes.
10    Q. Did you observe anything that you
11 considered to be inappropriate action on the
12 part of the Sunbridge staff?
13    A. No.
14    MR. WILLIAMS: That's all I have.
15    MR. DAVIS: Nothing further. Thank
16 you, Dr. Bloomingdale.
17    THE WITNESS: You're welcome.
18    (The deposition was concluded at 12:22 p.m.)
19
20
21
22
23
24

Page 108

1 IN RE: Runge v. Kelly, et al.
2 TAKEN: Thursday, December 14, 2007
3
4     C E R T I F I C A T E
5     I, KERRY L. BLOOMINGDALE, M.D., do
  hereby certify that I have read the foregoing
6 transcript of my testimony, and further certify
  that it is a true and accurate record of my
7 testimony (with the exception of the corrections
  listed below):
8 Page  Line          Correction
9 ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23
24         KERRY L. BLOOMINGDALE, M.D.

Page 109

```
 1              CERTIFICATE
 2   Commonwealth of Massachusetts
 3   Suffolk, ss.
 4       I, Toni F. Beckwith, Registered Merit
 5   Reporter and Notary Public in and for the
 6   Commonwealth of Massachusetts, do hereby certify
 7   that KERRY L. BLOOMINGDALE, M.D., the witness
 8   whose deposition is hereinbefore set forth, was
 9   duly sworn by me and that such deposition is a
10   true record of the testimony given by the
11   witness.
12       I further certify that I am neither related
13   to or employed by any of the parties in or
14   counsel to this action, nor am I financially
15   interested in the outcome of this action.
16       In witness whereof, I have hereunto set my
17   hand and seal this 27th day of December 2006.
18       _____
19              Notary Public
20              CSR No. 111293
21   My commission expires:
22   February 11, 2011
23
24
```

# <u>EXHIBIT G</u>

Medical Certificate, April 29, 2003

**Commonwealth of Massachusetts**
**The Trial Court**

Norfolk Division          Probate and Family Court Department          Docket No. _____

# TEMPORARY

### MEDICAL CERTIFICATE --- GUARDIANSHIP          03P11046I

To the Honorable Justices of the Probate and Family Court:

The undersigned hereby certifies under the penalties of perjury that I am a registered physician and that I personally examined ___Helen Runge___

___Sunbridge, 1380 Columbia Rd.___   ___Randolph___          ___MA___
(street address)          (name of proposed ward)          (city or town)          (state)

on ___April 29, 2003___
(date of examination)

and in my opinion the proposed ward:

[x]x   is a mentally ill person to the degree that he/she is incapable of caring for his/her personal and/ or financial affairs.

[ ]   is a person who is unable to make or communicate informed decisions due to physical incapacity.

## THIS SECTION MUST BE COMPLETED FOR A GUARDIANSHIP PETITION

Describe in detail the diagnosis leading to the aforementioned opinion (including the types of decisions which the proposed ward has sufficient mental ability to make):

This 87 year old Caucasian divorced female suffers from Alzheimer's dementia with paranoid delusions. Because of her paranoia, and probably also because of her cognitive limitations, she lacks the ability to make sound decisions about certain personal affairs, in-

(OVER)

CJ-P 112 (10/93)

**(MEDICAL CERTIFICATE --- GUARDIANSHIP BACK)**

fuding whether to take her psychiactive medications. For example, she thinks that the nursing home staff is purposely giving her too many medications to take — compared to what has been ordered.

Date ___4/29/03___

___Bloomingdale MD___
(signature)

Kerry Bloomingdale, M.D.    (NEG)
(PRINT name

1132 Westfield Street
(address, including zip code)

Springfield, MA 01089

Tel. No. ( 800 ) 378-5454

# <u>EXHIBIT L</u>

Deposition of Dorothy Stanley, November 15, 2006

(Day2), p. 25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
NO.: 05-10849-RGS

---

HELEN A. RUNGE,  )
          Plaintiff,  )
          v.  )     <u>DEPOSITION OF</u>
  )
  )     <u>DOROTHY STANLEY - DAY 2</u>
WALTER J. KELLY, et al.,  )
          Defendants.  )
  )

---

     On Wednesday, November 15, 2006, commencing at 10:34
a.m., the deposition of Dorothy Stanley was taken on behalf of
the Defendants at the residence of Mr. and Ms. Stanley, 5
Stirrups Downs, Columbus, North Carolina, and was attended by
Counsel as follows:

