**ORIGINAL**

1

Volume: I

Pages: 1-304

UNITED STATES DISTRICT COURT

EASTERN DIVISION

- - - - - - - - - - - - - - - - - x

HELEN RUNGE,                        Civil Action

      Plaintiff,                    No. 05-10849-RGS

WALTER J. KELLY,
KERRY L. BLOOMINGDALE, M.D, and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

      Defendants.

- - - - - - - - - - - - - - - - - x


DEPOSITION OF WALTER J. KELLY

Friday, December 1, 2006, 9:26 a.m.

Blake J. Godbout & Associates

33 Broad Street - 11th Floor

Boston, Massachusetts 02109


----- Reporter: Toni F. Beckwith, RMR -----


Toni F. Beckwith, Registered Merit Reporter
50 Winsor Avenue
Watertown, Massachusetts 02472
Tel: 617.924.2731
Fax: 617.924.9899

1    A.    The police already knew about it.  So
2  if it was a question of notifying the police,
3  the police already knew about it because they
4  were there at the Sunbridge Nursing Home.
5        MR. ROCKAS:  I'm going to try to make
6  my call.
7        (Pause)
8        (Exhibit 19 marked
9         for identification)
10    Q.    Mr. Kelly, a document has been placed
11  in front of you marked Kelly 19 dated May 12,
12  2003, a letter authored by a Robert M. Palmer,
13  M.D.  Have you seen that letter prior to today?
14    A.    Yes.
15    Q.    Do you recall when you first saw that
16  letter?
17    A.    Around the end of July of '03.
18    Q.    What did you understand from that
19  letter?
20    A.    I understood that Helen was in --
21  Helen was with her daughter in Columbus.  I
22  understood that I was never going to get an
23  independent evaluation of Helen.  I understood
24  that my ethical duties under the professional

1  conduct rules could not be fulfilled any
2  further, and I had taken all reasonable steps to
3  do what I needed to for Helen. And I knew I
4  wasn't going to be successful to get an
5  independent evaluation of her.
6      Q. And why were you required to get an
7  independent evaluation of her, Mr. Kelly?
8      A. Based upon the abduction, I couldn't
9  trust the Stanleys were looking out for her best
10 interest.
11     Q. And you made that determination when,
12 that you couldn't get an independent evaluation?
13     A. In my discussions with Tom Schiavoni.
14     Q. And when were those discussions taking
15 place?
16     A. At the end of July.
17     Q. And that's of 2003?
18     A. That's correct.
19     Q. And did you understand that this
20 letter from Dr. Palmer wasn't an independent
21 evaluation?
22     A. I don't know who Dr. Palmer is. I
23 know nothing about Tryon Medical Group. I don't
24 know that it's an independent -- it's not a

1  friend of Dorothy Stanley's through the hospital
2  that she works at in order to assist her in
3  having me stop going forward any further.
4      Q.  Did you ever contact Dr. Palmer to
5  explore any questions or concerns you had with
6  regard to his May 12, 2003 letter?
7      A.  No.
8      Q.  You indicated that you couldn't
9  fulfill your ethical duty.  What ethical duty
10 are you referring to?
11     A.  It was rules of professional conduct,
12 1.14.
13     Q.  And interpret that to this
14 information.
15     A.  If you have an elderly client that you
16 are in fear that they're being abused mentally,
17 physically or financially, you have a duty to
18 continue to represent them.
19     Q.  And just so I'm clear, Attorney Kelly,
20 in your opinion, your ethical obligation under
21 1.14, did that arise from the court appointing
22 you as a guardian?
23     A.  No.
24     Q.  It arose as a result of the

1  attorney-client relationship that you had with
2  Helen Runge?
3      A.  That's correct.
4      Q.  And that's the same relationship that
5  she, in essence, terminated you from on April
6  29?
7      A.  At a time when there was a medical
8  certificate saying that she wasn't competent to
9  make decisions for herself.
10     Q.  Okay.  When I was asking you about the
11 police reports that were attached to Kelly 18, I
12 think I asked you if you had filed that police
13 report, and you indicated no.
14     A.  Filed what police report?
15     Q.  There appears to be some type of a
16 narrative on the back of --
17     A.  I believe that came from the nursing
18 home, but I'm not sure.
19     Q.  It says, Notified State Police,
20 notified staff, attempted.  So apparently the
21 State Police were notified?
22     A.  Yes.
23     Q.  And am I correct in understanding your
24 testimony that you didn't notify the police?

```
                                                              1
```

# ORIGINAL

Volume:  II

Pages: 1-104

UNITED STATES DISTRICT COURT

EASTERN DIVISION

- - - - - - - - - - - - - - - - - - x

HELEN RUNGE,                       Civil Action

    Plaintiff,                 No. 05-10849-RGS

WALTER J. KELLY,
KERRY L. BLOOMINGDALE, M.D., and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

    Defendants.

