UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

     *Plaintiff,*

*v.*

WALTER J.  KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

     *Defendants.*

Civil Action No. 05-10849-RGS

**OPPOSITION OF DEFENDANT SUNBRIDGE TO
PLAINTIFF'S MOTION FOR LEAVE OF COURT TO DEPOSE GILBERT STANLEY**

**INTRODUCTION**

The Plaintiff seeks leave of the Court to conduct a second deposition of Gilbert Stanley in North Carolina.  As conceded by the Plaintiff in her motion, one question before this Court in deciding whether to permit this untimely out-of-state deposition on the eve of trial, is whether the testimony of Gilbert Stanley will be merely duplicative of the testimony of other witnesses who will be appearing at trial.  Gilbert Stanley had absolutely no interaction with Defendant SunBridge or its staff until April 29, 2003, when he and his wife both arrived at the facility for the two days of visits that ended with the forcible removal of Helen Runge on April 30, 2008.  At all time Gilbert Stanley interacted with SunBridge staff or with Defendant Walter Kelly, his wife, Dorothy, was present.  Dorothy Stanley is the named Plaintiff in this matter and will presumably be testify at the trial.  The Plaintiff has not identified any relevant and competent testimony that Gilbert Stanley can offer that cannot also be offered by Dorothy Stanley.

More importantly, the motion should be denied because Plaintiff's counsel already questioned Gilbert Stanley during his earlier November 15, 2006 deposition.

## FACTS

### I.    Prior Deposition of Gilbert Stanley

A deposition Gilbert Stanley was conducted on the afternoon of November 14, 2006 and morning of November 15, 2006.  The deposition was taken in North Carolina, where Gilbert Stanley resides and filled 221 pages of transcripts.

Day two of the deposition began with a cross examination by Attorney Glenn Davis, counsel for the Plaintiff.  *See* **Exhibit A** – *Depo of Gilbert Stanley, Vol. 2*, page 4, line 1 – page 23, line 3.  Given that Plaintiff's Counsel has already elicited testimony from Gilbert Stanley, there is no justification for imposing the expense of a second out-of-state deposition of Gilbert Stanley on the Defendants.

### II.    Duplicative Nature of Gilbert Stanley's Testimony

Helen Runge became a resident at SunBridge's Randolph facility on January 22, 2003. She was removed from the facility by Dorothy and Gilbert Stanley on April 30, 2003.  The Stanleys were not involved in the admission process in January of 2003.  They were not involved in any of the healthcare decisions related to Helen Runge at any point during her stay.  With the exception of a limited number of telephone calls between Dorothy Stanley and a SunBridge nurse, during which the nurse was unable to give any details about Runge's case because of HIPAA restrictions, the Stanleys had no interaction with SunBridge at any point prior to their arrival on April 29, 2003.  At no point did Gilbert Stanley interact with SunBridge without Dorothy Stanley being present.

At no point in Gilbert Stanley's deposition or Plaintiff's motion is any event identified that involved Gilbert Stanley, which could not be testified about to an equal degree by Dorothy Stanley.

Gilbert Stanley did not speak with anyone at Defendant SunBridge prior to April 29, 2003.  Gilbert Stanley did not even speak to Helen Runge during the time she was at SunBridge. The Stanleys have only spoken to Defendant Walter Kelly on one occasion while Helen Runge was a resident of SunBridge and both Stanleys took part in that April 25, 2003 telephone conversation with Defendant Kelly.

> Q     When was the next time you spoke to Helen Runge after the visits at Marion Manor?
>
> A     The next time I spoke to her was at Sunbridge on the 29th of April, '03.
>
> Q     Now, you were here when your wife was testifying and we went over a telephone conversation that occurred on or about April 25.   Were you a participant in that phone conversation?
>
> A     Yes.  In fact, I answered the telephone.
>
> Q     That was a conversation with Mr. Kelly?
>
> A     That was a conversation with Mr. Kelly, yes.
>
> Q     Prior to that conversation with Mr. Kelly on the 25th, you had no conversation with Helen Runge while she was at Sunbridge?
>
> A     No.  No, I had not.
>
> Q     Then, I take it, you never talked to Helen Runge on the phone, from your prior testimony?  I just want to be clear on that.
>
> A     I can't ever remember talking to her on the telephone.  You're right.
>
> Q     So you saw her twice at Marion Manor, and the next time you saw her was on April 29?
>
> A     April (pause) ---
>
> Q     Twenty-ninth, 2003?
>
> A     Twenty-ninth, that's correct.

**Exhibit A –** *Depo of Gilbert Stanley, Vol. 2*, page 29, line 8 - page 30, line 8.

During all the events of April 29, 2003, both Gilbert and Dorothy Stanley were present.

> Q     So did you talk to Helen alone or was Dorothy there when you talked to Helen?
>
> 47:11   A   Helen's room was right next to the desk, so we were just in between her room and the desk, so we were both there so that -- it wasn't any more room than there was between you and I between her door and the desk.

**Exhibit B –** *Depo of Gilbert Stanley, Vol. 1*, page 47, line 9 - page 47, line 15.

On April 30, 2003, when Dorothy Stanley was having discussions with SunBridge staff, Gilbert remained outside in his truck because of his hot temper. Gilbert Stanley's involvement on April 30, 2003 began when Helen Runge and Dorothy Stanley exited the SunBridge facility's building, ostensibly to talk in an outdoor sitting area.

