UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

     *Plaintiff,*

*v.*

WALTER J.  KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

     *Defendants.*

Civil Action No. 05-10849-RGS

## MOTION IN LIMINE BY ALL DEFENDANTS TO PRECLUDE DOROTHY AND GILBERT STANLEY FROM TESTIFYING REGARDING EVENTS PRIOR TO APRIL 29, 2003

The Stanleys have no personal knowledge of events occurring at Mediplex of Massachusetts, Inc. d/b/a SunBridge Care and Rehabilitation for Randolph prior to their arrival at the facility on April 29, 2003.  They have no personal knowledge of Helen Runge's interactions with Dr. Kerry Bloomingdale or with her attorney, Walter Kelly.  They have no personal knowledge of Helen Runge's opinions regarding the actions of the Defendants or her level of assent to and approval of the Defendants' actions.  Their sole source of knowledge of these events is the hearsay statements of Helen Runge.  Because those statements cannot form the basis of their testimony, the Stanleys cannot establish that they have the requisite personal knowledge of the events to which they will be testifying.

Helen Runge became a resident at SunBridge's Randolph facility on January 22, 2003.  She was removed from the facility by Dorothy and Gilbert Stanley on April 30, 2003, the day after the Stanleys first visited with Helen Runge on April 29, 2003.  The Stanleys were not

involved in the admission process in January of 2003. They were not involved in any of the healthcare decisions related to Helen Runge at any point during her stay. With the exception of a limited number of telephone calls between Dorothy Stanley and a SunBridge nurse, during which the nurse was unable to give any details about Runge's case because of HIPAA restrictions, the Stanleys have no personal knowledge of events at SunBridge between Helen Runge and the facility or its staff. With the exception of Dorothy Stanley's limited telephone contact with a facility nurse, the Stanleys' knowledge of this time period is based entirely on what was told to them verbally and in writing by Helen Runge or what they have read in the records.

During her stay at SunBridge, Helen Runge was cared for by a number of medical professionals in addition the SunBridge staff, such as Dr. Bloomingdale and the staff of New England Geriatrics, as well as other medical specialist in podiatry, optometry and dental care. The Stanleys have never spoken to these caregivers and have no personal knowledge of their interactions with Helen Runge, the care they provided or Helen Runge's assent to those services.

The Stanleys have only spoken to Walter Kelly on one occasion while Helen Runge was a resident of SunBridge. They had no involvement in decisions related to his representation of Helen Runge. The Stanleys spoke with Walter Kelly in April of 2003 prior to their arrival at SunBridge on April 29, 2003, and their forcible removal of Helen Runge from SunBridge on April 30, 2003. They discussed Helen's refusal to take her medications and that Kelly was going to seek a Rogers petition. **Exhibit A –** *Depo of Dorothy Stanley, Vol. 1*, pages 130-134.

Under Rule 602 of the Federal Rules of Evidence, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The Stanleys should therefore be precluded from testifying about any events occurring at SunBridge other than (1) their personal observations made by them on April

29 and 30, 2003 and (2) the discussions with SunBridge staff identified in their depositions and detailed below.

The Stanleys should be precluded from testifying regarding the relationship between Runge and her attorney, Walter Kelly, as they have no personal knowledge of these interactions.

## I.    SunBridge

### A.    Lack of Personal Knowledge about Helen Runge's Stay at SunBridge

During their depositions, the Stanleys acknowledged their lack of personal knowledge about what was happening with Helen Runge during and before her three month stay at SunBridge.

> Q  Do you have any personal knowledge of what healthcare services Helen was and was not being provided while at Sunbridge?
>
> A  Are you asking me -- put a time frame on that, please.
>
> Q  Well, during the entire period at Sunbridge.  Is there some period where she got ---
>
> A  No.  What I'm saying is you asked if I had personal knowledge.  At what point in time did I have that personal knowledge, is what I'm trying to get at, and I'll answer the question my way.
>
> Q   During ---
>
> A  I'll answer the question my way.  She wrote a letter, which I certainly had personal knowledge of, saying that she did not have podiatry care, she did not have dental care, she didn't have proper eye care, and she needed a hearing aid.
>
> Q  So is it -- I'm sorry.
> A  And that, if I remember right, was about the 21st or probably we got it about the end of March of '03.
> Q  During the time Helen was actually at Sunbridge, did you have any other information about what care she was and wasn't receiving?
> A  When -- excuse me.  When she was at Sunbridge during that period of time?
> Q  Yes.
>
> A  No, because we could get nothing, no information, out of Sunbridge.

