UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

     *Plaintiff,*

*v.*

WALTER J. KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

     *Defendants.*

Civil Action No. 05-10849-RGS

---

**MEMORANDUM IN SUPPORT OF
DEFENDANT KELLY'S MOTION IN LIMINE TO EXCLUDE
THE FOLLOWING OUT OF COURT STATEMENTS OF HELEN RUNGE: 1)
DEPOSITION DATED 1/16/04; 2) AFFIDAVIT; 3) INTERROGATORY ANSWERS;
AND 4) WRITTEN STATEMENT AND TESTIMONY BASED ON THE ORAL
STATEMENTS OF HELEN RUNGE**

---

     Helen Runge passed away in February of 2007. The Plaintiff has identified a number of statements of Ms. Runge, including affidavits, and even interrogatory answers, which she intends to offer as evidence at trial. These statements, if offered by the Plaintiff, would not fall within any of the exceptions to the hearsay rule and therefore should be excluded.

**I.      Argument**

     By choosing to bring this action in federal court, the Plaintiff has also chosen to subject her case to federal, rather than Massachusetts, procedural rules. "In diversity cases, the general rule is that state law governs substantive questions, while federal law governs procedural questions." *Donovan v. Sears Roebuck & Co.*, 849 F.Supp. 86, 87 (D.Mass. 1994) *citing Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684, 688-689 (1st Cir. 1994); *Ricciardi v. Children's Hosp. Medical Center*, 811 F.2d 18, 21 (1st Cir. 1987). Rules governing the admissibility of

evidence are rules of procedural rather than substantive policy and therefore the Federal Rules of Evidence control admissibility of evidence in diversity cases. *Id.*

Under Rules 801 and 802 of the Federal Rules of Evidence, the out of court statements of an individual now deceased are inadmissible as hearsay unless the statements fall into one of the exceptions of Rules 803 or 804. *Donovan*, 849 F.Supp. at 87. In *Donovan*, another Judge of this Court granted the defendant's motion *in limine* to exclude the out-of-court statements of the plaintiff, who had died before trial. Judge Lindsay noted that Massachusetts General Laws Chapter 233, §65, which creates an exception to the hearsay rule for statements of individuals now deceased, is a rule of admissibility and therefore is procedural rather than substantive.

> Unlike the Dead Person's Statutes under consideration in *Lovejoy* and by the Rule's drafters, M.G.L. c. 233, § 65, however, is not related to any substantive policy to prevent fraudulent claims against estates or business entities (and the plaintiff does not suggest that it was). As a rule of admissibility, as opposed to a rule of competency, the Massachusetts statute does not implicate the policy issues which concerned the drafters of Rule 601.

*Donovan*, 849 F.Supp. at 88.

Given that the Federal Rules of Evidence will control the admissibility of the statements of Helen Runge, those statements are inadmissible unless the Plaintiff could lay the foundation for their admissibility under Rules 803 or 804. No such exceptions exist for any of the statements of Helen Runge listed on Plaintiff's list of proposed exhibits.[1]

## II.    Statements at Issue

The following out-of-court statements were identified in Plaintiff's list of proposed exhibits and contain inadmissible statements by Helen Runge. **Exhibit A**.

---

[1] Although the Plaintiff would be precluded from offering the out-of-court statements of Helen Runge, if any of the Defendants offer those same statements, the statements would be excluded from the hearsay rule under Rule 801(d)(2)(D) as a statement by a party-opponent.

A.    **January 16, 2004 Deposition**

Plaintiff's counsel lists a statement of Helen Runge taken by a stenographer on January 16, 2004 in Columbus, North Carolina.  This statement was taken 15 months prior to the commencement of this action.  The only attorney present was Plaintiff's counsel.  There is no indication in the transcript that anyone else was notified that the deposition would be taken or given the opportunity to cross examine Ms. Runge.

Unlike the deposition taken in November of 2006 as part of this matter, the January 2004 statement purportedly taken as part of *In re Guardianship of Helen Runge*, does not fall within 804(b)(1)'s exception to the hearsay rule.[2]  In order for former testimony to be admissible under 804(b)(1), that testimony must be given in a proceedings in which "the party against whom the testimony is now offered, or . . . a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."  None of the Defendants were aware of this deposition until the transcript was produced in discovery.  The Plaintiff has never produced any evidence that the Defendants, or anyone, were notified prior to this deposition being taken.

In addition to being inadmissible as hearsay, the transcript of the January 16, 2004 deposition suggests that Helen Runge's mental state had already deteriorated to a point where she was unable to testify on her own behalf.  The opening dialogue of the deposition is telling:

Q:  And today is January 16th, year 2004?

A:  Yes.

Q:  And we're sitting here at the home of your daughter Dorothy and Gilbert Stanley?

---

[2] The January 16, 2002 deposition also failed to meet any of the requirements of Rule 27 of the Federal Rules of Civil Procedure.  Apparently the Plaintiff did not seek leave of the Court for this deposition and the Plaintiff did not provide the required notice to the expected adverse parties.

3

A:  Yes.

Q:  In North Carolina?

A:  Yes.

Q:  And my name, as you know, is Glenn Davis?

A:  Glenn Davis.

**Exhibit B** – *January 2004 Deposition Transcript* (00592-00672), page 4, lines 4 – 12.  It is readily apparent from this exchange that Ms. Runge was already at a point where she needed to have even the simplest answers feed to her.  While Helen Runge was able to remember some details of her life in later questions, such as details of her earlier life and housing, the questioning by her attorney was consistently leading.

### B.    Affidavit

The Plaintiff identifies an affidavit purportedly dictated by Helen Runge in July of 2003.

**Exhibit C** – *Affidavit of Helen Ann Runge* (00583-00585).  The Affidavit was prepared for purposes of the dispute between the Stanleys and Walter Kelly over Kelly's appointment as guardian by the Probate Court for Norfolk County.  This document does not fall within any of the exceptions of 803 or 804.  Given that the document was prepared for purposes of litigation, it even fails 807's residual exception because it lacks the guaranties of trustworthiness equivalent to those provided for in 803 or 804.

### C.    Interrogatory Answers

The Plaintiff includes Plaintiff's answers to defendants' interrogatories on her list of proposed exhibits.  While interrogatory answers of opposing parties are certainly admissible against that party, the Plaintiff cannot place her own answers to interrogatories into evidence.

4

Under Rule 33(c) of the Federal Rules of Civil Procedure, answers to interrogatories are only admissible "to the extent allowed by the Federal Rules of Evidence." Nothing in the Rules of Evidence permits a party to place their own answers to interrogatories into evidence.

### D.    Written Statement by Helen Runge

A type written document prepared after Helen Runge's removal to North Carolina, titled "Statement of Helen Runge" and dated May 12, 2003, purports to express Runge's dissatisfaction with SunBridge and with Walter Kelly. **Exhibit D –** *May 12, 2003 Statement of Helen Runge* (00587).

### E.    Testimony based on the oral statements of Helen Runge.

The Plaintiff and her witnesses should not be permitted to testify to oral statements purportedly made by Helen Runge. As discussed in the *Motion In Limine by All Defendants to preclude Dorothy and Gilbert Stanley from Testifying Regarding Events Prior to April 29, 2003*, much of the Plaintiff's key witnesses' testimony is expected to be based on the hearsay statements of Helen Runge. Since there is no basis for excluding these statements from the hearsay rule, such testimony should be precluded.

## III.    Conclusion

This Court should preclude the Plaintiff from offering the out-of-court statements of Helen Runge into evidence as inadmissible under Rule 801 and 802 of the Federal Rules of Evidence.

122078.1

Respectfully submitted,

The Defendant, Walter J. Kelly,

By his attorneys,


_s/ Michele Carlucci_
George C. Rockas, BBO #544009
Michele Carlucci, BBO #655211
WILSON ELSER LLP
260 Franklin Street
Boston, MA 02110
(617) 422-5300


## CERTIFICATE OF SERVICE

I, Michele Carlucci, certify that on June 13, 2008, I have served a copy of the foregoing by electronic filing.

_/s/ Michele Carlucci_
Michele Carlucci

6

122078.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, AS EXECUTRIX OF : 
THE ESTATE OF HELEN A. RUNGE, :
        Plaintiff :
         :
         :      No. 05-10849-RGS
      v. :      (Judge Stearns)
         :
WALTER J. KELLY, et al., :      CIVIL ACTION
        Defendants :      JURY TRIAL DEMANDED

## EXHIBIT LIST

1.     Letter of Helen Runge to "To Whom It May Concern," April 30, 2003

2.     Letter of Helen Runge to Sunbridge, May 12, 2003

3.     Notes of Walter Kelly, 3 pages (Kelly Dep. Exh. 25)

4.     Resident fund material (3466 - 3470)

5.     Sunbridge Healthcare Mission/Core Values Policy, August 2002 (4320)

6.     Sunbridge Healthcare Standards in the Department of Nursing Policy, June 2002 (4414)

7.     Sunbridge Healthcare Health and Medical Condition, Informing Residents of, Policy, June 2002 (4475)

8.     Sunbridge Healthcare Psychoactive Medications Policy, June 2002 (4490)

9.     Sunbridge Healthcare Refusal of Treatment Policy, June 2002 (4491)

10.    Deposition of Sandra M. Porazzo-Perry, March 28, 2007

11.    Letter of Helen Runge to Walter J. Kelly, August 1, 2000 (Kelly Dep. Exh. 5)

12.    Letter of Helen Runge to Walter J. Kelly, October 10, 2000 (Kelly Dep. Exh. 7)

124226

13.   Letter of Helen Runge to "To Whom It May Concern," November 8, 2001 (Kelly Dep. Exh. 8)

14.   Letter of Walter J. Kelly to Helen Runge, November 27, 2001 (Kelly Dep. Exh. 9)

15.   Massachusetts Health Care Proxy of Helen Runge, May 10, 2002 (Kelly Dep. Exh. 3)

16.   Note of Helen Runge, January 17, 2003 (Kelly Dep. Exh. 12)

17.   Sunbridge Healthcare Medical Record Release, January 22, 2003 (Kelly Dep. Exh. 13)

18.   Fax of Walter J. Kelly to Bay View Village, January 24, 2003 (Kelly Dep. Exh. 14)

19.   Sunbridge Healthcare Antipsychotic Medication - Informed Consent, January 30, 2003 (Kelly Dep. Exh. 26)

20.   Note of Walter Kelly, February 11, 2003 (Kelly Dep. Exh. 27)

21.   Fax of Walter Kelly to Sunbridge Healthcare, February 27, 2003 (Kelly Dep. Exh. 29)

22.   Fax of Sunbridge Healthcare to Walter Kelly, March 24, 2003 (Kelly Dep. Exh. 30)

23.   Letter of Helen Runge to Walter Kelly, March 12, 2003 (Kelly Dep. Exh. 10)

24.   Letter of Helen Runge to Dorothy Stanley, March 2003 (Kelly Dep. Exh. 11)

25.   Letter of Thomas F. Schiavoni to Kerry Bloomingdale, M.D., April 25, 2003 (Kelly Dep. Exh. 15)

26.   Medical Certificate - Guardianship, April 29, 2003 (Kelly Dep. Exh. 16)

27.   Authorization for Use and Release of Information to Sunbridge Healthcare, April 29, 2002 (WK0491 - 0493)

28.   Sunbridge fax to Walter Kelly, April 29, 2003 (WK0501 - 0520)

29.    Randolph Police Report

30.    Memoranda of Walter J. Kelly, April 30, 2003; May 2, 2003 (Kelly Dep. Exh. 32)

31.    Motion for Appointment of Temporary Guardian, May 1, 2003 (Kelly Dep. Exh. 17)

32.    Letter of Thomas Schiavoni to Patrolman Brent Jackson, May 5, 2003 (WK0044 - 0053)

33.    Letter of Robert M. Palmer, M.D., to Dorothy Stanley, May 12, 2003 (Kelly Dep. Exh. 19)

34.    Note of B. Rhett Myers, M.D., May 30, 2003 (Kelly Dep. Exh. 20)

35.    Letter of Robert M. Palmer, M.D., to Dorothy Stanley, July 25, 2003 (Kelly Dep. Exh. 22)

36.    Letter of Phillip R. Feagan to Michael J. McCann and Thomas Schiavoni, June 2, 2003 (Kelly Dep. Exh. 23)

37.    Letter of Thomas Schiavoni to Lawrence Hale, July 21, 2003 (Kelly Dep. Exh. 21)

38.    Members Plus Credit Union Check, May 20, 2003

39.    Sunbridge Healthcare invoice, May 2, 2003, and check (Kelly Dep. Exh. 34)

40.    Members Plus Credit Union check, August 7, 2003

41.    Walter J. Kelly check, June 4, 2003 (Kelly Dep. Exh. 37)

42.    Invoices of Walter J. Kelly dated June 3, 2003; August 8, 2003 (Kelly Dep. Exh. 36)

43.    Schiavoni invoices and check copies (Schiavoni Dep. Exh. 4 and 5)

44.    Deposition of Farrah Seidler, May 8, 2007

45.    Deposition of Linda Johnson, October 16, 2006

46.    Affidavit of Helen A. Runge, July 27, 2003

47.    Transcription of Videotaped Statement and Videotaped Statement of
       Helen A. Runge, January 16, 2004

48.    Helen Runge's Answer to Kelly's Interrogatories, October 12, 2006, and
       Answer to Bloomingdale's Interrogatories, October 12, 2006

