IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, AS EXECUTRIX OF   :
THE ESTATE OF HELEN A. RUNGE,       :
      Plaintiff                   :
                                 :      No. 05-10849-RGS
      v.                      :      (Judge Stearns)
                                 :
WALTER J. KELLY, et al.,          :      CIVIL ACTION
      Defendants          :      JURY TRIAL DEMANDED

<u>PLAINTIFF'S TRIAL MEMORANDUM</u>

AND NOW, COMES, Plaintiff, Dorothy Stanley, Executrix of the Estate of

Helen A. Runge, by and through her counsel, and respectfully submits this Trial

Memorandum as follows:

**I.     BACKGROUND**

The original Complaint in this matter was filed on April 27, 2005, and an

Amended Complaint was filed on August 7, 2006.  On January 8, 2007, Plaintiff filed

her Second Amended Complaint, including sixteen counts sounding in state law.

Helen A. Runge passed away on January 15, 2007, and, by Court Order entered

March 29, 2007, Dorothy Stanley, Executrix of the Estate of Helen A. Runge,

("Plaintiff") was substituted as Plaintiff in this matter.

Plaintiff has brought fifteen state counts (Counts II through XVI) in the Second

Amended Complaint against Defendant Walter J. Kelly ("Kelly") and Defendant

124187

Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for

Randolph ("Sunbridge") seeking to recover for injuries sustained as a result of a

pervasive pattern of conduct that led to Runge's physical, emotional and financial

injuries. Count I of the Second Amended Complaint brought against Defendant

Kerry L. Bloomingdale, M.D. was withdrawn by Plaintiff prior to trial.

## II.   STATEMENT OF FACTS

Helen A. Runge ("Runge") was born in 1915 and was a resident of Boston,

Massachusetts for most of her life. In July 2001, Runge moved into Marian Manor

after living on her own for decades. Runge then moved into Bay View Assisted

Living in November 2002. In or about this time period, Runge understood Kelly to

have been working with Attorney Peter Kerr ("Kerr"). Kerr had been Runge's

attorney for many years and had retired. Kelly became Runge's Power of Attorney

on December 7, 2001, and her Healthcare Proxy on May 10, 2002. Although Kelly

was the Power of Attorney during her residence at both Marion Manor and Bay

View, Runge took care of her own medical care and finances. It was not until

Runge's admission to Sunbridge that Kelly usurped these tasks.

Runge was admitted into Sunbridge's facility on January 22, 2003, after being

discharged from Carney Hospital. Kelly executed Runge's admissions documents.

Runge made known her wish to move to North Carolina to live with her daughter

upon her discharge from Carney Hospital. Runge's desire, and Kelly's knowledge

thereof, was documented multiple times in her medical records at Carney Hospital and Sunbridge.

During Runge's residency at Sunbridge, she found the living conditions and care to be deplorable and unacceptable. During her residency, Runge wrote to both Kelly and her daughter expressing her unhappiness with Sunbridge and detailing certain services that she had requested but was not receiving from Sunbridge and Kelly.

Sunbridge denied Runge her usual medical care, including but not limited to her podiatrist, dentist, ear doctor, eye doctor and dermatologist. Despite maintaining pervasive control over her finances, Kelly failed and/or refused to timely set up a resident financial account, nor did he provide Runge with adequate clothing and personal hygiene products. Runge did not have money available so that she could purchase these items or items such as writing stationery or stamps.

Runge was extremely hard of hearing, yet was denied access to a telephone, which was functional for her in order to be able to communicate with her daughter or others. Runge owned a hearing impaired telephone that was in Kelly's possession, but he failed and/or refused to make arrangements to have it timely installed at Runge's Sunbridge residence.

While in Sunbridge, Runge also received numerous medications that impaired her cognitive abilities, causing her to be in a stupor and feel as though she was intoxicated. Kelly began consenting to the administration of these medications to

Runge as her Healthcare Proxy. These medications affected Runge's motor skills, including her ability to walk and be in an awakened state. When Runge questioned the need to take such medication, Sunbridge's management and Kelly insisted that Runge take the medication, indicating that if she refused to take medication, it would be forced upon her.

On or about April 25, 2003, Kelly informed Dorothy Stanley that he was considering filing a "Roger's petition" to force Runge to take antipsychotic medications. Dorothy Stanley advised Kelly that she did not like the situation of Runge being forced to take drugs. Dorothy Stanley, a medical professional, suspected that Runge was being overmedicated. Dorothy Stanley informed Kelly that she would come to Boston and speak with Runge before Kelly took any action in relation to the Roger's petition. She informed Kelly that she and Gilbert Stanley, her husband and Runge's son-in-law (collectively the "Stanleys"), would be in Boston on April 30 to review the situation. Dorothy Stanley further indicated to Kelly that she desired to be appointed as guardian if a guardianship petition regarding medication was presented to the Court.

