# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

No. 05-10849RGS

| |
|---|
| DOROTHY STANLEY, EXECUTRIX OF THE ESTATE OF HELEN A. RUNGE, |
| Plaintiff |
| |
| v. |
| |
| WALTER J. KELLY, et al. |
| Defendants |

## DEFENDANT WALTER J. KELLY'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE OF COURT TO DEPOSE GILBERT STANLEY
### *(LEAVE TO FILE GRANTED BY ORDER DATED 6/18/08)*

NOW COMES the Defendant, Walter J. Kelly, and responds to Plaintiff's Supplemental Memorandum and further opposes Plaintiff's motion for leave of court to depose Gilbert Stanley for a second time, as it is unnecessary, duplicative and highly burdensome. All parties would be better served by spending this time preparing for trial so as to assure that this matter is tried efficiently, as opposed to traveling to North Carolina for a duplicative deposition.

Plaintiff's supplemental memorandum is tantamount to a fraud on this Court and contains egregiously inflammatory remarks against Defendant Kelly which have no support in the record. Should Plaintiff's motion be allowed, and should Gilbert Stanley's testimony fail to deliver testimony solely within his knowledge and not previously addressed by Mr. Stanley, Defendant Kelly will seek the costs of this motion and the costs of the deposition and will seek other sanctions commensurate with the Plaintiff's actions.

121695.1

First and foremost, the Defendant must address the baseless and inflammatory statement by the Plaintiff that Mr. Stanley will testify about the alleged "financial destruction wrought by Kelly and his abuse of Mrs. Runge's assets." The Plaintiff claims that Gilbert Stanley was Ms. Runge's power of attorney and handled her financial affairs following her departure from Sunbridge. Runge's finances were already addressed in the probate court matter relevant to Kelly's court-appointed guardianship over Runge, and wer discussed at length and Gilbert Stanley's deposition in this matter. In the probate matter, Kelly provided an accounting of Helen Runge's finances and accounted for each and every payment made by Kelly with Helen Runge's funds. [See attached Accounting, attached as Exhibit A]. The majority of the accounting was accepted by the Court. [See Order, attached as Exhibit B]. Runge objected to attorneys fees paid by the Estate as well as medication costs. [See Helen Runge's Objections to the Accounting, attached as Exhibit C]. These objections were left open by the Court, and then eventually settled. [See Exhibit B]. Gilbert Stanley already testified at great length as to his thoughts on the accounting, the Plaintiff's objections to the accounting and Plaintiff's finances, and therefore any testimony would be duplicative and unnecessary. [See Deposition of Gilbert Stanley, Vol. 1, pp. 69-80, and 127-133, attached as Exhibit D]. Even Mr. Stanley said in his deposition that Defendant Kelly received Court approval for necessary withdrawals from the estate's account. [Exhibit D, Vol. 1, p. 69, lines23-25 and p. 70, lines 1-8]. Furthermore, to characterize to this Court challenged attorneys fees in the amount of $19,777.50 ($7,500 of which went to Attorney Kelly) and medication costs in the amount of $702.10 as wreaking "financial destruction" is baseless and meant to inflame this Court, particularly when one considers that the Estate was left with

$119,388.33.  [See Exhibit A].  Moreover, testimony as to whether or not attorneys fees and medication costs are reasonable is solely for an expert – not Gilbert Stanley, who is not an attorney and is not qualified to testify about the reasonableness of attorneys fees. Therefore, a second deposition of Gilbert Stanley should not be allowed.

Plaintiff also alleges that Gilbert Stanley had conversations with Sunbridge employees around the time that he removed Helen Runge from the facility.  Oddly, Plaintiff cites to the deposition testimony of Gilbert Stanley, which already addresses these conversations and observations. [See Plaintiff's Supplemental Memorandum, and Deposition of Gilbert Stanley, Vol. 1, pp. 171-173, attached as Exhibit D].  While questionably relevant, this testimony is most assuredly duplicative and therefore not necessary.

Plaintiff's baseless and inflammatory supplemental memorandum raises an eyebrow as to Plaintiff's motivations for seeking the second deposition of Gilbert Stanley,

WHEREFORE, the Defendant, Walter Kelly, respectfully requests that this Honorable Court deny Plaintiff's motion for leave to depose Gilbert Stanley for a second time.  Should this Court grant leave to take Mr. Stanley's deposition, it should not allow a videotape deposition, which will be highly prejudicial given Mr. Stanley's physical condition.

121695.1

Dated:  June 18, 2008                    Respectfully submitted,

                                         The Defendant,
                                         Walter J. Kelly,
                                         By his attorneys,

                                         *s/ Michele Carlucci*
                                         George C. Rockas, BBO #544009
                                         Michele Carlucci, BBO #655211
                                         WILSON ELSER MOSKOWITZ
                                         EDELMAN & DICKER  LLP
                                         260 Franklin Street
                                         Boston, MA 02110
                                         (617) 422-5300

## CERTIFICATE OF SERVICE

I, Michele Carlucci, certify that on June 18, 2008, I have served a copy of the foregoing by electronic filing.

                                         */s/ Michele Carlucci*
                                           Michele Carlucci

121695.1

## Commonwealth of Massachusetts
### The Trial Court

__NORFOLK__ Division      Probate and Family Court Department      Docket No. __03P1104GI__

## INVENTORY

To      WALTER J. KELLY

of      W. ROXBURY, IN THE COUNTY OF SUFFOLK

~~Administrator/Administratrix~~ ~~Executor/Executrix~~ ~~Trustee~~ — TEMPORARY Guardian — ~~Conservator~~ ~~Receiver~~

YOU are directed to appraise, under the penalties of perjury, the estate and effects of

HELEN RUNGE      of      RANDOLPH

DATE TEMPORARY ALLOWED MAY 2, 2003

which may be in said Commonwealth; and return to the Probate Court for said County of ——— Norfolk

_[signature]_

Register of Probate Court

Pursuant to the foregoing order to _____ said estate is appraised as follows:

Amount of Personal Estate, as per schedule exhibited, _____ $ _____

Amount of Real Estate, as per schedule exhibited, _____ $ _____

I — ~~WE~~ — Walter J. Kelly

the — ~~trustee~~ ~~administrator/administratrix~~ — executor/executrix — guardian — conservator — receiver —, of the estate ~~of said deceased~~, certify under the penalties of perjury that the foregoing is a true and perfect inventory of all the estate of the within named that has come to — my — ~~our~~ — possession or knowledge; and sets forth the actual market values of the various items thereof ascertained by — me — ~~us~~ — to the best of — my — ~~our~~ — knowledge, information and belief.

