UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

     *Plaintiff,*

*v.*

WALTER J.  KELLY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

     *Defendants.*

Civil Action No. 05-10849-RGS

---

### DEFENDANT'S OFFER OF PROOF

---

The Court has indicated that it is inclined to admit into evidence the affidavit of Helen Runge dated July 27, 2003.  Defendant seeks reconsideration and clarification of the Court's decision as to the admissibility of the Affidavit of Helen Runge.  To the extent that the Court bases its decision on the representation that the subject Affidavit was filed in the underlying Probate Court proceeding, Defendant submits this offer of proof that the Affidavit was not actually filed in the Probate Court proceeding, *In re Guardianship of Helen Runge*, Docket No.03P1104GI.

Defendant's Offer of Proof includes the following:

1.     An Affidavit of Giana Festa, a paralegal at the law firm of Wilson Elser, LLP, 260 Franklin Street, Boston, MA, who reviewed all of the filings within the court's file and docket of *In re Guardianship of Helen Runge*, Docket No.03P1104GI at Norfolk Probate Court, and found no Affidavit of Helen Runge.  [Exhibit A]

2.      A Certified copy of the docket of *In re Guardianship of Helen Runge*, Docket No.03P1104GI which does not include an Affidavit of Helen Runge. [Attached as Exhibit 2, to the Affidavit of Giana Festa (Exhibit A)].

3.      The following deposition testimony of Gilbert Stanley:

> Q.      So you were thinking that this document, this affidavit, might prove useful in the Probate Court case?
>
> A.      Would help –yeah, would help Attorney Hale in preparing for what he thought he may to do.

[Deposition of Gilbert Stanley, Page 156, lines 17-22, attached as Exhibit B]

> Q.      So at the time this affidavit of July 27 was signed by Ms. Runge, she had already expressed to you her desire to Mr. Kelly?
>
> A.      She actually wanted – yes. Yes.
>
> Q.      You certainly thought that this affidavit might be somehow useful in that suit, assuming such a suit was filed; true?
>
> A.  I wasn't thinking of a suit. Really what I wanted to do is to get documents what my wife knew and what she knew and what I knew, and there's – that's – you know, I was trying to get this stuff on paper while it was fresh in our minds.

[Exhibit B, Page 157, Lines 13-21.]

Respectfully submitted,

The Defendant, Walter J. Kelly,

By his attorneys,

_____*s/ Michele Carlucci*_____
George C. Rockas, BBO #544009
Michele Carlucci, BBO #655211
WILSON ELSER LLP
260 Franklin Street
Boston, MA 02110
(617) 422-5300

2

## <u>CERTIFICATE OF SERVICE</u>

I, Michele Carlucci, certify that on June 23, 2008, I have served a copy of the foregoing by electronic filing.

*/s/ Michele Carlucci*
Michele Carlucci

123054.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOROTHY STANLEY, as Executrix of the
ESTATE of HELEN RUNGE,

    *Plaintiff,*

v.

WALTER J. KELLEY; KERRY L.
BLOOMINGDALE, M.D.; and
SUNBRIDGE NURSING AND
REHABILITATION CENTER,

    *Defendants.*

Civil Action No. 05-10849-RGS

## AFFIDAVIT OF GIANA FESTA

I, Giana Festa, of 7 Henchman Street, Boston, MA 02113, do hereby attest to the following upon my own personal knowledge:

1.    I am a paralegal for the law firm of Wilson Elser, LLP, 260 Franklin Street, Boston, MA.

2.    On the afternoon of June 23, 2008, I went to Norfolk Probate Court and reviewed all of the pleadings and filings contained in the Docket of *In re Guardianship of Helen Runge*, Docket No.03P1104GI 3. The Affidavit of Helen Runge dated July 27, 2003, attached hereto as Exhibit 1, was not included in the docket or the Court's file on this matter.

4.    I obtained a certified copy of the docket of *In re Guardianship of Helen Runge*, Docket No.03P1104GI, which is attached as Exhibit 2.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, THIS 23 DAY OF JUNE, 2008.

                                Giana Festa

123058.1

# EXHIBIT 1

# Affidavit of Helen Anne Runge

I am an 87-year-old lady who has supported herself since she was 15 years old. I was born in South Boston to Lithuanian parents, was married for a short period, and had one daughter. I have always managed my own affairs including my finances. I used an attorney to do my taxes and to make out my wills as required. Up until the last few years, I used an attorney named Peter Kerr. Mr. Kerr retired and turned over my file to a Walter Kelly. I believe Mr. Kelly was a law partner of Mr. Kerr. My initial involvement with Walter Kelly was in the middle of 2001 just prior to entering Marion Manor Assistant Living facility.

