IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOROTHY STANLEY, AS EXECUTRIX OF : <br> THE ESTATE OF HELEN A. RUNGE, : <br>     Plaintiff : <br> : <br>     v. : <br> : <br> WALTER J. KELLY, et al., : <br>     Defendants : | No. 05-10849-RGS <br> (Judge Stearns) <br><br> CIVIL ACTION <br> JURY TRIAL DEMANDED |

### MOTION IN LIMINE TO PRECLUDE TESTIMONY
### AND OPINION OF DAVID APTAKER

David Aptaker has been identified by Defendant as an expert witness who will testify on Friday, June 27, 2008. Plaintiff respectfully submits that the testimony and/or opinion of David Aptaker ("Aptaker") should be precluded. Aptaker's opinion is based in part upon medical records that are not a part of the record in this proceeding. Further, the parties have agreed to not proffer additional medical evidence, which would include records and testimony, and this Honorable Court has ruled that further medical evidence and testimony regarding such evidence have been precluded from becoming part of the record.

Aptaker stated in his written opinion dated February 9, 2007 that he based his opinion in part on "records from Ms. Runge's admission to the Jewish Memorial

Hospital and Rehabilitation Center, in February of 2000, the Marian Manor from October 2001 to November 2002, Carney Hospital in August of 2002 and in January 2003 (two separate admissions)" and "the records of Sunbridge Nursing Home". See Aptaker's opinion attached as Exhibit A. Aptaker sets forth an extensive "Chronology" in his opinion to address Defendant's dealings with Helen Runge, which includes obvious reliance on and review of medical records from Jewish Memorial Hospital and Rehabilitation Center, NOVA Psychiatric Services, Marian Manor (including notes of Dr. Accadia, Dr. Lasky, nursing notes and social worker notes), Carney Hospital and Sunbridge. See pp. 2-9 of Exhibit A.

It is clear from the review of these portions of Aptaker's opinion that his testimony will include discussion of medical documents and opinions. Moreover, the "Analysis" portion of Aptaker's opinion goes into detail about Defendant's alleged knowledge of Helen Runge's medical information, which is not in evidence and cannot become part of the record in this matter. Accordingly, Plaintiff respectfully requests that David Aptaker's testimony and opinion be precluded in this matter. In the alternative, Plaintiff requests that Aptaker's opinion and testimony be precluded to the extent that the opinion and testimony is based on, includes or refers to medical information.

Respectfully submitted,

LATSHA DAVIS YOHE & MCKENNA, P.C.

Dated: June 26, 2008    By____/s/ Blake J. Godbout_____
                              Blake J. Godbout, BBO #196380
                              BLAKE J. GODBOUT & ASSOCIATES
                              33 Broad Street, 11th Floor
                              Boston, MA 02109
                              (617) 523-6677
                              blake@bjalaw.com

                              Glenn R. Davis
                              1700 Bent Creek Boulevard, Suite 140
                              Mechanicsburg, PA 17050
                              (717) 620-2424
                              gdavis@ldylaw.com
                              *Pro Hac Vice*

                          Attorneys for Plaintiff, Dorothy Stanley, Executrix
                          of the Estate of Helen A. Runge

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the attorney of record for each party by electronic filing.

> Michele Carlucci
> George S. Rockas
> Wilson Elser Moskowitz Edelman & Dicker LLP
> 155 Federal Street
> Boston, MA 02110
> michele.carlucci@wilsonelser.com
> george.rockas@wilsonelser.com
>
> Michael Williams
> Lawson & Weitzen, LLP
> 88 Black Falcon Avenue, Suite 145
> Boston, MA 02210-1736
> mwilliams@lawson-weitzen.com

Dated: June 26, 2008                    By____/s/ Blake J. Godbout_____
                                              Blake J. Godbout

EXHIBIT A

# DAVID APTAKER
Counselor at Law
265 Medford Street, Suite 402
Somerville, MA 02143

Tel: 617-776-2211
Fax: 617-776-5937

Kimberly L. Kelly, Associate
*also admitted in CT

John DiPietrantonio
Of Counsel

February 9, 2007

*Via Facsimile No.: (617) 423-6917*
*and Via First Class Mail*

Attorney George C. Rockas
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
155 Federal Street, 5th Floor
Boston, MA 02110

Re: Runge v. Kelly

Dear Attorney Rockas:

I have been asked to provide an opinion on whether Walter Kelly's conduct with regard to Helen Runge met the standard duty of care and skill owed to a client by the average qualified elder law practitioner. In rendering this opinion, I have reviewed and based my opinion on the following documents: (1) underlying Federal Complaint, captioned Helen A. Runge, Plaintiff v. Walter J. Kelly, Kerry L. Bloomingdale and Sunbridge Nursing and Rehabilitation Center, Defendants (hereafter Runge v. Kelly); (2) the deposition transcript of the depositions of Walter Kelly and Attorney Thomas Schiavoni and all of the exhibits introduced at those depositions; (3) the pleadings and correspondence related to the action in the Norfolk Probate and Family Court, In Re: The Guardianship of Helen Runge, (hereafter guardianship case) and the correspondence generated after the guardianship case was filed up until the dismissal of the guardianship and settlement of the accounts; (4) the materials provided to the Board of Bar Overseers regarding B.B.O. File No. B1-05-9123 in regard to their investigation of Mr. Kelly pursuant to a complaint filed with them in regard to this matter; (5) the opinion letter of Attorney Arnold R. Rosenfeld, dated January 16, 2007; (6) the Reporters' notes on S.J.C. Rule 3:07, RPC 1.14, which rule was referenced in Mr. Rosenfeld's letter, the Ethics Opinions of the Massachusetts Bar Association which pertain to that Rule, those being Opinion 2004-1 and Opinion 05-03; (7) records from Ms. Runge's admission to the Jewish Memorial Hospital and Rehabilitation Center, in February of 2000, the Marian Manor from October 2001 to November 2002, Carney Hospital in August of 2002 and in January 2003 (two separate admissions) to ascertain what information was provided to Mr. Kelly from those facilities, to determine his role in assisting Ms. Runge to obtain services

Attorney George C. Rockas
February 9, 2007
Page 2

or deal with problems at those facilities and to learn the history of the involvement of Helen Runge's daughter during that time and/or to learn what Helen Runge was telling others (including Mr. Kelly) about her daughter; (8) a July 24, 1997 opinion issued by the Massachusetts Attorney General; (9) the records of the Sunbridge Nursing Home and (10) November 5, 2004 Affidavit of Walter Kelly (attached). I also based my opinion on my twenty years of experience as an attorney whose private practice is concentrated in the areas of guardianship, mental health, elder and disability law.

This level of research and knowledge of facts is strikingly absent from Mr. Rosenfeld's report on the matter (he reviewed the Complaint, one deposition and "other exhibits"). I also note, for your information, that Helen Runge had a history of asserting specious or exaggerated claims against previous providers, as well as prior landlords and neighbors. When those claims were investigated by independent third parties, they were found to be unsubstantiated. Mr. Kelly knew of at least two of these filings of unsubstantiated complaints which took place during the time he provided services to Ms. Runge. I believe this knowledge would have influenced the average qualified practitioner in making decisions about how to treat Helen Runge's later complaints.

## CHRONOLOGY

It would be instructive to provide a chronology of Mr. Kelly's pertinent dealings with Helen Runge.

On March 5, 1998, Helen Runge executed a Durable Power of Attorney form in which she named Deborah Gaughan of Milton, MA as her agent and attorney in fact.

On February 25, 2000, during Helen Runge's admission to Jewish Memorial Hospital and Rehabilitation Center, it was noted in her chart that she was "... delusional talking about being a model..."; "...alteration in thought processes..." Case Management Review: Psychotic Disorder with Hallucinations and Delusions.

In 2000, Helen Runge told Walter Kelly that she had never met her adult grandchildren. She also told Attorney Kelly that she was scared of her daughter's husband, Gilbert Stanley.

On October 4, 2000, Helen Runge sent Walter Kelly a letter, in her own writing. She had filed a Complaint about a problem she experienced during a psychiatric hospitalization at Jewish Memorial Hospital. She wanted Walter Kelly to represent her in regard to that Complaint.

On October 10, 2000, Helen Runge wrote a letter, in her own writing, to Walter Kelly asking for his help in arranging for admission to Marian Manor Nursing Home. She had been

Attorney George C. Rockas
February 9, 2007
Page 3

living in an apartment in Hyde Park. In the letter, she notes, "my health and strength are failing. I cry a lot now."

On November 1, 2000, Mass Pro sent a report of its review of Helen Runge's Complaints regarding the care she received at Jewish Memorial Hospital between February 25, 2000 and February 29, 2000. Attorney Kelly received a copy of the report of the investigation by Mass Pro. Mass Pro concluded that Helen Runge was admitted for evaluation and treatment of a change in her mental status and because of paranoid delusions. After evaluation and an examination, a new medication regimen was initiated. It was determined that the services provided were medically necessary to treat Helen Runge's psychosis, were performed in an appropriate setting and met professionally recognized standards of care. (N.B. These unfounded Complaints, known to Walter Kelly, were not unlike the Complaints Helen Runge made in 2003 when in a similar untreated condition).