<u>APPEARANCES:</u>

        GLENN R. DAVIS, ESQ.
        Latsha, Davis, Yohe & McKenna, P.C.
        1700 Bent Creek Boulevard, Suite 140
        Mechanicsburg, Pennsylvania  17050
        on behalf of the Plaintiff

        GEORGE C. ROCKAS, ESQ.
        Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
        155 Federal Street
        Boston, Massachusetts  02110
        on behalf of Walter Kelly

        JAMES S. HAMROCK, JR., ESQ.
        Hamrock & Tocci
        101 Main Street, 18th Floor
        Cambridge, Massachusetts  02142
        on behalf of Dr. Bloomingdale

        MICHAEL WILLIAMS, ESQ.
        Lawson & Weitzen, L.L.P.
        88 Black Falcon Avenue
        Boston, Massachusetts  02210
        on behalf of Sunbridge Nursing Home

Attending:  Gilbert Stanley

REPORTED BY:  Mai-Beth Ketch, CVR
             ASHEVILLE REPORTING SERVICE

2

1    (Document aa121)

2                            Index

3    Stipulations . . . . . . . . . . . . . . . .    3

4    Signature (Reserved) . . . . . . . . . . .    3

5    Cross-Examination By Mr. Hamrock . . . . . .    4

6    Cross-Examination By Mr. Williams. . . . . .    60

7    Cross-Examination By Mr. Davis . . . . . . .    73

8    Recross-Examination By Mr. Hamrock . . . . .    85

9    Certificate of Oath. . . . . . . . . . . . .    90

10   Certificate of Verbatim Transcript . . . . .    91

11   EXHIBITS:

12   None Marked

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1        PURSUANT TO NOTICE and/or Agreement to Take

2    Depositions, the within Deposition was taken by me,

3    Mai-Beth Ketch, a Notary Public as required in Rules

4    26 and 30 of the North Carolina Rules of Civil

5    Procedure.

6    STIPULATIONS:

7        IT WAS STIPULATED AND AGREED by and between

8    Counsel for the Plaintiff and Counsel for the

9    Defendant that each question in this Deposition is

10   deemed to be followed by an objection and that each

11   answer or portion thereof is deemed to be followed by

12   a motion to strike; and that the objections and

13   motions to strike may be ruled upon by the presiding

14   Judge at any hearing or trial of this cause,

15   provided, however, that any objections as to the form

16   of the question must be made at the time the question

17   is propounded or else the same is waived.

18   SIGNATURE:

19       The Deponent did agree that both the reading

20   over and signing of the transcript are hereby

21   reserved.

22       Dorothy Stanley, having previously been duly

23   sworn to tell the truth, the whole truth, and nothing

24   but the truth of her own knowledge concerning the

25   within matter, testified as follows:

25

```
1              mental health state since she left

2              Massachusetts?

3    A    That is correct.

4    Q    Had she been on any medications for her mental

5              health state at that facility she was at for

6              the three weeks in the summer when folks were

7              up here?

8    A    No, she was not on anything.

9    Q    Since this admission, in the past three years,

10             just over three years, from October 2003 until

11             now, has your mother consistently been on

12             certain mental health medications?

13   A    Especially the Risperdal.

14   Q    So as best you recall, for the entire three

15             years she has been on Risperdal?

16   A    As I told you, the dosage has been dropped on

17             Risperdal.

18   Q    But she's been on it for three years?

19   A    To the best of my knowledge.  She was also in

20             the assisted living.  Did they give her a pill

21             every day?  I can't verify that.

22   Q    We'd have to look at those records to figure

23             that out?

24   A    That's correct.

25   Q    Did your mother understand when she came home,
```

# EXHIBIT M

Report of Dr. Richard Dupee, M.D., May 16, 2007

### The MedWest Center For Memory Disorders
65 Walnut Street
Suite 440
Wellesley Hills, Massachusetts 02451
(781) 235-9089



**Tufts-New England Medical Center**



Physicians Serving Physicians



The principal teaching hospital for
Tufts University School of Medicine

May 16, 2007

Glenn Davis, Esq
Latsha Davis Yohe and McKenna, PC
1700 Bent Creek Boulevard, Suite 140
Mechanicsburg, PA 17050

*Re: Helen Runge V. Kerry Bloomingdale, M.D. et al.*

Dear Mr. Davis:

As you have requested, I am offering an opinion on the decisions surrounding the cognitive status, insight, judgement, and decision-making capacity on the part of Mrs. Helen Runge during the period between 01/22/02 and 04/30/07.