- - - - - - - - - - - - - - - - - - x


CONTINUED DEPOSITION OF WALTER J. KELLY

Thursday, December 14, 2006, 1:13 p.m.

Blake J. Godbout & Associates

33 Broad Street - 11th Floor

Boston, Massachusetts 02109


----- Reporter:  Toni F. Beckwith, RMR -----


Toni F. Beckwith, Registered Merit Reporter
50 Winsor Avenue
Watertown, Massachusetts 02472
Tel: 617.924.2731
Fax: 617.924.9899

62

```
 1        Q.   Did you contact anyone with regard to
 2   their attempt to become the representatives of
 3   Helen Runge?
 4        MR. ROCKAS:   Objection.
 5        A.   I contacted her bank accounts, banks.
 6        Q.   Banks?
 7        A.   Yes.
 8        Q.   When did you contact them?
 9        A.   The 30th.  I think the 30th or the
10   1st.  I'm not sure.
11        Q.   Why did you contact the banks?
12        A.   Well, again, Rules of Professional
13   Conduct 1.4 says if you feel that you have a
14   client who's being taken advantage of mentally,
15   physically, psychologically, an elderly client
16   like Helen, or financially, you have a duty to
17   continue to represent them, to protect them.
18        Q.   So you contacted the banks on either
19   the 30th or the 1st?
20        A.   I don't remember the exact date.
21        Q.   Did you go out and see Helen on the
22   29th, 30th or 1st?
23        MR. ROCKAS:   Objection.
24        A.   I did not go to see Helen on the 29th,
```

1   no.  I expected a meeting on the 1st with the
2   family.
3       Q.  Did you go to the facility on the 30th
4   to see Helen?
5       A.  No.  I had gone on the 25th to see
6   Helen.
7       Q.  Had Dorothy Stanley or Gilbert Stanley
8   ever told you that they intended to take Helen's
9   money out of bank accounts?
10      A.  No.
11          (Exhibit 32 marked
12          for identification)
13      Q.  I placed in front of you a deposition
14  Exhibit 32.  It's a three-page exhibit.
15  Mr. Kelly, have you seen those documents prior
16  to today?
17      A.  Yes.
18      Q.  Are you the author of those three
19  letters?
20      A.  I am.
21      Q.  Am I correct in understanding that the
22  first page marked WK 0864 was a letter from you
23  to a treasurer Stephen McNulty of the Hyde Park
24  Savings Bank?

```
 1     Bank you indicated?
 2         A.   That's correct.
 3         Q.   Was that in a client fund of yours?
 4         A.   That's correct.
 5         Q.   What did you do with the 25,000 bucks?
 6         A.   Well, I believe I paid Tom
 7     Schiavoni -- well, if you look on my accounting
 8     filed with the court, you can see where I spent
 9     it.
10         Q.   You paid Tom Schiavoni for what?
11         A.   For representing me regarding the
12     guardianship.
13         Q.   To get yourself appointed?
14         A.   That's correct.
15         Q.   You paid Tom Schiavoni out of Helen
16     Runge's funds?
17         A.   That's correct.
18         Q.   You didn't pay him out of your own
19     funds?
20         A.   No.
21         Q.   Did Helen Runge consent to
22     Mr. Schiavoni representing you on her behalf?
23         A.   Again, I'm saying that it's under
24     Professional Conduct Rules 1.14.
```

1        MR. ROCKAS:  Just answer the question.
2    A.   No.
3    Q.   Did Tom Schiavoni send an engagement
4    letter to Helen Runge?
5    A.   No.
6    Q.   Was Helen Runge ever made aware that
7    Tom Schiavoni was providing legal services for
8    which she was about to be billed?
9    A.   No, not that I know of.
10   Q.   The fees for which Tom Schiavoni was
11   paid was for the preparation of a petition for
12   your appointment?
13   A.   And going over all the facts and the
14   information on Helen with me, going over
15   affidavits and the various.
16   Q.   Was Tom Schiavoni ever engaged to
17   represent Helen specifically during this
18   proceeding?
19   A.   No.
20   Q.   Other than Tom Schiavoni's fees being
21   paid, where did the remainder of the 25,000
22   bucks go on May 20, 2003?
23   A.   Well, that's the deposit.  You have a
24   copy of the accounting, and it tells you where