> Q     Did you yourself have any conversation with anybody at Sunbridge on April 30, 2003?
>
> A     Yes.
>
> Q     Who was that?
>
> A     Ellen Redwine, the escort that they sent down to bodyguard her at the front door, a couple of the orderlies.
>
> Q     Did all of those discussions take place outdoors, outside of the facility?
>
> A     Yes, they did.
>
> Q     So your wife was the only one that went inside and talked to anybody?
>
> A     Yes.
>
> Q     What was the nature of your discussion with Ellen? What did you say to her, what did she say to you, the best you can remember?
>
> A     She came out screeching like a banshee that she had a power of -- or a healthcare proxy, I couldn't take her, and my sole discussion with her was, "I have a healthcare proxy and she's going with me."
>
> Q     Is that it for your discussion with Ellen?
>
> A     With Ellen, it was, yes.
>
> Q     How about with the escort? What was the discussion with the escort?
>
> A     The escort -- I told the escort that we were taking Helen, that we thought she was being held prisoner illegally, and she was leaving.
>
> Q     What about with the orderlies?

A      The orderly that went to grab Helen, I stepped in between Helen and the orderly and told him, "Don't touch her," and the orderly backed off and said okay. The other orderly that stood in front of the car, he -- excuse me -- he shouted out, "You don't intimidate me."  I said, "I don't mean to.  But you don't intimidate me either.  So I just want to get out of here."  That was the sum total of the discussions with the people outside.

**Exhibit B –** *Depo of Gilbert Stanley, Vol. 1*, page 171, line 3 - page 172, line 16.  The Plaintiff has failed to identify any subject matter to which Gilbert can testify, but about which Dorothy Stanley cannot.

### ARGUMENT

Since Gilbert Stanley resides in North Carolina, there was always a risk that he would be unavailable for trial.  It appears that this risk was apparent to Plaintiff's counsel, who chose to question Gilbert during the deposition taken in North Carolina in November of 2006.  **Exhibit A**. The fact that counsel now wishes to ask additional questions, questions that could have been asked during the original deposition, does not justify the expense that would be imposed on the Defendants by holding a second deposition in North Carolina; nor does it justify the disruption of Defense counsel trial preparations that would be caused by an out-of-state deposition on the eve of trial.

The few events about which Gilbert Stanley is competent to testify can be addressed by Dorothy Stanley.

In addition to the added expense of conducting a second deposition, the trial in this matter is scheduled for June 23, 2008.[1]  Even though the mediation in this matter failed on May 12, 2008, the Plaintiff waited until June 2, 2003 to file her motion.  This assures that the second

---

[1] On May 13, 2008, Counsel for the Plaintiff indicated that he may request a postponement of the trial.  Since, as of this late date, no motion has been filed requesting a postponement, it appears that all parties and counsel are available for the June 23, 2008 trial date.

deposition, if permit, would occur at a time Defense Counsel would otherwise be preparing for trial.

## CONCLUSION

The Plaintiff has not offered grounds for permitting Plaintiff's Counsel a second round of questioning of Gilbert Stanley.  A lengthy two part deposition of Gilbert Stanley is available for use at trial, including questioning by Plaintiff's Counsel. In contract, the expense to the Defendants of appearing at this out-of-state deposition would far outstrip any value of the deposition at trial.  This Honorable Court should therefore deny the Plaintiff's motion.

Should the Court choose to permit a second deposition of Gilbert Stanley; the Plaintiff should bear the cost of Defense Counsel in attending this out-of-state deposition.

Respectfully submitted,

**Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph**

by its attorneys,

___/s/ Michael Williams_____
K. Scott Griggs     (BBO# 555988)
Michael Williams (BBO# 634062)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987
MWilliams@Lawson-Weitzen.com

**CERTIFICATE OF SERVICE**

I hereby certify that this Document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 3, 2008.