**Exhibit A –** *Depo of Gilbert Stanley, Vol. 1*, page 161, lines 7 – page 162, line 12.

> Q  Do you have any actual knowledge of the discussions that went into deciding on Sunbridge?

A  I was just informed.

**Exhibit C –** *Depo of Dorothy Stanley, Vol. 2*, page 69, lines 9 – 12.

Q  Do you have any personal knowledge about what medical care she was receiving while at Sunbridge?

A  I would have been seeing this part of -- like I said, I have not read it.  I have not had access to it.  No, because I was not privileged to know.

**Exhibit C –** *Depo of Dorothy Stanley, Vol. 2*, page 71, lines 11 – 17.

Not withstanding Mr. Stanley's misunderstanding to the contrary, personal knowledge of letters written by Helen Runge does not constitute personal knowledge on the part of the Stanleys as to the events described in those letters.  The statements made to the Stanleys by Helen Runge are second level hearsay.  Knowledge of these inadmissible statements cannot form the basis of "personal knowledge" sufficient to permit the Stanleys to testify about these events. *United States v. Blackwell*, 459 F.3d 739 (6th Cir. 2006).

Likewise, the only basis for the Stanleys' knowledge of events involving Helen Runge leading up to her three-month stay at SunBridge prior to April 29, 2003 is what they read in letters written by Helen Runge or what they were told by Helen Runge.  Outside of the information provided by Helen Runge or what the Stanleys have subsequently read in various records, the Stanleys lack personal knowledge of much of what occurred in Helen Runge's life prior to their removing her to North Carolina in late April 2003.  They were even unaware of her earlier hospitalization for psychiatric care.

Q  Before you came here today, were you aware that Helen Runge had a social worker assigned to her in 2000?

A  Had a social worker assigned to her in 2000 from where?

Q  Did you have any knowledge of any social workers working with her in Boston in 2000?

A  No.

**Exhibit B –** *Depo of Gilbert Stanley, Vol. 1*, page 168, lines 15 – 22.

> Q  So you weren't aware that that social worker had been involved in getting her sent to Jewish Memorial Hospital for a psych evaluation?
>
> A  No.

**Exhibit B –** *Depo of Gilbert Stanley, Vol. 1*, page 169, lines 8 – 12.

> Q   Do you know anything about your mother's stay at Jewish Memorial Hospital in 2000?
>
> A   No.  I hadn't heard she stayed there.
>
> Q   You don't know anything about her stay at Jewish Memorial Hospital?
>
> A   Not that I can recollect.

**Exhibit A –** *Depo of Dorothy Stanley, Vol. 1*, page 86, lines 14 – 19.

### B.    Telephone Calls with SunBridge Staff

Dorothy Stanley did have telephone contact with a nurse from SunBridge during Runge's stay.  But according to her deposition testimony, the nurse was unwilling to give her details related to Runge's treatment due to HIPAA restrictions.

> Q   Yesterday, you talked about a conversation you had with Nurse Kayla about whether or not your mother was taking medication; do you remember that conversation?
>
> A   Okay.  Yes, probably.  Yeah.  Okay.  Go ahead.
>
> ***
>
> Q   Did you inquire about what those medications were?
>
> A   The exact pills?  Not the exact pills, no.
>
> Q   Did you ask about what the medications were treating, what they were for?
>
> A   I wouldn't have been allowed the knowledge.
>
> Q   Why is it that you wouldn't have been allowed that knowledge?
>
> A   I'm not her healthcare proxy, and under HIPPA, they would have not given me that over the phone.  We certainly wouldn't give it at the hospital for someone on the phone like that either.
>
> ***
>
> Q   Do you have any personal knowledge about what medical care she was receiving while at Sunbridge?
>
> A   I would have been seeing this part of – like I said, I have not read it.  I have not had access to it.  No, because I was not privileged to know.