49.    Affidavit of Walter J. Kelly in Support of Motion for Award of Costs in
       guardianship proceeding

50.    July 13, 2006, Chapter 93A demand letter

51.    August 10, 2006, response to Chapter 93A demand letter

52.    Helen Runge's medical records from Sunbridge

53.    Photographs of Helen Runge

54.    Massachusetts Resident Admission Agreement

55.    Patient's Bill of Rights

56.    Sunbridge trust fund disbursements of Helen Runge, August 2002

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

NORFOLK DIVISION
PROBATE AND FAMILY
COURT DEPARTMENT
DOCKET NO. 03 P1104-G1

IN RE:   GUARDIANSHIP OF
         HELEN RUNGE

)
)
)
)

APPEARANCE:

LATSHA, DAVIS, YOHE & McKENNA, P.C.
BY GLENN R. DAVIS, ESQ.
Executive Park West II, Suite 101
4720 Old Gettysburg Road
Mechanicsburg, PA  17055
Appearing on Behalf of the Deponent

ATTENDING:  GILBERT STANLEY, DOROTHY STANLEY and
            RANDY SHELTON, Videographer

-------------------------

## VIDEOTAPE DEPOSITION

OF

## HELEN RUNGE

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



0 0 5 9 2

2

1                          DEPOSITION OF

2                          <u>HELEN RUNGE</u>

3                          <u>I N D E X</u>

4

5                                       <u>Page</u>

6   Examination by Mr. Davis             3

7

8

9

10

11

12   <u>Exhibits:</u>

13    1 - Durable Power of Attorney        11

14    2 - Durable Power of Attorney        13

15    3 - Application                        16

16    4 - Durable Power of Attorney        25

17    5 - Health Care Proxy               29

18    6 - Handwritten Letter             37

19    7 - Handwritten Letter             47

20    8 - Letter                             55

21    9 - Affidavit                         60

22   10 - Handwritten Letter             67

23   11 - Guardianship Petition         79

24

25

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



00593

3

1       PURSUANT TO AGREEMENT, I, Carol J. Patwin, a

2  Notary Public as required in Rules 26 and 30 of the

3  North Carolina Rules of Civil Procedure, proceeded to take

4  the testimony upon oral examination of the witness HELEN

5  RUNGE at 5 Stirrup Downs, in the City of Columbus, County of

6  Polk, State of North Carolina, on Friday, January 16, 2004,

7  commencing at 11:00 o'clock A.M., said deposition being

8  taken by GLENN R. DAVIS, attorney for the deponent herein.

9            (Whereupon, Exhibit Nos. 1-10 were marked for

10                identification by the court reporter prior to the

11                commencement of the deposition.)

12                    HELEN RUNGE,

13  having been first duly sworn, was examined and testified as

14  follows:

15                    EXAMINATION

16  BY MR. DAVIS:

17       Q    Good morning, Mrs. Runge, how are you this

18  morning?

19       A    Oh, I am very fine, thank you.  Nice to meet

20  you all.

21       Q    Since now today when we speak from time to

22  time I'll reference the fact that we're talking on the

23  record and what that means is we're talking and the court

24  reporter that just swore you in is making a record of

25  everything you said and we also have a videographer here

## HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



00594

4

1   that's also making a record of you and I talking together;

2   do you understand that?

3           A    Yes.

4           Q    And today is January 16th, year 2004?

5           A    Yes.

6           Q    And we're sitting here at the home of your

7   daughter Dorothy and Gilbert Stanley?

8           A    Yes.

9           Q    In North Carolina?

10          A    Yes.

11          Q    And my name, as you know, is Glenn Davis?

12          A    Glenn Davis.

13          Q    And your name is what?

14          A    Helen A. Runge, R-u-n-g-e.

15          Q    Helen, when were you born?

16          A    When?

17          Q    Yeah.

18          A    I was born August the 3rd in 1915.

19          Q    So you're almost 89 years old?

20          A    Yes, I will be 89 this year.

21          Q    This year?

22          A    Yes.

23          Q    And it's about eleven o'clock or so and let

24   me just ask you a couple questions?

25          A    Yes.

**HENDERSONVILLE COURT REPORTING SERVICE**

*Hendersonville, North Carolina*


0 0 5 9 5

5

1      Q    Prior to us sitting down and talking today,
2  this morning did you ingest any drugs or did you take any
3  alcohol that would affect your ability to listen to and
4  comprehend the questions I'm asking you?
5      A    No, I haven't.
6      Q    Are you on a lot of medications?
7      A    I take mine at night, my medication, like
8  vitamins and I have a Tylenol, an iron pill, something like
9  that, but no drugs.
10     Q    Now, as we talk back and forth today, if
11 there's a question, if I ask you something that you don't
12 understand, you just say, "Mr. Davis, could you help me out
13 with that, could you re-ask that question so I can
14 understand it?"
15     A    Yes.
16     Q    And you know that we're here in the living
17 room of Dorothy and Gilbert's house so, if you want to take
18 a break and you want to have a cup of tea or go to the
19 bathroom, you just say, "Can we take a break," and we can do
20 that?
21     A    Yes.
22     Q    Do you understand that?
23     A    Yes, thank you.
24     Q    Now, we're here today to take your statement
25 with regard to some things that happened over the last year



6

1   or so; do you understand that?

2       A    Yes.

3       Q    So what I'd like to do is I'd like to kind of

4   go back in time a little and ask you a little bit about your

5   life?

6       A    Okay.

7       Q    Now, do you recall, where were you born?

8       A    Where?

9       Q    Yeah.

10      A    In South Boston.

11      Q    South Boston, Massachusetts?

12      A    Massachusetts.

13      Q    And you spent most of your life in

14  Massachusetts?

15      A    Yes.

16      Q    You moved here last April of 2003?

17      A    Yes, it was just recently.  It wasn't like

18  years ago.

19      Q    And you've lived here now in North Carolina

20  with Dorothy and Gilbert since May of 2003?

21      A    That's right.

22      Q    Now, as you were growing up in Boston, did

23  you work once you became an adult?

24      A    Yes, I did.

25      Q    Who did you work for?



7

1    A    Well, when, the last one?

2    Q    Yes.

3    A    The last one was the Boston Edison Company, I

4    worked for them.

5    Q    What did you do with the Boston Edison

6    Company?

7    A    I did clerical work doing calculating.  What

8    do you call it, did watts, you had to have, I had to do all

9    kinds of figuring for the bill because those watts went into

10   thousands, not just a few like a house but in a big business

11   like IBM or anything like that, they're all big business and

12   I would calculate that and then it went to somebody to check

13   it and then it went in to get a bill.

14   Q    How long did you work for the electric

15   company?

16   A    About thirty years.

17        (Off-the-record discussion.)

18   Q    Mrs. Runge, we were chatting just before our

19   short break, we were chatting about what you did at Edison?

20   A    It was the calculating for bill, you had to

21   calculate the watts.

22   Q    And I think you had said that you're retired

23   from there?

24   A    Yes, I retired from there.

25   Q    Do you recall what year that was you retired?

## HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



8

1     A     Well, it was, I think, in 1932, '42.  I get

2   mixed up because I was so glad to get out.

3     Q     When you retired, it was sometime in the

4   eighties, wasn't it?

5     A     Yeah, that was it because I remember they

6   had, we went and had lobster.

7     Q     Now, after you've retired from the electric

8   company, have you worked at a job since then?

9     A     No.

10     Q     As a result of all those years, those thirty

11   years of working with the electric company, do you get a

12   monthly retirement from them?

13     A     Yes, I do get a retirement amount.  Do you

14   want me to give you the amount?

15     Q     Well, if you know it?

16     A     Yes, three hundred forty dollars and fourteen

17   cents.

18     Q     How about, do you also get a check from

19   Social Security every month?

20     A     Yes, I do get a check every month from Social

21   Security.  It goes directly to the bank.

22     Q     In an account in your name?

23     A     Yes.

24     Q     And you take care of your finances?

25     A     Well, Mr. Gilbert, Stanley and Dorothy are



9

1    taking care of my finances now.

2              Q    Do you know about how much you get from

3    Social Security?

4              A    I know it's a little over a thousand dollars,

5    yeah.

6              Q    Now, let's go back, at about the time you

7    retired, where did you live in Boston?

8              A    I lived in Hyde Park.

9              Q    And you lived in an apartment?

10             A    Yes, I lived in an apartment.

11             Q    And that was on Sierra Road?

12             A    75 Sierra Road, Hyde Park.

13             Q    And you lived there for, what, about thirty

14   years or so?

15             A    Well, I don't know exactly.  Time just

16   marched on but it was quite a few years I was there.  I felt

17   right at home there.

18             Q    When you say you felt at home, you went to

19   church in that area?

20             A    Yes.

21             Q    And you had friends in that area?

22             A    Yes.

23             Q    And you had social affairs?

24             A    Yes.

25             Q    And, at the time, Dorothy is your only child?

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*


00 0600

10

```
1        A    Yes.

2        Q    And Dorothy is married to Gilbert, you've

3   referenced him?

4        A    Yes.

5        Q    And they have two children?

6        A    Yes.

7        Q    Do you recall their children's names, they

8   would be your grandchildren?

9        A    Bryan and Lynn.

10        Q    And Lynn?

11        A    Yes.

12        Q    And they've lived all over the country with

13   Gilbert's work?

14        A    Yes.

15        Q    They've lived in Texas?

16        A    Yes.

17        Q    They've lived in State College, Pennsylvania?

18        A    Yes.  I visited there, yes.

19        Q    But they've never really lived in the Boston

20   area?

21        A    No.

22        Q    Now, let me go back to, like, the mid to late

23   1980's, okay?

24        A    1980's.

25        Q    In the 1980's, did you have an Attorney Kerr
```

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



11

1    that worked for you?

2        A    Yes.

3        Q    What did Attorney Kerr do for you, do you

4    recall, what type of legal services did he do for you?

5        A    Well, he helped me make out a will and, if I

6    had a problem, he helped me and he was very kind and I

7    appreciated his kindness, he was very honest but he retired.

8        Q    And you did things for many years with

9    Attorney Kerr?

10       A    Yes.

11       Q    Let me show you a document which we've had

12   the reporter mark as Exhibit 1 and you're going to see these

13   little blue things down at the bottom and it says, "Exhibit 1,"

14   and it has your name on it?

15           (Document shown to the witness.)

16       A    Yes.

17       Q    It's a two page document and it's entitled at

18   the top, "Durable Power of Attorney?"

19       A    Power of Attorney, yes.

20       Q    And it references your name and living at

21   75 Sierra Road in Hyde Park District of the City of Boston,

22   do you see that?

23       A    Yes.

24       Q    If we could just go to the second page, it

25   has a signature on it and it's imprinted Helen A. Runge and

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



12

 1    then it's signed.  Is that your signature?

 2              A    Yes.

 3              Q    Again, it appears to be dated on the 25th of

 4    August?

 5              A    August, 1989.

 6              Q    1989?

 7              A    Yes.

 8              Q    And it has a gentleman's name --

 9              A    Peter Kerr.

10              Q    -- Peter Kerr on it?

11              A    Yes.

12              Q    And that was your attorney at the time?

13              A    Yes, very nice.

14              Q    And this document's of a Power of Attorney

15    and it's appointing someone as your power of attorney and

16    her name is Deborah Gaughan?

17              A    Gaughan, yes.

18              Q    How do you spell her last name?

19              A    G-a-u-g-h-a-n.

20              Q    And who was Deborah Gaughan?

21              A    She was a very dear friend of mine.  She

22    lived in Milton and I'm in Hyde Park and she helped me and

23    visited me and we got along beautifully.

24              Q    Over the years --

25              A    Yes.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*


0 0 6 0 3

1        Q      -- you and Deborah have been friends for

2    quite sometime, haven't you?

3        A      Oh, yes.

4        Q      And Attorney Kerr helped you draft a will and

5    helped you make a Power of Attorney that she could do things

6    for you if she needed to?

7        A      Yes.  Every time you asked him a question or

8    called, he was very helpful, very kind.

9        Q      Now, did Deborah ever have to sign anything

10    for you?

11        A      I think there was a time when she was

12    supposed to be power of attorney, yeah.

13        Q      But was there ever a time where you weren't

14    able to write your own checks or take care of all your --

15        A      I always did that, yeah.

16        Q      And Deborah never had to do that for you?

17        A      No.  I always made my own.  I had no problems

18    in that.  I was a well woman.  I thank God for that.

19        Q      Let me show you another document so I'm going

20    to take this away from you?

21        A      Okay.

22        Q      And I'm going to show you another document.

23    Now, this document you'll see is marked Exhibit 2 on the

24    bottom?

25                (Document shown to the witness.)

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



14

1          A    Yes.

2          Q    And it almost appears to be the same

3   document.  Again, it's called a, "Durable Power of

4   Attorney."

5          A    "Power of Attorney."

6          Q    This time it's four pages long, okay, there's

7   four pages but, again, it has the name at the top, "I,

8   Helen A. Runge," and, again, it shows 75 --

9          A    Sierra Road.

10         Q    -- Sierra Road and Hyde Park, Massachusetts?

11         A    Yes.

12         Q    Is that correct?

13         A    Yes.

14         Q    Now, if we could go back to the last page,

15  it's signed again and there's a signature that appears to

16  say Helen A. Runge?

17         A    Yes.

18         Q    Is that your signature?

19         A    Yes.

20         Q    And this document is dated March 5, 19- --

21         A    '98.

22         Q    -- -98, so that's about nine years or so

23  after this first document I showed you; is that correct?