Despite Runge's requests to Kelly for assistance in stopping or adjusting the medications she was receiving, Kelly failed and/or refused to provide the requested assistance to Runge. Although Runge did not want to take certain medications and made this desire known to Sunbridge, Sunbridge's employees threatened to,

attempted to and/or did force Runge to take certain medications despite her not providing consent for the medications.

The Stanleys arrived at Sunbridge on April 29, purposefully a day earlier than they had informed Kelly they were to arrive. They contacted Kelly on April 29, leaving him a message that they were at Sunbridge and expressing the need to talk with him and meet him the next day. Kelly did not take or return the Stanleys' April 29 telephone call and made no attempt to meet with them and/or Runge on April 29 or April 30.

Upon the Stanleys' arrival at Sunbridge, Runge granted permission for the Stanleys to review her medical records. Sunbridge failed and/or refused to provide the Stanleys access to Runge's medical records. This request was made to and/or known by Sandra Porazzo Perry ("Perry"), the Director of Nursing ("DON") who was on duty at the time of the April 29 request, as well as Social Workers Farrah Seidler ("Seidler") and Ellen Richwine ("Richwine"), all employees of Sunbridge.

Instead, Kelly and Sunbridge arranged for Bloomingdale to meet with Runge. Bloomingdale served as a consulting physician for Sunbridge, made weekly consultation visits to the facility and had met with Runge two other times during her residency at Sunbridge. On April 29, 2003, Bloomingdale met with Runge for a few minutes. Although the Stanleys were there in Sunbridge, Perry, Seidler and/or Richwine did not advise them of, or involve them in, the meeting with Bloomingdale. After meeting with Runge on April 29, Bloomingdale rendered a medical opinion

that Runge was not mentally competent to make medication decisions. This medical opinion was intended solely for use in a Rogers' Petition.

In the afternoon of April 29, the Stanleys presented Sunbridge management with a new Healthcare Proxy and Power of Attorney that Runge had executed, which dismissed Kelly and appointed the Stanleys as her new fiduciaries. Kelly likewise was provided copies.

Sunbridge refused to recognize the new Healthcare Proxy and Power of Attorney and further refused to allow Runge to be discharged from the facility. Sunbridge continued to follow Kelly's unauthorized direction to imprison Runge within Sunbridge on April 29 and April 30. Sunbridge even attempted to confine Runge solely to her third floor wing on April 30. Runge was aware of her confinement and suffered extreme mental distress because she could not be discharged.

On April 30, Sunbridge attempted to influence and intimidate Runge and the Stanleys by agreeing that Runge could accompany her children from her nursing floor to the first floor lobby to have a private conversation only as long as a large male nursing assistant and employee of Sunbridge accompanied them. Management of Sunbridge was acting at the direction of, or in concert with, Kelly in refusing to allow Runge to be discharged. Sunbridge continued to fail to recognize the new fiduciary documents and refused to discharge Runge, despite having been made

aware that its actions were directly against the wishes of Runge and her fiduciaries. At this time, no court had determined that Runge was incompetent.

On April 30, Runge, along with her daughter, walked out of the facility and drove away, even though employees of Sunbridge tried to physically restrain them from leaving and driving away. Simultaneously with these actions, Sunbridge called the Randolph police and reported a kidnapping.

Once Runge left Sunbridge on April 30, she moved to North Carolina to happily live with her daughter and son-in-law for the remainder of her life. When Runge arrived in North Carolina, she immediately was examined by Robert M. Palmer, M.D., who discontinued all medications at that time that Runge was taking at Sunbridge. She also was examined by B. Rhett Myers, M.D. on May 30, 2003, who conducted a psychiatric evaluation of Runge and found her to be mentally competent. In North Carolina, Runge also received medical services from a podiatrist, dentist and eye doctor, and obtained hearing aids.

Runge and the Stanleys directed Sunbridge to send Runge's belongings to her North Carolina address, but the facility refused to cooperate in any manner. Sunbridge also refused to send Runge's medical records upon request, which impeded any consistency of medical care.

On April 30, rather than be involved in Runge's medical care and discharge, Kelly busied himself contacting Runge's two financial institutions, Hyde Park Credit Union and Member Service Credit Union, directing them to freeze her accounts.

Kelly took these actions even though he knew that he then had no authority to act on behalf of Runge and that freezing her access to her financial accounts could have a potential and significant effect on her health. Kelly took these actions in concert with Sunbridge so that they could obtain assets from these accounts. According to Kelly's billing records, Kelly also "billed" Runge for these actions.