8/29/03      _[signature] Walter J Kelly_

_____      _____

_____      _____

Date(s)      Signature(s)

CJ-P 41 (5/89)

## SCHEDULE OF PERSONAL ESTATE IN DETAIL

|  |  | Dollars | Cts. |
|---|---|---:|---:|
| 1. | Personal belongs in 9 large boxes and 1 small box | value | unknown |
| 2. | Jewelry in two metal boxes | value | unknown |
| 3. | Shares of NSTAR Stock possibly located in one of two safe deposit boxes unaccessed by the temporary guardian | value | unknown |
| 4. | Members Plus Credit Union – Share Account | 30 | 64 |
| 5. | Members Plus Credit Union – Money Market Account | 89,231 | 85 |
| 6. | Hyde Park Savings Bank – Checking Account | 15,030 | 60 |
| 7. | Hyde Park Savings Bank – Certificate of Deposit | 12,917 | 42 |
|  | PERSONAL ESTATE | 117,210 | 51 |

## SCHEDULE OF REAL ESTATE IN DETAIL

|  | Dollars | Cts. |
|---|---|---|
| NONE | 0 | |

Docket No. _____ 03P1104GI _____

**Inventory**

/

## INSTRUCTIONS

Appraise estate as of date of death when filing as administrator, executor, administrator with the will annexed, special administrator, public administrator.

Appraise estate as of date of appointment when filing as conservator, guardian, trustee, receiver.

**EXHIBIT 12**

## Commonwealth of Ma
### The Trial Court
Probate and Family Court Department

__Norfolk__ Division

Docket No. __03P1104-GI1__

## Account

__First and Final__ _____ Account of___ __Walter J. Kelly__
__Temporary Guardian of__ _____ and__ __Helen Runge__
_____ ~~as~~ _____

(Specify type of fiduciary and name of estate)

This account is for the period of ___ __May 2, 2003__ ____ to __August 11, 2003__
_____ inclusive.

Principal amounts received per Schedule A                $__119,388.33__

Principal payments and charges per Schedule B            $__119,388.33__

Principal balance invested per Schedule C                $__-0-__
   Market value as of _____ per Schedule C       $_____
                        (date)

Income received per Schedule D                           $_____

Payments from income per Schedule E                      $_____

Income balance per Schedule F                            $_____

The United States Veterans' Administration ~~is~~ - is not - a party in interest to this account. The ward ~~is~~ - is not - a patient in a State Hospital.

I - ~~We~~ certify under the penalties of perjury that the within account is just and true.

Date __8/29/03__

_____
                        Signature of Fiduciary

The undersigned, being _____ interested, having examined the foregoing account, request that the same may be allowed without further notice.

_____
_____
_____
_____

CJ-P 30 (8/88)

For Petitioner:

__ Attorney Thomas F. Schiavoni __

_P.O. Box 311, Lynn, MA 01903_

Tel No. ___ (781) 596-1090 ___

For Respondent:

_Attorney Lawrence Hale_

_300 Tremont St., Suite 8, Carver,_
_MA 02330_
Tel. No. _(508) 866-2900_

Publication in the _____

_____

Docket No. ___ 03P1104-GI ___

**Account**

Filed _____ 19____

Citation Issued _____ 19____

Returnable _____ 19____

Allowed _____ 19____

Recorded Vol. _____ Page _____

## Instructions

Refer to Massachusetts General Laws Chapter 206.
(Sugested format for Schedules and use continuation sheets as needed)

SCHEDULE A    shall contain the amount of personal property and with respect to a trustee, guardian or conservator, also the amount of real property, per inventory or balance of principal according to next prior account, and amounts received on account of principal or gains from the sale of any property.

SCHEDULE B    shall contain amounts paid out and charges on account of principal, losses and distributions of estates.

SCHEDULE C    shall contain the investment of the balance of such account with market values of all assets separately stated. A final account of fiduciary shall contain no balance in this Schedule. Schedule C requires both appraised (book) and market values (P.R. 29A).

SCHEDULE D    trustees only shall report balance of income according to next prior account and amounts received on account of income.

SCHEDULE E    **trustees** only shall report payments chargeable to income.

SCHEDULE F    **trustees** only shall report balance of income.

**First and Final Account of Walter J. Kelly
as Temporary Guardian of Helen Runge**

<u>**May 2, 2003 to August 11, 2003**</u>                    <u>**Docket No. 03P 1104-GI**</u>

<u>**SCHEDULE A**</u>

| 1 | 5/2/03 | Balance according to the inventory | 117,210.51 |
| 2 | 7/26/03 | Michael J. McCann, Esquire - refund on retainer | 1,102.00 |
| 3 | 7/31/03 | Interest Members Credit Union | 285.82 |
| 4 | 8/7/03 | Commonwealth of Massachusetts - tax refund | 790.00 |

**TOTAL SCHEDULE A:**                                    **119,388.33**

1

**First and Final Account of Walter J. Kelly**
**as Temporary Guardian of Helen Runge**

<u>May 2, 2003 to August 11, 2003</u>                                    <u>Docket No. 03P 1104-GI</u>

### <u>SCHEDULE B</u>

| | | | |
|---|---|---|---|
| 1 | 5/23/03 | Sunbridge - nursing home expenses | 9,475.31 |
| 2 | 5/23/03 | Meridian Health Association - dental services | 75.00 |
| 3 | 5/23/03 | Katherine F. Eddy - bond premium | 540.00 |
| 4 | 5/23/03 | McGee & Schiavoni - legal services for guardian in Massachusetts | 4,227.50 |
| 5 | 6/4/03 | Walter J. Kelly - services | 7,500.00 |
| 6 | 6/4/03 | Attorney Michael McCann - legal services for guardian in North Carolina | 1,900.00 |
| 7 | 6/4/03 | Sunbridge of Randolph - medication | 702.10 |
| 8 | 8/4/03 | Transfer of safe deposit keys and personal property to attorney for daughter | Unknown Value |
| 9 | 8/7/03 | McGee & Schiavoni - legal services for temporary | 6,150.00 |
| 10 | 8/7/03 | AACE Delivery to Attorney Hale in Carver | 88.00 |
| 11 | 8/7/03 | Transfer of boxes in storage to attorney for daughter | Unknown Value |
| 12 | 8/7/03 | Funds held by Hyde Park Savings Bank pending further order of the court: Checking Account: Savings Bank - Certificate of Deposit: | 15,820.56 12,917.42 |
| 13 | 8/8/03 | Funds held in reserve by Walter Kelly for costs of pending account resolution | 1,944.09 |
| 14 | 8/11/03 | Funds released by credit union to agents of Helen Runge Members Plus Credit Union: Money Market Account | 30.68 58,017.67 |