I was living in the Hyde Park section of Boston, MA, was about 85 years old, and finding it increasingly difficult to climb the four flights of stairs to my apartment. I decided to investigate assisted living facilities with the thought that it would make life a little more pleasant. I knew of Marion Manor in South Boston and that it had a very good reputation as a nursing home. Marion Manor also had some facilities for assisted living. My friend Debbie drove me to the home and inspected it with me. The facility was well kept and the people very nice. It lived up to its reputation. I decided that I would move there. I contacted Mr. Kelly to tell him what I was going to do and told him I wanted him to prepare a will for me. He offered to help me move from my apartment to Marion Manor and I accepted. He of course charged me for his time to do this. Up until this point in time
(approximately 2 years from this writing) I had very little interface with Mr. Kelly. Mr. Kelly did help me move and stored some of my belongings in a storage facility that he had. He charges me storage for this.

I moved to Marion Manor in July of 2001. When I moved into Marion Manor, unknown to me, Mr. Kelly made himself the primary point of contact if I had a health problem. He also had me sign a health care proxy that I understood would only apply if I were determined to be incompetent by a court. I wanted my daughter to be the primary point of contact since she is a health care professional and I trust her. My daughter came to visit me several months after I moved there and found that she would not have been notified no matter what happened to me. Even though my daughter lived a long distance away, I felt more comfortable if she was the principle contact for my care. Working with the Marion Manor people, I had the change made.

Marion Manor was a very nice place with good people but had a drawback in that it did not have any available single rooms in assisted living. I had to room with a patient that had Alzheimer's disease. Most of the time this person was great to get along with but other times she was difficult. Having lived alone for over 60 years, it was difficult to adjust to living in a small room with another person. I decided I wanted to move to a facility that was more appropriate for assisted living. One of my friends that had just moved to the nursing home section of Marion Manor recommended that I look at Bayview Assisted Living. I went over to the facility by myself, found it was really nice and specialized in assisted living. I made a decision to move there and did so in November of 2002.

I moved into a large room that was very comfortable until the weather started to get colder. The room did not have adequate heat. When I complained about this, they moved me to a smaller room that had adequate heat and was still very comfortable. They refurbished the original room, fixed the heat, and put two people in it.

Things went well until a couple of months after I went there a prescription discount card issued to me by NSTAR, my old employer, was taken out of my room. I complained about it but no one could find who did it. When I called the company to get it replaced, I was told a large amount of prescriptions had been charged to the card. The only medication that I was taking at that time was an iron pill for anemia. The company canceled the missing card and issued me a new one.

In January of 2003, I returned to my room to find that my papers had been ransacked, apparently by someone looking for the new prescription card. I got very angry and reported this to the staff and they acted as if I had an over active imagination. I then called the police and they sent an officer to investigate but as often happens to us old people they handled the problem as if I was a mental case. I was not! I was mad and frustrated but I knew what I was doing. The home called Mr. Kelly and he had me taken to Carney Hospital in Boston for psychiatric evaluation. Before we left he remarked to one of the staff that I was mental. I asked him about my possessions and he said he would take care of them and see that I got them. This was late at night and he was very angry.

I was evaluated at Carney and found not to be psychotic, my thought process to be coherent and organized, and my cognition to be intact. In other words, to a young person I was angry but I was not mental. I received this information from Carney Hospital after I requested my daughter be given a copy of my medical records. Late one evening, Mr. Kelly came and took me to the Sunbridge nursing home in Randolph, MA. I did not want to go to Sunbridge but he said I could not stay at the hospital, as there was nothing wrong with me. I said my daughter was going to bring me to North Carolina or that I could go to several other homes that I knew. He said I did not want to go to North Carolina and did not want me to go to a nursing home in Roxbury that was near his office. He said I had to go to Sunbridge. Shortly after he took me, he said I had to sign a document so he could pay my bills. He would not let me read the document but I signed it because I felt helpless at that time. Mr. Kelly had taken all my money, identification, personal belongings, social security and Medicare cards. I had nothing but what I was wearing. I have always paid my bills and wanted them to be paid so I signed the document. I do not know what was in the document that I signed.



I started out in Sunbridge very unhappy and requested that Mr. Kelly move me. He refused and said I had to stay there. I could not write a letter, as I had no stamps or paper. Kayla, one of the nurses did not like the predicament that I was in and, using her own money bought me some stamps, paper, a watch, and other small things. This allowed me to write my daughter (this was the end of March). My daughter called me but Mr. Kelly had taken my hearing assist phone and would not return it even after several requests. I had my daughter talk to Kayla and she confirmed all that I said in my letter.