On November 8, 2001, Helen Runge wrote a letter, in her own writing, when she was at Marian Manor addressed "To whom it may concern". In it she said "I appoint Mr. Walter Kelly, Kelly and his associate to have the power of attorney in my behalf of my legal affairs". She also says "M. Walter Kelly has been my attorney for years plus he is available promptly to assist me in any problem. He has never refused to help me" (underlines are in her original).

"My daughter lives in North Carolina and not available to help me. She never offered assistance at any time all these years (underlines in original letter)." She concludes, "I shall stick with Mr. Walter Kelly. He is like a brother to me".

On November 26, 2001, Helen Runge mailed a short, handwritten letter, to Walter Kelly in which she expressed irritation at her friend Deborah for having left the area (moved to Florida) and not even coming to see Helen Runge to say good-bye.

On December 7, 2001, Helen A. Runge executed a Durable Power of Attorney, in which she appointed Walter Kelly as her agent and attorney and gave him extensive powers with regard to "managing her property and affairs in all respects". In the document, which was properly notarized, there was a specific provision "If it is deemed necessary to seek the appointment by a probate court of a guardian of my person or a conservator of my estate, I hereby nominate Walter J. Kelly . . . for appointment by such court to serve as such fiduciary". See Guardianship of Smith, 43 Mass. App. Ct. 493 (1997) which establishes the presumption that a person designated by the principal to serve as Guardian in the event of a future Guardianship case shall be given great weight by the Court in the subsequent Guardianship proceeding and that the named designee shall be appointed unless he or she is found to be unsuitable.

On November 16, 2001, the notes from a psychiatrist from NOVA Psychiatric Services, while Helen Runge was at Marian Manor indicate, "1 dtr estranged 30 years, recent visit to pt in NH" "Geriatric Depression Scale = 3/30".

Attorney George C. Rockas
February 9, 2007
Page 4

On November 23, 2001, Dr. Accadia notes in the record at Marian Manor, "Pt is a highly anxious woman . . . mistrustful, and openly talks about her things being missing. She has been estranged from dtr 30 years save for a recent visit from her to this N. Home."

On November 26, 2001, Dr. Lasky notes in the record at Marian Manor, "Question Bi-polar d/o?"

Nurses' notes from Marian Manor indicate on the following dates:

On October 15, 2001, "pt is alert with periods of confusion. Pt states that there were men in her bathroom last night who stole her flashlight and crawled away on the floor."

On November 10, 2001, "Resident continues with multiple complaints, appears to be hallucinating and paranoid that people are stealing from her and then items are found."

On August 8, 2002, hallucinating visually (spiders and bugs).

On August 20, 2002, ". . . screaming [at roommate] saying why did you clean the toilet with my socks . . ."

Social worker notes from Marian Manor indicate the following:

"Her daughter moved around a lot after her marriage to Gilbert Stanley and mother and daughter's communications became limited. Helen states she always wrote to her daughter but it took a long time for her daughter to write back."

On October 15, 2001, "Someone came by and flashed a light right in her eyes. When they saw she was awake they crouched down and walked out of the room."

On May 10, 2002, "I met with Atty. Walter Kelly, Helen's POA and #1 contact. Helen signed a new Health Care proxy."

On August 8, 2002, "I asked Helen about having her daughter as the number one contact person. Helen told me her daughter would not be of any help to her as the number one contact because she lived out of state. Helen continued to say she has a lawyer, Mr. Kelly, who is her number one contact. Her daughter should be second."

On August 22, 2002, "Although Dorothy (Helen's daughter) would like to be the number one contact she does understand it was her mother's decision to make her the number two contact. She states her mother is hard to get along with and doesn't think her mother will be totally happy anywhere. She also went on to say her mother is obsessed with financial matters and worried she will not have the finances to pay her bills."

Attorney George C. Rockas
February 9, 2007
Page 5

On August 26, 2002, "Dorothy continued to say her mother always thought someone used her phone. Even though she lived alone her mother had a lock on the rotary part of her telephone."

On January 15, 2002, the records of Marian Manor Nursing Home indicate that Helen Runge was "Emotional; obsessive thought; Psychiatric: Pt. refused PE by this provider but did speak for a short time. Speech pressured, tearful at times. Feels overwhelmed, believes her belongings have been stolen and or used by "someone." Admits to forgetfulness. States is trying to organize belongings. Patient exhibits: fearfulness, agitation, compulsive behaviors, obsessive thoughts, anxiety.