In preparation for this report, and in order to offer a fair and balanced opinion, I have reviewed the following medical records:

1.    SunBridge Health Care 01/22/03 – 04/30/03

2.    Carney Hospital 01/09/03, Carney Hospital 01/11/03 - 01/22/03

3.    Dr. Bloomingdale's notes 03/04/03, 04/01/03, 04/29/03

4.    Investigation report of Department of Public Health for Massachusetts 05/16/03, 05/21/03.

I feel qualified to comment on the care provided to Mrs. Runge based upon 32 years of experience as an internist and geriatrician, providing direct care to patients in an outpatient, hospital, and nursing home setting.

Additionally, I have had several years of experience as a nursing home medical director.

I am currently Chief of the Geriatrics Service at Tufts-New England Medical Center Hospital, where my responsibilities as an academician and associate clinical professor at Tufts University School of Medicine include teaching the principles of geriatric medicine to medical students and residents both in the hospital and outpatient settings.

Re: Helen Runge V. Kerry Bloomingdale, M.D. et al.
May 16, 2007
Page 2

Additionally, I serve as Director of the MedWest Center for Memory Disorders, and have significant experience in diagnosing and treating patients with dementia, delirium, associated behavioral disorders, falls and fall prevention, and stroke, as well as extensive experience in determining decision-making capacity.

I served as editor of the first version of the slide-teaching program in geriatrics published by the American Geriatrics Society, and then stayed on as special advisor.  As a result, I feel qualified to comment on the diagnosis, treatment, and prevention of pressure ulcers.

I am thus qualified by experience, education, and training to offer this opinion, and  have demonstrated competence with the standards of care for nursing facilities and treating physicians as currently relates to issues of care and treatment of the elderly and disabled.

---

On 01/09/03, Mrs. Runge was transferred from Bayview Assistance Home for the elderly to Carney Hospital for "psychiatric evaluation" under section 12.

It is documented that she had been complaining of worsening depression for about a month, even worse within the past week, and that she did not like where she was living.

It is further documented that she had had difficulty sleeping.

She denied hearing voices.

In addition, it is documented that she felt that the staff was stealing from her.

Prior medical history revealed that she was hypertensive, treated with lisinopril and Norvasc, that she was on iron supplements, and that she was being treated with Paxil, presumably for depression.

In the emergency room at Carney on that day, her speech is documented normal.  She was alert and oriented x3.

Her neurological examination was nonfocal.

Re: Helen Runge V. Kerry Bloomingdale, M.D. et al.
May 16, 2007
Page 3

It is further documented that her mental status examination showed no abnormalities in attitude, mood, affects, speech, language, thought process, thought content, perception, cognition, insight, or judgment, and that there was no evidence for neurovegetative signs.

It is documented that her memory and concentration were "fair" and that she was sad and somewhat angry.

The emergency room physician documents the information given to him by Bayview; Mrs. Runge had "paranoid ideation regarding her belongings at the current placement" and that her "insight and judgment were, by history, "fair" and that her impulse control was, by history "poor."

After a thorough examination in the emergency room, it is documented that Mrs. Runge's psychiatric and physical health was "normal", with no documentation of either agitation or paranoia.

It was agreed that Mrs. Runge had mild depression, but did not require hospitalization.

It is further documented that Mrs. Runge was; "reasonable and has warranted concerns about staff at residential housing."

It is further documented that her lawyer (Mr. Kelly) and power of attorney would be contacted to investigate her living situation and consider "changing housing." Dr. Gomes, her primary care physician, was made aware.

It is documented that Mrs. Runge had become increasingly agitated and angry and that she had for several nights made list for alternate nursing homes. It is documented that when she left her room, locked, that she came back and found that the paper that she had filled out regarding alternate nursing homes was not there. She became "angry, yelled, and screamed."

I am very surprised that as a result of this she was sent under a section 12 by Stanley Alexander, Ph.D. from Novo Physiatric Services, as he had not examined her.

Mrs. Runge had been assigned to live with a patient with advanced Alzheimer disease at Maryanne Manor and was having a difficult time with this roommate. She had requested transference.