___/s/ Michael Williams_____

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2                     NO.: 05-10849-RGS
 3     _____
                                          )
 4     HELEN A. RUNGE,                    )
                   Plaintiff,             )
 5            v.                          )   DEPOSITION OF
                                          )
 6                                        )   GILBERT STANLEY - DAY 2
       WALTER J. KELLY, et al.,           )
 7                 Defendants.            )
       _____)
 8
               On Wednesday, November 15, 2006, commencing at 9:34
 9     a.m., the deposition of Gilbert Stanley was taken on behalf of
       the Defendants at the residence of Mr. and Ms. Stanley, 5
10     Stirrups Downs, Columbus, North Carolina, and was attended by
       Counsel as follows:
11
       APPEARANCES:
12
13             GLENN R. DAVIS, ESQ.
               Latsha, Davis, Yohe & McKenna, P.C.
14             1700 Bent Creek Boulevard, Suite 140
               Mechanicsburg, Pennsylvania  17050
15             on behalf of the Plaintiff
16
               GEORGE C. ROCKAS, ESQ.
17             Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
               155 Federal Street
18             Boston, Massachusetts  02110
               on behalf of Walter Kelly
19
20             JAMES S. HAMROCK, JR., ESQ.
               Hamrock & Tocci
21             101 Main Street, 18th Floor
               Cambridge, Massachusetts  02142
22             on behalf of Dr. Bloomingdale
23
               MICHAEL WILLIAMS, ESQ.
24             Lawson & Weitzen, L.L.P.
               88 Black Falcon Avenue
25             Boston, Massachusetts  02210
               on behalf of Sunbridge Nursing Home
26
27     Attending:  Dorothy Stanley
28
       REPORTED BY:  Mai-Beth Ketch, CVR
29                 ASHEVILLE REPORTING SERVICE
```

2

1    (Document aa123)

2                    Index

3    Stipulations . . . . . . . . . . . . . . .    3

4    Signature (Reserved) . . . . . . . . . . .    3

5    Cross-Examination By Mr. Davis . . . . . .    4

6    Redirect Examination By Mr. Rockas . . . . .   23

7    Recross-Examination By Mr. Hamrock . . . . .   33

8    Recross-Examination By Mr. Williams. . . . .   39

9    Certificate of Oath. . . . . . . . . . . .   42

10   Certificate of Verbatim Transcript . . . . .   43

11   EXHIBITS:

12   Gilbert Stanley Exhibit No. 3 Marked . . . .   13

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      PURSUANT TO NOTICE and/or Agreement to Take

2   Depositions, the within Deposition was taken by me,

3   Mai-Beth Ketch, a Notary Public as required in Rules

4   26 and 30 of the North Carolina Rules of Civil

5   Procedure.

6   STIPULATIONS:

7      IT WAS STIPULATED AND AGREED by and between

8   Counsel for the Plaintiff and Counsel for the

9   Defendant that each question in this Deposition is

10  deemed to be followed by an objection and that each

11  answer or portion thereof is deemed to be followed by

12  a motion to strike; and that the objections and

13  motions to strike may be ruled upon by the presiding

14  Judge at any hearing or trial of this cause,

15  provided, however, that any objections as to the form

16  of the question must be made at the time the question

17  is propounded or else the same is waived.

18  SIGNATURE:

19      The Deponent did agree that both the reading

20  over and signing of the transcript are hereby

21  reserved.

22      Gilbert Stanley, having previously been duly

23  sworn to tell the truth, the whole truth, and nothing

24  but the truth of his own knowledge concerning the

25  within matter, testified as follows:

4

```
 1    CROSS-EXAMINATION BY MR. DAVIS:

 2    Q    Mr. Stanley, good morning.  My name is Glenn

 3         Davis, and as you know, I'm representing your

 4         mother-in-law, Helen Runge, in the lawsuit.

 5    A    Right.

 6    Q    I just had a couple followup questions to the

 7         many questions that were asked of you

 8         yesterday.  I'm directing your attention back

 9         to the time frame in April of 2003, toward the

10         end of April, when you were discussing the

11         matter of a Roger's petition with Mr. Kelly on

12         the phone.  I believe that might have been the

13         evening of what's been identified as Friday,

14         April 25; is that correct?

15    A    Yes, that is correct.

16    Q    Now, I believe your testimony yesterday was

17         during that phone call, Mr. Kelly indicated

18         that there was a need for a Roger's petition;

19         is that correct?

20    A    That is correct.

21    Q    What did he specifically say with regard to a

22         Roger's petition or what his intentions were

23         in that regard?

24    A    His intentions were to get a Roger's petition

25         so that they could force-medicate the
```

Stanley, Gilbert - Vol. 2 of 2 dated Nov 15 2006

5

```
 1        psychoactive drugs.
 2    Q   Did he ask either Dorothy or your permission
 3        to file a Roger's petition to do that?
 4    A   No.
 5    Q   Did he ask whether you would concur in the
 6        filing of that petition?
 7    A   No.
 8    Q   Did Mr. Kelly ever indicate to you during that
 9        conversation that he was required to make that
10        contact with either you or Dorothy in order to
11        file a Roger's petition?
12    A   No.
13    Q   Did Mr. Kelly advise either you or Dorothy
14        that you had the ability to object to the
15        presentment of a Roger's petition by him?
16    A   No.
17    Q   Now, I believe yesterday you also testified
18        that Dorothy had said, if I can paraphrase
19        from my notes, "If anyone is going to be her
20        guardian, I want to be her guardian"; is that
21        the gist of what she said?
22    A   Yes, that is correct.  As I remember it,
23        that's verbatim.
24    Q   What was Mr. Kelly's reaction to Dorothy's
25        statement?
```

6

```
 1    A    His reaction was that, "You don't have to

 2         become involved in it and, you know, I can do"

 3         -- kind of generalized rather a long

 4         conversation, but essentially, "You don't have

 5         to become involved in it.  I have a" -- as he

 6         called it, a judge in his pocket.  He had a

 7         friend that was going to represent Helen, and

 8         it was very unlikely that this judge was going

 9         to make her the guardian.

10    Q    Did Mr. Kelly identify any time frame in which

11         he was going to present this petition during

12         that phone call?

13    A    No.

14    Q    Did he indicate that he had engaged or had an

15         appointment with Dr. Bloomingdale or any other

16         psychiatrist to interview Helen in support of

17         that petition?

18    A    No.

19    Q    Yesterday, you also said that he indicated

20         that he had an old friend that would be

21         willing to represent Helen.  Did you have an

22         understanding from that conversation who the

23         old friend was?