**Exhibit C –** *Depo of Dorothy Stanley, Vol. 2*, page 69, line 13 – page 71, line 17.

### C.    April 29 and 30, 2003

With regard to April 29 and 30, 2003, Dorothy and Gilbert Stanley can testify about their personal observations made at SunBridge, but cannot testify about what Helen Runge told them about what medications had been prescribed to her, how those medications effected her, how the facility treated her, her opinions about the care she received at the facility or what was said to her by facility staff or other individuals.  All information conveyed to them by Runge either while at the facility or after she was removed to North Carolina would still be hearsay and cannot form the basis for testimony by Gilbert and Dorothy Stanley.

## II.    Walter Kelly

Likewise, the Stanleys have no personal knowledge of the relationship between Helen Runge and Walter Kelly and therefore should not be permitted to testify on the matter.  The Stanleys' personal knowledge is limited to what they did while at SunBridge on April 29-30, 2003 and when they removed Helen Runge.  Their limited phone conversations with Kelly cannot be the basis of their testimony, rather their testimony must be limited to their own personal observations.

## III.    Non-SunBridge Caregivers

Because the Stanleys never interacted with the non-SunBridge caregivers treating Runge (such as the staff of New England Geriatric, her dentist, her podiatrist, her optometrist, etc.), any testimony by the Stanleys concerning their examinations of Helen Runge or the treatments they prescribed or her reactions to those treatments can only be based on what they were told and not on their own observations.  Therefore, the Stanleys should not be permitted to testify regarding any interactions between Helen Runge and her non-SunBridge caregivers.

IV.    **Conclusion**

Given the extremely limited involvement of the Stanleys in Helen Runge's interactions with the Defendants, the Stanleys cannot testify about those interactions without relying on the inadmissible hearsay statements of Helen Runge.  This lack of personal knowledge should limit the testimony of Gilbert and Dorothy Stanley to those events in which they were personally involved.  They should not be permitted to circumnavigate the preclusion of Helen Runge's hearsay statements simply by adopting those purported statements as their own testimony.

Respectfully submitted,

**Mediplex of Massachusetts, Inc.**
**d/b/a SunBridge Care and**
**Rehabilitation for Randolph**

by its attorneys,

_____/s/ Michael Williams_____
K. Scott Griggs  (BBO# 555988)
Michael Williams  (BBO# 634062)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987
MWilliams@Lawson-Weitzen.com

**Walter J. Kelly,**

by his attorneys,

_____/s/ George C. Rockas_____
George C. Rockas, BBO #544009
Michele Carlucci, BBO #655211
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
260 Franklin Street
Boston, MA 02110
(617) 422-5300

**CERTIFICATE OF SERVICE**

I hereby certify that this Document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 13, 2008.

_____/s/ Michael Williams_____

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2                        NO.: 05-10849-RGS

 3   _____
                                      )
 4   HELEN A. RUNGE,                  )
                     Plaintiff,       )
 5            v.                      )   DEPOSITION OF
                                      )
 6                                    )   DOROTHY STANLEY - DAY
     WALTER J. KELLY, et al.,         )
 7               Defendants.          )
     _____ )

 8
              On Tuesday, November 14, 2006, commencing at 10:13
 9   a.m., the deposition of Dorothy Stanley was taken on behalf of
     the Defendants at Isothermal Community College, 1255 West Mills
10   Street, Columbus, North Carolina, and was attended by Counsel as
     follows:

11
     APPEARANCES:
12
13           GLENN R. DAVIS, ESQ.
             Latsha, Davis, Yohe & McKenna, P.C.
14           1700 Bent Creek Boulevard, Suite 140
             Mechanicsburg, Pennsylvania  17050
15           on behalf of the Plaintiff
16
             GEORGE C. ROCKAS, ESQ.
17           Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
             155 Federal Street
18           Boston, Massachusetts  02110
             on behalf of Walter Kelly
19
20           JAMES S. HAMROCK, JR., ESQ.
             Hamrock & Tocci
21           101 Main Street, 18th Floor
             Cambridge, Massachusetts  02142
22           on behalf of Dr. Bloomingdale
23
             MICHAEL WILLIAMS, ESQ.
24           Lawson & Weitzen, L.L.P.
             88 Black Falcon Avenue
25           Boston, Massachusetts  02210
             on behalf of Sunbridge Nursing Home
26
27   Attending:  Gilbert Stanley
28
     REPORTED BY:  Mai-Beth Ketch, CVR
29                 ASHEVILLE REPORTING SERVICE
```

86

1    Q    Hyde Savings Bank?

2    A    Uh-huh.  (Affirmative)

3    Q    Is that a yes?

4    A    Hyde Park Savings Bank, yes.

5    Q    When your mother was in North Carolina, did

6         she prepare a will?

7    A    Yes, she did.

8    Q    To whom did she leave her assets in that will?

9    A    To me and the two grandchildren.

10   Q    So you and the two grandchildren got

11        everything under her will?

12   A    Whatever there was.  Whatever there will be

13        for (pause) ---

14   Q    Do you know anything about your mother's stay

15        at Jewish Memorial Hospital in 2000?

16   A    No.  I hadn't heard she stayed there.

17   Q    You don't know anything about her stay at

18        Jewish Memorial Hospital?

19   A    Not that I can recollect.

20   BY MR. ROCKAS:

21        Let me just show you a document that may

22        stimulate your memory.  Could you mark this as

23        the next exhibit, please?

24   (DOROTHY STANLEY EXHIBIT NO. 9 MARKED)

25   DIRECT EXAMINATION RESUMED BY MR. ROCKAS:

130

1          I asked to see charts, lab work.

2    Q    No, that's not my question.  Did you actually

3         ask Attorney Kelly?

4    A    Him personally?

5    Q    Personally.

6    A    No.

7    Q    So you never said to Mr. Kelly, "I'd like to

8         look at my mother's medical records," and he

9         said, "I'm not going to let you look at them"?

10   A    No.  But they asked at the nursing home, and

11        he refused.

12   Q    You never personally asked him ---

13   A    Correct.

14   Q    Can you just let me try to finish my question?

15        I think you were beating me to the punch.  You

16        were answering as I was finishing.  Sometimes

17        that can create a garbled record.  Prior to

18        your arrival in Massachusetts on or about the

19        evening of April 28, 2003, did you have any

20        communications with Attorney Kelly in April

21        2003?

22   A    Not that I remember.

23   Q    Well, did you have a communication with him on

24        or about April 25?

25   A    Yes, yes.  Yes.  That was a Friday evening.  I

1       can't tell you if it was the 23rd, the 24th,

2       25th, and he called me.

3   Q   Called you in North Carolina?

4   A   Yes.

5   Q   What did he say to you?

6   A   That he was having -- that they were having

7       problems with my mother taking her medication

8       and that he wanted to go to court and get a

9       Rogers petition to force her to take her

10      drugs.

11  Q   What did you understand a Rogers petition was?

12  A   Just that it was just something that the Court

13      ordered that the patient be medicated, be

14      forced to take the medication, if they would

15      have previously taken it.  They would just be

16      force-fed their medication, and I told them I

17      didn't -- I would like -- I didn't like that

18      situation.

19  Q   Well, did you know your mother's mental state

20      at the time?

21  A   After talking -- just knew by talking to her,

22      and so -- and the nurse said she was pleasant,

23      cooperative, were not -- they did not have any

24      problems with her.

25  Q   Well, from talking to her, you didn't know one

132

1       way or the other her mental state because she

2       couldn't hear you?

3  A   Well, I ---

4  BY MR. DAVIS:

5       Objection.  That's argumentative, George.  I

6       don't think we have to get there.  She's

7       already told you that she had conversations

8       with the nurses and what those conversations

9       were.

10  BY MR. ROCKAS:

11       She can answer the question.

12  BY MR. DAVIS:

13       She can answer the question, but I don't think

14       we need to get argumentative with witnesses.

15  BY MR. ROCKAS:

16       Your objection is noted.

17  BY MR. DAVIS:

18       Thank you.

19  BY THE DEPONENT:

20       I could hear my mother's responses even though

21       she couldn't always hear me.  I could hear her

22       talk.

23  DIRECT EXAMINATION RESUMED BY MR. ROCKAS:

24  Q   Well, what did she say in these conversations

25       to you?

133

| | | |
|---|---|---|
| 1 | A | She would just be saying hello and "I'm so" -- |
| 2 | | "I can't hear you," and I could hear |
| 3 | | background noise.  Those type of things.  "I'm |
| 4 | | so glad you called." |
| 5 | Q | Did Attorney Kelly tell you in the April |
| 6 | | conversation that he was considering having a |
| 7 | | guardian appointed? |
| 8 | A | Just the Rogers petition. |
| 9 | Q | He didn't mention nothing about a guardian |
| 10 | | being appointed? |
| 11 | A | I don't believe he did. |
| 12 | Q | Were you the only one on the line with Mr. |
| 13 | | Kelly? |
| 14 | A | No. |
| 15 | Q | Your husband was on the line? |
| 16 | A | Yes, he was. |
| 17 | Q | What did you tell Mr. Kelly, if anything, |
| 18 | | about the medications your mother was taking? |
| 19 | A | I told him I just didn't like the situation of |
| 20 | | forcing her to take drugs and that I needed to |
| 21 | | come and talk to her before he did anything |
| 22 | | about the petition. |
| 23 | Q | Did you believe your mother was being over- |
| 24 | | medicated? |
| 25 | A | That had -- that was a suspicion. |

134

| | | |
|---|---|---|
| 1 | Q | Did you know what medications your mother was |
| 2 | | being given? |
| 3 | A | No.  That's what I was going to find out. |
| 4 | Q | You would agree with me that you were unable |
| 5 | | to determine whether she was being over- |
| 6 | | medicated, because you didn't know her |
| 7 | | condition and you didn't know what drugs were |
| 8 | | being administered? |
| 9 | A | And that's why I was going. |
| 10 | Q | So you went to Massachusetts to assess the |
| 11 | | situation? |
| 12 | A | Yes. |
| 13 | Q | How did the conversation end with Mr. Kelly on |
| 14 | | or about April 25? |
| 15 | A | That I told him I was coming and he told me it |
| 16 | | was not necessary for me to come, and I told |
| 17 | | him I was coming anyway. |
| 18 | Q | This would have been the first time you saw |
| 19 | | your mother since she was at Marion Manor |
| 20 | | when? |
| 21 | A | You tell me. |
| 22 | Q | 2002 sometime? |
| 23 | A | I -- yes, 2002. |
| 24 | Q | So you arrived in Boston or at the Sunbridge |
| 25 | | Nursing Home, which I understand is outside of |

## SIGNATURE PAGE

RE:    Deposition of <u>Dorothy Stanley</u>, taken on November 14, 2006

      I, the undersigned, certify that I have reviewed the foregoing transcript of testimony given by me in the above-referenced matter and hereby make the following corrections and/or changes. This testimony should be corrected as follows:

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 71 | 12 | "Moss" should be MaTHs | TRANSCRIPTION ERROR |
| 95 | 8, 10, 21, 23 | WAggARd should be WAgett | " " |
| 96 | 8, 9, 10, 15, 19, 23 | WAggARd → WAgett | TRANSCRIPTION ERROR |

Subject to the foregoing corrections, my testimony is as contained in the aforementioned transcript.

_Dorothy W. Stanley_
Signature

Sworn to me and subscribed before me this _8_ day of _January_, 2007.

_Beverly A. Gray_
Notary Public

My commission expires _____ Seal:

Notary Public for South Carolina
in Spartanburg County
My Commission Expires October 16 2011

(EXPLANATORY NOTE: Everything the deponent says is reported verbatim. Form styles include: two dashes means a change in train of thought; three dashes means an interruption; "(pause)" means a pause or trailing off in speech.)

(Doc ID AA120)

1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF MASSACHUSETTS |
| 2 | NO.: 05-10849-RGS |

3  _____
                                    )
4  HELEN A. RUNGE,                  )
              Plaintiff,            )
5        v.                         )   DEPOSITION OF
                                    )
6                                   )   GILBERT STANLEY - DAY
   WALTER J. KELLY, et al.,         )
7              Defendants.          )
   _____)

8

9        On Tuesday, November 14, 2006, commencing at 4:20
   p.m., the deposition of Gilbert Stanley was taken on behalf of
   the Defendants at Isothermal Community College, Room 118, 1255
10 West Mills Street, Columbus, North Carolina, and was attended by
   Counsel as follows:

11

   APPEARANCES:

12

13       GLENN R. DAVIS, ESQ.
         Latsha, Davis, Yohe & McKenna, P.C.
14       1700 Bent Creek Boulevard, Suite 140
         Mechanicsburg, Pennsylvania  17050
15       on behalf of the Plaintiff

16

         GEORGE C. ROCKAS, ESQ.
17       Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
         155 Federal Street
18       Boston, Massachusetts  02110
         on behalf of Walter Kelly

19

20       JAMES S. HAMROCK, JR., ESQ.
         Hamrock & Tocci
21       101 Main Street, 18th Floor
         Cambridge, Massachusetts  02142
22       on behalf of Dr. Bloomingdale

23

         MICHAEL WILLIAMS, ESQ.
24       Lawson & Weitzen, L.L.P.
         88 Black Falcon Avenue
25       Boston, Massachusetts  02210
         on behalf of Sunbridge Nursing Home

26

27 Attending:  Dorothy Stanley

28

   REPORTED BY:  Mai-Beth Ketch, CVR
29               ASHEVILLE REPORTING SERVICE

161