24         A    Yes.

25         Q    And I understand that this document, again,

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



15

1  is a Power of Attorney that was again appointing Deborah
2  Gaughan as your representative?

3          A    Yes.

4          Q    If you needed her to do something for you; is
5  that correct?

6          A    Yes.

7          Q    And this document again was drafted for you
8  by Attorney Kerr, wasn't it?

9          A    Yes.

10         Q    Now, if we could just go back to the back
11 page, I notice that Attorney Kerr didn't witness this one?

12         A    No.

13         Q    This was witnessed by a gentleman by the name
14 of Walter J. Kelly?

15         A    Yes.

16         Q    And I understand that Mr. Kelly is an
17 attorney; is that correct?

18         A    Yes.

19         Q    Now, in 1998, was Mr. Kelly working for you,
20 was he your attorney?

21         A    Well, I can't remember exactly if that was
22 1998.  Dates, I do get confused.

23         Q    But, in 1998, Attorney Kerr had drafted this
24 for you?

25         A    Well, that was an attorney but I don't know



16

1    where Mr. Kelly came in.

2            Q    Mr. Kelly shared office space with Attorney

3    Kerr?

4            A    They were in the same, well, not in the same

5    room but he had a different room but it was the same floor.

6    It was a big office.

7            Q    You had paid Attorney Kerr to draft this

8    Power for you back in '98?

9            A    Yes, '98.

10           Q    Now, I know change in dates sometimes and

11   time frames is a little difficult so I want you to think

12   about where we're going now because I'm going to give you a

13   new day, okay?

14           A    Okay.

15           Q    A new date, and I'm putting in front of you a

16   document that we've marked as Exhibit 3, okay?

17                (Document shown to the witness.)

18           A    Yes.

19           Q    And it's a one, two, three, four page

20   document and we'll have a chance to look at it and it's

21   entitled Marian Manor, okay?

22           A    Yes.

23           Q    So let's think about Marian Manor for a

24   second?

25           A    Yes.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



17

1      Q    What is Marian Manor?

2      A    It's a Catholic nursing home.  The nuns run

3 it.

4      Q    It's run by the Carmelite Sisters?

5      A    I don't know if they're Carmelite or not but

6 I think they are but I never asked which branch they were in

7 but I was very friendly with them.

8      Q    And this document we're looking at appears to

9 be an application that you were applying to become a

10 resident at Marian Manor?

11      A    Yes.

12      Q    And I just noticed that it's written and I

13 know it's not in your handwriting?

14      A    No.

15      Q    And I look at the back page -- excuse me, I'm

16 looking (pause) --

17      A    They have Deborah Gaughan down here.

18      Q    Yeah.  I'm looking at the document and did

19 you fill this out when you had gone to Marian Manor to visit

20 Marian Manor, do you recall?

21      A    Well, I know the secretary there, the social

22 worker did all the writing.  I didn't do any writing.

23      Q    The social worker was writing this out?

24      A    Yes, asking me questions and writing it down.

25      Q    When you were there, were you there by


00608

18

1    yourself that day?

2          A    Deborah drove me down.

3          Q    And, if I go back to the third page of this

4    document, it says, "Referred by," and that means referred to

5    Marian Manor and it has Deborah Gaughan's name there?

6          A    Yes.

7          Q    So she helped you find --

8          A    Yes, she drove me down and sat with me and

9    drove me back home.

10         Q    Now, this is dated July 24th, 2001 so now the

11   time frame we're talking about is in the year 2001.  That's

12   about three years ago, a little over three years ago?

13         A    Yes.

14         Q    So I'm looking at this document and it looks

15   like you were applying to Marian Manor to possibly go live

16   there; is that correct?

17         A    Yes.

18         Q    I'll just pull it away from you a second and

19   I'll give it right back to you?

20         A    That's all right.

21         Q    Now, in the application, it asks for why

22   you're considering moving into Marian Manor and at that time

23   you said, and I can read it here, it says, "Can't live

24   alone, need help with shopping, need a companionship, can't

25   walk up 60 stairs."  Where you were living in your

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



19

```
 1   apartment --
 2          A     There was 65 when you did laundry.
 3          Q     When you did laundry?
 4          A     65.
 5          Q     You were on the third floor --
 6          A     Yes.
 7          Q     -- of the apartment building and it was a
 8   walk-up, there was no elevator, was there?
 9          A     Yes.
10          Q     So you were looking to live somewhere where
11   you didn't have to walk up stairs?
12          A     Yes.
13          Q     And you wanted people around you that were
14   your age?
15          A     Yes.  I had tried previously to get into the
16   senior apartments but they were fixing them up and I
17   couldn't wait and I had made my application so I waited
18   awhile but I had to get out because I already paid for
19   apartment for a month and I didn't move so I had to move to
20   Marian Manor.
21          Q     Again, I'm still looking here at the
22   application that you filled out?
23          A     Yes.
24          Q     And, again, it says that you were referred to
25   Marian Manor by your friend Deborah Gaughan?
```



20

1       A    Yes.

2       Q    Now, I'm going back to the first page of this

3   again, okay?

4       A    Okay.

5       Q    And it has some of your history.  It has some

6   of your history and it says that you lived at that Hyde Park

7   address for about thirty years.  So, back when you filled

8   out this application, you were telling Marian Manor that you

9   had lived in that apartment for about thirty years, do you

10  recall that?

11      A    I don't recall how many years.  I can't tell

12  you, I don't recall it but I don't think it was that -- I

13  don't remember.

14      Q    And it says you were affiliated with the

15  Saint Peter's Lithuanian Church of South Boston?

16      A    Well, when I was growing up, that was my

17  church, that was in South Boston.

18      Q    So your parents were Lithuanian?

19      A    Yes.

20      Q    Had they moved over from Lithuania?

21      A    Yes.

22      Q    Growing up, did you speak English in the

23  household or did you speak Lithuanian?

24      A    Yes, I went to school and studied it.

25      Q    Lithuanian?

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



21

1    A    Yes.

2    Q    Can you still speak Lithuanian?

3    A    Yes, I can.

4    Q    Why don't you say something in Lithuanian for

5 me?

6    A    (Unintelligible to court reporter.)

7    Q    And, not speaking Lithuanian, what does that

8 mean?

9    A    How are you.

10    Q    If I wanted to respond to you, what would I

11 have to say back?

12    A    (Unintelligible to court reporter.)  That

13 means very good.

14    Q    And you still have a chance to speak

15 Lithuanian from time to time?

16    A    No.  Well, I'm not supposed to go -- I could

17 tell you more but I don't know if I have --

18    Q    Do you have a chance to speak some other

19 languages?  Do you like to speak languages?

20    A    Yes.  I like Spanish and my father used to

21 speak German so I like languages.

22    Q    So you speak Spanish?

23    A    Well, I do.  I forgot a lot because I had

24 nobody to talk to with Spanish.

25    Q    I think you related to me earlier a story

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



1    about you were learning to speak Chinese from a friend also?

2        A    Yes, my friend was teaching me Chinese but we

3    were separated and time marched on.

4        Q    Now, let's go back again back in July of

5    2001, back in July of 2001, just pull another copy of it so

6    I can look at it, down on the bottom in this first page you

7    said that in 2001 you had a Power of Attorney and the power

8    of attorney's name was who?

9        A    Deborah.

10       Q    Deborah?

11       A    Yes.

12       Q    So Deborah continued to be your power of

13   attorney --

14       A    Yes.

15       Q    -- when you went to live at Marian Manor?

16       A    Yes.

17       Q    Did you ultimately move into Marian Manor?

18       A    I applied, I think it was, in July.    In

19   August, I was trying how to do with the furniture and

20   everything but I know I was paying rent for Marian Manor and

21   I didn't live there so I made up my mind the next month to

22   move so that would be July, August, about September.

23       Q    And, when you were moving into Marian Manor,

24   you went to see an attorney to help you move, didn't you?

25       A    Yes.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



1      Q      And back here on the third page of this

2  document, in the application it asks you who your attorney

3  was at that time and now you don't have Mr. Kerr's name

4  anymore, you have Walter Kelly's name?

5      A      Yes.

6      Q      Why did Walter Kelly become your attorney at

7  that time?

8      A      Well, Mr. Kerr retired.

9      Q      And you had approached Mr. Kelly to help you

10  move into Marian Manor?

11      A      He said he would help me and he would store

12  my furniture -- not furniture, any of my goods, personal

13  belongings in his basement but I found out he lied, he put

14  them in his office cellar.

15      Q      Now, did Mr. Kelly help you find Marian

16  Manor?

17      A      No, he had nothing to do with it.

18      Q      That was Deborah Gaughan?

19      A      Gaughan, yes.

20      Q      Now, I also see, and if I could show you on

21  the same page, it has a couple levels of care that Marian

22  Manor had and, when you were applying to Marian Manor, it

23  appears that you were asking for some type of private living

24  quarters and you said that you didn't need any health care

25  services?



24

1        A      No.

2        Q      Is that what you were looking for at Marian

3    Manor?

4        A      No, I wasn't looking for help but they have

5    their own doctor and nurses that we were well taken care of.

6        Q      Now, you did move into Marian Manor and that

7    was about in September?

8        A      Yes.

9        Q      November of 2000  --

10        A      1.

11        Q      2001?

12        A      Yes.

13        Q      And, when you moved into Marian Manor, did

14    you have a private room all to yourself?

15        A      No.  I had a roommate.

16        Q      So you lived in a room with another, was it

17    another lady?

18        A      Yes.

19        Q      Did you have difficulty at times living with

20    someone?

21        A      Yes, because she had Alzheimer's disease and

22    we were not that compatible.

23        Q      And all those years you lived back in your

24    apartment you had lived by yourself, hadn't you?

25        A      Yes.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



25

1          Q    So that was a little bit of an adjustment,

2    wasn't it?

3          A    It was quite an adjustment, yes.

4          Q    Do you recall how long you lived at Marian

5    Manor?  Was there a time you moved out of Marian Manor?

6          A    Well, I went to Bay View, I moved out but it

7    was a couple years or so.  I don't remember years exactly.

8          Q    Let me show you another document now that we

9    marked as Exhibit 4.  There's a 4 at the top here, okay?

10               (Document shown to the witness.)

11         A    Yes.

12         Q    And, again, it almost looks like that

13   Exhibit 1 and that Exhibit 2 that I showed you and it says

14   it's a Durable Power of Attorney and it has your name on it

15   again, Helen Runge?

16         A    Yes.

17         Q    Now, it has a new address and it says

18   130 Dorchester Street, South Boston.  Do you recall what was

19   at Dorchester Street?

20         A    That's Marian Manor.

21         Q    So that's the address of Marian Manor?

22         A    Marian Manor, yes.

23         Q    So this document I now have in front of you

24   is, again, it's a four page document, okay, do you see it,

25   one, two, three, four and I'm going to the last page?

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



1          A     Yes.

2          Q     And there's a signature there and it looks to

3    be Helen A. Runge.   Is that your signature?

4          A     Yes.

5          Q     And this document is dated, what date is

6    that?

7          A     The 7th day of -- I haven't got my glasses.

8    What is that, can you see it?

9          Q     December.

10         A     December.

11         Q     2001?

12         A     2001, yes.

13         Q     And it appears that this Power of Attorney

14   that you signed isn't appointing Deborah like the others but

15   now it appoints Walter Kelly as your power of attorney?

16         A     That's what he did.

17         Q     Do you recall why you appointed Mr. Kelly

18   your power of attorney?

19         A     I don't know.   I don't remember.

20         Q     Had he suggested that he become your power of

21   attorney?

22         A     He must have, but I don't remember.

23         Q     Were you still friendly with Deborah at that

24   time?

25         A     Yes.   We still are.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



1      Q    And you're still very friendly with her?

2      A    Yeah.  I just showed you a picture.  Love her

3  for years, she is nice.

4      Q    Now, as I understand -- and, again, we're

5  going to change dates a little here, okay?

6      A    Okay.

7      Q    Now, you had moved into Marian Manor in the

8  fall of 2001?

9      A    Yes.

10      Q    And I understand that you moved into a

11  facility called Bay View?

12      A    Yes.

13      Q    Bay View, and you moved into that sometime in

14  the fall of 2002?

15      A    2.

16      Q    2002?

17      A    Yes.

18      Q    So you were at Marian Manor for --

19      A    About a year.

20      Q    -- about a year, a little over a year?

21      A    Yes.

22      Q    And I understand Bay View is a facility that

23  they commonly refer to as an assisted living facility; is

24  that correct?

25      A    I don't know about assisted.  I didn't pay

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



28

1    the rent.

2              Q    It wasn't a nursing home, was it?

3              A    No.  Marian Manor was the first time I went

4    in.

5              Q    When you were at Bay View, when you were at

6    Bay View, did you live with someone in a room?

7              A    No, I had a private room.

8              Q    And you liked that, didn't you?

9              A    I liked that very much.

10             Q    In your private room, you had an opportunity

11   to have some of your own things?

12             A    Yes.

13             Q    Personal possessions?

14             A    Yes.

15             Q    Now, when you were at Marian Manor -- I don't

16   mean to confuse you hopping back and forth and I'll try not

17   to do that -- when you were at Marian Manor, who was paying

18   your bills and paying your financial (pause)  --

19             A    I took care of my own things, yes.

20             Q    Now, when you moved to Bay View, when you

21   went to Bay View, who was paying your bills at Bay View?

22             A    I didn't have any.  It was taken away from

23   me.

24             Q    At Bay View or were you still paying your

25   stuff while you were at Bay View?



29

1          A     I had something but I don't remember exactly

2     how many I did because there was so much going back and

3     forth.