On May 1, Kelly, along with Social Worker Farrah Seidler, an employee of Sunbridge, filed an *ex parte* petition seeking to have Kelly appointed as Runge's guardian. Prior to filing the guardianship petition, both Kelly and Sunbridge knew that Runge had dismissed Kelly as her counsel and revoked the Power of Attorney and Healthcare Proxy previously held by Kelly. Kelly enlisted the aid of Bloomingdale, Seidler and Sunbridge in presenting this petition, based on the contents of the *ex parte* petition and the medical certificate completed by Bloomingdale on April 29. Kelly misrepresented facts to the court in having himself appointed as Runge's guardian.

Soon after Kelly's *ex parte* appointment as Runge's guardian on May 2, he distributed funds from her bank accounts to make payment for services allegedly rendered by himself, Bloomingdale, Sunbridge and others, including Attorney Thomas Schiavoni, an attorney Kelly hired to represent himself in the guardianship. Even after Kelly was advised by both the Stanleys as well as the Polk County Department of Social Services that Runge was safely and happily residing with her

daughter in North Carolina, he continued to pursue his guardianship of Runge, incur

expenses on her behalf and to pay himself and others out of her assets.

## III.    LEGAL ISSUES

### A.    Sunbridge Was Negligent In Its Care Of Runge (Count II)

The well-established elements of negligence are that (1) a duty is owed by the

defendant to the plaintiff, (2) there was a breach of the duty, (3) the defendant was

the proximate or legal cause of the breach and (4) there was actual damage or injury.

*Verge v. U.S. Postal Service*, 965 F.Supp. 112 (D.Mass. 1996). The underlying duty in

every case is to exercise care which circumstances reasonably require. *Kane v. Fields*

*Corner Grille, Inc.*, 341 Mass. 640, 171 N.E.2d 287 (Mass. 1961). The harm caused by

the defendant must have been foreseeable. *Kane, supra.* The harm must have been a

natural and probable consequence of the defendant's negligence. *Hill v. Winsor*, 118

Mass. 251, 1875 WL 9166 (Mass. 1875). An employer may be held liable for the torts

of its employees that are committed within the scope of the employee's employment.

*Dias v. Brigham Medical Assoc., Inc.*, 438 Mass. 317, 780 N.E.2d 447 (Mass. 2002).

Imposition of liability on an employer may result even from conduct of an

independent contractor if the employer has retained control of part of the work that

the independent contractor performs. *Paradoa v. CNA Ins. Co.*, 41 Mass.App.Ct. 651,

654, 672 N.E.2d 127, 129 (Mass.App.Ct. 1996).

Sunbridge owed a duty to Runge during her residency to provide her with

acceptable nursing care, as evidenced by pertinent federal regulations mandating

acceptable nursing care of residents. *See* 42 C.F.R. §§483.10, 483.13, 483.15, 483.20 and 483.40. Runge was not provided an acceptable standard of nursing care, including but not limited to noncompliance with federal regulations regarding Runge's care, being refused medical care that she requested, being threatened and/or forced to take certain medications that Sunbridge knew she did not want to take, being detained by Sunbridge on April 29 and 30, 2003, at the unauthorized direction of Kelly and being subjected to an improper examination by Bloomingdale. Runge was harmed physically, emotionally and financially as a result of Sunbridge's failure to provide acceptable nursing care, which harm was a natural and probable consequent of Sunbridge's failure to provide acceptable nursing care. Accordingly, Sunbridge was negligent in providing unacceptable nursing care to Runge. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

### B.    Kelly Was Negligent In Providing Services To Runge (Count III)

An attorney is negligent when (1) he fails to exercise reasonable care and skill in handling the matter(s) for which he was retained, (2) his client incurred a loss and (3) his negligence was the proximate cause of his client's loss. *Colucci v. Rosen, Goldberg, Slavet, Levenson and Wekstein, P.C.*, 25 Mass.App.Ct. 107, 111, 515 N.E.2d 891, 894 (Mass.App.Ct. 1987). A violation of a canon of ethics or disciplinary rule is evidence of an attorney's negligence when the cannon or rule was intended to protect his client. *Fishman v. Brooks*, 396 Mass. 643, 487 N.E.2d 1377 (Mass. 1986). Additionally, the well-established elements of non-attorney negligence are that (1) a

duty is owed by the defendant to the plaintiff, (2) there was a breach of the duty, (3) the defendant was the proximate or legal cause of the breach and (4) there was actual damage or injury. *Verge, supra.*

Kelly owed a duty to Runge to exercise reasonable care and skill in the handling of her affairs as her attorney. Kelly also owed a duty to Runge outside of the scope of his legal representation, including his role as Runge's Healthcare Proxy and Power of Attorney, actions in which the standard is governed by contract and statute. M.G.L. c. 201D, §1, *et seq.* Kelly breached his duty to Runge in accordance with the Healthcare Proxy and Power of Attorney. Kelly breached his duty to Runge by misrepresenting his status as Runge's prior attorney, Peter Kerr's legal partner. Kelly breached his duty to Runge by having Runge taken and admitted to Carney Hospital and then Sunbridge without her knowledge or informed consent. Kelly breached his duty to Runge by refusing to discuss alternate living arrangements with Runge or her daughter, despite Runge's request to do so. Kelly breached his duty to Runge by improperly attempting to or actually activating Runge's Healthcare Proxy and consenting to the administration of medication to Runge. Kelly breached his duty to Runge by directing Sunbridge to not disclose medical records to Runge's family.