**TOTAL SCHEDULE B:**                                    **119,388.33**

1

**First and Final Account of Walter J. Kelly**
**as Temporary Guardian of Helen Runge**

<u>May 2, 2003 to August 11, 2003</u>                                    <u>Docket No. 03P 1104-GI</u>

<u>SCHEDULEC</u>

1        8/11/03                Balance                                                    0.00

1

**EXHIBIT 15**

## COMMONWEALTH OF MASSACHUSETTS
### THE TRIAL COURT
### PROBATE AND FAMILY COURT DEPARTMENT

**Norfolk Division**                                   **Docket No. 03P 1104 GI**

---

**In Re: Guardianship of
Helen Runge**

---

## ORDER

*(On former Guardian's Motion to Strike Objections and Appearance)*

After hearing and review of relevant pleadings, the Court enters the following orders:

1) Objections numbers 1, 2, 3, 4, 5, 6 and 7 are stricken.

2) The remaining objections (numbers 8, 9. 10. 11 and 12) shall stand pending a final resolution or judgment on the merits.

3) The former ward, Helen Runge, shall place $10,000 in an escrow account in the name of her attorney until final resolution or judgment on the merits.

4) Discovery is limited to issues involving counsel/ guardian fees and medication costs.

5) Motion for Costs and Fiduciary Fees are deferred until final resolution or judgment on the merits.

6) If the attorneys are unable to resolve this matter, they may seek a Pre Trial Conference within 30 days of request by contacting Dianne Rowland at (781) 830-1244.

December 7, 2004

Angela M. Ordoñez
Judge of Probate and Family Court

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK DIVISION                    DOCKET NO. 03P0469-GI1

GUARDIANSHIP OF              )        MOTION TO STRIKE OBJECTIONS
                            )        AND APPEARANCE
HELEN RUNGE                  )
                            )

Now comes Walter J. Kelly, Esq., former temporary guardian of Helen Runge, and moves, pursuant to Mass. R. Civ. P. 72 , to (1) strike the objections of Helen Runge to his first and final account and (2) strike the appearance of Blake J. Godbout, Esq. previously filed on behalf of Helen Runge in connection with the allowance of said account for failure to file a sufficient and meritorious objection within the time required by said rule. In support of this motion, the following arguments are made:

1.   **Objection No. 1** asserts that Walter J. Kelly and Farrah Seidler as original petitioners for the temporary guardianship were not relatives and/or friends of Helen Runge. Such objection does not constitute a valid written statement specifying an item of the account to which the party objects. Further reference is made to <u>Gardiner v. Jardine</u>, 245 Mass 274, 139 NE 481 (1923) **(Attachment 1)** which stands for the proposition that even "a stranger who in good faith believes that the welfare of (a) person requires temporary restraint" may proceed under G.L. Ch. 201, Sec. 14.

2.   **Objection No. 2** alleges that Walter J. Kelly was "fired" by the ward who revoked her power-of-attorney and health care proxy prior to the filing of the guardianship petition. Such objection does not constitute a valid written statement specifying an item of the account to which the party objects. Moreover, the discharge of Walter J. Kelly as her health care agent placed upon him an affirmative duty of seeking instructions from a probate court according to G.L. Ch. 201D. Further reference is made to the response to Objection No. 1 above as well MBA Ethics Opinion 2004-1 regarding the ethical duties of a fired lawyer. **(Attachment 2)**

3.   **Objection No. 3** contends that the ward's power-of-attorney was executed while she was hospitalized and under the influence of narcotics (presumably medication). Helen Runge provides no further specificity beyond alleging that her authorization was fraudulently obtained. Such objection does not constitute a valid written statement specifying an item of the account to which the party objects.

1

The within Motion is hereby
Allowed in part, denied in part
see Ord

12/7/04   Angela M Ordoñez
Date      Justice

COMMONWEALTH OF MASSACHUSETTS
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK DIVISION                                    DOCKET NO.  03P0469-

|  |  |
|---|---|
| GUARDIANSHIP OF ) | MOTION FOR PROTECTIVE ORDER |
| ) | REGARDING CONTESTANT'S |
| HELEN RUNGE ) | DISCOVERY REQUEST |
| ) | |

Now comes Walter J. Kelly, Esq., former temporary guardian of Helen Runge, an moves for a protective order regarding a request for production of documents in a conte his final account. In support of this motion, he asserts that the contestant has not compl with SJC Rule 1:02A and M.R.Civ.P. Rule 72. He further states that:

1.  The discovery request is overly broad and duplicates a prior transfer of document arranged upon the expiration of the temporary guardianship by Walter Kelly, Esq. with Lawrence L. Hale, Esq. who was the previous counsel of record for Helen Runge.

2.  The discovery request improperly seeks documents based upon issues not previously raised in the contestant's objections to the guardian's final account.

3.  A motion to strike by the former guardian is pending before the court on the groun that objections invoked by Helen Runge and her agents are beyond the permissibl grounds for legitimately opposing the final account. The anticipated striking of all or a portion of such objections will eliminate and/or narrow the scope the contestant's discovery request.