I hated Sunbridge. I was a prisoner. I could not go out on my own, they would tell me nothing except I needed to take all my medicine. Kayla would talk me into taking most of the medicine by saying they would put me "away" if I did not take it. The time I took it all I was not able to stand and went to sleep on my bed for a day and a half. I felt like a drunk when I walked down the hallway. No matter how many times I asked they would not tell me what the medication was or what it was for. I complained to anyone who would listen that I did not need medication and that it was doing me harm. The nursing home and Mr. Kelly said they would force me to take it if I did not do it willingly. I knew they were trying to make me a zombie along with the other patients on the floor to keep me from complaining. I felt so bad about this inside that I couldn't even cry. I had no confidence in Mr. Kelly, as he would do nothing for me. I did not know how to get rid of him as he was very friendly with the nursing home staff and I feared he would have me committed to a state institution as he had threatened. I wrote my daughter in the March letter that I wanted to get a new lawyer.

The nursing home kept refusing me care of a podiatrist, a dentist, an ear doctor, and an eye doctor. I had recently had cataract surgery and my eyes needed to be checked. I have all my own teeth and they needed cleaning. I had growths on my face that were getting worse and I needed a skin doctor. I was having trouble with my feet and needed a podiatrist. I could pay for all this if Mr. Kelly would give me access to my money. He wouldn't even though I asked him everytime I saw him.

I was terrified and prayed to Saint Theresa to help me get out of this fix. I knew that I would eventually have to take the medication that they wanted to force on me as I could only resist so long. I knew when I started to take the medication that I would lose the ability to fend for myself and be like all the other zombies on my floor. It would essentially be the end of my life. Saint Theresa answered my prayers.

About 10:00AM on April 29, 2003 I came out of my cold shower and there was my daughter standing in the doorway to my room with her husband. One of the first things that I did was thank Saint Theresa for answering my pleas.

I asked the nursing staff to give my daughter all the information my daughter wanted from my medical records. They would give her nothing. They said, "Attorney Kelly had told them not to give her any information". My daughter called my doctor's office, they told her that there was no change in my behavior from when I was admitted, and that Mr. Kelly would not let them evaluate me.

Sunbridge has no private areas where we could have a private conversation but we found a staff conference room on another floor to talk. My daughter asked me about my treatment and I told her how bad that it was. I told her when I asked to have my eye surgery checked; a fellow came in and asked if I could read an eye chart that was on his lap. It was such a simple chart that I memorized it at first glance and read it to him. He said your eyes are OK without ever looking at them. I said other than that, they would not let me see the doctors that I needed to see. I told her that the food was inedible and the menus a farce. The toilets were often backed up and there was often no hot water for showers. The facility was filthy and smelled badly. I told her again that I wanted to "fire" Mr. Kelley. I did not trust him and wanted no more to do with him. He was taking my money while treating me with contempt. I told her I had not changed my mind from the letter I wrote her in March. I insisted that he be fired immediately.

My daughter asked if I wanted her to be my health proxy and I said I would be delighted as she has a lifetime of experience in medicine and I could trust her to do what was best for me. She asked if I would like my son-in-law to be her power of attorney. I said absolutely and that I was delighted that they offered. I emphasized that I did not want anything to do with Mr. Kelley after today. I told them that Mr. Kelley had everything I have ever owned down to the change purses in my pocket book and would do nothing for me. I told them that Mr. Kelley had come by with my income tax papers for me to sign in April. He was in a hurry and would not let me read them but said I had to sign. He did not have a copy for me to keep. I complained again about him not letting me have access to my money and he reached in his pocket, threw seven dollars across the table, and said "buy yourself something at Wal-Mart". I was shamed and mortified to the point I could say nothing. He treated me like a street beggar.

We went out of the facility and prepared a revocation of Mr. Kelly's Health care proxy and power of attorney as well as a letter saying I wanted no more services from him and requesting return of jewelry and other possessions that he had. We also prepared documents appointing my daughter my health care proxy and my son-in law my power of attorney. We had these notarized by a notary public. We returned to the facility about three hours later and I went to my room to freshen up while my daughter and son-in-law went to talk to the Sunbridge staff. While I was waiting for them to finish talking to the staff a doctor came by my room to talk to me. He asked one question " Why do you not want to take your medicine" I told him I did not need the medicine and no one would tell me what it was for therefor I did not intend to take it. I asked him "if he did not have a headache would he take Tylenol in case he might get one" and he answered that he wouldn't and left the room. I learned later that he thought I was not competent because of this two-minute conversation. I understood exactly what I was doing and why I was

0 0 5 8 4

doing it. I think it is very strange that Mr. Kelly thought I was competent enough to sign my income tax return a couple of weeks earlier but the minute I signed papers to fire him he tried to say I was not competent to sign them.