On May 2, 2002, Helen Runge executed a Massachusetts Health Care Proxy, according to M.G.L. Chapter 201D, in which she appointed Walter J. Kelly as her health care agent.

The Health Care Proxy signed by Helen Runge on May 2, 2002, included the following provision: "If I object to a health care decision made by my Health Care Agent, my decision shall prevail unless it is determined by Court Order that I lack capacity to make health care decisions."

Records from her August 2002 admission to Carney Hospital for cough and a fever indicate "She has a daughter in North Carolina who she rarely sees" During that admission, she was diagnosed with (among other things) history of depression.

In November of 2002, Helen Runge was sent to Carney Hospital from Bayview on a section 12 (psychiatric admission) because of depression, anxiety and dementia with psychotic features. The section 12 Order was signed by Dr. Stanley J. Alexander of NOVA Group. Walter Kelly was not consulted. Walter Kelly did not have authority to admit Helen Runge to a psychiatric hospital as he is not a qualified physician or police officer as required by section 12 (see M.G.L. c. 123, §12 (a)).

Records from Carney Hospital indicate that after her admission, in January of 2003, Walter Kelly was contacted by the attending physician, not before the admission.

Subsequent to the admission to Carney Hospital under M.G.L. c. 123, §12(a), Helen Runge was offered the opportunity to sign an application for conditional voluntary admission to the psychiatric facility at Carney Hospital (under M.G.L. c. 123, §§ 10 and 11). Helen Runge signed the conditional voluntary form on January 14, 2003, as did Walter Kelly, as Health Care Proxy.

During her admission to Carney Hospital, in January of 2003, Helen Runge was diagnosed with psychosis and paranoia.

Attorney George C. Rockas
February 9, 2007
Page 6

During Helen Runge's January 2003 admission to Carney Hospital, there were discussions about her possible move to North Carolina. The following quotes are excerpted from the progress notes in the Carney Hospital record:

On January 15, 2003, "P.C. w/patient's dt Dorothy Stanley. She is willing to take over mother's care, but is clearly overwhelmed. She estimates needing a month to visit nursing homes and get power of attorney. Pt. Will be screened tomorrow for short-term placement at Sunbridge-Randolph. Notified Walter Kelly, Esq."

On January 18, 2003, "Pt remains paranoid. Anxious. Agitated at times. . . says she does not want to be in North Carolina near her daughter."

The discharge summary from the Carney Hospital admission of January 2003, includes the following quotes:

"Daughter was out of touch with patient for almost 30 years. Daughter recently became reinvolved and wishes the patient to move to North Carolina to be with daughter."

"Bayview Inn Nursing Home refused to have the patient come back, and therefore, the patient was discharged to Sunbridge Nursing Home."

On January 15, 2003, Walter Kelly made notes of a telephone conversation he had with Dorothy Stanley. He reported that Beth Turner, as PC social worker suggested some nursing home options for Helen Runge upon her discharge from Carney Hospital. He noted Ms. Turner's suggestion of "Southbridge" (N.B. If Mr. Kelly was in a conspiracy with them – he probably would have known their correct name).

Helen Runge was discharged from Carney Hospital on January 22, 2003. Among her discharge medications was Zyprexa, an antipsychotic medication. Helen Runge had been voluntarily taking that medication while at Carney Hospital.

Helen Runge agreed to go to Sunbridge Nursing Home upon discharge from Carney Hospital. She did not want to return to Bayview.

After her discharge from Carney Hospital and her transfer to Sunbridge in January of 2003, Helen Runge continued to voluntarily take the Zyprexa, which ameliorated her psychosis and paranoia, for several weeks.

On January 30, 2003, Walter Kelly met with Helen Runge to discuss placement options. His notes of their meeting reflect the following statements by Helen Runge. "I'm not anxious to go there (North Carolina)." "She is working and there is bad blood between my daughter's husband and me. He controls Dorothy." "It will not work out. He won't let her give me much

Attorney George C. Rockas
February 9, 2007
Page 7

attention. It's her life and I will let it go." "I can't see the benefit of going to North Carolina. I've been estranged for 30 years. We do talk at times, but I don't see. I love Dorothy, but I know it won't work out." "I didn't want her to marry him, but to finish her education. She went against my will. She has three years until retirement and he will make her work. So for the next 3 years there is bad blood between him and me."

Helen Runge's admission note to Sunbridge, dated January 22, 2003, included the following diagnoses: history of depression, paranoid delusions, dementia, Alzheimer's and anemia. She was admitted to Sunbridge on the following medications: Aricept, Lisiprinol, Zyprexa, artiprenol.