It is further documented that Mrs. Runge was paying $ 3000 monthly and was "not receiving the services that she needs."

Finally, it is documented that Mrs. Runge did not meet the criterion for HLOC and in fact was not psychotic. Dr. Gomes further agreed that Mrs. Runge was not psychotic and had not been thinking of prescribing antipsychotic medication. He further agreed that arrangements for transference should be undertaken.

Re:  Helen Runge V. Kerry Bloomingdale, M.D. et al.
May 16, 2007
Page 4

Mrs. Runge returned to the Carney Emergency Room on 01/12/03.  It is documented that she
was complaining about "stealing her notes at the place where she lives."

It is further documented that the nursing home reported that Mrs. Runge was "paranoid and
unhappy about the place where she is living in."

Mrs. Runge had retired after working 30 years in the computer area of Boston Edison.  She had
lived alone for 45 to 50 years (she was divorced) and had one daughter, Dorothy Stanley, age
66 years old at this time.

Many of her friends had left the area or had died.  Her best friend had moved to Florida, thus
she moved into Marianne Manor, an assisted living facility in Dorchester, and had been there for
several years before her admission to Carney on 01/09/03.

Mrs. Runge also reported that her room had been ransacked.  She admitted she was angry, but
not depressed and she denied auditory or visual hallucinations.


Dorothy Stanley was contacted and reported that her mother had been paranoid most of her life,
but was never hospitalized for this, although the paranoia had gotten worse since she moved
into assisted living.  Mrs. Stanley documents that her mother was always very private and
secretive.

It is documented in the psychiatric notes at Carney that Mrs. Runge "most trusts Mr. Kelly, who
is the patient's health care proxy and has the power of attorney."

The mental status examination documents normalcy in cognition.  Mrs. Runge stated correctly
the month, day, week, and date.  She became increasingly uncooperative with further
examination of cognition and walked out from the interview.  It is therefore documented that she
appeared to have no insight into her paranoia and that her judgment was impaired.

Mrs. Runge was admitted to Carney and started on a small dose of Zyprexa 2.5 mg at bedtime
as a higher dose caused too much sedation.

At discharge, she was given an Axis I diagnosis of "rule out paranoid delusional disorder.  An
Axis II, rule out Alzheimer dementia.  She was discharged to SunBridge Nursing Home on low
dose Zyprexa.

Her thought process was felt to be generally coherent and organized, although the content
preoccupied with "possible paranoid delusions regarding her belongings at her assisted living
facility."

Re: Helen Runge V. Kerry Bloomingdale, M.D. et al.
May 16, 2007
Page 5

There is support for her preoccupation with this and I do not believe that this was paranoia, but reality.

On admission to SunBridge on 01/22/03, it is documented that Mrs. Runge suffered from episodes of "paranoid delusions, dementia, and Alzheimer."

There is absolutely no evidence that Mrs. Runge suffered from dementia and certainly did not have Alzheimer disease. Her mental status evaluation at Carney was well within normal limits. Therefore the diagnosis of dementia and Alzheimer is false charting. The Axis II discharge diagnosis at Carney was that of "rule out" Alzheimer disease, and clearly Alzheimer disease had neither been proven nor ruled out.

Informed consent was signed by Walter Kelly, her lawyer. Zyprexa 2.5 mg at night is documented as being given for "paranoia."

The first physician's progress note is dated 01/27/03. Diagnoses include hypertension, anemia, DJD and "STAT."

Again this is incorrect. There is no evidence that Mrs. Runge suffered from severe dementia of the Alzheimer type.

The physician note of 02/12/03 and 02/26/03 documents an impression of "anxiety" with no documentation of a diagnosis of paranoia or dementia. Likewise notes dated 03/03/03 and 03/05/03 document anxiety and then on 03/26/03, 04/10/03, and 04/23/03 the attending physician documents paranoia.

On 04/30/03, the attending physician documents that Mrs. Runge had refused psychiatric intervention. He further documents that Mrs. Runge had been seen by Dr. Bloomingdale and that "she is unable to make informed decisions secondary to paranoia."

The admission assessment carried out on 01/22/03 is documented by the nursing staff. Memory problem" is checked off", without any further information given. Cognitive skills for daily decision-making are documented as "moderately impaired" without any further evidence for this finding.