24    A    No.  We -- I don't know -- I had no idea of

25         the name of the old friend, except it was a
```

7

```
 1         colleague of his that he had been friendly

 2         with for -- my impression was that he had been

 3         friendly with a long time and he was going to

 4         do him a favor by being Helen's attorney.

 5    Q    Did you form an understanding from that

 6         conversation with Kelly as to why Helen needed

 7         another attorney?

 8    A    Not from that conversation, no.  Not from that

 9         conversation.  Let me modify that a little

10         bit.  As I think about it, Mr. Kelly said that

11         she had to be represented by an independent

12         counsel in the court.

13    Q    From that conversation, who did you understand

14         Mr. Kelly would then be representing in that

15         proceeding?

16    A    Himself.

17    Q    Was it clear from your conversation and

18         Dorothy's conversation with Mr. Kelly on the

19         25th that both of you didn't want Mr. Kelly to

20         file any type of Roger's or guardianship

21         petition?

22    A    It was very clear.

23    Q    Now, I think you also testified that you

24         talked to Mr. Kelly in that conversation about

25         coming up to Boston?
```

8

```
 1    A    Yes.

 2    Q    Did you agree upon a day or a date that you

 3         would be in Boston?

 4    A    No, except we said we would probably get there

 5         about Wednesday, because we didn't know

 6         exactly when we were going to leave.

 7    Q    I understand from your testimony yesterday

 8         that, in fact, you arrived on Monday and then

 9         showed up at the Sunbridge Nursing Center on

10         Tuesday, the 29th?

11    A    That's correct, and when I say Wednesday, that

12         means arriving at the nursing home on

13         Wednesday, not arriving in Massachusetts.

14    Q    When you arrived on the 29th, what type of

15         reception did you meet with at the nursing

16         home?

17    A    Hostile.

18    Q    Who was hostile?

19    A    The shift supervisor, the social worker,

20         Farrah Sidler, certainly Ellen Redwine and the

21         director of nurses.  It was, frankly, bizarre.

22    Q    I think you also indicated that you had,

23         during the course of the 29th, asked to see

24         your mother-in-law, Helen Runge's, medical

25         records at Sunbridge?
```

9

| | | |
|---|---|---|
| 1 | A | Yes, we did. |
| 2 | Q | Did you ever see -- and by see, I mean have an |
| 3 | | opportunity to review or inspect -- her |
| 4 | | medical records in any detail on the 29th? |
| 5 | A | No, we had no opportunity to inspect them at |
| 6 | | all, other than seeing a folder across the |
| 7 | | table, a chart across the table, closed. |
| 8 | Q | Did you ever have an opportunity to review or |
| 9 | | inspect her medical records on Wednesday, |
| 10 | | April 30? |
| 11 | A | No, we did not. |
| 12 | Q | Did you request on either of those days to |
| 13 | | review and inspect her records? |
| 14 | A | Yes, several times. |
| 15 | Q | Was that prior to or after you gave the |
| 16 | | facility the healthcare proxy and power of |
| 17 | | attorney that Helen had executed on both your |
| 18 | | behalf and Ms. Stanley's behalf? |
| 19 | A | It was both before and after. |
| 20 | Q | Did Helen at any point advise any of the staff |
| 21 | | at Sunbridge that you were allowed to look at |
| 22 | | her medical records? |
| 23 | A | Yes.  She advised the shift nurse to allow |
| 24 | | Dorothy to see her records. |
| 25 | Q | Did Dorothy in fact see her records? |

1    A    No, she did not.

2    Q    Did anyone at Sunbridge ever indicate to you

3         that Mr. Kelly had given permission to you to

4         look at medical records?

5    A    No.

6    Q    There was some testimony yesterday, and I'm

7         not sure I quite followed it.  I just wanted

8         to make sure that I understood it.  At one

9         point, you said you were on the third floor

10        and you were in a room that the medical

11        records had been brought into.  Would you

12        explain that again?

13   A    Yes.  We were on the third floor.  They looked

14        as if they were going to allow us to see the

15        medical records.  So they brought them into

16        the -- they couldn't find a place that we

17        could sit down in privacy with the nurse and

18        the social worker, so they brought us into the

19        social worker's office, which was on the third

20        floor, and at that point in time was when we

21        presented the healthcare, power of attorney

22        and a copy -- gave them a copy of the letter

23        that was discharging Mr. Kelly.  At that

24        point, they wouldn't let us see the records.

25        They went out and talked to -- said they

11

```
 1              talked to Mr. Kelly.  Farrah Sidler went out,

 2              and she seemed to be the person interfacing

 3              with him, and it wasn't very long after that

 4              Ellen Redwine, Farrah Sidler's supervisor,

 5              came in in a fury and I will say kicked us out

 6              of the office.  It was not physically, but was

 7              highly irate and told us to get out, which we

 8              did, and so we did not see the records.

 9    Q    Then I think your testimony, and I didn't

10              follow this, was at a later time that day you

11              again saw the records on the first floor?

12    A    Yes.  They brought -- they had a meeting about

13              this problem.  They called their attorney out

14              in Albuquerque, I think it is.

15    Q    How do you know they called their attorney in

16              Albuquerque?

17    A    They told us they were, and they had -- the

18              shift supervisor, Ellen Redwine, and a couple

19              other people were going through her chart,

20              taking pages out, making copies of pages.