```
 1          made the request to the nurses, because the

 2          nurses told us -- Kayla, I think was the nurse

 3          involved that we talked to, said that Walter

 4          Kelly was supposed to bring her telephone and

 5          he hadn't brought it yet and that she didn't

 6          understand what the delay was.

 7    Q     Do you have any personal knowledge of what

 8          healthcare services Helen was and was not

 9          being provided while at Sunbridge?

10    A     Are you asking me -- put a time frame on that,

11          please.

12    Q     Well, during the entire period at Sunbridge.

13          Is there some period where she got ---

14    A     No.  What I'm saying is you asked if I had

15          personal knowledge.  At what point in time did

16          I have that personal knowledge, is what I'm

17          trying to get at, and I'll answer the question

18          my way.

19    Q     During ---

20    A     I'll answer the question my way.  She wrote a

21          letter, which I certainly had personal

22          knowledge of, saying that she did not have

23          podiatry care, she did not have dental care,

24          she didn't have proper eye care, and she

25          needed a hearing aid.
```

162

```
 1    Q    So is it -- I'm sorry.

 2    A    And that, if I remember right, was about the

 3         21st or probably we got it about the end of

 4         March of '03.

 5    Q    During the time Helen was actually at

 6         Sunbridge, did you have any other information

 7         about what care she was and wasn't receiving?

 8    A    When -- excuse me.  When she was at Sunbridge

 9         during that period of time?

10    Q    Yes.

11    A    No, because we could get nothing, no

12         information, out of Sunbridge.

13    Q    You were talking earlier about on April 29,

14         2003, when you were in a room on the third

15         floor trying to get access to Helen's medical

16         records?

17    A    Yes.

18    Q    Was Helen with you in that room?

19    A    No.

20    Q    Did Helen herself tell the staff at Sunbridge

21         that she wanted the medical records released,

22         or were you the one ---

23    A    She told them that -- it's the 29th.  She told

24         them that morning that she wanted her medical

25         records released to us.
```

1           acquiescence on her part?

2      A    No.  She acquiesced after she got beat up

3           around the head and shoulders, figuratively

4           speaking.  But she would acquiesce, provided

5           she got the right nurse to convince her.

6      Q    So the only element of force was this rule

7           about, "If you don't take your medication,

8           we're not going to let you stay as a

9           resident"?

10     A    Yeah.

11     BY THE DEPONENT:

12          Off the record.

13     (OFF THE RECORD)

14     CROSS-EXAMINATION RESUMED BY MR. WILLIAMS:

15     Q    Before you came here today, were you aware

16          that Helen Runge had a social worker assigned

17          to her in 2000?

18     A    Had a social worker assigned to her in 2000

19          from where?

20     Q    Did you have any knowledge of any social

21          workers working with her in Boston in 2000?

22     A    No.

23     Q    2001?

24     A    Let's see, when did she go to Marion Manor,

25          2001?  She had one in -- as every resident

```
 1            does in -- when she was at Marion Manor.

 2            That's the only one that I knew of.  Then she

 3            obviously had one at BayView and she had one

 4            at Carney and she had one at Sunbridge.

 5      Q    So you weren't aware that she had one prior to

 6            being moved in to Marion Manor?

 7      A    No, of course not.

 8      Q    So you weren't aware that that social worker

 9            had been involved in getting her sent to

10            Jewish Memorial Hospital for a psych

11            evaluation?