4          Q     Now, let me just show you one more document

5     before I confuse you too much on time frames but this is a

6     document that is marked Exhibit No. 5, you see that, and

7     it's a one, two, three, four, five page document and it's

8     entitled at the top, "Massachusetts Health Care Proxy," do

9     you see that?

10                (Document shown to the witness.)

11         A     Yes.

12         Q     Now, I'll take you back to that last page of

13    it, actually to the next to last page and there's a

14    signature on the next to last page and it appears to say

15    Helen Runge?

16         A     Yes.

17         Q     Is that your signature?

18         A     Yes.

19         Q     And there's a date above it but it doesn't

20    look like your writing but there's a date above it, it says

21    May 10th?

22         A     I didn't write that.

23         Q     It says May 10th, 2002.  So, on May 10th,

24    2002, you were still living at Marian Manor?

25         A     Yeah.



30

1        Q    And it appears that by this document you're

2   appointing Walter J. Kelly as your health care proxy.  Do

3   you recall why you appointed Mr. Kelly your health care

4   proxy?

5        A    No.

6        Q    Do you recall whether that was your idea or

7   whether that was Mr. Kelly's idea or that was someone else's

8   idea to do that?

9        A    It was somebody else's, I don't know.

10       Q    Do you recall Mr. Kelly bringing this to you

11  and showing this to you?

12       A    No.

13       Q    Also just point out here on the first page

14  there's a gentleman that you were also appointing by the

15  name of Michael Rossman?

16       A    I never heard of him, I don't know.

17       Q    Do you know a Mr. Rossman?

18       A    No.

19       Q    Do you know who he is?

20       A    No.

21       Q    I apologize again for jumping back and

22  forth --

23       A    That's all right.

24       Q    -- in time frames?

25       A    That's part of the fun.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



1    Q    Now we're back in the fall of 2002?

2    A    Yes.

3    Q    So you've already lived at Marian Manor for a

4  year and now you've moved to Bay View and you have your own

5  room?

6    A    Yes.

7    Q    Was Bay View located close to the ocean or

8  water?

9    A    Yes.

10    Q    Did you enjoy that?

11    A    I enjoyed that.

12    Q    How was the food at Bay View?

13    A    Very good.

14    Q    Yeah?  Did you enjoy eating there?

15    A    I enjoyed it there.

16    Q    Did you have a group of people that you ate

17  with?

18    A    Yes.  They were very nice.

19    Q    How did you share meals with them?

20    A    Pardon me?

21    Q    How did you share meals?  Did you sit at the

22  same table with folks in the evening?

23    A    Well, first come first serve, picked your

24  own.

25    Q    How were the desserts there, were they pretty



32

1   good?

2          A    I liked my dessert.  I always had two.

3          Q    Did everyone get two desserts there at Bay

4   View?

5          A    They only got one, I had two.

6          Q    They made special arrangements, hmm?

7          A    Well, they have it in their hand like that,

8   "Which one."  I say, "Both of them."

9          Q    Now, when you were there at Bay View, when

10  you were at Bay View --

11         A    Yes.

12         Q    -- every month you had to pay your rent, so

13  to speak, at Bay View?

14         A    Yes.

15         Q    Do you recall writing checks out and taking

16  care of your own funds there?

17         A    I don't remember writing anything because

18  everything was taken away from me.

19         Q    Now, remember we're at Bay View, we're not at

20  Sunbridge?

21         A    Yeah, but I don't remember.  I can say this,

22  that I don't remember.

23         Q    That's fair enough.

24         A    I don't want to say something wrong.  That

25  would be like lying and I don't remember.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



00623

33

1        Q        Did you have any problems when you were at
2    Bay View that you got upset?   I recall that you told me a
3    story about your drug card or your medicine card?
4        A        Yeah, it was stolen.
5        Q        And it was stolen from your room --
6        A        Yes.
7        Q        -- or out of your purse?
8        A        No, at my room.   I kept everything -- I
9    figured it's my room but it was gone.
10       Q        And did you bring that to the attention of
11   the people that ran the place?
12       A        Yeah.
13       Q        Did they take care of that for you, did they
14   fix that problem?
15       A        No.   They were ordering on it.
16       Q        Ordering, when you say ordering, they were
17   ordering medicines?
18       A        They were ordering medicine.
19       Q        Did that upset you?
20       A        Very much because they had no right to order
21   them because the Edison Company was paying for it.
22       Q        Was there a time in January of 2003 that you
23   got upset again with them ordering stuff on your card?
24       A        Well, all I remember is they were ordering
25   medicine.



34

1      Q    Did you call the police about it?

2      A    Yes.

3      Q    Did you call 911 and report that?

4      A    Yes, I had the police down but they couldn't

5 do anything right then and there.

6      Q    And that night when you called 911, do you

7 recall Mr. Kelly coming to visit you that evening?

8      A    No.  As far as I know or remember, I don't

9 remember him.

10      Q    Did he come to visit you very often?

11      A    No.  He only came -- I don't even remember if

12 I could count on my fingers how many times so few.

13      Q    Did he come to visit you when you were back

14 in Marian Manor?

15      A    I don't remember, maybe he came once and

16 that's it.

17      Q    And then I understand there was a time then

18 when you were at Bay View in January of 2003 that you were

19 taken to Carney Hospital, you were taken to Carney Hospital,

20 do you recall that?

21      A    Yeah.

22      Q    Do you remember why you were taken to Carney

23 Hospital?

24      A    I don't know why Mr. Kelly ordered it.  I

25 don't know why I had to go.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



35

1      Q      That night when you called 911, do you

2  remember Mr. Kelly there and kind of --

3      A      Because I didn't want to go and I was very

4  obstinate but I says, "I'd have to leave everything," and

5  Mr. Kelly went like this (indicating) to say that I'm

6  mental, don't pay any attention to me.

7      Q      And he was making that gesture to the staff?

8      A      Yeah, like a loose screw.

9      Q      And that was there while you were at Marian

10  Manor -- or, excuse me, while you were at Bay View?

11      A      Bay View.

12      Q      Thank you for correcting me.  So then they

13  took you to Carney Hospital that evening?

14      A      Yes.

15      Q      And you stayed there a couple days?

16      A      It was more than a couple days but exactly I

17  can't remember.

18      Q      And then they left you go out of Carney

19  Hospital?

20      A      Yes.

21      Q      They discharged you, I think, is the proper

22  term?

23      A      Yes, they discharged me and then I had to go

24  to (pause) --

25      Q      Now, did they take you back to Bay View when

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



36

1    you left Carney Hospital?

2            A    No.  I went to Sunbridge.

3            Q    Sunbridge?

4            A    Yes.

5            Q    And Sunbridge is a nursing home, I believe

6    it's in, what town is that in?

7            A    Randolph.

8            Q    Randolph, Massachusetts?

9            A    Yes.

10           Q    And had you asked to go to Sunbridge when you

11   left Carney Hospital?

12           A    I never heard of it.  No, I didn't ask.  No,

13   I did not ask because I never heard of that place.

14           Q    How did you get between the hospital and

15   Sunbridge?

16           A    In an ambulance.

17           Q    In an ambulance?

18           A    Yes.

19           Q    So Mr. Kelly didn't take you?

20           A    No.

21           Q    When you got in the ambulance, did you think

22   you were going to Sunbridge or did you think you were going

23   back to Marian Manor?

24           A    He wasn't in the ambulance.

25           Q    I understand that, but, when you got in the

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



37

1    ambulance when you left the hospital, did you know that you

2    were going to Sunbridge?

3          A    No, I didn't know where I was going.

4          Q    What type of place was Sunbridge?

5          A    Well, my opinion, to me it was like a

6    dungeon.

7          Q    Were you happy at Sunbridge?

8          A    No.

9          Q    Were you happy like you were happy at Bay

10   View?

11          A    I was a little happier till they stole and

12   then I lost that.

13          Q    Let me show you then another document, okay?

14          A    Yes.

15          Q    And this is one that we've marked as Exhibit 6,

16   you see the Exhibit 6 here on the top?

17           (Document shown to the witness.)

18          Q    And that appears to be a handwritten

19   document.  Have you seen that document before today, is that

20   familiar to you?

21          A    This says No. 6.

22          Q    Yeah, and there's a date on the top, it

23   says --

24          A    March 12th.

25          Q    -- March 12th of 2003?



38

1        A    3, yes.

2        Q    Does that appear to be your handwriting, is

3  that your handwriting, Mrs. Runge?

4        A    It must be.

5        Q    Why don't we take a look at that document?

6        A    It doesn't look too much like it but what it

7  says it's mine.  Yeah, that must be mine because nobody else

8  would know that.  (Indicating.)

9        Q    Why don't we just look at it together?  It

10  says, "Dear Mr. Kelly?"

11        A    Yeah.

12        Q    You see that?

13        A    "Dear Mr. Kelly."

14        Q    It says, "Dear Mr. Kelly, it was nice to see

15  you again.  Next time bring something of mine as I do miss a

16  lot?"

17        A    Yeah.

18        Q    "Even a newspaper is something?"

19        A    Yes.

20        Q    So Mr. Kelly had obviously visited you?

21        A    No, that's why I was looking for something.

22        Q    Do you have some glasses you want me to go

23  get?

24        A    I can see it.

25        Q    You can read it okay by yourself?



39

```
 1          A     Yeah.

 2          Q     So you're referencing on March 12th to Mr.

 3   Kelly that it was nice to have seen him?

 4          A     Yes.

 5          Q     So you must have seen him recently then,

 6   right?

 7          A     Yes, it must have been.

 8          Q     And were you asking him in that first

 9   paragraph of your letter that you wanted him to bring you

10   something?

11          A     A newspaper.

12          Q     You didn't even have a newspaper?

13          A     No, nothing.

14          Q     Then you go on to say, "There is a nursing

15   home in Hyde Park I am curious about by the location, not

16   the one on Truman Parkway, as I have seen that one.  The

17   other is by the near the library."  So you were asking him

18   about a nursing home?

19          A     Yes, he always didn't recommend them.

20          Q     So you were suggesting that you get --

21          A     I wanted out.

22          Q     You wanted out of Sunbridge?

23          A     Yeah.

24          Q     You were at Sunbridge at this time, correct?

25          A     Yes.
```

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



40

1        Q    And you wanted out?

2        A    I wanted out.

3        Q    Then you go on to say, "I do miss my phone

4   and telephone books all latest.  I miss my purses with -- "

5        A    Cash.

6        Q    " -- cash in them."  So did you have any

7   money at all when you were here at Sunbridge?

8        A    Nothing.

9        Q    Did you have your checkbooks?

10       A    No.

11       Q    Did you have any of your financial papers?

12       A    No.

13       Q    Did you have your personal effects?

14       A    Nothing, very few.

15       Q    So all that stuff that was with you over at

16  Bay View hadn't come over to Sunbridge?

17       A    No.

18       Q    Did you ask Mr. Kelly to bring it to you?

19       A    He said he'd take care of them and put them

20  in his basement but it wasn't, it was in the office

21  basement.

22       Q    And he didn't make any arrangements to bring --

23       A    I never see him.  He wasn't interested.

24       Q    Your letter goes on to say, "I need cash when

25  we go to Wal-Mart trip.  I do not even have a dime."

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



41

1   A    Yeah.

2   Q    So you didn't have any money at all?

3   A    (Shook head in the negative.)

4   Q    Then you say, "Just thinking of this place I

5   cry, I am so unhappy.  Right now I feel better off taking an

6   apartment for the elderly like the Blake Estates?"

7   A    Yes, that's a senior citizens, they help you,

8   they go by your income, the rent, yes.

9   Q    When you said that, "Just thinking of this

10  place I cry, I am so unhappy -- "

11  A    That's right.

12  Q    -- what did you think about Sunbridge, what

13  did you think about that nursing home?

14  A    I haven't got even enough words to tell you.

15  I just didn't like it at all.  To me, it was like a dungeon.

16  Q    When you were at Sunbridge, where did you

17  live?  I mean, did you have your own room there?

18  A    I had a roommate.

19  Q    You had a roommate?

20  A    Yes.

21  Q    So you had one other person in your room?

22  A    Yes, I did.

23  Q    Who was that, do you recall?

24  A    I don't know her name but she was a black

25  woman.  That's all.  We didn't have anything in common.


0 0 6 3 2

42

1          Q    Now, were there different floors at

2   Sunbridge?  Was there a first floor, second floor, third

3   floor?

4          A    Yeah, first floor, second floor and a third

5   floor.

6          Q    Which floor did you live on?

7          A    I lived on the third floor.

8          Q    Now, on the third floor, a lot of times in

9   nursing homes floors have locks on them so you can't get

10  out?

11         A    That's right.

12        Q    Could people get off the third floor?

13        A    You had to get on and get off at the third

14  floor.  People work there, they get on and off and patients,

15  if they know how to go, they go.

16        Q    Did you learn how to get off the third floor?

17        A    I wanted to make sure, I wanted to get

18  around.  I was tired of just sitting there.

19        Q    How did you learn to get off the third floor?

20        A    Well, there was a code to get the elevator

21  and I watched them at different times, what they were

22  pressing and I memorized it so that I know when I got on I

23  know how to go down.

24        Q    And, when you went down, where did you go

25  down to?



43

1    A    I went down to the second floor, the first

2  floor.

3    Q    Why did you go down to the second floor?

4    A    Well, they had a TV there and I had asked

5  somebody to turn it on for me and I'd sit there and I'd

6  watch the TV.