Kelly further breached his duty to Runge by arranging with Sunbridge and Bloomingdale an examination of Runge after Kelly's services had been discharged, including his services as her attorney, Healthcare Proxy and Power of Attorney, and

directing Sunbridge to detain Runge on April 29 and 30, 2003. Kelly breached his duty to Runge through his unauthorized actions in freezing Runge's bank accounts, filing a petition for guardianship and paying money out of Runge's bank accounts to himself and others and in operating under an improper conflict of interest. Kelly's reliance on the Massachusetts Rules of Professional Conduct to justify his conduct was also negligent.

Kelly's breaches of his duties to Runge resulted in emotional, physical and financial losses to Runge. Therefore, Plaintiff requests that judgment be entered against Kelly and in her favor.

### C.    Sunbridge Committed Assault And Battery Against Runge (Count IV)

An assault is "an attempt to use physical force, or a threat of use of physical force." *Gouin v. Gouin*, 249 F.Supp.2d 62, 69 (D.Mass. 2003). Two types of assault are an attempted battery or a threatened battery. *Gouin, supra.* Threatening words with objectively menacing gestures that "create an imminent apprehension of harmful contact" may constitute the tort of assault. *Gouin, supra.*

A battery is the unconsented to, intentional, harmful or offensive touching of another without any right to do so. *Coxall v. Gonfrade*, 1995 WL 1146819 (Mass.Super. 1995) (citing *Waters v. Blackshear*, 412 Mass. 589, 591 N.E.2d 184 (Mass. 1992). A result is intended if the act is done for the purpose of accomplishing the result or with the knowledge that such result will ensue to substantial certainty. *In re Limieux*, 306 B.R. 433 (Bkrtcy.D.Mass. 2004) (citing *Waters, supra*).

Runge received numerous medications while a resident at Sunbridge that impaired her cognitive abilities, that caused her to be in a stupor and to feel as though she was intoxicated. These medications affected her motor skills, including her ability to walk and be in an awakened state. Runge questioned the necessity of these medications to both Sunbridge and Kelly. Dorothy and Gilbert Stanley advised Kelly that they believed Runge was being overmedicated by Sunbridge and they would be in Boston on April 30 to review the situation.

Despite Runge's requests to Kelly to assist her in having the medications stopped or adjusted and Dorothy and Gilbert Stanley's discussion with Kelly, Kelly failed to provide the requested assistance to Runge. Although Runge did not want to take certain medications and made this desire known to Sunbridge, Sunbridge's employees threatened to, attempted to and/or did force Runge to take certain medications despite her not providing consent for the medications. Accordingly, Sunbridge committed assault and battery of Runge. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

**D.    Sunbridge Falsely Imprisoned Runge (Count V)**

The intentional tort of false imprisonment consists of an unlawful confinement of a person, directly or indirectly, of which the person confined is conscious or harmed by such confinement. *Noel v. Town of Plymouth, Mass.*, 895 F.Supp. 346 (D.Mass. 1995) (citing *Wax v. McGrath*, 255 Mass. 340, 151 N.E. 317 (Mass. 1926) (stating that restraint of plaintiff against his will was wrongful and constituted a false

imprisonment unless justification was shown by defendant on whom the burden of proving it rested)). On April 29 and 30, 2003, Sunbridge and its employees were aware of Runge's wishes to leave the facility and to move to North Carolina with her daughter and son-in-law. Runge's desire to live with her daughter in North Carolina had been made part of the admission paperwork when she came to Sunbridge. Sunbridge and Kelly knew that Runge had revoked Kelly's Power of Attorney and Healthcare Proxy for her. Kelly did not take or return the Stanleys' April 29, 2003, phone call and made no effort to discuss Runge's situation with them.

Sunbridge continued to follow Kelly's unauthorized direction to keep Runge within Sunbridge on April 29 and April 30, 2003. Sunbridge even attempted to confine Runge solely to the nursing floor on April 30, 2003. Runge knew of her confinement and was extremely upset that she could not be discharged. These actions of Sunbridge and Kelly were not justified. Accordingly, Sunbridge and its employees falsely imprisoned Runge. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

### E.    Sunbridge Intentionally Inflicted Emotional Distress On Runge (Count VI)

A defendant brings about intentional infliction of emotional distress of the plaintiff when (1) he intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct, (2) the conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause

of the plaintiff's distress and (4) the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable person could be expected to endure it. *Gouin, supra.* Extreme and outrageous conduct may be found in the totality of the circumstances and does not have to be alleged in a single incident. *Gouin, supra.* A plaintiff may recover under a claim for intentional infliction of emotional distress for purely emotional suffering unaccompanied by physical injury. *Wagenmann v. Adams,* 829 F.2d 196 (1st Cir. 1987).