WHEREFORE, the court is respectfully requested to:

1.  Issue an order to postpone the production request pending a ruling on the guardiar motion to strike.

2.  If any objections remain after a ruling on the motion to strike, the court is further requested to issue an order for the contestant Helen Runge to deposit funds with a escrow agent in the Commonwealth. The amount of such funds should be commensurate with Walter J. Kelly's past and future anticipated costs of discovery, attorney and fiduciary fees in undertaking a full trial on the merits of his final accoun

3.  Issue any other orders deemed appropriate.

Walter J. Kelly, Esq.
By his attorney:

November 4, 2004

The within Motion is ~~hereby~~ See order of
~~Allowed/Denied~~                    12/7/04

12/7/04    Angele M Ordax
Date        Justice

Thomas F. Schiavoni
BBO No.  445460
McGee & Schiavoni
37 Friend St., P.O. Box 311
Lynn, MA  01903-0311
781-596-1090

**EXHIBIT 13**

# BLAKE J. GODBOUT & ASSOCIATES
### ATTORNEYS-AT-LAW

33 BROAD STREET - 11ᵀᴴ FLOOR
BOSTON, MASSACHUSETTS 02109

BLAKE J. GODBOUT

JAMES L. KIMBALL

TELEPHONE: (617) 523-6677
FACSIMILE: (617) 227-3709

January 29, 2004

<u>By Hand</u>

Clerk
Norfolk County Probate Court Department
35 Shawmut Road
Canton, MA 02021

     RE:  Guardianship of Helen Runge
          Norfolk Probate Court Docket No. 03 P1104 GI

Dear Sir/Madam:

    Enclosed regarding the above captioned matter is Helen Runge's Objection to the First and Final Accounting of Walter J. Kelly, Temporary Guardian of Helen Runge together with a Certificate of Service.

    I thank you in advance for your time and attention to this matter.

                             Very truly yours,

                             Blake J. Godbout

cc:  Glenn Davis
      Thomas F. Schiavoni

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss                          PROBATE AND FAMILY COURT
                                     DEPARTMENT
                                     DOCKET NO. 03 P1104 GI

_____
                                )
                                )
GUARDIANSHIP OF                 )
HELEN RUNGE                     )
                                )
_____)

## OBJECTIONS OF HELEN RUNGE TO THE FIRST AND FINAL ACCOUNTING OF WALTER J. KELLY, TEMPORARY GUARDIAN OF HELEN RUNGE

NOW COMES Helen Runge and hereby files these objections to the First and Final Accounting of Walter J. Kelly, Temporary Guardian of Helen Runge. In support of these objections, Helen Runge states as follows:

### PROCEDURAL OBEJCTIONS:

1. The Guardianship Petition filed by Walter J. Kelly and Farrah Seidler is in violation of M.G.L. c. 201, sec. 6 as neither Walter J. Kelly ("Attorney Kelly") or Farrah Seidler are relatives and/or friends of Helen Runge.

2. Helen Runge fired Walter J. Kelly and revoked both his Power-of-Attorney and Health Care Proxy prior to the filing of the Guardianship Petition.

1

3.    Furthermore, the Power-of-Attorney obtained by Attorney Kelly and used as the basis for the Guardianship Petition was fraudulently obtained while Helen Runge was under the influence of narcotics at Carney Hospital.

4.    Upon information and belief, Farrah Seidler is an employee of Sunbridge Nursing and Rehabilitation Center who barely knew Helen Runge and in any event did not know Helen Runge outside of her relationship as a health care professional charged with Helen's care.

5.    The Medical Certificate certifying Helen Runge's mental status that Walter Kelly submitted to the Court during the proceedings appointing Helen Runge's Temporary Guardian contains material factual discrepancies.  These discrepancies call into question the accuracy and authenticity of the Certificate. Specifically, Helen Runge was not at 1380 Columbia Road, Randolph, MA, on April 29, 2003, as certified by Dr. Kerry Bloomingdale in the Medical Certificate declaring her mentally ill.

**OBJECTIONS TO ACCOUNTING:**

6.    Helen Runge objects to the amounts paid to Sunbridge Nursing Home ("Sunbridge"), listed as Item One (1) in Schedule B of the Fiduciary's account.  Specifically, the services Helen Runge received while at Sunbridge were not commensurate with the expenses charged.  Walter Kelly knew of Helen's dissatisfaction

2

with Sunbridge yet did nothing to investigate whether the charges accurately reflected the nursing care she received. These facts are corroborated in the medical examinations received by Helen after leaving Sunbridge.

    7.  Helen Runge further objects to Item One (1) in that Attorney Kelly potentially violated his fiduciary duty by failing to investigate her eligibility for Medicare benefits for her time at Sunbridge, which totaled fewer than 100 days and resulted after an in patient stay of over three (3) days.

    8.  Helen Runge objects to the amounts paid to McGee & Schiavoni, listed as Item Four (4) in Schedule B of the Fiduciary's Account, as excessive for the services provided. Helen was not in the state and received no benefits from these services and calls upon Attorney Kelly to substantiate the same.

    9.  Helen Runge objects to the amounts paid to Attorney Kelly for services rendered, listed as Item Five (5) in Schedule B of the Fiduciary's Account, as excessive and calls upon Attorney Kelly to substantiate the same. The temporary Guardianship lasted 90 days and these amounts total over five (5) percent of her total estate. Furthermore, these amounts appear to represent legal services, which were provided to the Ward by McGee and Schiavoni, and therefore potentially violate the fiduciary duty Attorney Kelly owed to Helen Runge.

3

10.   Helen Runge objets to the amounts paid for legal services in North Carolina, listed as Item Six (6) in Schedule B of the Fiduciary's Account, as unnecessary and excessive. Helen Runge never received the benefit of these services and calls upon Attorney Kelly to substantiate the same.

11.   Helen Runge objects to the payment of medication expenses to Sunbridge, listed as Item Seven (7) in Schedule B of the Fiduciary's Account. As grounds therefor, Helen Runge states that she had full medication coverage through her insurance. Attorney Kelly knew of this coverage, yet failed to submit these expenses to her insurance and paid them out of her estate. This potentially violated the fiduciary duty Attorney Kelly owed to Helen Runge.

12.   Helen Runge objects to the amounts paid to McGee & Schiavoni, listed as Item Nine (9) in Schedule B of the Fiduciary's Account, as excessive for the services provided. As grounds therefor, Helen states that the total amount paid to McGee & Schiavoni for the 90 day Guardianship totals ten (10%) percent of her total estate. Furthermore, she never received any benefit of the services and calls upon Attorney Kelly to substantiate the same.