My daughter told me that the meeting with the Sunbridge staff did not go well and that they would not accept her health care proxy. We discussed what to do and she asked if I would like to come to North Carolina to live with her. I told her that I wanted to do that when I was in Carney Hospital but that Mr. Kelley said I could not do that. I said I certainly wanted to come live with her. She asked just before she left that evening if I wanted to leave with her then. I said no because I wanted to say good bye to a friend but would want to go the next day. I signed a letter saying I wanted my daughter to take me to North Carolina.

The next day, April 30, my daughter arrived about 2:00PM. The Sunbridge staff told her that " Attorney Kelly had requested that she not be allowed to leave the floor". Now I was truly being held prisoner. A long discussion took place and my daughter left for a short period of time. When my daughter returned she insisted that I be allowed to go outside the front door with her to have a private conversation. After a long time, they agreed that I could go for a few minutes but that I would have to have a "bodyguard" go with me. We went to the front door and as soon as we got outside my son-in-law drove up to the front door and told my bodyguard that they were holding me against my will and they were taking me. A crowd of people came out of the front door with the intent to stop us. One large black man grabbed for my daughter and me but my son-in- law stepped in and stopped him from doing it. . I hurriedly got in the front seat of the car, fastened my seatbelt, and got ready to go. I felt like a giant load was lifted off my shoulders and that I was being liberated. They then stood in front of the car to keep it from moving. My son-in-law got in the car and started it. For some reason, the man standing in front of the car moved far enough away that my son-in-law was able to steer around him and leave. Sunbridge had called the police and was trying to hold us there until they came. I knew I had the right to leave this facility but they tried to hold me by force. They knew whom I was with and still tried force. My son-in-law is a very large person and I am convinced if it was not for that, they would have grabbed and retained me.

We left for North Carolina and I felt as if I was rescued by white knights. On Thursday we had Lynn, my granddaughter, call Sunbridge to tell them I was out of the state and request that they send my belongings. They refused and said it was a police matter. I must say, if they had my best interest at heart they picked a strange way to show it. The trip was beautiful. The first thing my daughter did when we got to North Carolina was to bring me by the hospital to draw blood for lab work to make sure there was nothing wrong with me. This was on a Saturday evening. On Monday, she took me to a doctor for a physical examination. The doctor said I was fine and needed no medication. I was slightly anemic but he did not want to medicate me for that until he saw what good food would do.

My daughter has since bought me a hearing aid that really works well. People don't have to shout at me and I don't shout back. I only had 16% of my hearing in my left ear and 62% of my hearing in my right ear. What a pleasure it is just to hear the rain. I have been to the podiatrist and had my feet taken care of. He said they were badly neglected and had bacterial and fungus infections. I have appointments to see the eye doctor and the dentist. A psychiatrist has examined me and found I was competent and capable of managing my own affairs. The physician that first examined me when I came to North Carolina has recently examined me again. He says I am in good health and receiving all the required care for my eyes, feet, and skin. He agrees with the psychiatrist that I am capable of managing my own affairs and do not need a guardian.

I arrived here in North Carolina with nothing. Mr. Kelley has it all and has refused send me anything. Mr. Kelley has even kept all my mail that has been forwarded from Bayside Assisted Living over the past four months. I have had to apply to social security for a Medicare and social security card. I have had to buy all new clothes, wallets, change purses, address books, shoes and cosmetics. I have had to apply for a new insurance card from my previous employer. I can get no information from any of my credit union or bank accounts as they say Mr. Kelley has them frozen. I think this is very strange behavior for someone that is supposed to have my best interest at heart.

I don't know if I will ever get over the trauma Mr. Kelley and Sunbridge have caused. They have stripped me of my dignity, confidence, and self-respect. It is as if I had been raped. It scares me to think how close Mr. Kelly came to controlling my very existence. They came close to destroying my will to fight back but fortunately did not.

I sign this document under penalty of perjury.