On February 5, 2003, the social progress note at Sunbridge indicated that Helen Runge had "been doing really well in her two weeks here, no behaviors, she is at baseline." The care plan conference summary of that date, attended by Walter Kelly, concluded Helen Runge "had been adjusting well to facility."

On February 10, 2003, Helen Runge's anxiety level began to increase.

On February 12, 2003, Helen Runge was seen by a psychiatrist because of continued anxious behavior. Dr. Bregoli recommended an increase in Zyprexa. Walter Kelly was informed of this increase and approved it.

On February 25, 2003, nurses at Sunbridge noted increased paranoid behavior and on-going confusion.

On or about February 27, 2003, Buspar was added to Helen Runge's medication regimen to treat increased anxiety. Walter Kelly was informed of this medication change and agreed to same as Health Care Proxy. He asked the nurse, in writing, to advise him how Helen Runge was handling the medication and whether her condition improved.

On March 4, 2003, Walter Kelly was notified of a need to increase the dosage of Buspar for Helen Runge.

On March 5, 2003, Walter Kelly visited Helen Runge and agreed to the doctor's recommendation regarding the Buspar.

On March 12, 2003, Helen Runge wrote a letter to Walter Kelly, in her own handwriting when she was living at Sunbridge Nursing Center. She thanked him for a recent visit. She also complained of her unhappiness at her placement at that time, but wrote, "N. Carolina would have been worse. Not much help from MR. STANLEY" (original in capital letters) "After 30 years no change. I was never invited in their home."

Attorney George C. Rockas
February 9, 2007
Page 8

On March 13, 2003, Helen Runge was seen by a psychiatrist from New England Geriatrics who diagnosed her with "dementia/Alzheimer's" and noted she was paranoid and that both her judgment and her insight were impaired.

On April 11, 2003, Dr. Bregoli noted "resident is no longer capable of making decisions, health care proxy is in effect per previously expressed wishes."

Sometime in mid-April of 2003, Helen Runge began to refuse to take her medications at Sunbridge. Walter Kelly was called to see Helen Runge at Sunbridge. He observed her to be agitated and confused. He had never seen Helen Runge in such a troubling state.

On April 19, 2003, Helen Runge was evaluated by a psychiatrist (name unreadable) because of an increase in Helen Runge's paranoia and delusions and her depression and behavior disorders. The physician noted that on April 19, 2003 (ten days before Helen Runge signed the documents prepared by Dorothy Stanley) Helen Runge was tangential in her associations, had constricted and depressed mood, and had impaired memory, judgment and insight.

Sunbridge nurse's notes on April 22, 2003, note that Helen Runge was alert and confused, very argumentative, screaming and yelling.

On April 23, 2003, the chart at Sunbridge includes the quarterly note that Helen Runge is forgetful at times and needs reminders.

On April 24, 2003, Walter Kelly visited Helen Runge regarding her refusal of medications. Helen Runge became agitated and paranoid and left the room while the discussion was taking place.

On April 25, 2003, Walter Kelly called Helen Runge's daughter, Dorothy Stanley, to advise her of Helen's deteriorated mental condition and her refusal to take the medications to which she had responded so favorably at Carney Hospital. Mr. Kelly informed Dorothy Stanley that he planned to petition the Court to obtain Temporary Guardianship to seek authority for the administration of antipsychotic medications as recommended by the clinical and nursing staff at Sunbridge (and previously noted in the discharge plan from Carney Hospital).

On April 25, 2003, there was a telephone conversation between Walter Kelly and Dorothy Stanley, who was in North Carolina. Dorothy Stanley's husband, Gilbert Stanley, participated in portions of that call. Mr. Kelly told the Stanleys he was going to Petition the Court to be appointed Guardian of Helen Runge. The Stanleys told Mr. Kelly they would come to the Boston area to meet with him on April 30, 2003. No specific time was set for the meeting.

On April 29, 2003, Helen Runge was evaluated by Dr. Kerry Bloomingdale, who had last seen her on April 1, 2003. Dr. Bloomingdale noted that Helen Runge had become more paranoid

Attorney George C. Rockas
February 9, 2007
Page 9

in the intervening weeks, in part because she was not taking her Zyprexa. He noted Helen Runge to have impaired insight and judgment and was of the opinion that she lacked ability to make sound decisions.