Mini-Mental Status examination was carried out on 02/10/03, although Mrs. Runge had difficultly with "season," and "hospital" she had no other evidence for difficulties with orientation, registration, attention, and recall, language, reputation, three stage command, reading, writing, or copying and a total score was 28 out of 30. This is basically a normal Mini-Mental Status examination.

Re: Helen Runge V. Kerry Bloomingdale, M.D. et al.
May 16, 2007
Page 6

Therefore this document clarifies Mrs. Runge's cognitive status.  There is no evidence for aphasia, apraxia, or amnesia or any evidence whatsoever for dementia.

On 04/20/03, Mrs. Runge is documented as being upset because "someone took my nightgown."  Based upon prior presentation, one would suppose that this was her "paranoia."  In fact her nightgown was found in the laundry and brought back to Mrs. Runge who was "very happy, no further crying."

The MDS was completed on 01/31/03.  Memory and recall ability are all reported as being normal and cognitive skills for daily decision making are reported as modified independent with some difficulty in new situations only.  There is no evidence in this document that Mrs. Runge had any deficiency in decision-making capacity.

A RAP key summary for "dementia not Alzheimer" is unnecessary and inappropriate as there is no evidence that Mrs. Runge had Alzheimer.  Furthermore, it is documented that she will be monitored for "resolving delirium" and there is no evidence that Mrs. Runge suffered at any time from delirium.

In summary, Mrs. Runge was inappropriately labeled as demented when there is no evidence to support that diagnosis.

In addition, although, Mrs. Runge had a long history for stable, mild paranoia, there is no evidence that she was psychotic to the point where she would have required the use of atypical antipsychotics.

Dr. Bloomingdale documents in a note of 03/04/03 that Mrs. Runge "had a diagnosis of Alzheimer's."  This is laughable.  There is no evidence that Mrs. Runge ever had any evidence of Alzheimer disease.  Furthermore, he documents as an Axis I diagnosis of Alzheimer dementia with delusions.  There is no evidence that Mrs. Runge suffered from delusions.

Dr. Bloomingdale documents in a note of 04/29/03 that Mrs. Runge became aggravated with the nursing home with "many paranoid ideas about their treatment."  He documents that she was more paranoid, "probably in part because she is not taking her Zyprexa."

It is documented that Mrs. Runge felt too sedated on Zyprexa and did not want to take it.

Furthermore, I see no evidence that it was needed.

Dr. Bloomingdale documents that Mrs. Runge "lacks the ability to make sound decisions about her psychoactive medications and a variety of other personal issues."

Re:  Helen Runge V. Kerry Bloomingdale, M.D. et al.
May 16, 2007
Page 7

There was no documentation, however, which questions were asked regarding "personal issues." It is clear that Mrs. Runge did not want to take Zyprexa because it made her feel too sedated.

On 04/29/03, a temporary medical certificate for guardianship is signed by Dr. Bloomingdale. Dr. Bloomingdale documents that Mrs. Runge "suffers from Alzheimer dementia with paranoid delusions."

As stated there is no evidence that Mrs. Runge had Alzheimer disease.  This is an incorrect diagnosis.

Dr. Bloomingdale also documents that "because of her paranoia and probably also because of her cognitive limitations, she lacks the ability to make sound decisions about certain personal affairs including whether to take her psychoactive medications."

It is my opinion, within a reasonable degree of medical certainty, that Mrs. Runge was not only mislabeled as having Alzheimer dementia, that the very aggressive over treatment with an atypical antipsychotic, leading to sedation, led to her decision to have it discontinued.

I see no evidence that an adequate examination was carried out to determine her decision-making capacity.  Based upon her normal cognitive status, I would argue that there was no justification for guardianship on 04/29/03.

I reserve the right to alter my opinion should further information be made available.

Yours very truly,

Richard M. Dupee, M.D., A.G.S.F., F.A.C.P.