21              They spent the better part of two hours doing

22              that, and that was down in an office on the

23              first floor.  So we saw them at a distance.

24    Q    Where were you physically located to be able

25              to observe that?
```

12

```
 1    A    We were sitting outside the office, down in a

 2         lobby of the -- this office was off the main

 3         lobby of the facility.  We were sitting down,

 4         waiting for them to come to a determination on

 5         whether they were going to allow us to see her

 6         records or not.

 7    Q    Now, after you had taken Helen from the

 8         facility on April 30, did you or Dorothy make

 9         any subsequent requests for Sunbridge to

10         provide you with copies of the medical

11         records?

12    A    Yes.  We sent a letter to them, a registered

13         letter to them, requesting the records, would

14         they ---

15    Q    Did they -- go ahead.

16    A    Would they release records signed by Helen.

17    Q    Did they provide you those medical records?

18    A    No, they did not.

19    Q    Did you ever ask Sunbridge for Helen's

20         physical possessions?

21    A    Yes, we did.  We began -- my daughter in her

22         telephone call asked them to send us her

23         possessions.  That -- nothing happened from

24         that.  We sent a registered letter with a $50

25         cashier's check to pay for the shipment of
```

1          whatever belongings she had down here.  They

2          never cashed the check, never sent the

3          possessions.  They wouldn't communicate with

4          us.

5     Q    You said your daughter called the facility?

6     A    Yes.

7     Q    When did she call the facility?

8     A    She called the facility, actually, twice.  She

9          called them on the -- if I remember right, on

10         the 1st.  She made that on Monday.

11    Q    When you say the 1st, is that May 1?

12    A    I'm sorry, yes.  It's on a -- the day after we

13         took her, which was May 1.

14    Q    What were the purposes of those calls?

15    A    The first call was just to tell them that she

16         was safe, we had her out of the state, and she

17         was going to be brought to a medical facility

18         for a checkup.

19    Q    The second call?

20    A    The second call was to ask them to send her

21         possessions.

22    (OFF THE RECORD)

23    (GILBERT STANLEY EXHIBIT NO. 3 MARKED)

24    CROSS-EXAMINATION RESUMED BY MR. DAVIS:

25    Q    Mr. Stanley, let me place in front of you a

14

```
 1          multiple-paged document that we've asked

 2          marked as Gilbert Stanley Exhibit No. 3.  If

 3          you would take a moment to review that?

 4          (Tenders)

 5    A     (Upon review)  Okay.

 6    Q     Have you seen that document prior to today?

 7    A     Yes.

 8    Q     What do you understand that document to be?

 9    A     That document was an affidavit that Walter

10          Kelly presented to the Court in order to

11          support his application for guardianship for

12          Helen Runge.

13    Q     Now, did Mr. Kelly provide you with a copy of

14          this affidavit before he filed it with his

15          petition?

16    A     No, no.

17    Q     When did you obtain a copy of this affidavit?

18    A     After he filed it with the Court and we hired

19          a lawyer in Massachusetts and he got the

20          filing from the Court.

21    Q     Did you have an opportunity to review the

22          affidavit that Mr. Kelly prepared and filed?

23    A     Before he filed it or after he filed?

24    Q     Well, let's start with that.  Before he filed

25          it?
```

15

```
 1    A    Before he filed it, no, I didn't see it.

 2    Q    Since he filed it, obviously, you've reviewed

 3         it then?

 4    A    Yes, I have.  Sure.

 5    Q    If I could direct your attention to some of

 6         the representations, let me ask you your

 7         opinion on them.  In Paragraph 3 where he

 8         says, "Helen has been estranged from her

 9         daughter's family for over 30 years according

10         to Helen and Helen told me that she had seen

11         the daughter on only a few occasions during

12         that time," do you have an opinion as to the

13         truthfulness of that statement?

14    BY MR. ROCKAS:

15         Objection.

16    CROSS-EXAMINATION RESUMED BY MR. DAVIS:

17    Q    You can answer.

18    A    Yes.

19    Q    Was, in fact, Helen estranged from Dorothy?

20    A    No.  That's ridiculous.

21    Q    In fact, though, it was true that Dorothy had

22         only seen Helen on several occasions for a

23         long period of time?

24    BY MR. ROCKAS:

25         Objection.
```

16

```
 1     CROSS-EXAMINATION RESUMED BY MR. DAVIS:

 2     Q    You can answer.

 3     A    Yeah.  I'm just reading.  Excuse me.  Yes.

 4          You know, I can't count how many, but probably

 5          under 20.

 6     Q    Now, there's some discussion in that paragraph

 7          about being "invited to their North Carolina

 8          home."  Had you had any discussion or had

 9          Dorothy had any discussions with Attorney

10          Kelly with regard to Helen coming to North

11          Carolina prior to him signing his affidavit on

12          May 2, 2003?

13     A    Yes.

14     Q    What was your understanding of the

15          representations that either or Dorothy made to

16          Mr. Kelly with regard to Helen's availability

17          to come to North Carolina?

18     BY MR. ROCKAS:

19          Objection.

20     BY THE DEPONENT:

21          My understanding was that Helen wanted to come

22          to North Carolina and we were working towards

23          bringing her down here to North Carolina,

24          where we could take care of her.