12      A    No.

13      Q    Were you aware that there were a number of

14            instances where Helen Runge had called the

15            Boston Police and Boston Fire Department about

16            bugs in her carpeting and water supposedly

17            leaking out of her walls?  Do you have any

18            knowledge of those instances?

19      A    No.  If we had, we would have got her out of

20            the dump ahead of time.

21      Q    Did you ever see the apartment she was living

22            in before she went into Marion Manor?

23      A    No.

24      Q    But is it your belief that if she was

25            complaining about bugs in the carpeting, that
```

## SIGNATURE PAGE

RE:   Deposition of <u>Gilbert Stanley</u>, taken on November 14, 2006

I, the undersigned, certify that I have reviewed the foregoing transcript of testimony given by me in the above-referenced matter and hereby make the following corrections and/or changes. This testimony should be corrected as follows:

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 8 | 3 | Division should Read "Agency" | Transcribed incorrectly |
| 16 | 20 | "has" should Read "As" | Transcribed incorrectly |
| 19 | 5 | "Now" should Read "NOT" | Transcribed incorrectly |
| 35 | 20 | "Impressions" should be "possesions" | Transcribed incorrectly |
| 39 | 10 | "Yeah" is NOT THE Answer to THE Question on Line 9 | Transcribed incorrectly |
| 52 | 23 | Colt → Cole | Incorrect Spelling |
| 77 | 18 | This was NOT THE Answer I gave to this Question, it makes no sense | Transcribed incorrectly. |
| 107 | 23 | Fund → Fun | Transcription Error. |
| 126 | 6 | Take to → Take time to | Transcription Error |

Subject to the foregoing corrections, my testimony is as contained in the aforementioned transcript.

_____
Signature

Sworn to me and subscribed before me this <u>8</u> day of <u>January</u>, 2007.

_____
Notary Public
My commission expires _____    Seal:

Notary Public for South Carolina
in Spartanburg County
My Commission Expires October 18, 2011

(EXPLANATORY NOTE: Everything the deponent says is reported verbatim. Form styles include: two dashes means a change in train of thought; three dashes means an interruption; "(pause)" means a pause or trailing off in speech.)

(Doc ID AA122)

1

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2                       NO.: 05-10849-RGS

 3     _____
                                              )
 4     HELEN A. RUNGE,                         )
                      Plaintiff,              )
 5              v.                             )   DEPOSITION OF
                                              )
 6                                            )   DOROTHY STANLEY - DAY 2
       WALTER J. KELLY, et al.,               )
 7                    Defendants.             )
       _____)

 8
                On Wednesday, November 15, 2006, commencing at 10:34
 9     a.m., the deposition of Dorothy Stanley was taken on behalf of
       the Defendants at the residence of Mr. and Ms. Stanley, 5
10     Stirrups Downs, Columbus, North Carolina, and was attended by
       Counsel as follows:

11
       APPEARANCES:
12
13              GLENN R. DAVIS, ESQ.
                Latsha, Davis, Yohe & McKenna, P.C.
14              1700 Bent Creek Boulevard, Suite 140
                Mechanicsburg, Pennsylvania  17050
15              on behalf of the Plaintiff
16
                GEORGE C. ROCKAS, ESQ.
17              Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
                155 Federal Street
18              Boston, Massachusetts  02110
                on behalf of Walter Kelly
19
20              JAMES S. HAMROCK, JR., ESQ.
                Hamrock & Tocci
21              101 Main Street, 18th Floor
                Cambridge, Massachusetts  02142
22              on behalf of Dr. Bloomingdale
23
                MICHAEL WILLIAMS, ESQ.
24              Lawson & Weitzen, L.L.P.
                88 Black Falcon Avenue
25              Boston, Massachusetts  02210
                on behalf of Sunbridge Nursing Home
26
27     Attending:  Gilbert Stanley
28
       REPORTED BY:  Mai-Beth Ketch, CVR
29                ASHEVILLE REPORTING SERVICE
</pre>

1        it's frightening.

2    Q   Was there another place that she could have

3        gone at that point?

4    A   I'm -- certainly there could have been places

5        searched.  Do I know what the status of every

6        unoccupied bed and nursing home in the greater

7        Boston area at that moment?  That would be a

8        little far-fetched.

9    Q   Do you have any actual knowledge of the

10       discussions that went into deciding on

11       Sunbridge?

12   A   I was just informed.

13   Q   Yesterday, you talked about a conversation you

14       had with Nurse Kayla about whether or not your

15       mother was taking medication; do you remember

16       that conversation?

17   A   Okay.  Yes, probably.  Yeah.  Okay.  Go ahead.

18   Q   Was it one conversation or were there multiple

19       conversations about your mother's medication?

20   A   There could have been at least two of them.

21       I'm not positive on the exact number.  I don't

22       recall the exact number.

23   Q   Was this a case where you were asking her

24       about the medication?

25   A   Was she taking her medication and most -- she

70

```
1              said most of the time she was.  Occasionally

2              she wouldn't.