7    Q    Was there a TV up on the third floor?

8    A    Yes, there was one but you never could get

9  near it because there were a lot of patients there.

10    Q    And then you went down to the first floor at

11  times?

12    A    The lunch room was down on the first floor,

13  the papers or the machine to make, the copier was down there

14  and there was another lady down there that helps you.  She

15  was very nice to me.  The door was locked, you couldn't get

16  out.

17    Q    Now, we're still looking at this letter that

18  you wrote to Mr. Kelly back in March of 2003, if I can go

19  over to the second page of it with you, and you're telling

20  him that one of your sweaters was stolen --

21    A    Yes, yeah.

22    Q    -- while you were there and then, after that,

23  you say, "How am I -- "

24    A    "Going to fill out my income tax."

25    Q    "I always went to -- "

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



44

1      A      "HR Block."

2      Q      So you were concerned with how you were going

3  to do your income tax in March because April was coming up,

4  right?

5      A      Yes.

6      Q      And you had always done your taxes?

7      A      Yes.  I didn't make it, I went to HR Block.

8      Q      Did you have any of your legal papers or your

9  papers to do your taxes?

10     A      I wasn't getting anything.

11     Q      You say, "I do not have any of my data for

12  income tax forms?"

13     A      "I cannot even get them to make the income

14  tax form."

15     Q      What did you mean by that?

16     A      I can't go there, I have no papers.  They

17  were taken from me.

18     Q      They were taken, so you didn't --

19     A      I didn't receive them in order to take them

20  but I didn't have anything.

21     Q      Let me just, let's go down to the last

22  paragraph of the letter and all we're trying to do is

23  remember what you were writing about at that time?

24     A      "You've got me into here and please help me

25  out of here."

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



45

1          Q    By that, you were asking Mr. Kelly to get you

2  out of Sunbridge?

3          A    (No verbal response.)

4          Q    You're writing this letter to Mr. Kelly,

5  right?

6          A    Yeah.

7          Q    And he was the attorney?

8          A    Yes.

9          Q    And, in that paragraph, you say, "You got me

10  into here and please help me get out of here?"

11         A    Help me out of here, yeah.

12         Q    So you were asking Mr. Kelly --

13         A    Yes.

14         Q    -- to get you out of Sunbridge?

15         A    Yes.

16         Q    Did he help you get out of Sunbridge?

17         A    I never saw him.

18         Q    Did Mr. Kelly come to see you after you wrote

19  him this letter?

20         A    I only think I saw him once or twice all the

21  time I was there but it was for his own benefit.

22         Q    Let me just hop forward in the letter.  If

23  I'm confusing you  --

24         A    No, you're not confusing me, no, dear.

25         Q    Now, at the bottom of this letter to Mr.


00636

46

1    Kelly, you say, if we can go there, it says, "I am still
2    waiting to see doctors for eyes, ophthalmologist and not
3    just an optometrist; teeth, overdue for cleaning and
4    checkup, bleed gums; feet, have developed bunions, callouses
5    and ingrown nails; skin, bites all over; hair, loss in
6    bunches, haircut, over."  So you were asking Mr. Kelly to
7    help you get some medical care, weren't you?
8             A    Yes.
9             Q    Did he ever help you get that?
10            A    No, no help at all.  He just laughed.
11            Q    Then, at the end of that letter, let's go
12   just to the last page, you say to Mr. Kelly, you say, "Hope
13   to see you soon and my telephone with -- "
14            A    Tone adjustments.
15            Q    " -- tone adjustments placed on the wall?"
16            A    Yes.
17            Q    So, when you say tone adjustments, did you
18   have to have a special phone so you could hear?
19            A    Yes.  The telephone company gave me the
20   special telephone.
21            Q    Did you have trouble hearing at that time?
22            A    Yes.
23            Q    Did you have a hearing aid then?
24            A    No.
25            Q    Did Mr. Kelly know that you were hard of

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



1    hearing?

2            A    Yeah, but he didn't do anything.

3            Q    He didn't help you get a hearing aid?

4            A    No.

5            Q    Do you have a hearing aid now, Mrs. Runge?

6            A    Yes.   Dorothy and Gilbert made sure that I

7    went to an ear doctor and got one and I have one in my ear

8    now.

9            Q    And you can hear me talking pretty well?

10           A    Yes.

11           Q    After you sent this March letter to Mr.

12   Kelly, did he show up or did he give you a call and say,

13   "I'm going to help you with these issues?"

14           A    Nothing.

15           Q    Were you a little discouraged by that?

16           A    Oh, very discouraged.

17           Q    Did you think he was doing what he should be

18   doing?

19           A    I knew he wasn't doing anything.   I was

20   getting very upset.

21           Q    Let me then show you one more document, okay?

22           A    Yes.

23           Q    Now we're up to No. 7, okay?   I'll put

24   another document and, again, it looks like it's a

25   handwritten document?



48

```
 1              (Document shown to the witness.)

 2         A    Yeah.

 3         Q    Is that your handwriting, Mrs. Runge?

 4         A    Yes.

 5         Q    Down at the bottom it's signed, "Love you,

 6  Mother."  So you must have been writing that to Dorothy?

 7         A    Yes.

 8         Q    At the top where you say, "Dearest Dorothy,"

 9  you were obviously writing to Dorothy Stanley, your

10  daughter?

11         A    Yes.

12         Q    I'm not sure, there's not a date on that --

13         A    No, there's no date.

14         Q    -- but we did have a chance to photostat the

15  envelope and the envelope is dated 24 March, 2003?

16         A    Um-hmm.

17         Q    So it seems like you, at least, mailed this

18  letter about a week or so after you wrote to Mr. Kelly.  Do

19  you recall writing a letter to Dorothy?

20         A    No, I don't recall.

21         Q    No?

22         A    No.

23         Q    Well, let's just take a look at the letter

24  then for a moment and, if I read it incorrectly, you correct

25  me, okay?
```

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



49

1      A      Yeah.

2      Q      It says, "Dearest Dorothy," and why don't you

3   read it for me after that?

4      A      "I am sorry for the delay writing to you.  I

5   have moved again now to above address."  That was the

6   Sunbridge.

7      Q      That was Sunbridge?

8      A      Yes.

9      Q      And that was in Randolph, Massachusetts?

10     A      Yes, in Randolph, Mass.

11     Q      Okay.

12     A      "I was taken here without my knowledge and

13  now I am stuck.  I don't know why."

14     Q      What do you mean by that, you were taken

15  there without your knowledge?

16     A      They didn't tell me anything.

17     Q      So Mr. Kelly hadn't told you anything about

18  it?

19     A      Nothing, nothing.

20     Q      What else does your letter say there?

21     A      "Wish you were nearer so you would see the

22  lawyer Mr. Kelly and find out if a decent place can be found

23  in local Boston.  He is very evasive.  I just hate it here.

24  It is like a prison."

25     Q      So you were saying that Mr. Kelly wasn't



50

1   giving you any answers?

2          A     No.  He was, I say evasive, he was avoiding

3   me.

4          Q     And you were trying to contact him?

5          A     When I couldn't get him on the phone, I

6   wrote.  What else could I do?

7          Q     Then your letter says, I think, let's pick it

8   up there, it says, "I think I need -- "

9          A     " -- a new lawyer.  I have had no mail,

10  checks and so on.  I just wonder what he is doing.  All

11  legal papers, money, jewelry he has.  I think it is time for

12  a new lawyer and a good talking with all of us together.  I

13  could not write as I had no paper, envelopes, postage stamps

14  and so on.  Wish you could make a trip here to straighten

15  things out.  The place is situated in the middle of nowhere.

16  I was taken here under false pretenses.  Hope to hear from

17  you soon.  Love, your mother."

18         Q     Then it says, "over," and I think there's

19  just a little bit more on the next page.  There's a "PS"?

20         A     "I need to see some doctors for my eyes,

21  losing my sight; teeth, teeth need cleaning and so on; ears,

22  I need a hearing aid; skin needs a skin doctor.  I am very,

23  very upset."

24         Q     So you wrote that letter to Dorothy at the

25  end of March?

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



51

1       A     She came but I don't remember the dates.

2       Q     So she came to visit you --

3       A     She did, her and Gilbert.

4       Q     -- soon after you sent this letter?

5       A     Yes.

6           MR. DAVIS:  We've been going for about an hour

7    now and why don't we take a little five minute

8    break  --

9          WITNESS:  Okay.

10       MR. DAVIS:  -- and that will give you a chance

11   to just relax for a second and that'll give us a

12   chance to also change some paper in the Stenographic

13   machine and also change the tapes, all right?

14        WITNESS:  That would be fine.

15       (Recess taken.)

16      Q    Mrs. Runge, we're back on.  Remember what I

17 said the record, we had taken a break so you could have a

18 cup of tea and you had a couple crackers and you just took a

19 break --

20       A    Yes.

21      Q    -- and we're back now and I understand that

22 we had gone for about an hour and I told you that we'd go

23 for an hour or so and take a break so you could get your

24 energy back?

25       A    Wonderful.



00642

52

1       Q    So we're back now and let me just refresh

2  your memory where we were before we took our break.  We had

3  been looking at a document and we had marked that Exhibit 7 --

4       A    Yes.

5       Q    -- and that was a document that I believe we

6  had identified as a letter you had written to Dorothy?

7       A    Yes.

8       Q    And you had written that letter to Dorothy at

9  the end of March, I believe, of 2003.  We had looked at the

10  date of the envelope?

11       A    Yeah.

12       Q    In the letter to Dorothy, you had read it for

13  us but you were, in essence, asking her if she could come up

14  and help you with your situation there at Sunbridge?

15       A    Yeah.

16       Q    And you were living at that point at

17  Sunbridge Nursing Home in Randolph, Massachusetts?

18       A    Yes.

19       Q    So where we are is we're in March of last

20  year and I understand that you had told us just before we

21  took our break that Dorothy and Gilbert did come up and

22  visit you?

23       A    Yes.

24       Q    And they had come up and visited you at the

25  end of April, about a month after you had written this

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



53

1    letter?

2           A    Yes.

3           Q    And you recall that they came into your room

4    and they spent a day or two with you, didn't they?

5           A    I don't know exactly how much time but they

6    did the best they could for the circumstances.

7           Q    Let me now take this document, this letter

8    that you wrote to Dorothy out in front of you and I'm going

9    to put another document in front of you and we're not going

10   to look at it right away but it's a document that we've

11   marked Exhibit 8.  So between the letter you wrote to

12   Dorothy at the end of March when she came up to visit you

13   you were still a resident at Sunbridge Nursing Home?

14          A    Yes.

15          Q    At some point, you had kind of stopped taking

16   some of your medication at Sunbridge, hadn't you?

17          A    Yes, because they were pills that I never saw

18   before.

19          Q    When you took those pills, what happened to

20   you?

21          A    I slept almost up to late afternoon.

22          Q    When you stopped taking those pills, you were

23   more alert?

24          A    Yes.

25          Q    And you didn't sleep as much, did you?



54

```
 1        A    No.

 2        Q    Did they get upset with you when they found

 3   out you had stopped taking your pills?

 4        A    Yes.  They made sure the nurse stood there

 5   while I, to make sure I took them.

 6        Q    Now, when Dorothy arrived in the end of

 7   April, there was this issue of you not wanting to take your

 8   medication?

 9        A    Yeah.  I was afraid.

10        Q    Did you try to tell Mr. Kelly that you didn't

11   want to take that medication?

12        A    I don't remember what I said to him.

13        Q    Now, you were making telephone calls to Mr.

14   Kelly from time to time?

15        A    Yeah.

16        Q    And was he returning your phone calls?

17        A    No.

18        Q    Now, Dorothy and Gilbert came to visit you in

19   the end of April, do you recall that?

20        A    I know they came, yes.

21        Q    And that first day when they came to visit

22   you you spent all day with them talking and going over

23   things, didn't you?

24        A    Yeah.

25        Q    Do you recall going out for some ice cream
```



55

1    that day?

2            A    No, I don't remember much at all.  I was very

3    unhappy or upset, I don't remember, but it was nice to see

4    them.

5            Q    Now, let me have you focus down on that

6    document I have in front of you and it's marked as Exhibit 8,

7    do you see that?

8                 (Document shown to the witness.)

9            A    This is 8 here.

10           Q    Yes.

11           A    Yeah.

12           Q    And Exhibit 8 has a date on it, doesn't it?

13           A    Yeah, April 29.

14           Q    2003?

15           A    3, yes.

16           Q    And that's a letter that's addressed to who?

17    Could you read that for us?

18           A    Yeah.  "Dear Mr. Kelly, This letter revokes

19    any and all Powers of Attorney, letters of authorization and

20    any other documents authorizing you on my behalf.  This is

21    effective immediately as of nine A.M. on the date of this

22    letter.  Please provide copies of all financial transactions

23    you have executed on my behalf over the last nine months.

24    These copies are to be furnished to Dorothy Helen Stanley,

25    5 Stirrup Downs, Columbus, North Carolina."



56

1    Q    And then there's another paragraph?

2    A    Do you want  --

3    Q    (Nodded head in the affirmative.) There's

4    another paragraph.

5    A    "And also provide all property belonging to

6    me that you are holding for me to the above named person.

7    Please make this property, including jewelry, available for

8    pick up at your office by May 3, 2003."

9    Q    And then there's a signature?

10    A    Helen Runge, date April 29, 2003, Randolph,

11    Mass.

12    Q    And then that letter is notarized by a

13    gentleman, you see that down here?