Sunbridge knew or should have known, if it did not actually intend, that its actions in failing to provide an acceptable standard of nursing care would result in emotional distress to Runge. Sunbridge further knew or should have known, if it did not actually intend, that its actions of April 29 and 30, 2003, in refusing to discharge Runge against her wishes would result in emotional distress. This conduct of Sunbridge was extreme and outrageous and beyond the bounds of decency and cannot be tolerated in a civilized community.

Runge's emotional distress, caused by Sunbridge's actions, was severe and of the kind no one could be expected to endure. Her severe emotional distress continued the entire time she resided in Sunbridge. The severe emotional distress continued for many months after she left Sunbridge and moved to North Carolina to reside with her daughter and son-in-law. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

**F.    Sunbridge Negligently Inflicted Emotional Distress On Runge (Count VII)**

A defendant brings about negligent infliction of emotional distress of the plaintiff when (1) the plaintiff suffered emotional distress as a result of the defendant's negligence, (2) the plaintiff suffered physical harm manifested by objective symptomatology and (3) a reasonable person would have suffered emotional distress under the circumstances. *Godette v. Stanley*, 490 F.Supp.2d 72 (D. Mass. 2007). Plaintiff herein incorporates her argument set forth in Section A above as support that Sunbridge was negligent in providing unacceptable nursing care to Runge. Runge suffered emotional distress as a result of Sunbridge's failure to provide an acceptable standard of nursing care the entire time she resided in Sunbridge and for many months after she left Sunbridge and moved to North Carolina.

Runge further exhibited objective symptomatology of physical harm. While residing in Sunbridge, Runge made her wishes known to Sunbridge and Kelly that she did not want to take certain medicines but was threatened or forced to do so, based at least in part on Kelly's direction to Sunbridge. Some of the medications impaired her cognitive abilities, caused her to be in a stupor and feel as though she was intoxicated. These medications affected her motor skills, including her ability to walk and remain awake. Runge further failed to receive medical care that she had requested, including usual medical care from at least a podiatrist, dentist, ear doctor, eye doctor and dermatologist. After Runge moved from Sunbridge to reside in

North Carolina, she continued to suffer physical harm that was exhibited by objective symptomatology of distress.

Any reasonable person would suffer emotional distress in a situation similar to Runge's where she was not provided acceptable nursing care. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

### G.    Sunbridge Breached Its Contract With Runge (Count VIII)

A plaintiff recovers for a breach of contract when (1) the parties reached valid and binding agreement, (2) the defendant breached the terms of the agreement and (3) the nonbreaching party suffered damages as result of the breach of contract. *Michelson v. Digital Financial Servs.*, 167 F.3d 715, 720 (1st Cir. 1999). Sunbridge and Runge reached a valid and binding agreement when Runge was admitted into the Sunbridge facility for residency in accordance with its policies and procedures

Sunbridge breached the agreement when it failed to fulfill its policies and procedures to provide acceptable nursing care to Runge. Sunbridge breached the agreement by failing to comply with federal regulations regarding Runge's care, refusing medical care that Runge requested, threatening and/or forcing Runge to take certain medications that Sunbridge knew she did not want to take, detaining Runge on April 29 and 30, 2003, at the unauthorized direction of Kelly and being subjected to an improper examination by Bloomingdale. Runge suffered emotional, physical and financial damages from Sunbridge's breach. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

**H.     Kelly Falsely Imprisoned Runge (Count IX)**

Plaintiff herein incorporates her argument in Section D above.  Therefore,

Plaintiff requests that judgment be entered against Kelly and in her favor.

**I.     Kelly Intentionally Inflicted Emotional Distress On Runge (Count X)**

Plaintiff herein incorporates the elements of intentional infliction of emotional

distress set forth in Section E above.  *See Gouin, supra*.  Kelly knew or should have

known, if he did not actually intend, that the actions listed in Section D above would

result in emotional distress to Runge.  Kelly's conduct was extreme and outrageous

and beyond the bounds of decency and cannot be tolerated in a civilized community.

Runge's emotional distress, caused by Kelly's actions, was severe and of the kind no

one could be expected to endure.  Therefore, Plaintiff requests that judgment be

entered against Kelly and in her favor.