Respectfully Submitted,

**HELEN RUNGE,**
By her attorney,

Blake J. Godbout, Esq.
BLAKE J. GODBOUT & ASSOCIATES
33 Broad Street, 11th Floor
Boston, MA 02109
(617) 523-6677
BBO# 196380

January 29, 2004

5

## CERTIFICATE OF SERVICE

I, Blake J. Godbout, attorney for Helen Runge, hereby certify that I have this day served a copy of:

1.   Objections of Helen Runge to the First and Final Accounting of Walter J. Kelly, Temporary Guardian of Helen Runge.

upon the Parties, by mailing a copy of same, postage prepaid, to the attorneys of record:

Thomas F. Schiavoni
McGEE & SCHIAVONI
37 Friend Street, P.O. Box 311
Lynn, MA 01903-0311

Blake J. Godbout
BLAKE J. GODBOUT & ASSOCIATES
33 Broad Street, 11th Floor
Boston, MA 02019
(617) 523-6677
BBO # 196380

Dated: January 29, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
NO.: 05-10849-RGS

ORIGINAL

)
HELEN A. RUNGE,                          )
        Plaintiff,                   )
    v.                                   )   <u>DEPOSITION OF</u>
)
)   <u>GILBERT STANLEY - DAY 1</u>
WALTER J. KELLY, et al.,                 )
        Defendants.                  )
)

On Tuesday, November 14, 2006, commencing at 4:20 p.m., the deposition of Gilbert Stanley was taken on behalf of the Defendants at Isothermal Community College, Room 118, 1255 West Mills Street, Columbus, North Carolina, and was attended by Counsel as follows:

<u>APPEARANCES:</u>

        GLENN R. DAVIS, ESQ.
        Latsha, Davis, Yohe & McKenna, P.C.
        1700 Bent Creek Boulevard, Suite 140
        Mechanicsburg, Pennsylvania  17050
        on behalf of the Plaintiff

        GEORGE C. ROCKAS, ESQ.
        Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
        155 Federal Street
        Boston, Massachusetts  02110
        on behalf of Walter Kelly

        JAMES S. HAMROCK, JR., ESQ.
        Hamrock & Tocci
        101 Main Street, 18th Floor
        Cambridge, Massachusetts  02142
        on behalf of Dr. Bloomingdale

        MICHAEL WILLIAMS, ESQ.
        Lawson & Weitzen, L.L.P.
        88 Black Falcon Avenue
        Boston, Massachusetts  02210
        on behalf of Sunbridge Nursing Home

Attending:  Dorothy Stanley

REPORTED BY:  Mai-Beth Ketch, CVR
          ASHEVILLE REPORTING SERVICE

1    Q    You weren't personally involved in these court

2         proceedings?  But you said they went back in

3         regarding the bank accounts.  You have no

4         firsthand knowledge of that?

5    A    Sure.  I mean, we got the documents

6         eventually.  We got the filings from our

7         attorney.

8    Q    Well, you were represented by Attorney Hale?

9    A    Yeah.  He got the filings.  So we had that

10        documentation.  We knew what happened.  So I

11        called the financial institutions.  The one

12        was a credit union and the other was the Hyde

13        Park Savings Bank.  Hyde Park Savings Bank --

14        both of them said, "Hey, we'll just" -- "we'll

15        shut the accounts down.  We'll freeze them.

16        No one can get any money out."  I said,

17        "That's just great.  Fine.  We'll" -- "as long

18        as no one's stealing her money, I don't care."

19        It turned out that was inaccurate.  The credit

20        union let them have all the money he wanted,

21        and (pause) ---

22   Q    When you say that, what do you mean by that?

23   A    I mean that he immediately withdrew $25,000,

24        not knowing what bills he had to pay or

25        anything else.  There was an immediate draw

70

1          out of $25,000.

2     Q    Do you know whether he got Court approval for

3          that?

4     A    No.  He got Court approval to do whatever he

5          wanted with her money, and the week that the

6          guardianship was to expire, temporary

7          guardianship was to expire, he withdrew

8          another $6,500.  So I went to the credit union

9          up there and raised cain and they said, "Well,

10         you know, that's just the way it is."

11    Q    Did you ever instruct Mr. Hale to go to court

12         to try to freeze any withdrawals?

13    A    We had a conversation with Mr. Hale, asking

14         him about what we should do, because money is

15         an issue.  You know, Mr. Hale, if he went to

16         Probate Court, that's $3,000 or $4,000 for him

17         to show up at the front door, and -- the way

18         the Probate Court is run in Massachusetts,

19         especially, and he said, "Don't worry about

20         it.  As long as they've frozen the accounts,

21         don't worry about it.  Just the let the thing

22         expire and it'll go away.  We'll get her

23         belongings back.  I'll work towards getting

24         her belongings back and we'll go from there."

25         So we took that as gospel.

71

1    Q    It was the gospel according to Hale; correct?

2    A    No.

3    Q    What was incorrect about Mr. Hale's gospel?

4    A    Mr. Hale should have been up at the Probate

5         Court getting that guardianship turned around.

6         He should have opposed it immediately.

7    Q    Did you instruct him to do that?

8    A    Did I instruct him to do it?  No, I didn't,

9         because I took his advice that, you know, it

10        was going to cost a lot of money to do that

11        and, you know, we're not rich people.  We're

12        not poor, but we're not rich people, and I

13        personally don't enjoy paying lawyers much.

14        It's -- your welfare depends on it.  I don't

15        enjoy doing it.  So we were trying not to

16        spend a lot of money.  It was -- in hindsight,

17        it was a mistake.  We made a mistake.

18   Q    But, at least as far as you know, the

19        temporary guardianship ended in August of

20        2003?

21   A    Yes.  It ended 90 days after the 3rd of May,

22        if I remember properly.

23   Q    So that's approximately August 3, 2003?

24   A    Yeah, something like that.

25   Q    Did it just expire, as far as you know?

72

```
 1    A    I know what happened.

 2    Q    What do you say happened?

 3    A    The judge that we suspect Mr. Kelly had a very

 4         good relationship with, this problem was

 5         getting far too hot, and he decided to hand it

 6         off to a different judge, and that's what he

 7         did, and this judge Mr. Kelly didn't have the

 8         same association with, we suspect, okay --

 9         supposition.  We suspect he didn't have that

10         same association with, so they decided to drop

11         it, and that's what they did.

12    Q    Was the first judge Judge Angela Ordonez?

13    A    No.

14    Q    It was a different judge?

15    A    Yes.  It was Langois or something like that.

16    Q    Is it Langois or Langois?  (Pronounces

17         differently)  L-a-n-g-o-i-s?

18    A    He's the one that signed the original.

19    Q    The original order?

20    A    He's the one that Kelly said he had the firm

21         association with.

22    Q    If that's the case, do you know why your wife

23         wrote this letter to Judge Ordonez?

24    A    You bet.

25    Q    Why?
```