*Helen A. Runge*
Helen Anne Runge July 27, 2003

State of North Carolina, County of Polk

On July 29, 2003, before me , Arthur Bourbeau, A Notary Public in and for said state, personally appeared Helen Runge, personally known to me to be the person whose name is subscribed to within this instrument, and acknowledged to me that she executed the same in her authorized capacity and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.My commission expires 05-30-2006

*Arthur Bourbeau*


0 0 5 8 5

# EXHIBIT 2

# THE COMMONWEALTH OF MASSACHUSETTS
## THE TRIAL COURT

## PROBATE AND FAMILY COURT

**NORFOLK DIVISION**

**I, Patrick W. McDermott,** Register of the Probate and Family Court for said County of Norfolk, having, by law, custody of the seal and all the records, books, documents and papers of or appertaining to said Court, hereby certify the paper hereunto annexed to be a true copy of a paper appertaining to said court, and on file and of record in the office of said Court, to wit:

IN THE MATTER OF GUARDIANSHIP OF HELEN RUNGE

DOCKET ENTRIES RE: 03P1104G1

IN WITNESS WHEREOF,
I have hereunto set my hand and
affixed the seal of said Court,
this 23rd day of June
In the year of our Lord two thousand and eight

_____
*Register*



# The Trial Court of Massachusetts, Probate and Family Department
## Norfolk

| Case Name | Docket Type | Cross Reference | Docket Number |
|---|---|---|---|
| Ward: HELEN RUNGE<br>Petitioner: WALTER J KELLY | Probate/Fiduciary | | 03P1104GI |
| | Case Type | | |
| | GDN of Mentally Ill | | |

| Petitioner | Attorney | | Attorney |
|---|---|---|---|
| WALTER J KELLY<br>1996 CENTRE STREET<br>WEST ROXBURY, MA<br>02132 | THOMAS FRANCIS SCHIAVONI<br>P.O. Box 311<br>37 Friend Street<br>LYNN, MA<br>01903 | | |

| Citation Returnable: | Date of Will: | Aff Disclosing Care & Custody: | Military Affidavit: |
|---|---|---|---|
| Return of Service Filed: | Date of Death: | Info and Rights Form: | CCF:    P ☐    R |
| | Death Certificate: ☐ | GAL Appointed: ☐ | Rogers: ☐ |

| Event Date | Event No | Event Code | Document | Docket Date |
|---|---|---|---|---|
| 05/09/2003 | 1 | DCRTMPGI | DECREE APPOINTING WALTER J KELLY TEMPORARY GUARDIAN OF HELEN RUNGE , A MENTALLY ILL PERSON.  5/2/03  Robert Langlois , J. | 05/09/2003 |
| 05/09/2003 | 2 | BOTMP | TEMPORARY BOND OF GUARDIAN -  APPROVED  5/2/03  RWL | 05/09/2003 |
| 05/09/2003 | 3 | MFG | MOTION FOR APPOINTMENT OF TEMPORARY GUARDIAN - ALLOWED 5/2/03  RWL | 05/09/2003 |
| 05/09/2003 | 4 | M | PETITIONER'S MOTION FOR RELEASE OF BANK FUNDS -  ALLOWED  5/2/03  RWL | 05/09/2003 |
| 05/09/2003 | 5 | M | PETITIONER'S MOTION FOR APPOINTMENT OF GUARDIAN AD LITEM (TEMPORARY) | 05/09/2003 |
| 05/09/2003 | 6 | AFF | AFFIDAVIT OF WALTER J KELLY (TEMPORARY) | 05/09/2003 |