On April 29, 2003, Walter Kelly, (as Health Care Proxy) authorized Sunbridge Healthcare to release medical information to Dorothy Stanley. The date printed next to Walter Kelly's signature is April 29, 2002, but the form was prepared in 2003 and sent by fax on April 29, 2003 at 10:15 a.m.

On April 29, 2003, Helen Runge purportedly signed a typed letter, notarized by John Raposo (with no indication in the jurat on whether or not he knew Helen Runge's identity). The document purported to be effective as of 9:00 a.m. on the date signed. However, said letter would not have been signed until later on that date and was not provided to Mr. Kelly until some later date.

On April 29, 2003, Helen Runge also purportedly signed a generic Durable Power of Attorney for Healthcare (which made no reference to Massachusetts law).

On April 29, 2003, Helen Runge also purportedly singed a pre-printed, fill-in-the-blank (partially incomplete) Notice of Revocation of Power of Attorney form which was witnessed by her son-in-law Gilbert Stanley and allegedly also witnessed by a party who listed an address in Denville, MA but who did not date the form beneath that alleged witness' alleged signature. The revocation form did not list Helen Runge's city, county or state of residence.

There was a three paragraph typed statement, dated May 12, 2003, signed by Helen Runge. Unlike her earlier letters, it was not written in her own penmanship. It was not addressed to anyone. Mr. Kelly did not see this statement until after the Federal litigation was commenced.

The record contains a four page, typed "Statement of Helen Anne Runge" which is unsigned. The narrator of this statement changes from first person to third person, so it is unclear who authored the statement and for what purpose it was prepared. Mr. Kelly did not see it until after the Federal Complaint was filed.

### ANALYSIS OF CONDUCT AND DUTY OWED BY AVERAGE QUALIFIED PARACTIONER IN CIRCUMSTANCES

It is my opinion that the actions Walter Kelly took in regard to his representation of Helen Runge, his conduct as her Fiduciary under the Health Care Proxy and Durable Power of Attorney, his actions in facilitating her discharge from Carney Hospital and subsequent admission to Sunbridge Nursing Home met the standard of care owed by the average qualified

Attorney George C. Rockas
February 9, 2007
Page 10

elder law attorney. Furthermore, his actions and response to the Stanleys' attempts to intervene and remove Helen Runge from her placement in Massachusetts, the Stanleys inappropriate attempts to impose their wishes upon Helen Runge and the efforts Mr. Kelly made to properly utilize the legal process in the Probate Courts were totally consistent with the duty of care and skill of the average qualified attorney in this area. I have carefully considered the Affidavit of Walter J. Kelly, signed by him on November 5, 2004. That Affidavit, containing fourteen numbered paragraphs is incorporated by reference into this opinion letter.

Rule 1.14 provides a guideline for a subjective test. If a lawyer <u>reasonably</u> believes a client has become incompetent because the client lacks sufficient capacity to communicate or to make adequately considered decisions . . . and if the lawyer <u>reasonably</u> believes that the client is at risk of substantial harm (of any type) the lawyer <u>may</u> take one or more of several actions. (emphasis added) Among these actions are to consult family members (which Walter Kelly did on April 25, 2003) . . . consult the individuals or entities that have authority to protect the client (Walter Kelly consulted with nursing home staff and with a qualified independent attorney experienced in guardianship law). The rule goes on to say if it reasonably appears necessary, the lawyer may seek the appointment of a Guardian Ad Litem or a Guardian (Walter Kelly did both).

Perhaps the most important provision of the rule, which is noticeably absent from Ms. Rosenfield's recitation of the rule is the second to the last sentence of 1.14 (b). "The lawyer may consult only those individuals or entities reasonably necessary to protect the client's interests and <u>may not</u> consult any individual or entity that the lawyer believes, after reasonable inquiry, will act in a fashion adverse to the interests of the client." (emphasis added) Mr. Kelly's conduct was totally consistent with this rule.

In fact, Ethics Opinion 2004-1 of the Massachusetts Bar Association deals with a situation in which the long-time attorney for a client, an elder, who has experienced conflict with an adult child, is instructive in the current situation. Mr. Kelly's behavior was consistent with the approach recommended by the Ethics Committee in this analogous situation.

Walter Kelly had known Helen Runge for several years prior to 2003. Walter Kelly knew that Helen Runge has previously chosen someone other than her daughter to be her substitute decision maker (Deborah Gaughan), in 1998 when there was no question as to Helen Runge's legal capacity. Walter Kelly knew that Helen Runge had felt estranged from her only child, her daughter, Dorothy Stanley for many years. Helen Runge expressed this feeling many times to many people, including to Mr. Kelly; to social workers at various facilities where she was a resident and to other treatment providers.