RMD/sss

# EXHIBIT N

Report of Elizabeth Gaufberg, M.D., August 3, 2007



# Cambridge Health Alliance                     Harvard Medical School

*Director of Professional Development*          ***Department of Medicine***          *Elizabeth Gaufberg, M.D., M.P.H.*
617-665-1343                                                                      *Assistant Professor of Medicine and Psychiatry*
                                                                                  *Email: egaufberg@challiance.org*

August 3, 2007


James Hamrock, Esq.
Hamrock & Tocci
101 Main Street
Cambridge, MA 02142


Dear Mr. Hamrock:

At your request, I am offering an opinion on the care provided to Mrs. Helen Runge by Kerry Bloomingdale MD. I am qualified to offer such an opinion based on my 12 years practice experience as both an internist and psychiatrist. I graduated in 1988 as valedictorian of my medical school class at SUNY Syracuse. I completed sequential Internal Medicine and Psychiatry residencies at the Cambridge Hospital from 1989-1995, with board certification in Internal Medicine in 1992 and Psychiatry and Neurology in 1996. Currently I am Director of the Medicine Consultation service to the Inpatient Psychiatry Units at the Cambridge Hospital/Cambridge Health Alliance. In this position, I consult on the care of hospitalized psychiatric patients with both medical and mental illness. The vast majority of these patients are hospitalized under Section 12, and many have guardianships or other legal aspects to their care. In addition, I am an Assistant Professor in Medicine and Psychiatry at Harvard Medical School, and teach Harvard Medical Students, and Cambridge Health Alliance Internal Medicine and Psychiatry Residents about the care of patients with medical and mental illness.

I reviewed the following documents in preparing this letter:

1. Medical records from: Jewish Memorial Hospital and Rehab Center 2/25/00-2/29/00; Marian Manor 10/11/01 – 11/15/02; Bayview ALF 11/15/02-2/5/03; Carney Hospital 12/17/96-1/22/03; Sunbridge Health Care 1/22/03-4/30/03; St. Luke's Hospital (Psychiatric Assessment and Discharge Summary) 10/07/03-10/28/03 hospitalization; New England Geriatrics; Lilian Mahrokhian MD; New England Geriatrics; Kerry L. Bloomingdale MD.

2. Letters from Dr. Palmer (5/12/03) and Dr. Myers (5/30/03).

3. Deposition transcripts of Dr. Bloomingdale, Helen Runge, Mr. Geraghty, Dorothy Stanley, Gilbert Stanley, Walter Kelly, Donna Foley, and Linda Johnson.

4. Expert Letter and Curriculum Vitae from Richard Dupee MD and Linda Fagan RN.

1

It is my opinion that Mrs. Runge was most likely suffering from a long standing paranoid personality disorder. This is initially suggested by Mr. Geraghty's (manager of the apartment complex where Mrs. Runge resided for approximately 20 years) testimony in which he describes many years of paranoid/bizarre behavior on the part of his tenant involving unsubstantiated claims of bugs invading her apartment, grease and water dripping on the walls of her apartment, with multiple calls to the management, police and fire departments.   Mrs. Runge's social worker was concerned enough that these were psychotic delusional thoughts that she arranged for hospitalization at Jewish Memorial Hospital from 2/25/00-2/29/00.  During this hospitalization she was diagnosed with Psychotic Disorder not otherwise specified with Delusional and Paranoid thinking and started on an antipsychotic medication, Zyprexa.  Mrs. Runge's long-standing personality problems and paranoid tendencies are also suggested by her daughter, Dorothy Stanley's, statements to Linda Johnson LCSW (recorded in the Marion Manor records) that her mother "has never been happy" and that she "doesn't think her mother will be totally happy anywhere." In response to reports that Mrs. Runge accuses other residents of using and taking her things, Mrs. Stanley reported to Ms. Johnson that her mother had longstanding suspicions that people were using her telephone , and "even though she lived alone her mother had a lock on the rotary part of the phone".   In Mrs. Runge's 1/12/03 Carney hospital admission Mrs. Runge's daughter is noted as saying that Mrs. Runge was "paranoid for most of her life".

Personality disorders are enduring patterns of perceiving, relating to and thinking about the world and oneself that are exhibited in a wide range of social and personal contexts.  Individuals with paranoid personality disorder exhibit ongoing, unbased suspiciousness and distrust of other people.  They often express suspicion that others are exploiting or deceiving them.  Patients with personality disorders sometimes suffer from other psychiatric conditions superimposed on their underlying personality disorder – such as anxiety, psychosis, depression or dementia.  It is quite possible that during her time at Sunbridge Mrs. Runge was suffering from early Alzheimer's or other dementia in addition to her paranoid personality disorder.