25     CROSS-EXAMINATION RESUMED BY MR. DAVIS:
```

17

1    Q     Was Mr. Kelly aware that you and Dorothy were

2          working to get Helen to North Carolina?

3    BY MR. ROCKAS:

4          Objection.

5    BY THE DEPONENT:

6          Yes, yes.  We had sent Mr. Kelly the

7          applications and so forth and -- to the Tryon

8          Estates retirement community in Tryon, North

9          Carolina, and he was supposed to be getting

10         them filled out and sent back to us.

11   CROSS-EXAMINATION RESUMED BY MR. DAVIS:

12   Q     I direct your attention to Paragraph 7.  Just

13         take a moment to read that.

14   A     Okay.

15   Q     What was your reaction to that paragraph, upon

16         first reading it?

17   A     Helen had expressed a desire to come to North

18         Carolina.  When she was discharged from

19         Carney, we did -- Dorothy did a lot of talking

20         with the nurses and the social worker and the

21         doctor at Carney Hospital, and everybody --

22         and Walter Kelly, and everybody was in

23         agreement that she should come down here to

24         North Carolina, and Helen said she wanted to

25         come.  So we assumed that that was correct,

18

1           that she wanted to come.

2    BY MR. ROCKAS:

3           Move to strike.  Even though motions to strike

4           are reserved, I want to move to strike that.

5    CROSS-EXAMINATION RESUMED BY MR. DAVIS:

6    Q     Now, on April 29, while you were at Sunbridge,

7           did either you or Dorothy express to anyone

8           Helen's desire to come to North Carolina?

9    A     Express to anyone at Sunbridge?

10   Q     Sunbridge.

11   A     No, not that I recall.

12   Q     On the 30th, did you express Helen's desire

13          for her to come along with you and Dorothy to

14          North Carolina?

15   A     No, because I didn't go in -- not that I know

16          of, because I did not go into the facility on

17          the 30th.

18   Q     Now, yesterday we had marked as Exhibit 1 a

19          letter that I believe you indicated had been

20          prepared at your stepmother-in-law's home?

21   A     Yes.

22   Q     Was that letter given to anyone at Sunbridge?

23   A     No, it was just given to us.

24   Q     If I could direct your attention to Paragraph

25          9 of Exhibit Gilbert Stanley 2?  Mr. Kelly

19

1          indicates that "during that conversation," and

2          I believe he's referring to the Friday, April

3          25 conversation, that Dorothy explored

4          financial matters with him.  Was there any

5          discussion with regard to financial matters

6          between Mr. Kelly and Dorothy during that

7          telephone call?

8    A     No.  It wasn't about finances at all.

9    Q     What was the conversation about?

10   A     It was about the Roger's petition and the whys

11         and wherefores of getting it.

12   Q     He also says that "he told me" -- and I'm

13         assuming that he is referring to you -- "her

14         medications were not necessary."  Do you

15         recall a conversation with Attorney Kelly on

16         Friday, April 25, with regard to medications?

17   A     The only conversation we had with medications

18         was that he said she was very excitable and

19         they were trying to calm her down, and I said,

20         "Well, she's always been very excitable.  So

21         why are you giving her these types of drugs to

22         calm her down?  What are you trying to do?"

23   Q     Did he mention the drug Zyprexa in that

24         conversation?

25   A     Yes.

1    Q    Did he mention any other drugs?

2    A    If I remember, BuSpar or BuSpar.  (Pronounces

3         differently)

4    Q    BuSpar?

5    A    BuSpar, B-u-s-p-a-r, I think it is.

6    Q    Specifically with regard to the Zyprexa

7         referenced by Attorney Kelly, did that raise

8         any concern in your mind?

9    A    It raised a lot of concern in my mind.  That's

10        a -- we had looked up that drug when she was

11        at Carney, because she was given it at Carney,

12        and what -- we found in the US Department of

13        Health MedLine and the manufacturer's drug

14        labels that it was not permissible to give

15        that drug to an elderly patient with any

16        dementia.  So it -- the FDA had not approved

17        it for that use.  So that really started to

18        concern me, and then, of course, at Carney, we

19        had some of the medical records and they had

20        started it at Carney at five milligrams and

21        she had a reaction to it and had to cut it

22        back to two and a half milligrams.  So yeah, I

23        was concerned that she was getting a drug that

24        -- essentially, the survey said that causes

25        death in the individual, that type of an

21