3     Q    Did you inquire about what those medications

4              were?

5     A    The exact pills?  Not the exact pills, no.

6     Q    Did you ask about what the medications were

7              treating, what they were for?

8     A    I wouldn't have been allowed the knowledge.

9     Q    Why is it that you wouldn't have been allowed

10             that knowledge?

11    A    I'm not her healthcare proxy, and under HIPPA,

12             they would have not given me that over the

13             phone.  We certainly wouldn't give it at the

14             hospital for someone on the phone like that

15             either.

16    Q    So what did Kayla tell you about your mother's

17             taking her medication or not?

18    A    That she took it most of the time, but there

19             were times that she did not and had to be

20             tried to be persuaded to take it.

21    Q    What did she tell you about that persuasion?

22             What form did that persuasion take?

23    A    Usually it was talking with her, maybe, you

24             know, "Take this now and maybe, you know,

25             we'll do this, take this one now," it was a
```

1           persuasion thing.

2     Q    Was she more receptive to taking it from

3           certain nurses than others?

4     A    She was with Kayla, and also that they --

5           Kayla begged her, "Please take this medication

6           or they're going to take you away, they're

7           going to put you somewhere.  You must take the

8           medication," she was told, and, "Please do it

9           for me."  She got down to that, "Please do me

10          the favor."

11    Q    Do you have any personal knowledge about what

12          medical care she was receiving while at

13          Sunbridge?

14    A    I would have been seeing this part of -- like

15          I said, I have not read it.  I have not had

16          access to it.  No, because I was not

17          privileged to know.

18    Q    You talked about some specific complaints that

19          your mother had about Sunbridge, particularly

20          the shower.  Were there other specific

21          complaints that she had about the facility?

22    A    It was the water, the toilets backing up, the

23          food, the -- there was nowhere for her to go.

24          There was nothing for her to do or go or see

25          or -- there was no, like, really areas for her

72

1           to go to.  She was in an area that most of the

2           patients were heavily medicated, and they

3           threatened her with her medications.  She

4           didn't have -- of course, she didn't have the

5           phone.  She did not believe that she was

6           receiving adequate medical care.  She didn't

7           see specialists, like eye doctors.  They

8           didn't take her to see eye doctors, foot

9           doctors, dentists.  That -- at all, even

10          though she had requested, and she said, "All

11          they tell me is I'm on the list.  I'm not the

12          list."

13   Q      The list, is that for physicians who visited

14          the facility and the residents?

15   A      I don't know what the list is.

16   Q      Did you know at the time were there any

17          discussions as to actually what doctors she

18          was seeing or not seeing?

19   A      Like I said, I wasn't privileged.

20   Q      As far as the food goes, was it a matter of

21          she didn't like the taste of it or that she

22          thought it wasn't healthy food, or what was

23          the complaint about the food?

24   A      She basically didn't like it, and I happened

25          to see a meal be served to a patient, and I

# Affidavit

In the Matter of:

County:                                          FileNumber:   **05-10849-RGS**

Caption:     **Helen A. Runge,**
**v.**
**Walter J. Kelly, et al.**

THIS is to certify that          **Dorothy Stanley - Day 2**                    , at his/her deposition taken on    **Wednesday, November 15, 2006**   reserved the right to read over a sign the transcript of his/her deposition;

THAT the deponent was provided with a copy of said transcript, along with an errata sheet on which to record any corrections desired;

THAT the deponent was given at least 30 days to return said errata sheet to me for filing with the transcript;

THAT after the designated time, I had no response from the deponent and, therefore, am filing this transcript with proper authorities in absence of any signature.

Signature of Court Reporter
**Mai-Beth Ketch**

**Wednesday, January 31, 2007**
Date