14    A    Now you're going down here?

15    Q    Yeah.  You had it notarized?

16    A    Notarized.

17    Q    You see that?

18    A    John, I don't know, I can't read his writing.

19    Q    But Gilbert and Dorothy gave you that letter

20    and asked you to look at it and sign it, do you recall that?

21    A    No.

22    Q    You don't recall this?

23    A    No.  I don't recall a lot.

24    Q    So that time period is a little confusing to

25    you?

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



57

1    A    Yeah.

2    Q    But, when Gilbert and Dorothy came up to see

3    you, they ultimately took you out of (pause) --

4    A    Yes.

5    Q    And can you tell me what happened?  What do

6    you recall about them taking you out of Sunbridge?

7    A    Well, they were following them.  They didn't

8    want them to talk to me.

9    Q    Who didn't?

10    A    The help, the nurses, the help, they weren't

11    helping me and they were afraid they might take me, I guess,

12    because they were watching but I didn't know anything, I

13    didn't know what was going on.  I just watched them and then

14    they took me downstairs and Gilbert says, "Get in the car,"

15    and away we went.

16    Q    Did you see Mr. Kelly at that time?  Did Mr.

17    Kelly come when Gilbert and Dorothy were there?

18    A    No.  Mr. Kelly, I didn't see him.  He was

19    there but I didn't see him.

20    Q    Did you want Mr. Kelly to continue to work

21    for you at that time?

22    A    No, I didn't want him at all.

23    Q    You commonly refer to it that you would have

24    wanted to fire him?

25    A    I don't want to even see him again.



58

1        Q    Now, Dorothy and Gilbert took you out of

2   Sunbridge?

3        A    Yes.

4        Q    Did you get into a car?

5        A    Yes, got into the car and there was a group

6   of them, about nine of them, all talking to each other and

7   looking at what's going on, how come I'm in the car and I'm

8   not supposed to even go out and Gilbert took off.

9        Q    You wanted to go with Dorothy, didn't you?

10       A    Oh, of course I wanted to go and away we went

11  but I didn't know what was going on.  I knew something was

12  going on and I just kept my mouth shut and followed

13  directions and away we went.

14       Q    Now, Dorothy didn't physically force you to

15  go with her, did she?

16       A    No, nobody forced me, no.

17       Q    After you left with Dorothy and Gilbert there

18  on the 29th and 30th, have you talked to Mr. Kelly since

19  that day?

20       A    (Shook head in the negative.)

21       Q    No?

22       A    Not that I remember anything.

23       Q    And Carol here that's taking this

24  Stenographically, when you shake your head no, she can't

25  say, "no," you have to say, "yes," or, "no."



59

1    A    No.

2    Q    Did you talk to Mr. Kelly?  So that day or

3   since then you've never again talked to Mr. Kelly?

4    A    No, no, sir, I don't think I've talked to

5   him.  I think he's afraid of me now.

6    Q    Did you tell Mr. Kelly that he could do

7   things on your behalf since that day you left Sunbridge?

8    A    I haven't seen him or spoken to him.

9    Q    Did you tell Mr. Kelly that he could spend

10   any of your money in your bank accounts?

11    A    Absolutely no.

12    Q    After you left that day in April with Dorothy

13   and Gilbert, where did you go?

14    A    Well, we were heading to go to North Carolina

15   but it's a long drive so we went to a hotel and had a

16   night's sleep and to start off the next morning again.

17    Q    And then you ultimately came down here?

18    A    Yes.

19    Q    And we're sitting here in North Carolina

20   right now?

21    A    Yes, and I've been here since.

22    Q    And you enjoy it here in North Carolina?

23    A    Yes, I'm enjoying it very much.

24    Q    And Dorothy's taken pretty good care of you?

25    A    Oh, yes, very fine girl.



60

1      Q      And you're happy here?

2      A      I'm much happier.

3      Q      And has she gotten you to your medical

4   doctors?

5      A      Yes.

6      Q      And those are the doctors that in these

7   letters we were looking at that Mr. Kelly didn't get you to?

8      A      Mr. Kelly, every time I hear him, I can get

9   along without him.

10     Q      Now, I want to look at another document with

11  you?

12     A      Okay.

13     Q      This is a document that we marked as Exhibit

14  No. 9?

15            (Document shown to the witness.)

16     A      Yes, No. 9, yeah, Temporary Probate and

17  Trial.

18     Q      I think it's been explained to you that Mr.

19  Kelly started some court proceedings to have him appointed

20  as a guardian on your behalf; are you aware of that?

21     A      No.

22     Q      You're not aware of that?

23     A      No way.

24     Q      Well, let's take a look at this document that

25  is marked as Exhibit No. 9 then and up on the top it says

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



61

1  Commonwealth of Massachusetts?

2         A    Yes.

3         Q    And it's something that was filed in what's

4  called Probate Court.  Do you see the reference to Probate

5  Court?

6         A    Yes, Probate and Trial.

7         Q    Then, if I could get you down here in the

8  middle, it's a document that says, "I, Walter J. Kelly, am

9  an attorney licensed to practice law in Massachusetts.  I do

10 depose and say under oath the following," you see that?

11        A    Yes.

12        Q    Let's look at a couple of those things and

13 what I would intend to do, Mrs. Runge, would be let me read

14 them and why don't you tell me whether that statement's true

15 or false and then maybe we could talk a little bit about why

16 it's true or why it's false, okay?

17        A    Okay.

18        Q    He says in his first paragraph and I'll read

19 it for you verbatim, "I have as one of my clients Helen

20 Runge formerly of Hyde Park,, Massachusetts.  I have known

21 Helen Runge for approximately ten years?"

22        A    That's false.  I didn't know him that long.

23        Q    Did you really know Mr. Kelly before --

24        A    No.  I had Mr. Kerr was my attorney.

25        Q    So he wasn't --

00652

62

1    A    No, he was not my attorney.

2    Q    Then he goes on in that same paragraph to

3  say, "She was a client of Attorney Peter Kerr who share

4  office space with me until he retired in 1998," and Mr. Kerr

5  did retire?

6    A    Yes, he retired.

7    Q    So that part of the statement is correct?

8    A    Yes.

9    Q    Let's look then at paragraph 2 and he says in

10  that, he says, "Helen contacted me at the end of 2000,

11  requested that I begin exploring assisting her to look for

12  housing in an assisted living facility preferably Marian

13  Manor in South Boston.  She said she was alone in the world

14  and wanted to start planning for her future.".  Do you

15  recall contacting Mr. Kelly and asking him to find you a

16  place?

17    A    I remember I spoke to him, when or where I

18  don't know, but I wanted to go into a nursing home that's in

19  Hyde Park.  I'll be alone or somebody, but I would get out

20  of Sunbridge.

21    Q    Now, we had talked before and sometimes when

22  we change time frames it's tough but this time frame 2000

23  would have been back when Deborah and you were looking at

24  places to live.  Do you recall back when you --

25    A    No, she wasn't looking for places for me.



63

1     She only took me to Marian Manor.

2              Q     Oh, she took you to Marian Manor?

3              A     Yes, drove me down and drove me back.

4              Q     Then, after you went to Marian Manor, then

5     Mr. Kelly helped you to move into there?

6              A     He said he would help me but he says to leave

7     all my furniture there and he would put my clothing and

8     stuff in his basement but he never did that.

9              Q     Let's then look, we'll go down to paragraph

10    number 3, okay?

11             A     Yes.

12             Q     And it says, "Helen had been estranged from

13    her daughter's family for over thirty years according to

14    Helen and Helen told me that she had seen her daughter on

15    only a few occasions during that time," and it goes on to

16    state some more things but were you estranged from Helen for

17    thirty years?

18             A     No, that's a lie.  We weren't estranged, we

19    just lived far apart but that doesn't mean we were

20    estranged.

21             Q     Did you and Helen talk on the phone?  Excuse

22    me, Dorothy.  Now I'm confused and you're not.  Were you

23    talking to Dorothy on the phone throughout that period of

24    time?

25             A     Well, not constantly because in the good

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



64

1    weather I'm going on trips.  I was going on trips when I was

2    able but we weren't that close because we were so far apart.

3        Q    You talked on the phone?

4        A    But we talked.

5        Q    You wrote letters?

6        A    I wrote, yes.

7        Q    How about cards, did you send cards to each

8    other?

9        A    If I went on a trip, I sent a card or we

10   talked but that wasn't constantly.

11       Q    Now, let me just skip forward in that

12   paragraph 3 and let me read a little more.  It says, "Helen

13   told me that she had never been invited to their home in

14   North Carolina.  Helen told me that she never met her adult

15   grandchildren.  Helen and her daughter spoke on the phone

16   periodically.  However, Helen was scared of her daughter's

17   husband Gilbert Stanley?"

18       A    That's a lie.

19       Q    Were those true statements?

20       A    He's lying all the time, that's what it is,

21   he's lying.  I was never afraid of Gilbert.  Gilbert was

22   afraid of me.

23       Q    He says that you never met your

24   grandchildren.  Is that true?

25       A    Well, they all lived far away but I went to

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



65

1    the wedding.

2            Q    So you went to their wedding?

3            A    Lynn's wedding.

4            Q    And Lynn's your granddaughter?

5            A    Yes, my granddaughter.

6            Q    Now, let me just go to the next paragraph

7    then, okay?  We're down to number 4?

8            A    Yes, "In the summer of 2001."

9            Q    Why don't you go ahead and read it?

10           A    "I assisted Helen in obtaining admission to

11   Marian Manor's assisted living unit."  That's a lie.

12           Q    And Deborah had helped you do that, didn't

13   she?

14           A    Yes, Deborah did.  He had nothing to do with

15   it.

16           Q    Then he states something else, keep going in

17   number 4?

18           A    "At that time, the daughter and her husband

19   came to see Helen and pick up some belongings.  I believe

20   that that was the last time they saw Helen."

21           Q    So he's saying that Dorothy and Gilbert came

22   to see you at about the time you moved into Marian Manor.

23   They came up to see you a couple times, didn't they?

24           A    Yeah, they saw me but that doesn't mean they

25   disowned me or anything.  It just was too far for traveling.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



66

1        Q    Now, let's go down to number 5.  It says,

2  "After her admission to the assisted living facility at

3  Marian Manor, she asked if I would be the power of attorney

4  and her health care agent.  I requested she put in writing

5  the reasons why she wanted me to act as such.  See letter to

6  me dated November 8, 2001 attached hereto."  Did you ask Mr.

7  Kelly to be your power of attorney?

8        A    No.  I had Debbie all the time.

9        Q    So, when we had looked back at that Exhibit 1

10  and Exhibit 2, you had appointed Debbie your power of

11  attorney, hadn't you?

12        A    Yes, yes.

13        Q    So all of a sudden then we looked at that

14  Exhibit No. 4 where Mr. Kelly was appointed your power of

15  attorney.  Do you recall whose idea that was?

16        A    (Shook head in the negative.)

17        Q    Was that your idea or was that his idea?

18        A    That's his idea.

19        Q    I think in the time frame that you signed

20  that you were a resident of Marian Manor?

21        A    Yes.

22        Q    Now, let me just then, let's just take a

23  second and look at one last document.  I'm going to put it

24  in front of you and, again, let's just forget about this

25  document No. 9 for a second?



67

```
1          A     Yeah.

2          Q     And we're going to look at a document that's

3    No. 10, okay?

4                (Document shown to the witness.)

5          A     Do you want me to read it?

6          Q     No, I just want you to take a look at it.  So

7    we're looking now at something that's 10 and it appears to

8    be another handwritten letter; is that correct?

9          A     It's my writing so that's true.

10         Q     And there's a signature down at the bottom?

11         A     And my signature's down at the bottom.

12         Q     And it appears to be a letter that's dated

13   November 8?

14         A     8th.

15         Q     Of 2001?

16         A     Yes.

17         Q     And it's written, "To whom it may concern?"

18         A     Yes.

19         Q     Do you want to read it out loud?

20         A     "To whom it may concern, as of this date, the

21   year of our Lord 11-8-01 I appoint Mr. Walter Kelly and his

22   associate to have the power of attorney on behalf of my

23   legal affairs and my two safe deposit box numbers 605 and

24   709 with -- "

25         Q     Looks like, "with no?"
```

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



68

1    A    I don't know what that is.

2    Q    Let me --

3    A    Money?

4    Q    Looks like, "no monies?"

5    A    "No monies and no cash in either box, only

6    valuable personal papers and copies. Mr. Walter Kelly has

7    been my attorney for years plus he is available promptly to

8    assist me in my problem. He has never refused to help me.

9    My daughter lives in North Carolina and not available to

10   help me. She has never offered assistance at any time all

11   these years. I shall stick with Mr. Walter Kelly. He is

12   like a brother to me. Sincerely, Helen Runge." Because I

13   felt like I was licked. I had to be nice to him so he could

14   help me. I had nothing. They're in Carolina and I'm all

15   alone and I'm going out of my mind and that's what happened.

16   I felt, I was afraid I was going to go mental.

17        Q    And Mr. Kelly, did he suggest that you write

18   that letter? Do you recall why you wrote that?

19        A    Yes. He was going to help me.

20        Q    And that was in November of 2001, that would

21   have been right about the time you had moved into Marian

22   Manor?

23        A    Marian Manor.

24        Q    So you had moved from your apartment into

25   Marian Manor at that time, correct?



69

1      A    Yeah.  It was in the fall because I was
2  interviewed in July.  I paid for August but they told me why
3  don't I move because, "you're keeping a room and you're not
4  living in it."