**J.     Kelly Negligently Inflicted Emotional Distress On Runge (Count XI)**

Plaintiff herein incorporates the elements of intentional infliction of emotional

distress set forth in Section F above.  *See Godette, supra*.  Plaintiff also herein

incorporates her argument set forth in Section B above as support that Kelly was

negligent in providing services to Runge.  Runge suffered emotional distress as a

result of Kelly's failure to provide reasonable care and skill in the handling of her

affairs as her attorney.  Runge also suffered emotional distress as a result of Kelly's

failure to properly fulfill his duties under the Healthcare Proxy and Power of

Attorney.

Runge exhibited objective symptomatology of physical harm. While residing in Sunbridge, Runge made her wishes known to Sunbridge and Kelly that she did not want to take certain medicines but was threatened or forced to do so. Kelly improperly attempted to or actually activated Runge's Healthcare Proxy and consented to the administration of medication to Runge. Some of the medications impaired her cognitive abilities, caused her to be in a stupor and feel as though she was intoxicated. These medications affected her motor skills, including her ability to walk.

Runge further failed to receive medical care that she had requested from Sunbridge and also had requested that Kelly assist her in obtaining, including usual medical care from at least a podiatrist, dentist, ear doctor, eye doctor and dermatologist. Kelly's actions in freezing Runge's bank accounts, filing a petition for guardianship and paying money out of Runge's bank accounts to his and others benefit to Runge's detriment led to additional objective symptomatology of distress that occurred after Runge moved from Sunbridge to reside in North Carolina.

Any reasonable person would suffer emotional distress in a situation similar to Runge's where her attorney, Healthcare Proxy and Power of Attorney engaged in such negligence. Therefore, Plaintiff requests that judgment be entered against Kelly and in her favor.

### K.    Kelly Breached His Contract With Runge (Count XII)

Plaintiff herein incorporates the elements of a breach of contract set forth in Section G above. *See Michelson, supra.* Kelly and Runge reached a valid and binding agreement when Kelly offered to provide legal services and services in accordance with being Runge's attorney, Healthcare Proxy and Power of Attorney and Runge accepted.

Kelly breached the terms of the agreement when he took the actions detailed in Section B above and, without authorization, had Runge's bank accounts frozen, filed a petition for guardianship and paid money out of Runge's bank accounts to his and others' benefit in direct opposition to Runge's benefit and interest. Runge suffered damages from Kelly's breach when she was threatened or forced to take certain medications against her will, and continued to suffer financial, emotional and physical damages after Runge left Sunbridge and moved to North Carolina. Had it not been for the financial support of her family, Kelly's actions would have left Runge destitute. Therefore, Plaintiff requests that judgment be entered against Kelly and in her favor.

### L.    Kelly Breached His Fiduciary Duty To Runge (Count XIII)

A fiduciary duty is defined as a duty of utmost good faith and loyalty. *Vakil v. Anesthesiology Assoc. of Taunton, Inc.,* 51 Mass.App.Ct. 114, 118 (2001). A plaintiff recovers on a breach of fiduciary duty claim when (1) the defendant owed her a fiduciary duty, (2) the fiduciary duty to her was breached, (3) the defendant caused

the breach of his fiduciary duty and (4) the plaintiff incurred damages as a result of the defendant's breach of his fiduciary duty. *Hanover Ins. Co. v. Sutton,* 46 Mass.App.Ct. 153, 164 n.18 (1999); *Bowen v. Richardson,*133 Mass. 293, 296 (1882). When "a fiduciary benefits from a transaction with his principal", like an attorney who bargains with his client in a matter of advantage to himself, the *fiduciary* must prove by a preponderance of the evidence that the transaction was fairly and equitably conducted. *Cleary v. Cleary,* 427 Mass. 286, 290-291, 692 N.E.2d 955, 958 (Mass. 1998) (emphasis added).

A fiduciary duty exists in conjunction with an express agreement or agency relationship that carries express obligations to act in the best interests of others. Fiduciary duty arises when the plaintiff reposes faith, confidence and trust in the defendant's judgment and advice, and when the defendant knows that the plaintiff will rely on his services. *Van Brode Group, Inc., supra.* An attorney-client relationship is one category of fiduciary relationship. *New Webster Nursing Home, Inc. v. Roy,* 3 Mass.L.Rptr. 688, 1995 WL 809900 (Mass.Super. 1995); *Van Brode Group, Inc., supra.*

Kelly's relationship with Runge was one of a fiduciary, whether based on their attorney-client relationship or on their relationship in which Kelly acted as Healthcare Proxy and Power of Attorney for Runge. Kelly breached his fiduciary duty to Runge when he took the actions detailed in Section B above. In addition, to the extent that Kelly misrepresented his status as Attorney Peter Kerr's legal partner to Runge in order to obtain Runge's legal business and become her Healthcare Proxy

and Power of Attorney, it is Kelly's duty to prove by the preponderance of the evidence that such transaction was conducted equitable and fairly, because it resulted in Kelly's financial benefit, which he cannot do. As a result of Kelly's breach of fiduciary duty, Runge suffered financial, physical and emotional damages. Therefore, Plaintiff requests that judgment be entered against Kelly and in her favor.