73

| 1 | A | Because she was -- she came and asked for |
| 2 | | Helen to put up $10,000, which she didn't |
| 3 | | have, and she needed what she had left in |
| 4 | | monies for her own healthcare, and she wanted |
| 5 | | her to put up $10,000 before she could get an |
| 6 | | accounting, and my wife just got furious, and |
| 7 | | that's the result of it right there.  She was |
| 8 | | mad. |
| 9 | Q | Was she willing to put up a $10,000 bond? |
| 10 | A | $10,000 -- no, not a bond.  It was -- she |
| 11 | | wanted her to place $10,000 in escrow, in an |
| 12 | | escrow account. |
| 13 | Q | Why, as far as you know? |
| 14 | A | To cover Kelly's attorney's fees. |
| 15 | Q | In preparing the accounting? |
| 16 | A | In preparing the accounting, in doing |
| 17 | | whatever, in defending the account. |
| 18 | Q | Well, you were challenging the account?  You |
| 19 | | filed an objection? |
| 20 | A | Of course, and the good judge never read this. |
| 21 | Q | How do you know the good judge never read |
| 22 | | that? |
| 23 | A | Because her clerk sent it back to us and said |
| 24 | | that the judge did not read it and would not |
| 25 | | read it because it was an ongoing case, it |

74

```
1              would be improper, and that we should file a
2              complaint with the bar association or
3              whatever, but the judge wouldn't read this.
4    Q    Did a letter accompany the return of this
5              letter to you, or was this a statement made
6              over the phone?
7    A    No, no.  It was a letter.  The clerk wrote a
8              letter.
9    Q    So during the whole probate proceeding
10             regarding the guardianship, the accounting,
11             you never talked to Attorney Kelly; is that
12             fair to say?
13   A    No.  It was -- we never talked to him because
14             we hired a lawyer to represent us.
15   Q    You were represented by Mr. Hale?
16   A    Yeah, sure.  He talked to him.
17   Q    Did you observe any conversations Mr. Hale had
18             with Mr. Kelly?
19   A    No, no.
20   Q    Did you listen in on any conversations Mr.
21             Hale had with Mr. Kelly, in which you were on
22             the line when they may have been talking?
23   A    If I would have listened in, I would have
24             observed.  It's synonymous, to me.
25   Q    So, then, you have no firsthand knowledge of
```

75

```
 1            any conversation between Attorney Hale and

 2            Attorney Kelly?

 3        A   No, I don't.

 4    BY MR. DAVIS:

 5            My recollection, George, is that at the time,

 6            Attorney Kelly was represented by Attorney

 7            Schiavoni.

 8    BY MR. ROCKAS:

 9            I understand that.

10    BY MR. DAVIS:

11            I believe those discussions would have

12            probably been between Attorney Hale and

13            Attorney Schiavoni.

14    BY MR. ROCKAS:

15            I just want to get all the conversations, and

16            if there are other conversations out there.

17    DIRECT EXAMINATION RESUMED BY MR. ROCKAS:

18        Q   Who was Attorney Hale representing?

19        A   He was representing my wife and myself.

20        Q   In filing an objection to the accounting?

21        A   Yes.

22        Q   Was he representing you ---

23        A   Well, he was also representing Helen, as far

24            as the objection the accounting was concerned.

25            So it would be proper to say, I guess, he was
```

76

```
 1              representing all three of us.
 2    Q    Was he representing anyone with respect to the
 3         guardianship issue?
 4    A    Yes.  He was representing my wife and myself
 5         as far as the guardianship itself was
 6         concerned.  But again, we had elected not to
 7         do anything about the guardianship, just leave
 8         it laying until the accounting, and then
 9         (pause) ---
10    Q    Well, the guardianship lapsed, though, on
11         August 3?
12    A    Yes.  The guardianship lapsed, and we then
13         asked him to represent Helen as far as getting
14         an accounting was concerned, and he
15         represented Helen initially as far as the
16         accounting is concerned, and then eventually
17         we changed attorneys.
18    Q    Who did you go to?
19    A    Blake Godbout.
20    Q    He represented you with respect to ---
21    A    He represented Helen as far as the accounting
22         was concerned in the Probate Court.
23    Q    Did Mr. Hale continue to represent you with
24         respect to the accounting?
25    A    No, no.
```

77

```
 1    Q    You went unrepresented?

 2    A    In the Probate Court?

 3    Q    Yes.

 4    A    Yes, because the only issue left was the

 5         accounting.

 6    Q    How did Helen get Mr. Godbout's name?

 7    A    I got it from Mr. Davis.

 8    Q    You brought up Mr. Schiavoni.  Did you ever

 9         personally talk to Mr. Schiavoni?

10    A    No, not that I can remember.

11    Q    So you never observed a conversation where Mr.

12         Schiavoni was talking to someone else?

13    A    No.  In fact, Mr. Schiavoni brought down some

14         of the things that Mr. Kelly had to Mr. Hale's

15         office, and he specifically requested that we

16         not be there.  So we respected that.

17    Q    But that was probably a good thing; wasn't it?

18    A    I don't care.  I don't hate you yet.

19    (OFF THE RECORD)

20    DIRECT EXAMINATION RESUMED BY MR. ROCKAS:

21    Q    When do you understand Mr. Schiavoni went to

22         Mr. Hale's office?

23    A    That was about 90 days or 91 days after 3 May.

24         So that would have been August 4 or 5 or

25         somewhere in that period of time, because we
```

78

1      were up there, ready to -- or they had filed a

2      -- an initial application or initial --

3      whatever you want to call it -- now is when I

4      become really a dumb lawyer -- petition to the

5      Court to extend the 90-day period.

6    Q   Who filed that petition?

7    A   Kelly and Schiavoni.

8    Q   But then they withdrew it?

9    A   Then -- yes.  But we went up there intending

10     at that point in time to appear in court and

11     oppose it, and by the time we got there, they

12     had decided to withdraw it.

13   Q   So at some point during the first part of

14     August, you got a call from Mr. Hale saying,

15     "Mr. Schiavoni brought over Helen's stuff,

16     please come by and get it"?

17   A   No.

18   Q   No?

19   A   When we got up there, we went to Mr. Hale's

20     office.  We got in his office and he says, "We

21     won."  I said, "Well, yeah.  What did we win?"

22     "Well, they backed off and they're going to

23     give us her possessions."  So it was two or

24     three days later that -- they had two

25     shipments of it.  Schiavoni brought down some

79

1    and then they had a courier bring down some,

2    several boxes full of stuff.