| Event Date | Event No | Event Code | Document | Docket Date |
|---|---|---|---|---|
| 05/09/2003 | 7 | MISC | TEMPORARY FINDINGS OF FACT ] | 05/09/2003 |
| 05/09/2003 | 8 | CERTMED | TEMPORARY MEDICAL CERTIFICATE DATED 04/29/2003 | 05/09/2003 |
| 05/09/2003 | 9 | PTNGI | PETITION FOR APPOINTMENT OF GUARDIAN OF MENTALLY ILL PERSON | 05/09/2003 |
| 05/09/2003 | 10 | AFFNTCDEV | AFFIDAVIT OF NOTICE TO DEVISEES AND LEGATEES | 05/09/2003 |
| 06/20/2003 | 11 | APPCNS | NOTICE OF APPEARANCE OF SLAWRENCE L. HALE , COUNSEL FOR HELEN RUNGE | 06/20/2003 |
| 09/30/2003 | 12 | INVFIL | INVENTORY OF GUARDIAN FILED:   PE = $ ; RE = $ | 09/30/2003 |
| 09/30/2003 | 13 | ACCGI | GUARDIAN OF MENTALLY ILL PERSON 1ST AND FINAL ACCOUNT:  SCH A = $  ; SCH B = $ ; SCH C = ]] | 09/30/2003 |
| 10/06/2003 | 14 | CITISSU | CITATION ISSUED, RETURNABLE 12/01/2003 | 10/06/2003 |
| 11/30/2003 | 15 | APPCNS | NOTICE OF APPEARANCE OF LAWRENCE L. HALE , COUNSEL FOR DOROTHY H. STANLEY  IN THE 11/30/2003 ALLOWANCE OF FIRST AND FINAL ACCOUNT OF WALTER J.KELLY | 11/30/2003 |
| 12/08/2003 | 16 | M | LAWRENCE L. HALE 'S MOTION TO WITHDRAW APPEARANCE | 12/08/2003 |
| 12/19/2003 | 17 | iM | HELEN RUNGE 'S MOTION FOR EXTENSION  ON TIME IN WHICH TO FILE OBJECTIONS | 12/19/2003 |
| 12/22/2003 | 18 | ORMALL | MOTION FOR SEE LINE 16 *****MOTION TO WITHDRAW ALLOWED.  Christina Harms . J.  ATTYS/PTYS ND | 01/05/2004 |
| 12/22/2003 | 19 | ORMALL | MOTION FOR SEE LINE 17 *****NO FURTHER EXTENSIONS ALLOWED.  Christina Harms . J.  ATTYS/PTYS ND | 01/05/2004 |
| 02/01/2004 | 20 | OBJ | HELEN RUNGE  'S OBJECTIONS TO FIRST AND FINAL ACCOUNT | 02/01/2004 |
| 02/01/2004 | 21 | APPCNS | NOTICE OF APPEARANCE OF BLAKE J. GODBOUT , COUNSEL FOR HELEN RUNGE | 02/01/2004 |
| 12/07/2004 | 22 | iM | WALTER J KELLY  'S MOTION FOR PROTECTIVE ORDER REGARDING CONTESTANT'S DISCOVERY 01/04/2005 REQUEST | |

| Event Date | Event No | Event Code | Document | Docket Date |
|---|---|---|---|---|
| 12/07/2004 | 23 | M | WALTER J KELLY 'S MOTION TO STRIKE OBJECTIONS AND APPEARANCE ALLOWED AMO | 01/04/2005 |
| 12/07/2004 | 24 | M | WALTER J KELLY 'S MOTION FOR ATTORNEY'S COSTS & FEES | 01/04/2005 |
| 12/07/2004 | 25 | AFF | AFFIDAVIT OF WALTER J KELLY IN SUPPORT OF MOTION FOR AWARD OF COTS | 01/04/2005 |
| 01/31/2005 | 26 | AFF | AFFIDAVIT OF GILBERT J. STANLEY | 01/31/2005 |
| 02/02/2005 | 27 | M | THOMAS F. SCHIAVONI 'S MOTION TO STRIKE OBJECTIONS AND APPEARANCE ***4/7/2005-DENIED THE ORDER OF 12/7/2004 REMAINS IN EFFECT  AMO, J.*** | 02/02/2005 |
| 02/22/2005 | 28 | M | THOMAS F. SCHIAVONI 'S MOTION TO STRIKE AFFIDAVIT OF CONTESTANT | 02/22/2005 |
| 02/24/2005 | 29 | M | petitioner 'S MOTION TO CONTINUE HEARING CONTINUE  TO MARCH 9,2005 A.M.O. | 02/24/2005 |
| 03/09/2005 | 30 | AFF | AFFIDAVIT OF ATTORNEY THOMAS F. SCHIAVONI COUNSEL FOR WALTER J. KELLY ESQ. | 03/09/2005 |
| 03/09/2005 | 31 | M | HELEN RUNGE 'S MOTION TO AMEND THE ORDER OF DECEMBER 7,2005 ***4/4/2005-DENIED THE ORDER OF 12/7/2004 REMAINS IN EFFECT  AMO, J.*** | 03/09/2005 |
| 03/09/2005 | 32 | MISC | OPPOSITION OF HELEN RUNGE TO THE MOTION TO STRIKE OBJECTIONS AND APP. DUE TO NONCOMPLIANCE WITH ORDER TO ESCROW FUNDS] | 03/09/2005 |
| 03/09/2005 | 37 | OR | SCHEDULING ORDER ***THE HEARING SCHEDULED FOR MARCH 9, 2005 IS CONTINEUD TO: APRIL 4, 2005 @ 9:30 AM***.   WILLIAM F. MCSWEENEY, J.     ATTYS/PTY'S ND | 04/15/2005 |
| 03/29/2005 | 33 | CTM | Motion, Contested scheduled on 3/25/2005. | 03/29/2005 |
| 03/29/2005 | 35 | CTM | Motion, Contested scheduled on 3/25/2005 rescheduled for 4/4/2005. | 03/29/2005 |
| 03/30/2005 | 36 | OR | RESCHEDULING ORDER .  WILLIAM MCSWEENEY , J.     ATTYS/PTY'S ND | 03/30/2005 |
| 05/17/2005 | 38 | CMPCTM | WALTER J KELLY 'S COMPLAINT FOR CONTEMPT FROM  DATED 12/07/2004 , RETURNABLE 06/13/2005.    THOMAS F. SCHIAVONI , FOR PLAINTIFF | 05/17/2005 |
| 05/17/2005 | 39 | RTCTMP | Contempt Returnable scheduled on 6/13/2005. | 05/17/2005 |