Helen Runge put these feelings about her daughter in writing to Walter Kelly on more than one occasion. Helen Runge told Water Kelly that her daughter and son-in-law drove within three miles of her house on trips from their home in North Carolina to their vacations in Maine,

Attorney George C. Rockas
February 9, 2007
Page 11

but did not stop to visit her. Helen Runge told Walter Kelly that there was bad blood between Helen Runge and her son-in-law and that he was a very controlling person. Whether or not this was true, this information would influence the average qualified practitioner when the events of April 25, 2003 through early May of 2003 transpired.

Walter Kelly knew that when Deborah Gaughan left the greater Boston area, Helen Runge made a request that Walter Kelly become her Health Care Agent and her Agent and Attorney in Fact under a Durable Power of Attorney. Walter Kelly knew the reasons Helen Runge chose him instead of her daughter Dorothy Stanley. Walter Kelly knew that Helen Runge, at a time when her competence and legal capacity were not questioned, selected Walter Kelly as the person whom she would want to be designated as her Court-appointed Fiduciary if that became necessary. Walter Kelly knew that, in accordance with the terms of the Health Care Proxy, Helen Runge wanted Court intervention if she and her Health Care Agent disagreed about her course of treatment at some point after she properly executed the Health Care Proxy form, (in front of the requisite number of neutral witnesses.)

Walter Kelly also knew that Helen Runge had a recent history of mental health treatment for paranoia, psychosis and depression, which included at least three separate hospitalizations at Jewish Memorial Hospital and Carney Hospital, between 2000 and January of 2003. Walter Kelly knew that Helen Runge had experienced intermittent episodes during which she had become acutely paranoid and psychotic. He knew that she had responded well to various psychotropic medications, which were prescribed by psychiatrists affiliated with several different health providers, both in previous nursing home and assisted-living settings and hospitals. Walter Kelly had been informed that some of the exacerbations of Helen Runge's paranoia and psychosis were the result of non-compliance with her psychotropic medications.

Walter Kelly knew that Helen Runge had a history of making complaints about and against previous health care providers and a landlord. Walter Kelly knew that when these Complaints were investigated by impartial or neutral bodies or individuals charged with investigating such allegations, that the Complaints were found to be without merit. Walter Kelly knew that Helen Runge was prone to distort and/or exaggerate the problems she experienced in all of her prior living situations. He also knew she was not welcome back at Marian Manor, or Bayview as she had left both facilities on less than favorable terms. In fact, Donna Foley, the admissions coordinator for Marian Manor, advised Walter Kelly that Marian Manor would not take Helen Runge back.

With all of the above knowledge, Walter Kelly helped Helen Runge to obtain placement at the Sunbridge Nursing Home in Randolph, upon her most recent discharge from a locked psychiatric unit at Carney Hospital. He knew that her initial adjustment to Sunbridge would not be without some problems, but Helen Runge had made it clear to Walter Kelly and to the discharge planner at Carney Hospital that she preferred to remain in Massachusetts when given the option to go to North Carolina to be nearer to her daughter. She was able to articulate a

Attorney George C. Rockas
February 9, 2007
Page 12

litany of reasons why she preferred not to go to North Carolina. These statements were consistent with her previously expressed wishes, all of which were known to Mr. Kelly.

Walter Kelly saw Helen Runge at Sunbridge when she was on the prescribed medication and she seemed to be making the adjustment to her new placement. However, by early April, Mr. Kelly received information from nursing staff at Sunbridge that Helen Runge had not been compliant with taking her prescribed medications and that her mental status and behavior were deteriorating and that her paranoia was returning. Walter Kelly went to visit Helen Runge and saw the deterioration for himself. Action was needed to help Helen Runge regain the level of well-being which would enable her to be discharged from the locked psychiatric unit at Carney Hospital, so she would not be re-hospitalized.

Walter Kelly undertook actions, which the average, qualified attorney should be commended for taking in such a situation. He consulted with clinical staff at the nursing home and with a skilled and highly regarded guardianship attorney, Thomas Schiavoni. Walter Kelly also attempted to include Dorothy Stanley in being part of the plan to carry out the wishes expressed in Helen Runge's estate plan documents of 2001. Her chosen fiduciary would become her Temporary Guardian at the time when she was unable to make health care treatment decisions on her own behalf (See Smith case, supra).