It should be noted that personality disorders are exceedingly difficult to treat, as they are enduring patterns of perceiving and relating to others.  Medications may be somewhat helpful with associated psychiatric disorders or symptoms such as agitation, anxiety or depression, but the underlying personality disorder is resistant to both pharmacologic and psychotherapeutic interventions.

It is quite predictable that an individual with Mrs. Runge's history suggestive of longstanding paranoid personality disorder would exhibit paranoid behavior in any environment in which she would reside.  For example, during the Marian Manor stay, Mrs. Runge accused others of taking her belongings and opening her mail.  Her complaints were relentless, and expressed in an agitated manor.  Her brief stay at the Bayview Assisted Living Facility, during which she called 911 twice to render complaints that others were stealing from her, ended in an admission to Carney Hospital Psychiatric Unit in which she was agitated and angry, and expressing loud complaints about other residents.  She was discharged from Carney Hospital to Sunbridge Nursing Home on Zyprexa (for psychotic symptoms/agitation) and Aricept (for presumed early dementia).

2

Mrs. Runge stayed at Sunbridge from 1/22/03-4/30/03 and was treated with a variety of antipsychotic and anti-anxiety medications. She was seen by Dr. Bloomingdale on three occasions: 3/4/03; 4/1/03 and 4/29/03. Dr. Bloomingdale consulted on Mrs. Runge in tandem with his colleague from New England Geriatrics, Ruth Miller NP, who saw the patient on 2/10/03, 3/13/03, 3/31/03 and 4/21/03. Ms. Miller's and Dr. Bloomingdale's impressions and recommendations were consistent with and complementary to one another. On 2/10/03, Ms. Miller evaluated Mrs. Runge and found her to be paranoid, agitated and angry, with staff reports of patient hoarding food and paper goods in her room. Ms. Miller spoke with Dr. Bloomingdale who suggested an increase in Zyprexa dose to 5 mg at bedtime (from 2.5 mg at bedtime) with 2.5 mg twice a day as needed for agitation – which Ms. Miller recommended in her note of that day. On 3/4/03, Dr. Bloomingdale's initial assessment noted her history of paranoia, delusions and depression. His diagnosis was Alzheimer's dementia with delusions and he agreed with continuing the Zyprexa. On 3/13/03, Ms. Miller again visited Mrs. Runge for a medication review and suggested no change in medication. On 3/31/03, Ms. Miller again visited Mrs. Runge, and found her to be paranoid and depressed, and recommended the addition of the anti-depressant Zoloft 25 mg a day, with an increase to 50 mg a day after one week, if tolerated. On 4/1/03, Dr. Bloomingdale saw Mrs. Runge, and his impression was that she had been, at times, more paranoid and sadder, and was chronically dissatisfied and angry. He suggested some basic laboratory tests, and suggested that if labs turned out to be normal, that Ms. Miller's recommendation of 3/31 for Zoloft may be helpful. On 4/29/03, Dr. Bloomingdale again saw Mrs. Runge, found her to be "more paranoid, probably in part because she is not taking her Zyprexa." He found that "she lacks the ability to make sound decisions for herself about her psychoactive medications and about a variety of other personal issues. " This determination was based on reports from staff and personal interview with Mrs. Runge. He suggested keeping the Zyprexa dose unchanged, as the "problem is not with the medication but with her refusal to take it", and suggested medication guardianship. He completed the Medical Certificate for the Guardianship petition.

Also on 4/29/07, Mrs. Runge's daughter, Dorothy Stanley, and her husband arrived to Sunbridge a day earlier than they were expected to visit. They brought Mrs. Runge out of the facility to a notary to sign papers revoking Attorney Walter Kelly as health care proxy and power of attorney and appointing themselves in that role. (For several years, Attorney Walter Kelly had been the power of attorney for Mrs. Runge, and as such had involvement in all Mrs. Runge's major life decisions. Mrs. Runge had also appointed Attorney Kelly to be her health care proxy. Mrs. Runge had been largely estranged from Mrs. Stanley. Mrs. Stanley had not been involved in any life or health care decisions for Mrs. Runge. However, in 2002, Mrs. Runge and her daughter had begun to communicate more regularly, and Mrs. Runge had expressed the desire to move to North Carolina to be nearer to her daughter. Her care providers at Sunbridge, including Dr. Bloomingdale, were aware of this desire and had expressed no objections to this idea.) On this same day that Mrs. Runge had been taken to the notary by her daughter, Mrs. Runge had refused most of her medications. On this same day, Dr. Bloomingdale found her to be more paranoid and unable to make sound decisions for herself.