```
1              individual, 1.6 to 1.7 times that of the
2              person that was not getting it.
3      Q     Did you express your concerns with the Zyprexa
4              being administered to Helen to Mr. Kelly in
5              that conversation?
6      A     Yes.  I said, you know, "We're not" -- well, I
7              made a general statement.  I said, "We don't
8              want" -- "we need to come up and explore
9              what's happening with these drugs, because
10             we're not satisfied with what we're hearing,"
11             words to that effect.
12     Q     Do you recall Mr. Kelly's reaction to that
13             statement, if he had any?
14     A     Yeah.  He said, "Well, they're not giving her
15             very much."  That's what (pause) ---
16     Q     Yesterday, I believe there was some discussion
17             with you with regard to either getting a call
18             or a police officer coming to your house here
19             in North Carolina.  Did a police officer come
20             to your house in North Carolina after Helen
21             had been brought here in May of 2003?
22     A     No.
23     Q     Did you get a call from a police officer here
24             at your ---
25     A     Yes.  When I got back in here on a Sunday, a
```

1        Brett Jackson from Columbus Police Department

2        had a call on -- had left a message on our

3        answering machine and I returned the call.  He

4        said that, to quote him, "Those guys up there

5        are really after you.  They think you kidnaped

6        your mother-in-law," and I said, "Okay, what

7        business is it of yours?"  "Oh.  Well, you

8        know, I've turned it over to DSS," because

9        Officer Brett Jackson had no authority down

10       here.  This is in the county.  He wasn't even

11       supposed to be fooling with it.  So he said,

12       "You better satisfy those guys, or they're

13       going to make it mean for you," and that's

14       where the telephone conversation stopped.

15  Q   To your knowledge, were any criminal charges

16       ever filed against you or Ms. Stanley with

17       regard to caring for Helen here in your home?

18  A   No.  We -- I went down to the sheriff the

19       first thing Monday and explained what was

20       happening, and he -- his reaction is, "Is if

21       you get those guys to come down here, I have

22       some free room and board for them."  He said,

23       "We don't look kindly on filing false police

24       reports," which in his case and his thought

25       the police report that had been filed was

23

```
 1          false.
 2     BY MR. DAVIS:
 3          I have no further questions at this point.
 4     REDIRECT EXAMINATION BY MR. ROCKAS:
 5     Q    I have a couple questions.  Attorney Davis,
 6          Mr. Stanley, asked you some questions
 7          regarding the April 25 phone call.  So let's
 8          just focus on that for a few minutes.
 9     A    Sure.
10     Q    Mr. Davis asked you whether Walter Kelly had
11          informed you whether you had the ability to
12          object to his going into court to get a
13          Roger's petition and you answered no, that he
14          did not?
15     A    I'm sorry.  Excuse me.  Off the record.
16     (OFF THE RECORD)
17     REDIRECT EXAMINATION RESUMED BY MR. ROCKAS:
18     Q    Mr. Davis asked you whether during this April
19          25 phone call Mr. Kelly advised you that you
20          had the ability to object to the Roger's
21          petition and you answered no; do you remember
22          that testimony?
23     A    Yeah.  Mr. Kelly did not inform me that I had
24          the ability to object to that, if that's what
25          you're asking me.
```

Stanley, Gilbert - Vol. 2 of 2 dated Nov 15 2006

# Affidavit

In the Matter of:

County:                                                          FileNumber:   **05-10849-RGS**

Caption:    **Helen A. Runge,**
            **v.**
            **Walter J. Kelly, et al.**

---

THIS is to certify that                    **Gilbert Stanley - Day 2**                    , at
his/her deposition taken on   **Wednesday, November 15, 2006**   reserved the right to read over a
sign the transcript of his/her deposition;

THAT the deponent was provided with a copy of said transcript, along with an errata sheet
on which to record any corrections desired;

THAT the deponent was given at least 30 days to return said errata sheet to me for filing
with the transcript;

THAT after the designated time, I had no response from the deponent and, therefore, am
filing this transcript with proper authorities in absence of any signature.


Signature of Court Reporter
**Mai-Beth Ketch**

**Wednesday, January 31, 2007**
Date

1

1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
2                          NO.: 05-10849-RGS

3    _____
                                     )
4    HELEN A. RUNGE,                 )
                   Plaintiff,        )
5            v.                      )   DEPOSITION OF
                                     )
6                                    )   GILBERT STANLEY - DAY
     WALTER J. KELLY, et al.,        )
7                  Defendants.       )
     _____)

8
             On Tuesday, November 14, 2006, commencing at 4:20
9    p.m., the deposition of Gilbert Stanley was taken on behalf of
     the Defendants at Isothermal Community College, Room 118, 1255
10   West Mills Street, Columbus, North Carolina, and was attended by
     Counsel as follows:

11
     APPEARANCES:
12
13           GLENN R. DAVIS, ESQ.
             Latsha, Davis, Yohe & McKenna, P.C.
14           1700 Bent Creek Boulevard, Suite 140
             Mechanicsburg, Pennsylvania  17050
15           on behalf of the Plaintiff
16
             GEORGE C. ROCKAS, ESQ.
17           Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
             155 Federal Street
18           Boston, Massachusetts  02110
             on behalf of Walter Kelly
19
20           JAMES S. HAMROCK, JR., ESQ.
             Hamrock & Tocci
21           101 Main Street, 18th Floor
             Cambridge, Massachusetts  02142
22           on behalf of Dr. Bloomingdale
23
             MICHAEL WILLIAMS, ESQ.
24           Lawson & Weitzen, L.L.P.
             88 Black Falcon Avenue
25           Boston, Massachusetts  02210
             on behalf of Sunbridge Nursing Home
26
27   Attending:  Dorothy Stanley
28
     REPORTED BY:  Mai-Beth Ketch, CVR
29               ASHEVILLE REPORTING SERVICE

47

```
 1              the cold water, and then she said that -- she

 2              saw us and popped out of her room about half

 3              dressed, with excitement, and said that -- I

 4              forget what saint it was, but some saint has

 5              "answered my prayers," and we got her dressed

 6              -- or she got dressed and then we took her

 7              downstairs so we could talk.  In the meantime,

 8              Dorothy talked to the nurses on the desk.

 9    Q    So did you talk to Helen alone or was Dorothy

10         there when you talked to Helen?