5      Q    So what you're referring to there is you were
6  paying for your apartment in Boston and you were paying for
7  a room in Marian Manor and he was helping you stop paying
8  one and move into the other?

9      A    He says, "You're paying two rents, you better
10 move."

11     Q    So you had a lease for the apartment and he
12 was helping you get out of the lease?

13     A    Well, I just paid the rent and, "you better
14 move out or you'll have to keep paying rent, even if you're
15 not living there, you better -- you have to end it, you're
16 paying two rents, you can't afford that."

17     Q    Now, since --

18     A    Now you can see that I was in a quandary.
19 It's a terrible feeling when you don't know what to do.

20     Q    You were relying on Mr. Kelly to help you?

21     A    No, but I had to have somebody.  There's
22 nobody near me.  They would help me but they're so far away.
23 I need help right away so write them a letter so I wrote a
24 letter.

25     Q    Now, let's change some times again and I'm



00660

70

1    not going to change any more times on you after this, okay?

2        A    It doesn't matter.  I'm familiar with it all.

3        Q    Let's go back to the present time, let's go

4    back to today and moving down here to North Carolina?

5        A    Yes.

6        Q    And you were just saying that you relied on

7    Mr. Kelly.  Do you think that Mr. Kelly did a good job for

8    you and did what you asked him to do while you were living

9    at either Marian Manor or at Bay View or then at Sunbridge?

10        A    He did not help me.  I don't rely on him.

11    Even when I asked him to go to another place in Hyde Park,

12    he ignored it.

13        Q    After you left Sunbridge with Dorothy and

14    Gilbert in April of 2003, did you want Mr. Kelly to take any

15    actions on your behalf, did you want him to act as your

16    friend and agent?

17        A    I didn't want him anymore.  I'd had it.

18        Q    Did Mr. Kelly ever call you after you left

19    with Dorothy and Gilbert and say, "Helen, would you like me

20    to do some acts on your behalf?"

21        A    No way.  He did not call me at all.

22        Q    Now, in that letter we were just looking at,

23    it referenced Mr. Kelly or associates.  Were you familiar

24    with any associates that Mr. Kelly had?

25        A    No, never saw them.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



71

1          Q    Let me ask you another name.  Have you ever

2    heard the name Schiavoni?

3          A    (Shook head in the negative.)

4          Q    Do you know an attorney in Boston by the name

5    Schiavoni?

6          A    No.

7          Q    Did you ever authorize Mr. Schiavoni to do

8    anything on your behalf?

9          A    No.

10          Q    Did you ever authorize anyone to pay an

11    Attorney Schiavoni --

12          A    No.

13          Q    -- for anything done on your behalf?

14          A    No way.

15          Q    Did Mr. Kelly, did Attorney Kelly ever call

16    you and say, "Helen, I'm writing checks out to myself to pay

17    me for things that I did for you?"

18          A    I don't remember anything like that.

19          Q    So he never called you?

20          A    No.

21          Q    Did you ever call Mr. Kelly and he said,

22    "Helen, may I write some checks out to pay myself?"

23          A    No, he never said that, called me saying

24    that, never.

25          Q    So he never called you and you never called

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



72

1   him.  Now, let me ask you one other question.  Did anyone

2   ever call you on behalf of Mr. Kelly and ask if they could

3   write checks out?

4            A     Nobody called me.

5            Q     Would it surprise you, Mrs. Runge, if I told

6   you that Mr. Kelly wrote checks out of your checking

7   accounts and paid himself thousands of dollars for legal

8   fees?

9            A     I never heard of it.  I remember him sending

10  me bills before I went into Marian Manor for talking on the

11  phone, a thousand dollars.

12           Q     And did you pay him for that?

13           A     Yeah, I paid him, that was service but

14  anything else I have nothing to do with him.  To charge a

15  thousand dollars for a telephone call and he said he helped

16  me -- time.

17           Q     If you learned that Mr. Kelly paid himself

18  thousands of dollars --

19           A     No, I didn't know that.

20           Q     Listen to the question, let me finish it?

21           A     Okay, dear.

22           Q     If you learned that Mr. Kelly paid himself

23  thousands of dollars for legal work that he says that he did

24  for you after -- now, listen to the time frame -- after you

25  came down here to live with Dorothy and Gilbert, would that


00663

73

1    upset you?

2          A    Very upset.

3          Q    Why would that upset you?

4          A    He never contacted me.  That's a lie.  The

5    only one that contacted me was Dorothy and Gilbert.

6          Q    Now, do you think, Mrs. Runge, that you could

7    go back and live in a nursing home, would you feel good

8    about that?

9          A    No, I don't like nursing homes anymore.  I

10   don't like to go back but, if I had to, I suppose I would

11   but I don't like.  I'd rather live with Dorothy and Gilbert.

12         Q    Do you think that you could ever let Mr.

13   Kelly do any legal work for you?

14         A    I would never have Mr. Kelly do my legal

15   work.

16         Q    And why would that be?

17         A    Because he lies.

18              MR. DAVIS:  Can we take a break for a second?

19              (Recess taken.)

20              (Off-the-record discussion.)

21         Q    We just took a little break because we're

22   just about at the end and I wanted to make sure that we

23   looked over some things and then we're going to wrap it up.

24   We can probably have some lunch.  I think Dorothy made some

25   clam chowder for us all.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



74

1        A    Oh, that's wonderful.

2        Q    So let me just ask you one or two other

3   questions.  I think, while we were going through, that we

4   might have both been a little confused and I'm going back

5   now to Bay View when you were living close to the ocean?

6        A    Yes.

7        Q    And you were eating those two desserts every

8   day?

9        A    Yes.

10       Q    While you were at Bay View, were you able to

11  go out and do some shopping and get around the city a

12  little?

13       A    Well, it was nearer to the water than to the

14  Broadway, that would be the shopping center, it would be a

15  walk, but I never went out by myself there because it's a

16  long walk so I didn't do any shopping because the girl in

17  that Bay View bungalow, she would go out and do it and, if

18  you wanted something, she'd get it for you.

19       Q    And then would you pay her when she got stuff

20  for you?

21       A    Yeah.  She brought back a comb for me and

22  something else, I can't remember, but she'd do it and

23  brought it back.

24       Q    And you had money in your purse --

25       A    Yes.

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



75

1      Q    -- that you could pay her for that stuff?

2      A    Yes, and had what I had, it was very little.

3      Q    You had a little desk or something that you

4   kept your checkbook so you could write things when you were

5   in Bay View?

6      A    I don't remember any checkbook writing.  I

7   don't remember.  I might have but I don't remember.  That's

8   a part that hurts, I don't remember.

9      Q    Well, you were saying that Mr. Kelly sent you

10  bills and you were paying him and that would've been  --

11     A    I wasn't paying him.

12     Q    No?

13     A    No, no way.  I wasn't paying him.  He didn't

14  do anything for me.

15     Q    I think we've got everything then.  Is there

16  anything else that we didn't talk about that you want to

17  talk about that I forgot to ask you about?

18     A    No.  You did a very fine job and I can't

19  think of anything that I need.  I think you did very good

20  but, like myself, sometimes I don't remember the dates or

21  the times.  It isn't good.  I know I'm not stupid.

22     Q    Before we started the deposition here, you

23  and I had a chance to talk for awhile?

24     A    Yes.

25     Q    And I told you that we would be hopping back



76

1    and forth between times?

2          A    Yes.

3          Q    And it would be hard for you to do that; do

4    you remember me saying that?

5          A    Yes, but it doesn't matter to me, it's still

6    time.

7          Q    One other thing that I said to you as we were

8    talking before we started the deposition, that I said to you

9    that I wanted you to do something for me today as you and I

10   were talking and do you recall what I asked you to do?  I

11   asked you to always tell the (pause)  --

12         A    The truth, always tell the truth.

13         Q    As we were talking here today, you've told me

14   the truth, haven't you?

15         A    You have to tell the truth and I put my hand

16   on the Bible I swear to tell the truth.

17         Q    Thank you.  We're going to stop now, all

18   right?

19         A    Yeah, because you're not going to gain

20   anything by lying.  You only hurt yourself.

21         Q    Thank you.

22         A    And I thank everybody was so kind and so

23   nice, it was a pleasure.

24              (Off-the-record discussion.)

25         Q    Mrs. Runge, I apologize for this.  Just as we



00667

77

1    were packing up, I realized I'd forgot to ask you one or two

2    questions?

3           A    That's okay.

4           Q    So I'm going to make you work just a couple

5    more minutes?

6           A    No problem.

7           Q    Now, I wanted to ask you this.  When Mr.

8    Kelly filed some papers with the court to have himself

9    appointed as your guardian, he represented that he was your

10   friend.  In April or May of the year 2003, was Walter Kelly

11   your friend?

12          A    No, he was not my friend anymore.

13          Q    In May of 2003, did you want Walter Kelly to

14   be acting on your behalf?

15          A    I have no more use for Mr. Kelly.

16          Q    And that was after you had sent that April

17   letter to Mr. Kelly saying that he was not to act on your

18   behalf, wasn't it?

19          A    I didn't want him anymore.

20          Q    Let me ask you one or two other questions

21   then.  Do you recall a woman by the name of Farrah, and

22   that's spelled F-a-r-r-a-h, Siedler, S-i-e-d-l-e-r?

23          A    I heard the name Farrah.  I think she was a

24   nurse or (pause)  --

25          Q    I think she was an employee?



00668

78

```
1        A    Employee, Farrah.

2        Q    I think she was an employee?

3        A    Employee.

4        Q    For Sunbridge?

5        A    She could have been.

6        Q    Was she a friend of yours?

7        A    Just by association but we were not close.

8        Q    And you've never been in contact with her

9   since you've left Sunbridge with Dorothy and Gilbert?

10       A    No, I never was in any contact with Farrah.

11       Q    Did you ever ask Farrah to act on your behalf

12  or to file any papers on your behalf?

13       A    No, I couldn't have somebody do that.  I

14  didn't have any papers.

15       Q    Did Farrah ever come to you and say, "Helen,

16  do you want me to do something on your behalf with the

17  court?"

18       A    No, I never.

19       Q    Would it upset you to learn that Farrah

20  represented herself to be a friend of yours when she filed

21  some papers with the court?

22       A    I never knew anything about it.

23       Q    I think that's the end of the questions then,

24  okay?  Are we okay stopping here?  Do you have anything else

25  you want to tell us?
```



79

1          A    No.  It just belittles me that somebody's

2    lying about me doing things.  How can an elderly lady take

3    care of anything, you're so isolated and people are lying.

4    That's why I said I'd rather be here with Gilbert and

5    Dorothy.

6          Q    And they're taking pretty good care of you,

7    aren't they?

8          A    Yes.

9          Q    And you're happy here?

10         A    I'm much happier but I still like Boston.

11         Q    I think we're going to stop now, all right?

12         A    Okay.  That was very, very nice.  Everybody

13   is so nice, smiles.

14              (Off-the-record discussion.)

15              (Whereupon, Exhibit No. 11 was marked for

16              identification by the court reporter.)

17              (Whereupon, this deposition was concluded at

18              approximately 1:04 o'clock P.M.)

19              *         *         *         *         *

20

21

22

23

24

25

HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



80

CERTIFICATE

STATE OF NORTH CAROLINA

COUNTY OF HENDERSON

I, Carol J. Patwin, Court Reporter and Notary
Public in and for the County of Henderson, State of North
Carolina, do hereby certify:
That on the 16th day of January, 2004, at 11:00
A.M. in Columbus, North Carolina, there appeared before me
pursuant to Agreement HELEN RUNGE as a witness in the
above-entitled cause; that the said witness was sworn by me
and examined to tell the truth, the whole truth and nothing
but the truth in said cause; that the foregoing testimony
was taken by me in stenotype and the foregoing 79 pages
contain a full, true and correct transcription of all the
testimony of said witness; that the reading and signature of
the transcript by the witness was not waived by the witness
and respective counsel; that I am not of kin or in anywise
associated with any of the parties to said cause of action,
or their counsel, and that I have no interest in the event
thereof.
IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 2nd day of February, 2004.


_____
Carol J. Patwin
Hendersonville Court Reporting Service
P. O. Box 328
Hendersonville, NC  28793
(828) 692-8000


My Commission Expires:

January 16, 2007.


HENDERSONVILLE COURT REPORTING SERVICE

*Hendersonville, North Carolina*



LAWYER'S NOTES

| Page | Line | |
|------|------|---|
|      |      |   |

# Affidavit of Helen Anne Runge

I am an 87-year-old lady who has supported herself since she was 15 years old. I was born in South Boston to Lithuanian parents, was married for a short period, and had one daughter. I have always managed my own affairs including my finances. I used an attorney to do my taxes and to make out my wills as required. Up until the last few years, I used an attorney named Peter Kerr. Mr. Kerr retired and turned over my file to a Walter Kelly. I believe Mr. Kelly was a law partner of Mr. Kerr. My initial involvement with Walter Kelly was in the middle of 2001 just prior to entering Marion Manor Assistant Living facility.

I was living in the Hyde Park section of Boston, MA, was about 85 years old, and finding it increasingly difficult to climb the four flights of stairs to my apartment. I decided to investigate assisted living facilities with the thought that it would make life a little more pleasant. I knew of Marion Manor in South Boston and that it had a very good reputation as a nursing home. Marion Manor also had some facilities for assisted living. My friend Debbie drove me to the home and inspected it with me. The facility was well kept and the people very nice. It lived up to its reputation. I decided that I would move there. I contacted Mr. Kelly to tell him what I was going to do and told him I wanted him to prepare a will for me. He offered to help me move from my apartment to Marion Manor and I accepted. He of course charged me for his time to do this. Up until this point in time (approximately 2 years from this writing) I had very little interface with Mr. Kelly. Mr. Kelly did help me move and stored some of my belongings in a storage facility that he had. He charges me storage for this.