### M.    Kelly Committed An Abuse Of Process Against Runge (Count XIV)

A plaintiff recovers on an abuse of process claim when (1) process was used, (2) process was used for an ulterior or illegitimate purpose and (3) the use of process resulted in damages. *Gouin, supra.* It is well-established that "in the context of abuse of process, 'process' refers to the papers issued by a court to bring a party or property within its jurisdiction." *Jones v. Brockton Public Markets, Inc.,* 340 N.E.2d 484, 486 (Mass. 1975) (citations omitted).

The Massachusetts Probate Court has jurisdiction not only to hear a guardianship petition, but also has a "general equitable power to act in all matters relating to guardianships" pursuant to M.G.L.A. c. 201, §6. *Guardianship of Bassett,* 385 N.E.2d at 1029; *see* M.G.L.A. c. 201, §6. Therefore, a person filing a guardianship petition and the proposed ward are brought within the jurisdiction of the Probate Court once a guardianship proceeding is initiated. Kelly used process here when he filed a guardianship petition in order to gain guardianship of Runge, because the filing of the petition brought both Runge and Kelly properly within the jurisdiction of the court.

Kelly initiated this process even though he knew that Runge had dismissed him as her counsel, Healthcare Proxy and Power of Attorney. Kelly knew that Runge had chosen to have her daughter serve as Healthcare Proxy and her son-in-law serve as Power of Attorney. Kelly knew that Runge had left Sunbridge in accordance with her own wishes to reside with her daughter and son-in-law in North Carolina.

It certainly appears that Kelly's use of process was to accomplish an ulterior and illegitimate purpose for which it was not designed, which is born out in the manner in which Kelly used the guardianship for his purposes that were contradictory to Runge's wishes and interests. As a result of the use of process, Kelly was able to and did pay money out of Runge's frozen bank accounts to his and others' benefit in direct opposition to Runge's benefit and caused damages to Runge. Therefore, Plaintiff requests that judgment be entered against Kelly and in her favor.

### N.    Sunbridge Breached Its Fiduciary Duty To Runge (Count XV)

Plaintiff herein incorporates the elements of breach of fiduciary duty set forth in Section L above. *See Vakil; Hanover Ins. Co.; Bowen.; Van Brode Group, Inc., supra.* "Fiduciary" is a broad term that includes "informal relationships which exist whenever one person trusts and relies on another." *New Webster Nursing Home, Inc. v. Roy*, 3 Mass.L.Rptr. 688, 1995 WL 809900 (Mass.Super. 1995).

Sunbridge was in a fiduciary relationship with Runge. She trusted Sunbridge and its employees to provide a place for her to reside and an acceptable level of nursing care for her. She relied on Sunbridge's services for her wellbeing and

healthcare. Sunbridge breached its fiduciary duty to Runge when it failed to provide an acceptable standard of nursing care. As a result of Sunbridge's breach of fiduciary duty, Runge suffered financial, physical and emotional damages. Therefore, Plaintiff requests that judgment be entered against Sunbridge and in her favor.

**O.    Kelly's Conduct Is An Unfair Or Deceptive Act Or Practice Regarding Runge (Count XVI)**

An M.G.L. c. 93A action may be brought where the defendant has been engaged in trade or commerce in his dealings with the plaintiff. M.G.L. c. 93A §2. At least 30 days prior to commencing an action under M.G.L. c. 93A, a plaintiff must have mailed or delivered an adequate demand letter to the defendant. M.G.L. c.93A, §9(3). Here, Plaintiff mailed correspondence to Kelly on July 13, 2006, specifying her demand. Her demand letter detailed the facts that led to the demand, the section of M.G.L. c. 93A under which the demand was being made and Kelly's acts that violated M.G.L. c.93A. By correspondence dated August 10, 2006, Kelly responded to Plaintiff's demand by wholly rejecting it and making no counteroffer.