3  Q    The two of you brought that stuff back to

4    North Carolina?

5  A    Yeah.  We had a very full van.

6  Q    So you had a minivan?

7  A    Well, it was -- when did I have it?  I think

8    we had the truck.  I think we had the pickup.

9  Q    So you filled up a little moving truck?

10  A    No, no.  It was a (pause) ---

11  Q    U-Haul?

12  A    An F-250 pickup truck.

13  Q    So you loaded the pickup truck with the stuff?

14  A    If I remember right, yeah.  I'd have a hard

15    time swearing to that.  I really don't

16    remember.

17  Q    So, then, at that point, by August, Mr. Kelly

18    had returned Helen Runge's personal

19    belongings?

20  A    Well, he had returned belongings.  Whether it

21    was all of her belongings or not, we had a

22    very difficult time trying to figure it out.

23    The one thing that we had some suspicion about

24    was that -- no, not at that point in time.  He

25    had brought down -- in fact, I think Schiavoni

80

1     was the one that brought down the jewelry.

2     They tried to inventory it.  The clothing was

3     all brought down by a moving company or

4     messenger company.  So we essentially -- we

5     looked at it, we tried to inventory the

6     jewelry, but the rest of the stuff, some of it

7     was half boxes, some of it was full boxes.  So

8     we tried to repack it and just get it in a box

9     so we could get it out of there.  It was

10    filling up Mr. Hale's office.  He didn't have

11    a very large office.  So we didn't try to go

12    through it at that point in time.  But we had

13    what we had and we left.

14  Q   Is that the last time you saw Mr. Hale?

15  A   Yes.

16  Q   Now, let me show you Plaintiff Helen Runge's

17    response to Defendant Walter Kelly's first set

18    of interrogatories, which is Exhibit 5,

19    Dorothy Stanley Exhibit 5.  Did you prepare

20    those answers?  (Tenders)

21  A   (Upon review)  No.

22  Q   Did you play a role in preparing those

23    answers?

24  A   No.

25  Q   Now, in October of 2003, Helen Runge was

127

| 1 | | enough money to be financially acceptable in |
|---|---|---|
| 2 | | the ACTS community.  We couldn't do it. |
| 3 | Q | How much did you need to get into the ACTS |
| 4 | | community? |
| 5 | A | $80,000, at that point in time. |
| 6 | Q | How much did Ms. Runge have as of April of |
| 7 | | 2004? |
| 8 | A | April of 2004, didn't know. |
| 9 | Q | What do you mean, you don't know? |
| 10 | A | 2004?  I was thinking 2003.  I'm sorry.  April |
| 11 | | of 2004, probably $30,000. |
| 12 | Q | There was some financial statement introduced |
| 13 | | during your wife's deposition that suggested |
| 14 | | your mother-in-law's assets were worth about |
| 15 | | $120,000.  Why don't we find that exhibit? |
| 16 | | For the record, you have Exhibit 19 in front |
| 17 | | of you now? |
| 18 | A | Yes. |
| 19 | Q | Just take a moment and look at that. |
| 20 | A | Okay. |
| 21 | Q | It looks, to my read of this, that there was |
| 22 | | at some point $89,000 and some-odd in the |
| 23 | | credit union account, $15,000 in Hyde Park |
| 24 | | Savings, and a $12,000 certificate of deposit, |
| 25 | | almost $13,000, in Hyde Park Savings; do you |

128

1       see that?

2    A    Uh-huh.   (Affirmative)

3    BY MR. ROCKAS:

4       Is that a yes?

5    BY THE DEPONENT:

6       That's yes.

7    CROSS-EXAMINATION RESUMED BY MR. HAMROCK:

8    Q    Is it your understanding that these were

9       totals at the time Ms. Runge left

10       Massachusetts and went down to North Carolina,

11       as of around that time?

12    A    I don't know when it was.

13    Q    At some point, there were charges, attorney's

14       fees, that I think you referenced.   You

15       mentioned $25,000 or something was withdrawn

16       from one of the accounts, you said, and then

17       $6,500 on a second occasion?

18    A    Excuse me.   You characterized them as all

19       attorney's fees.   All I'm saying is that

20       $25,000 was withdrawn at one occasion and

21       $6,500 was withdrawn at another occasion.   An

22       attorney withdrew it, but I wouldn't say they

23       was all attorney's fees.

24    Q    You reject the characterization?

25    A    Yes.

129

1    Q    I guess what I'm getting at or what I'm

2         interested in -- I don't know the answer -- is

3         assuming that total for whatever purpose,

4         that's approximately $31,000?

5    A    $31,500.

6    Q    Was that taken from this total of $117,000, or

7         was that $31,000 already accounted for when

8         this inventory was done?

9    A    No, no.  It was taken from this.

10   Q    Was any of that $31,000 ever returned to Ms.

11        Runge?

12   A    Yeah.  We spent the better part of $25,000

13        getting $8,000 back.

14   Q    So $31,000 was taken from that account and she

15        received $8,000 back.  So that's ---

16   A    I think it was $8,000, $8,000 to $9,000,

17        somewhere in there.

18   Q    So that would mean about $23,000 was taken

19        from the account after she left Massachusetts?

20   A    Well, about $23,000 was debited against the

21        moneys that she had.

22   Q    So if the total in Massachusetts that she had,

23        if this inventory is correct, $119,000 and

24        $23,000 was taken, that would leave her with

25        -- I don't claim to be a math major, but I

130

1          think about $96,000; would you agree with

2          that?

3     A    This is as of August '03.

4     Q    Right.

5     A    Yes.

6     Q    So what happened to that $96,000 as of August

7          of '03?  Why wasn't there $80,000 there as of

8          eight months later, April of 2004, when

9          consideration was being given as to which

10         nursing home she should go into?

11    A    I just got finished telling you.  The $25,000

12         went -- about $25,000 went to fighting the

13         Probate Court in order to get the $8,000 that

14         we ended up getting back and to get the

15         guardianship lifted and so forth and to get

16         her possessions back, and then -- in fact,

17         there was at least that much money.

18    Q    So the $25,000 was all charged against various

19         accounts of Ms. Runge; is that true?