| Event Date | Event No | Event Code | Document | Docket Date |
|---|---|---|---|---|
| 06/13/2005 | 40 | PT | Pretrial scheduled on 6/22/2005. | 06/13/2005 |
| 06/13/2005 | 41 | NTCPTPR | SCHEDULING NOTICE FOR Pretrial - 06/22/2005 11:30 a.m. | 06/13/2005 |
| 06/13/2005 | 42 | M | HELEN RUNGE 'S MOTION MOTION FOR LEAVE TO PERMIT THE APPEARANCE AND LIVE TESTIMONY OF GILBERT STANLEY IN LIEU OF DEFENDANT'S APPEARANCE | 06/13/2005 |
| 06/13/2005 | 43 | ANS | HELEN RUNGE 'S ANSWER TO COMPLAINT FOR CONTEMPT | 06/13/2005 |
| 06/13/2005 | 44 | OR | ORDER OF CONTEMPT ORDER CONTINUED TO JUNE 22, 2005 .  Angela Ordonez , J. ATTYS/PTYS ND | 06/20/2005 |
| 06/13/2005 | 45 | OR | SCHEDULING ORDER ORDER PRETRIAL CONFERENCE ON JUNE 22, 2005 .  Angela Ordonez , J. ATTYS/PTYS ND | 06/20/2005 |
| 06/20/2005 | 46 | SUFIL | SUMMONS FILED; DATE OF SERVICE 05/27/2005 | 06/20/2005 |
| 06/22/2005 | 47 | MEMOPT | GUARDIAN 'S PRETRIAL MEMORANDUM | 06/27/2005 |
| 06/22/2005 | 48 | MEMOPT | FORMER WARD, HELEN RUNGE 'S PRETRIAL MEMORANDUM | 06/27/2005 |
| 06/22/2005 | 49 | OR | ORDER AFTER PRETRIAL CONFERENCE "AFTER HEARING, THIS MATTER IS CONTINUED FOR A FURTHER PRETRIAL CONFERENCE ON: 7/13/2005@8:45 AM" .  Angela Ordonez , J.   ATTYS/PTYS ND | 06/27/2005 |
| 06/22/2005 | 50 | OR | SUA SPONTE FURTHER ORDER ***SEE ORDER*** .   Angela Ordonez, J.      ATTYS/PTYS ND | 06/27/2005 |
| 06/22/2005 | 51 | J | JUDGMENT OF  ON (ON COMPLAINT FOR CONTEMPT FILED 5/17/2005) .   Angela Ordonez , J. ATTYS/PTYS ND | 06/27/2005 |
| 06/29/2005 | 52 | APPCNS | NOTICE OF APPEARANCE OF DAVID A CONTI, ESQ . COUNSEL FOR HELEN RUNGE | 06/29/2005 |
| 07/01/2005 | 53 | PT | Pretrial scheduled on 7/13/2005. | 07/01/2005 |
| 07/08/2005 | 55 | REQ | JOINT 'S REQUEST FOR POSTPONEMENT OF PRETRIAL CONFERENCE    ***7/8/2005-ALLOWED CONTINUED TO AUGUST 10, 2005 @ 2:00 PM  AMO, J.*** | 08/01/2005 |
| 07/11/2005 | 54 | PT | Pretrial scheduled on 7/13/2005 rescheduled for 8/10/2005. | 07/11/2005 |

| Event Date | Event No | Event Code | Document | Docket Date |
|---|---|---|---|---|
| 08/26/2005 | 56 | APPWDCNS | WITHDRAWAL OF APPEARANCE BY BLAKE J. GODBOUT , COUNSEL FOR HELEN RUNGE | 08/26/2005 |
| 08/26/2005 | 57 | MISC | 3 ASSENTS ] | 08/26/2005 |
| 09/09/2005 | 58 | JGI | JUDGMENT ON GUARDIANS OF MENTALLY ILL FIRST AND FINAL ACCOUNT.  Angela Ordonez , J. | 09/09/2005 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
NO.: 05-10849-RGS

HELEN A. RUNGE,                    )
             Plaintiff,     )
        v.                 )
                   )
                   )
WALTER J. KELLY, et al.,           )
          Defendants.    )
_____)