On April 25, 2003, Walter Kelly communicated the plan to pursue a Guardianship Petition to Helen Runge's daughter. The daughter then perpetrated the first of many inappropriate actions. She told Mr. Kelly she would be in Massachusetts on April 30, 2003 to meet with her mother, nursing home staff and Mr. Kelly. Instead, Dorothy Stanley arrived a day earlier than she told Mr. Kelly (and she admitted this was an intentionally planned deception), on April 29th and in possession of several pre-printed, generic forms to revoke various authorities her mother had given years earlier, when of clear and competent mind. Dorothy Stanley and her husband took Helen Runge out of the nursing home and to a Notary Public to sign the documents they had prepared in advance. There was no indication that Helen Runge had an opportunity to speak to an independent advisor or to act of her own free will. In fact, the way the documents were prepared and Helen Runge's signature was procured, reek of duress, undue influence and impropriety. The documents were not properly or thoroughly completed and the witnesses were either relatives of the allegedly appointed-fiduciaries or strangers to Helen Runge.

When Mr. Kelly learned of the existence of the documents which purported to terminate his authority as Helen Runge's agent and attorney in fact, his actions were totally appropriate within the context of both Ethics Opinion 2004-1, Rule 1.14 and the standards of care that an average qualified attorney would be expected to take in such a situation.

Mr. Kelly sought to protect his client's assets and to determine whether she was physically safe. On April 30, 2003, when Helen Runge's daughter and son-in-law took Helen Runge from Sunbridge by use of force and Walter Kelly learned that a police report had been

Attorney George C. Rockas
February 9, 2007
Page 13

filed and that staff at the nursing home were in fear of the Stanleys, he acted with due care to try to protect Helen Runge's interests.

Walter Kelly filed a Guardianship Petition. This course of conduct is specifically included in part (b) of Rule 1.14 as a reasonable action for the attorney to take. Mr. Kelly put the facts before the Probate Court, the impartial adjudicator of the case in this type of situation. Mr. Kelly did not act outside the scope of his duty in seeking the involvement and intervention of the Court in a situation which was fraught with peril for the elder, who was taken from her nursing home placement, without medicine or a discharge plan, by relatives from whom she had been estranged and about whom she expressed varying degrees of antipathy, ambivalence and anger within the recent past. Mr. Kelly's decision to bring the matter before the Probate Court and to seek to be appointed Temporary Guardian was well within the standard of care to be expected from the average qualified practitioner.

In sum, it is of my opinion that Walter Kelly comported with the standard of care of the average qualified elder care attorney.

Mr. Rosenfeld also offers the opinion that Attorney Kelly's action in seeking to have himself appointed Guardian was a violation of Mass. R. Proc. c. 1.7 (b) regarding conflict of interest. In seeking to be appointed Guardian, Attorney Kelly was not representing any client. In fact, Mr. Kelly stood in the shoes of his client when he hired an independent attorney to take steps to protect Helen Runge from the suspicious actions of Dorothy Stanley and Gilbert Stanley, which were contrary to Helen Runge's previously expressed wishes. Mr. Kelly was representing the wishes of Helen Runge, as expressed in the Durable Power of Attorney she executed when her competence was not in question. By seeking to implement Helen Runge's wishes that he be appointed her Guardian, there was no reason for Attorney Kelly to believe any conflict of interest may have existed.

Furthermore, the issue of Mr. Kelly's fee is addressed by S.J.C. Rule 1:07 which requires that an attorney, who serves as Guardian or in some other fiduciary capacity as a result of an appointment from the Probate Court, have his/her fee approved by the Court before his/her fee is paid. Since the Court must approve the fee of said fiduciary, there is sufficient oversight of this aspect of the case to protect the interest of the elder. It is common practice for attorneys to be appointed as fiduciaries for their former clients. It is common practice for attorneys to be paid for rendering those services. This explains why the Supreme Judicial Court has promulgated a rule to provide oversight in such a case. The situation is analogous to the practice of paying Trustees in bankruptcy from the funds of the debtor, when the Trustee is responsible for collecting those funds to pay the creditors. The fees paid to the Trustee reduce the amount of funds available to satisfy the claims of the creditors. Nevertheless, the Trustee is entitled to be paid for services rendered. The Probate Court recognizes that professional Guardians are to be paid a reasonable fee for their services. The approved process is designed to ensure that

Attorney George C. Rockas
February 9, 2007
Page 14

attorneys' compensation is reasonable. This protection would also apply to fees he earned as her attorney prior to his appointment as Guardian. This safeguard removes the potential for conflict in the situation where an attorney is paid for services rendered as Guardian or in a previous capacity.

I am of the opinion that Walter Kelly's conduct in this matter was consistent with the duty of care one would expect from an attorney of average skill in this area.

Sincerely,

David Aptaker

DA/dm