On 4/30/03, Mr. and Mrs. Stanley removed Mrs. Runge from Sunbridge and brought her with them to North Carolina with no prescriptions or medications.

3

Dr. Bloomingdale upheld the standard of care in his recommendations to Dr. Bregoli regarding Mrs. Runge's psychiatric care, and his pursuit of medication guardianship for Mrs. Runge. The medications he recommended during the course of her stay were appropriate treatment for the symptoms she was exhibiting. It has been alleged that Dr. Bloomingdale overmedicated Mrs. Runge and prevented her from voluntarily discharging herself from admission at Sunbridge. On the contrary, Dr. Bloomingdale recommended appropriate classes and dosages of medications to treat Mrs. Runge's symptoms of agitation and paranoia, none of which were ever forced on her against her will. On several occasions Mrs. Runge refused her medications, with expected worsening of her paranoia and agitation. Furthermore, it would have been dangerous and illegal for a patient in Mrs. Runge's paranoid, agitated and confused state to be discharged from the facility without appropriate guardianship and protection. Dr. Bloomingdales pursuit of guardianship was entirely appropriate and in the best interest of Mrs. Runge's safety and health.

Additional points to be noted are that:

1. Dr. Bloomingdale was not the attending of record in Mrs. Runge's care. He acted as a psychiatric consultant and as such made recommendations that Dr. Bregoli was free to accept or reject. As far as I can tell there was never any objection or concern about Dr. Bloomingdale's recommendations on the part of her primary team.

2. Dr. Bloomingdale worked as part of a multidisciplinary care team from New England Geriatrics, which included Ruth Miller NP and Ruth Murray LMHC. Such a team approach allows for providers to share impressions and receive feedback from one another, thus serving as a system of checks and balances regarding patient care. In Mrs. Runge's case, the impressions of all clinicians from New England Geriatrics were consistent with one another.

3. The psychiatric care Mrs. Runge received at Sunbridge for her symptoms of agitation and paranoia was part of a long history of such care. She had admissions to Jewish Memorial Hospital and Carney Hospital inpatient psychiatric units prior to her Sunbridge stay (both admissions involved the legal decision to admit the patient against her will in the interest of her own health and safety), and to St. Luke's hospital in North Carolina subsequent to her Sunbridge stay (see below). Diagnostic impressions were similar in all facilities and medication recommendations in all facilities were consistent with one another.

4. Dr. Bloomingdale's actions did not lead to any perceivable harm to Mrs. Runge. I cannot find evidence that a single does of medication was given to the patient against her will. There is no evidence that the course of her illness would have been any different, and certainly not any worse, as a result of Dr. Bloomingdale's treatment.

5. The course of Mrs. Runge's unfortunate illness resulted in a hospitalization at St.Luke's Hospital in North Carolina for progressive suspiciousness and paranoia from 10/7/03- 10/28/03. Mrs. Runge's daughter had her admitted to St. Luke's because apparently she could not manage her at home. According to the initial psychiatric assessment, the justification for admission was that the patient was yelling, screaming, demanding and feeling that the daughter and others were stealing from her. In the initial psychiatric assessment to St. Luke's, the admitting physician raised concern that the reason Mrs. Runge's symptoms worsened was that she was no longer

4

taking psychotropic medications while living at her daughter's home.   Her physicians at St. Luke's diagnosed late onset delusional d/o and early dementia as well as possible paranoid personality disorder with superimposed early dementia.   These diagnoses were entirely consistent with Dr. Bloomingdale's diagnoses.   They treated her with a combination of anti-anxiety , anti-depressant and antipsychotic medication -- similar classes and dose ranges of medication that Dr. Bloomingdale was recommending during her Sunbridge Nursing Home stay. 6. The ultimate course of Mrs. Runge's illness, with her progressive paranoia, agitation and ultimately severe dementia, requiring psychotropic medications and highly supervised care, suggests that Dr. Bloomingdale's recommendations were prescient and entirely appropriate.

Feel free to contact me if I can be of further assistance.

Sincerely,

Elizabeth Gaufberg MD MPH
Assistant Professor of Medicine and Psychiatry
Harvard Medical School
The Cambridge Health Alliance
1493 Cambridge St.
Cambridge, MA 02139