11    A    Helen's room was right next to the desk, so we

12         were just in between her room and the desk, so

13         we were both there so that -- it wasn't any

14         more room than there was between you and I

15         between her door and the desk.

16    Q    What did you talk about with Helen?

17    A    Well, just hello and, you know, how are you

18         doing, and just a normal greeting-type of

19         conversation at that point.

20    Q    That's it?

21    A    At that point, yes.  You know, when she was in

22         her room or outside of the door to her room.

23    Q    At some point, did she say other things to you

24         that day?

25    A    Yeah, a lot.
```

171

```
 1          You can go ahead.

 2     CROSS-EXAMINATION RESUMED BY MR. WILLIAMS:

 3     Q    Did you yourself have any conversation with

 4          anybody at Sunbridge on April 30, 2003?

 5     A    Yes.

 6     Q    Who was that?

 7     A    Ellen Redwine, the escort that they sent down

 8          to bodyguard her at the front door, a couple

 9          of the orderlies.

10     Q    Did all of those discussions take place

11          outdoors, outside of the facility?

12     A    Yes, they did.

13     Q    So your wife was the only one that went inside

14          and talked to anybody?

15     A    Yes.

16     Q    What was the nature of your discussion with

17          Ellen?  What did you say to her, what did she

18          say to you, the best you can remember?

19     A    She came out screeching like a banshee that

20          she had a power of -- or a healthcare proxy, I

21          couldn't take her, and my sole discussion with

22          her was, "I have a healthcare proxy and she's

23          going with me."

24     Q    Is that it for your discussion with Ellen?

25     A    With Ellen, it was, yes.
```

172

| | | |
|---|---|---|
| 1 | Q | How about with the escort?  What was the |
| 2 | | discussion with the escort? |
| 3 | A | The escort -- I told the escort that we were |
| 4 | | taking Helen, that we thought she was being |
| 5 | | held prisoner illegally, and she was leaving. |
| 6 | Q | What about with the orderlies? |
| 7 | A | The orderly that went to grab Helen, I stepped |
| 8 | | in between Helen and the orderly and told him, |
| 9 | | "Don't touch her," and the orderly backed off |
| 10 | | and said okay.  The other orderly that stood |
| 11 | | in front of the car, he -- excuse me -- he |
| 12 | | shouted out, "You don't intimidate me."  I |
| 13 | | said, "I don't mean to.  But you don't |
| 14 | | intimidate me either.  So I just want to get |
| 15 | | out of here."  That was the sum total of the |
| 16 | | discussions with the people outside. |
| 17 | Q | Some of those orderlies were standing in front |
| 18 | | and behind your vehicle; correct? |
| 19 | A | There was some guy standing behind the vehicle |
| 20 | | that they said was the new director of |
| 21 | | Sunbridge.  He had just go there that day, |
| 22 | | okay, poor guy.  He -- there was an orderly |
| 23 | | standing in front of the vehicle, because |
| 24 | | Ellen Redwine told them to. |
| 25 | Q | At some point, you started to drive off; |

## SIGNATURE PAGE

RE:    Deposition of <u>Gilbert Stanley</u>, taken on November 14, 2006

I, the undersigned, certify that I have reviewed the foregoing transcript of testimony given by me in the above-referenced matter and hereby make the following corrections and/or changes. This testimony should be corrected as follows:

| <u>Page</u> | <u>Line</u> | <u>Correction</u> | <u>Reason</u> |
|---|---|---|---|
| 8 | 3 | Division should read "PERKY" | TRANSCRIBED INCORRECTLY |
| 16 | 20 | "has" should read "AS" | TRANSCRIBED INCORRECTLY |
| 19 | 5 | "Now" should read "NOT" | TRANSCRIBED INCORRECTLY |
| 35 | 20 | "IMPRESSIONS" should be "POSSESIONS" | TRANSCRIBED INCORRECTLY |
| 39 | 10 | "YEAH" IS NOT THE ANSWER TO THE QUESTION ON LINE 9 | TRANSCRIBED INCORRECTLY |
| 52 | 23 | COLT → COLE | INCORRECT SPELLING |
| 77 | 18 | THIS WAS NOT THE ANSWER I GAVE TO THIS QUESTION, IT MAKES NO SENSE. | TRANSCRIBED INCORRECTLY. |
| 107 | 23 | FUND → FUN | TRANSCRIPTION ERROR. |
| 126 | 6 | TAKE TO → TAKE TIME TO | TRANSCRIPTION ERROR |

Subject to the foregoing corrections, my testimony is as contained in the aforementioned transcript.

_____
Signature

Sworn to me and subscribed before me this 8 day of January, 2007.

_____
Notary Public
My commission expires _____  Seal:

Notary Public for South Carolina
in Spartanburg County
My Commission Expires October 18, 2011

(EXPLANATORY NOTE: Everything the deponent says is reported verbatim. Form styles include: two dashes means a change in train of thought; three dashes means an interruption; "(pause)" means a pause or trailing off in speech.)

(Doc ID AA122)