I moved to Marion Manor in July of 2001. When I moved into Marion Manor, unknown to me, Mr. Kelly made himself the primary point of contact if I had a health problem. He also had me sign a health care proxy that I understood would only apply if I were determined to be incompetent by a court. I wanted my daughter to be the primary point of contact since she is a health care professional and I trust her. My daughter came to visit me several months after I moved there and found that she would not have been notified no matter what happened to me. Even though my daughter lived a long distance away, I felt more comfortable if she was the principle contact for my care. Working with the Marion Manor people, I had the change made.

Marion Manor was a very nice place with good people but had a drawback in that it did not have any available single rooms in assisted living. I had to room with a patient that had Alzheimer's disease. Most of the time this person was great to get along with but other times she was difficult. Having lived alone for over 60 years, it was difficult to adjust to living in a small room with another person. I decided I wanted to move to a facility that was more appropriate for assisted living. One of my friends that had just moved to the nursing home section of Marion Manor recommended that I look at Bayview Assisted Living. I went over to the facility by myself, found it was really nice and specialized in assisted living. I made a decision to move there and did so in November of 2002.

I moved into a large room that was very comfortable until the weather started to get colder. The room did not have adequate heat. When I complained about this, they moved me to a smaller room that had adequate heat and was still very comfortable. They refurbished the original room, fixed the heat, and put two people in it.

Things went well until a couple of months after I went there a prescription discount card issued to me by NSTAR, my old employer, was taken out of my room. I complained about it but no one could find who did it. When I called the company to get it replaced, I was told a large amount of prescriptions had been charged to the card. The only medication that I was taking at that time was an iron pill for anemia. The company canceled the missing card and issued me a new one.

In January of 2003, I returned to my room to find that my papers had been ransacked, apparently by someone looking for the new prescription card. I got very angry and reported this to the staff and they acted as if I had an over active imagination. I then called the police and they sent an officer to investigate but as often happens to us old people they handled the problem as if I had a mental case. I was not! I was mad and frustrated but I knew what I was doing. The home called Mr. Kelly and he had me taken to Carney Hospital in Boston for psychiatric evaluation. Before we left he remarked to one of the staff that I was mental. I asked him about my possessions and he said he would take care of them and see that I got them. This was late at night and he was very angry.

I was evaluated at Carney and found not to be psychotic, my thought process to be coherent and organized, and my cognition to be intact. In other words, I may have been very angry but I was not mental. I received this information from Carney Hospital after I requested my daughter be given a copy of my medical records. Late one evening, Mr. Kelly came and took me to the Sunbridge nursing home in Randolph, MA. I did not want to go to Sunbridge but he said I could not stay at the hospital, as there was nothing wrong with me. I said my daughter was going to bring me to North Carolina or that I could go to several other homes that I knew. He said I did not want to go to North Carolina and did not want me to go to a nursing home in Roxbury that was near his office. He said I had to go to Sunbridge. Shortly after he took me, he said I had to sign a document so he could pay my bills. He would not let me read the document but I signed it because I felt helpless at that time. Mr. Kelly had taken all my money, identification, personal belongings, social security and Medicare cards. I had nothing but what I was wearing. I have always paid my bills and wanted them to be paid so I signed the document. I do not know what was in the document that I signed.



I started out in Sunbridge very unhappy and requested that Mr. Kelly move me. He refused and said I had to stay there. I could not write a letter, as I had no stamps or paper. Kayla, one of the nurses did not like the predicament that I was in and, using her own money bought me some stamps, paper, a watch, and other small things. This allowed me to write my daughter (this was the end of March). My daughter called me but Mr. Kelly had taken my hearing assist phone and would not return it even after several requests. I had my daughter talk to Kayla and she confirmed all that I said in my letter.

I hated Sunbridge. I was a prisoner. I could not go out on my own, they would tell me nothing except I needed to take all my medicine. Kayla would talk me into taking most of the medicine by saying they would put me "away" if I did not take it. The time I took it all I was not able to stand and went to sleep on my bed for a day and a half. I felt like a drunk when I walked down the hallway. No matter how many times I asked they would not tell me what the medication was or what it was for. I complained to anyone who would listen that I did not need medication and that it was doing me harm. The nursing home and Mr. Kelly said they would force me to take it if I did not do it willingly. I knew they were trying to make me a zombie along with the other patients on the floor to keep me from complaining. I felt so bad about this inside that I couldn't even cry. I had no confidence in Mr. Kelly, as he would do nothing for me. I did not know how to get rid of him as he was very friendly with the nursing home staff and I feared he would have me committed to a state institution as he had threatened. I wrote my daughter in the March letter that I wanted to get a new lawyer.

The nursing home kept refusing me care of a podiatrist, a dentist, an ear doctor, and an eye doctor. I had recently had cataract surgery and my eyes needed to be checked. I have all my own teeth and they needed cleaning. I had growths on my face that were getting worse and I needed a skin doctor. I was having trouble with my feet and needed a podiatrist. I could pay for all this if Mr. Kelly would give me access to my money. He wouldn't even though I asked him everytime I saw him.

I was terrified and prayed to Saint Theresa to help me get out of this fix. I knew that I would eventually have to take the medication that they wanted to force on me as I could only resist so long. I knew when I started to take the medication that I would lose the ability to fend for myself and be like all the other zombies on my floor. It would essentially be the end of my life. Saint Theresa answered my prayers.

About 10:00AM on April 29, 2003 I came out of my cold shower and there was my daughter standing in the doorway to my room with her husband. One of the first things that I did was thank Saint Theresa for answering my pleas.

I asked the nursing staff to give my daughter all the information my daughter wanted from my medical records. They would give her nothing. They said, "Attorney Kelly had told them not to give her any information". My daughter called my doctor's office, they told her that there was no change in my behavior from when I was admitted, and that Mr. Kelly would not let them evaluate me.

Sunbridge has no private areas where we could have a private conversation but we found a staff conference room on another floor to talk. My daughter asked me about my treatment and I told her how bad that it was. I told her when I asked to have my eye surgery checked; a fellow came in and asked if I could read an eye chart that was on his lap. It was such a simple chart that I memorized it at first glance and read it to him. He said your eyes are OK without ever looking at them. I said other than that, they would not let me see the doctors that I needed to see. I told her that the food was inedible and the menus a farce. The toilets were often backed up and there was often no hot water for showers. The facility was filthy and smelled badly. I told her again that I wanted to "fire" Mr. Kelley. I did not trust him and wanted no more to do with him. He was taking my money while treating me with contempt. I told her I had not changed my mind from the letter I wrote her in March. I insisted that he be fired immediately.

My daughter asked if I wanted her to be my health proxy and I said I would be delighted as she has a lifetime of experience in medicine and I could trust her to do what was best for me. She asked if I would like my son-in-law to be her power of attorney. I said absolutely and that I was delighted that they offered. I emphasized that I did not want anything to do with Mr. Kelley after today. I told them that Mr. Kelley had everything I have ever owned down to the change purses in my pocket book and would do nothing for me. I told them that Mr. Kelley had come by with my income tax papers for me to sign in April. He was in a hurry and would not let me read them but said I had to sign. He did not have a copy for me to keep. I complained again about him not letting me have access to my money and he reached in his pocket, threw seven dollars across the table, and said "buy yourself something at Wal-Mart". I was shamed and mortified to the point I could say nothing. He treated me like a street beggar.

We went out of the facility and prepared a revocation of Mr. Kelly's Health care proxy and power of attorney as well as a letter saying I wanted no more services from him and requesting return of jewelry and other possessions that he had. We also prepared documents appointing my daughter my health care proxy and my son-in law my power of attorney. We had these notarized by a notary public. We returned to the facility about three hours later and I went to my room to freshen up while my daughter and son-in-law went to talk to the Sunbridge staff. While I was waiting for them to finish talking to the staff a doctor came by my room to talk to me. He asked one question " Why do you not want to take your medicine" I told him I did not need the medicine and no one would tell me what it was for therefor I did not intend to take it. I asked him "if he did not have a headache would he take Tylenol in case he might get one" and he answered that he wouldn't and left the room. I learned later that he thought I was not competent because of this two-minute conversation. I understood exactly what I was doing and why I was

doing it. I think it is very strange that Mr. Kelly thought I was competent enough to sign my income tax return a couple of weeks earlier but the minute I signed papers to fire him he tried to say I was not competent to sign them.

My daughter told me that the meeting with the Sunbridge staff did not go well and that they would not accept her health care proxy. We discussed what to do and she asked if I would like to come to North Carolina to live with her. I told her that I wanted to do that when I was in Carney Hospital but that Mr. Kelley said I could not do that. I said I certainly wanted to come live with her. She asked just before she left that evening if I wanted to leave with her then. I said no because I wanted to say good bye to a friend but would want to go the next day. I signed a letter saying I wanted my daughter to take me to North Carolina

The next day, April 30, my daughter arrived about 2:00PM. The Sunbridge staff told her that " Attorney Kelly had requested that she not be allowed to leave the floor". Now I was truly being held prisoner. A long discussion took place and my daughter left for a short period of time. When my daughter insisted that I be allowed to go outside the front door with her to have a private conversation. After a long time, they agreed that I could go for a few minutes but that I would have a "bodyguard" go with me. We went to the front door and as soon as we got outside my son-in-law drove up to the front door and told my bodyguard that they were holding me against my will and they were taking me. A crowd of people came out of the front door with the intent to stop us. One large black man grabbed for my daughter and me but my son-in- law stepped in and stopped him from doing it. . I hurriedly got in the front seat of the car, fastened my seatbelt, and got ready to go. I felt like a giant load was lifted off my shoulders and that I was being liberated. They then stood in front of the car to keep it from moving. My son-in-law got in the car and started it. For some reason, the man standing in front of the car moved far enough away that my son-in-law was able to steer around him and leave. Sunbridge had called the police and was trying to hold us there until they came. I knew I had the right to leave this facility but they tried to hold me by force. They knew whom I was with and still tried force. My son-in-law is a very large person and I am convinced if it was not for that, they would have grabbed and retained me.

We left for North Carolina and I felt as if I was rescued by white knights. On Thursday we had Lynn, my granddaughter, call Sunbridge to tell them I was out of the state and request that they send my belongings. They refused and said it was a police matter. I must say, if they had my best interest at heart they picked a strange way to show it. The trip was beautiful. The first thing my daughter did when we got to North Carolina was to bring me by the hospital to draw blood for lab work to make sure there was nothing wrong with me. This was on a Saturday evening. On Monday, she took me to a doctor for a physical examination. The doctor said I was fine and needed no medication. I was slightly anemic but he did not want to medicate me for that until he saw what good food would do.

My daughter has since bought me a hearing aid that really works well. People don't have to shout at me and I don't shout back. I only had 16% of my hearing in my left ear and 62% of my hearing in my right ear. What a pleasure it is just to hear the rain. I have been to the podiatrist and had my feet taken care of. He said they were badly neglected and had bacterial and fungus infections. I have appointments to see the eye doctor and the dentist. A psychiatrist has examined me and found I was competent and capable of managing my own affairs. The physician that first examined me when I came to North Carolina has recently examined me again. He says I am in good health and receiving all the required care for my eyes, feet, and skin. He agrees with the psychiatrist that I am capable of managing my own affairs and do not need a guardian.

I arrived here in North Carolina with nothing. Mr. Kelley has it all and has refused send me anything. Mr. Kelley has even kept all my mail that has been forwarded from Bayside Assisted Living over the past four months. I have had to apply to social security for a Medicare and social security card. I have had to buy all new clothes, wallets, change purses, address books, shoes and cosmetics. I have had to apply for a new insurance card from my previous employer. I can get no information from any of my credit union or bank accounts as they say Mr. Kelley has them frozen. I think this is very strange behavior for someone that is supposed to have my best interest at heart.

I don't know if I will ever get over the trauma Mr. Kelley and Sunbridge have caused. They have stripped me of my dignity, confidence, and self-respect. It is as if I had been raped. It scares me to think how close Mr. Kelly came to controlling my very existence. They came close to destroying my will to fight back but fortunately did not.

I sign this document under penalty of perjury.

*Helen A. Runge*

Helen Anne Runge July 27, 2003

State of North Carolina, County of Polk

On July 27, 2003, before me , Arthur Bourbeau, A Notary Public in and for said state, personally appeared Helen Runge, personally known to me to be the person whose name is subscribed to within this instrument, and acknowledged to me that she executed the same in her authorized capacity and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.My commission expires 05-30-2006

*Arthur Bourbeau*



# Statement of Helen Runge
## May12, 2003

On April 29, 2003, I requested that my daughter, Dorothy Stanley, remove me from the Sunbridge Rehabilitation Center in Randolph Massachusetts and bring me with her to North Carolina to live. I was very dissatisfied with the care I was getting at the facility and especially fearful of the drugs they were trying to force me to take. I was equally dissatisfied with my attorney Walter Kelley I dismissed him and revoked his power of attorney and health care proxy that he alleged I had signed, on this same date.

On Wednesday, April 30, 2003, I again requested that my daughter get me out of this facility. She agreed to do so and removed me against the will of the facility. I knew I had to get away from Sunbridge if I was to continue to function as a human being.

I am living in North Carolina with my daughter and her husband and am delighted to be here.

Helen Runge
Helen Runge