Section 9 of M.G.L. c. 93A "affords a private remedy to the individual consumer who suffers a loss as a result of the use of an unfair or deceptive act or practice." *Lantner v. Carson*, 373 N.E.2d 973, 976 (1978) (indicating that individual consumer under §9 is one who participated on a private, nonprofessional basis in her dealings with defendant). A plaintiff is entitled to recover under an M.G.L. c.93A claim if (1) the defendant's conduct is an unfair or deceptive act or practice and (2) the act or practice must be a foreseeable cause of injury to the plaintiff. M.G.L. c.93A,

§2; *Gossels v. Fleet Nat. Bank,* 69 Mass.App.Ct. 797, 811, 876 N.E.2d 872, 885

(Mass.App. 2007). The act or practice is deceptive if it could reasonably cause a

person to act differently from the way she would have acted if she knew the truth

about the matter. *Sargent v. Koulisas,* 29 Mass.App.Ct. 956,958, 560 N.E.2d 569, 571

(1990). There is no binding definition of what constitutes unfair practice. *Green v.*

*Blue Cross & Blue Shield of Mass., Inc.,* 47 Mass.App.Ct. 443, 447, 713 N.E.2d 992, 996

(1999). The existence of an unfair act or practice must be determined from the

circumstances of each case. *Green, supra.*

The defendant's conduct must be considered in light of all the circumstances.

*Martin v. Factory Mut. Research Corp.,* 401 Mass. 621, 623, 518 N.E.2d 846, 847 (1988).

Further, an attorney is considered to conduct trade or commerce in the handling of

his clients. *King v. Conant,* 20 Mass.L.Rptr. 223, 2005 WL 3605401, *7-8 (Mass.Super.

2005) (citing *Guenard v. Burke,* 387 Mass. 802, 808-811 (1982)).

Double or treble damages shall be awarded if the defendant's act or practice

was a "willful or knowing violation" of Chapter 93A. M.G.L. c. 93A §9(3).

Attorney's fees and costs shall be awarded in any action brought under M.G.L. c. 93A

§9 in which a violation of M.G.L. c. 93A §2 is found; they are to be considered in

addition to any other relief. *Barron v. Fidelity Magellan Fund,* 784 N.E.2d 634, 642, 57

Mass.App.Ct. 507, 516 (2003). Attorney's fees may be awarded even if the court does

not award damages. *Refuse & Environmental Systems, Inc. v. Industrial Servs. of*

*America, Inc.,* 932 F.2d 37 (1st Cir. Mass. 1991).

Kelly misrepresented and failed to adequately explain to Runge, who dealt with Kelly on a private and nonprofessional basis, the legal effect of the Healthcare Proxy and Power of Attorney, which granted Kelly access to Runge's care and finances. Kelly also instituted a guardianship proceeding to gain further control over Runge's assets and then made payment to his and others' benefit to the detriment of Runge. Not only were Kelly's actions blatantly unfair to Runge, they were deceptive and resulted in foreseeable injury to Runge.

Had Runge known how Kelly intended to and would misuse his access to her care and finances, she never would have agreed to entrust Kelly with such access. Further, Kelly could not think anything but that his blatantly self-serving actions were unfair and deceptive to Runge in violation of M.G.L. c. 93A, including but not limited to the following actions: his consent to the administration of medication to Runge when she had expressed that she did not want to take the medication and her Healthcare Proxy had not been properly activated; his filing of a guardianship petition after he had been informed that Runge happily had left Sunbridge to live in North Carolina; and his access of Runge's financial accounts to pay funds to himself and others after he knew she had revoked his Power of Attorney. Therefore, Plaintiff requests that judgment be entered against Kelly and in her favor, including treble damages, attorney's fees and costs.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that judgment be entered in her favor on Counts III, IX, X, XI, XII, XIII, XIV and XVI against Defendant Walter J. Kelly, including treble damages, costs, expenses, attorney fees and any other relief that this Honorable Court deems proper.  Plaintiff also respectfully requests that judgment be entered in her favor on Counts II, IV, V, VI, VII, VIII and XV against Defendant Mediplex of Massachusetts, Inc., d/b/a Sunbridge Care and Rehabilitation for Randolph, including damages, interest and costs and any other relief this Honorable Court deems proper.

Respectfully submitted,

LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated:  June 16, 2008

By___/s/ Glenn R. Davis_____
    Glenn R. Davis
    1700 Bent Creek Boulevard, Suite 140
    Mechanicsburg, PA 17050
    (717) 620-2424
    gdavis@ldylaw.com
    *Pro Hac Vice*

    Blake J. Godbout, BBO #196380
    BLAKE J. GODBOUT
    & ASSOCIATES
    33 Broad Street, 11th Floor
    Boston, MA 02109
    (617) 523-6677

    Attorneys for Plaintiff, Dorothy Stanley,
    Executrix of the Estate of Helen A. Runge

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the

attorney of record for each party by electronic transmission.

Michele Carlucci
George S. Rockas
Wilson Elser Moskowitz Edelman & Dicker LLP
155 Federal Street
Boston, MA 02110
michele.carlucci@wilsonelser.com
george.rockas@wilsonelser.com

Michael Williams
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 145
Boston, MA 02210-1736
mwilliams@lawson-weitzen.com

Dated:  June 16, 2008          By____/s/ Glenn R. Davis_____
                                           Glenn R. Davis

124187