20    A    Yes.  Of course.

21    Q    So none of that came out of your pocket or

22         your wife's pocket, it was all charged against

23         Ms. Runge; is that fair to say?

24    A    Sure.  It was her expense.

25    Q    Did you discuss with her the wisdom of whether

131

```
 1              she wanted to spend that $25,000 contesting
 2              the Probate Court proceeding?
 3      A       We didn't know it was going to be $25,000.
 4              But if your question is did we discuss with
 5              her whether she wanted to protest the
 6              proceeding, absolutely, and she definitely
 7              did.
 8      Q       Did you explain to her that this could bring
 9              the total amount of her cumulated bank
10              statements under the $80,000 which she might
11              need to go into what you and your wife
12              considered the premier nursing facility?
13      A       No, because we didn't know what it was going
14              to cost at that point in time.  When we
15              started this, we didn't know.
16      Q       Who was writing the checks to ---
17      A       Me.
18      Q       --- fight the Probate Court proceeding?
19      A       Me.
20      Q       You were writing them against your mother-in-
21              law's account?
22      A       Yes.  We had a bank account for her,
23              specifically for her.
24      Q       So you were making a decision yourself each
25              time you were writing a check as to whether
```

132

1        this was worth it or should we just let it go?

2   A   No.  We had no choice, as far as the letting

3        it go is concerned.  We had to get her (pause)

4        ---

5   Q   Well, at some point ---

6   A   Let me finish.  We had to get her material

7        back, her possessions back, in order to keep

8        her sane at all.  We had to get the -- we

9        could not allow the Probate Court up there to

10       extend the guardianship another 90 days,

11       because she wouldn't have had any money left.

12       So we had to fight that.  We didn't understand

13       how much money it was going to take to do

14       this.  I certainly didn't, and there wasn't

15       anybody on earth any madder than I was when I

16       found out how much it was going to cost.  But

17       it did and, you know, she agreed that we

18       should do it.  We did it and we were both

19       unhappy.

20   Q   What is the value of these shares of stock

21       that are described?

22   A   Almost nothing.  $17 or something like that.

23       They're just two or three shares of stock that

24       she had as residue from her employment with

25       Edison.

133

```
 1    Q    Did you apply at all for Ms. Runge to be
 2         admitted to the ACTS program in 2004?
 3    A    No, no.
 4    Q    How much money did she have as of April 2004?
 5    A    I don't know.
 6    Q    How much under $80,000 was it?
 7    A    I don't remember.
 8    Q    Did she have any other expenses, other than
 9         the legal fees, that were charged to that
10         money after she came here up until 2004?  So,
11         I guess, for the first year she was here?
12    A    Yes.  I mean, she had assisted living when she
13         was in the assisted living facility.
14    Q    The assisted living facility, again, was the
15         facility that you and your wife placed her in
16         when you went up to Massachusetts to contest
17         the Probate Court business; is that fair?
18    A    That is really respite care facility, but it
19         is an assisted living facility.  That was an
20         expense.
21    Q    How much was that?
22    A    I don't remember right now.  It's -- I don't
23         remember.  The -- what was the cutoff date?
24         Could you ask that question again?
25    Q    Sure.  Between when your mother-in-law came
```

171

1          You can go ahead.

2     <u>CROSS-EXAMINATION RESUMED BY MR. WILLIAMS:</u>

3     Q    Did you yourself have any conversation with

4          -anybody at Sunbridge on April 30, 2003?

5     A    Yes.

6     Q    Who was that?

7     A    Ellen Redwine, the escort that they sent down

8          to bodyguard her at the front door, a couple

9          of the orderlies.

10    Q    Did all of those discussions take place

11         outdoors, outside of the facility?

12    A    Yes, they did.

13    Q    So your wife was the only one that went inside

14         and talked to anybody?

15    A    Yes.

16    Q    What was the nature of your discussion with

17         Ellen?  What did you say to her, what did she

18         say to you, the best you can remember?

19    A    She came out screeching like a banshee that

20         she had a power of -- or a healthcare proxy, I

21         couldn't take her, and my sole discussion with

22         her was, "I have a healthcare proxy and she's

23         going with me."

24    Q    Is that it for your discussion with Ellen?

25    A    With Ellen, it was, yes.

172

1    Q   How about with the escort?  What was the

2          discussion with the escort?

3    A   The escort -- I told the escort that we were

4          taking Helen, that we thought she was being

5          held prisoner illegally, and she was leaving.

6    Q   What about with the orderlies?

7    A   The orderly that went to grab Helen, I stepped

8          in between Helen and the orderly and told him,

9          "Don't touch her," and the orderly backed off

10         and said okay.  The other orderly that stood

11         in front of the car, he -- excuse me -- he

12         shouted out, "You don't intimidate me."  I

13         said, "I don't mean to.  But you don't

14         intimidate me either.  So I just want to get

15         out of here."  That was the sum total of the

16         discussions with the people outside.

17    Q   Some of those orderlies were standing in front

18         and behind your vehicle; correct?

19    A   There was some guy standing behind the vehicle

20         that they said was the new director of

21         Sunbridge.  He had just go there that day,

22         okay, poor guy.  He -- there was an orderly

23         standing in front of the vehicle, because

24         Ellen Redwine told them to.

25    Q   At some point, you started to drive off;

173

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Yeah.  He -- I got in the car and, you know, |
| 3 | | this wasn't a fight, okay.  It wasn't |
| 4 | | somewhere where everybody was hollering at one |
| 5 | | another.  This guy, he obviously wasn't very |
| 6 | | enthusiastic about this whole deal.  So he |
| 7 | | just stepped away from the front of the car. |
| 8 | | He didn't -- you know, he didn't do what Ellen |
| 9 | | Redwine asked him to do.  When we did that, I |
| 10 | | started the car and I left. |
| 11 | Q | Did he step away before or after you started |
| 12 | | to move? |
| 13 | A | He stepped away well before I started to move. |
| 14 | | I'm not running anybody down, even for Helen. |
| 15 | Q | Was there any physical force used in any way |
| 16 | | to stop you or slow you down? |
| 17 | A | No, no.  I mean, the physical -- unless you |
| 18 | | say trying to intimidating me from ever |
| 19 | | stopping, because they were trying to hold me |
| 20 | | there until the police came. |
| 21 | Q | Does Helen currently have any involvement in |
| 22 | | the North Carolina Division of Mental Health? |
| 23 | A | No. |
| 24 | Q | Has she ever stayed at a facility run by them? |
| 25 | A | I have no idea what facilities they run, so I |