**COPY**

DEPOSITION OF

GILBERT STANLEY - DAY 1

        On Tuesday, November 14, 2006, commencing at 4:20
p.m., the deposition of Gilbert Stanley was taken on behalf of
the Defendants at Isothermal Community College, Room 118, 1255
West Mills Street, Columbus, North Carolina, and was attended by
Counsel as follows:

APPEARANCES:

        GLENN R. DAVIS, ESQ.
        Latsha, Davis, Yohe & McKenna, P.C.
        1700 Bent Creek Boulevard, Suite 140
        Mechanicsburg, Pennsylvania  17050
        on behalf of the Plaintiff

        GEORGE C. ROCKAS, ESQ.
        Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
        155 Federal Street
        Boston, Massachusetts  02110
        on behalf of Walter Kelly

        JAMES S. HAMROCK, JR., ESQ.
        Hamrock & Tocci
        101 Main Street, 18th Floor
        Cambridge, Massachusetts  02142
        on behalf of Dr. Bloomingdale

        MICHAEL WILLIAMS, ESQ.
        Lawson & Weitzen, L.L.P.
        88 Black Falcon Avenue
        Boston, Massachusetts  02210
        on behalf of Sunbridge Nursing Home

Attending:  Dorothy Stanley

REPORTED BY:  Mai-Beth Ketch, CVR
              ASHEVILLE REPORTING SERVICE

155

```
 1              him to represent Helen also.

 2        Q     But the fees that were being paid to him at

 3              the time he was representing just you and your

 4              wife were coming from Helen's accounts?

 5        A     No.  Initially, they were coming from ours,

 6              but the fees were nothing because -- I mean

 7              almost nothing, because he wasn't doing

 8              anything to begin with until he had to get

 9              involved in trying to -- or getting ready, I

10              should say, to go into the hearing to dispute

11              the extension and to get her material back or

12              her possessions back.  He did very little for

13              us.  In fact, he didn't even charge us to

14              begin with for his initial advice.

15        Q     At the time this affidavit was done, it's fair

16              to say you were thinking that this affidavit

17              might be used in some type of legal proceeding

18              down the road; is that true?

19        A     Yeah, that's true.

20        Q     You weren't sure who the legal proceeding

21              would be directed at, but you were reasonably

22              confident that one of the people it would be

23              directed at would be Mr. Kelly; is that true?

24        A     I'm not sure I even thought about it very much

25              at that point in time until August, after
```

1          August.  I wasn't really -- we really weren't

2          worrying about it.

3     Q    Well, weren't you preparing to go up to

4          Massachusetts the end of July to contest this

5          extension of the temporary order?

6     A    Sure.

7     Q    So clearly, at the time this was signed by Ms.

8          Runge on July 27, 2003, you were thinking that

9          this document might be of assistance in that

10         ongoing Probate Court matter; isn't that

11         correct?

12    A    I'm sorry.  I may have misunderstood your

13         question.  Yes.  As far as the Probate was

14         concerned, yes, and I look at that as -- and

15         it is two separate cases, not the federal

16         case.

17    Q    So you were thinking that this document, this

18         affidavit, might prove useful in the Probate

19         Court case?

20    A    Would help -- yeah, would help Attorney Hale

21         in preparing for what we thought he may have

22         to do.

23    Q    When did you first talk to Ms. Runge or when

24         did she talk to you about an actual lawsuit

25         against Mr. Kelly, Dr. Bloomingdale, and

1           Sunbridge?

2      A    She talked to us on the way down, on the trip

3           down.  She was hopping mad, as far as that was

4           concerned.  She wanted me to get somebody

5           sued.  Mr. Kelly was the main culprit, but she

6           wanted somebody sued, and I said, "Just a

7           second.  You know, don't do anything yet, and

8           we'll wait and see."

9      Q    So at the time this affidavit of July 27 was

10          signed by Ms. Runge, she had already expressed

11          to you her desire to sue Mr. Kelly?

12     A    She actually wanted -- yes.  Yes.

13     Q    You certainly thought that this affidavit

14          might be somehow useful in that suit, assuming

15          such a suit was filed; true?

16     A    I wasn't thinking of a suit.  Really what I

17          wanted to do is to get documented what my wife

18          knew and what she knew and what I knew, and

19          there's -- that's -- you know, I was trying to

20          get this stuff on paper while it was fresh in

21          our minds.

22     Q    The telephone conference you had with Mr.

23          Kelly on April 25, you mentioned some things

24          that you and he said.  I believe you mentioned

25          some things he said to your wife.  Were you on